# Exhibit A

1

**TRUST INDENTURE**

Dated as of July 1, 2016

by and between

**PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT**
as issuer

and

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
as Trustee

Relating to

$27,410,000
Philadelphia Authority for Industrial Development
Senior Housing Revenue Bonds
(The Pavilion)
Series 2016A

And

$2,205,000
Philadelphia Authority for Industrial Development
Senior Housing Revenue Bonds
(The Pavilion)
Subordinate Series 2016B

# TABLE OF CONTENTS

Page

RECITALS ................................................................................................................................1

GRANTING CLAUSES .............................................................................................................3

ARTICLE I          DEFINITIONS AND INTERPRETATION .......................................................5
    Section 1.01.     Definitions. ..........................................................................................5
    Section 1.02.     Rules of Construction. .........................................................................24
    Section 1.03.     Content of Certificates and Opinions. ..................................................25
    Section 1.04.     Authority's Performance. ....................................................................25

ARTICLE II         THE SERIES 2016 BONDS ............................................................................27
    Section 2.01.     Authority for and Issuance of Series 2016 Bonds; Interest on the Series 2016 Bonds....27
    Section 2.02.     Interest on Bonds. ...............................................................................28
    Section 2.03.     Execution. ...........................................................................................28
    Section 2.04.     Limited Obligations. ..........................................................................28
    Section 2.05.     Authentication. ...................................................................................28
    Section 2.06.     Form of Bonds. ...................................................................................28
    Section 2.07.     Delivery of Series 2016 Bonds. ..........................................................29
    Section 2.08.     Mutilated, Lost, Stolen or Destroyed Bonds. ......................................29
    Section 2.09.     Registration and Transfer of Bonds; Persons Treated as Holders. .......30
    Section 2.10.     Cancellation of Bonds. .......................................................................31
    Section 2.11.     Temporary Bonds. ..............................................................................31
    Section 2.12.     Book-Entry Form. ...............................................................................31
    Section 2.13.     Additional Bonds. ...............................................................................33
    Section 2.14.     Delivery of Additional Bonds. ............................................................33
    Section 2.15.     Parity Indebtedness. ............................................................................34
    Section 2.16.     Subordination of Series 2016B Bonds. ................................................35

ARTICLE III        REDEMPTION OR PURCHASE OF SERIES 2016 BONDS .........................36
    Section 3.01.     Mandatory Redemption of Series 2016 Bonds. ...................................36
    Section 3.02.     Optional Redemption of Series 2016 Bonds. ......................................36
    Section 3.03.     Mandatory Sinking Fund Redemption ..................................................38
    Section 3.04.     Selection of Bonds to Be Redeemed. ..................................................40
    Section 3.05.     Notice of Redemption .........................................................................40
    Section 3.06.     Payment of Redemption Price. ............................................................41
    Section 3.07.     No Partial Redemption After Event of Default. ...................................41
    Section 3.08.     Effect of Notice of Redemption ...........................................................41

ARTICLE IV         GENERAL COVENANTS ............................................................................42
    Section 4.01.     Payment of Bonds; Limited Obligations. ...........................................42
    Section 4.02.     Performance of Covenants; Authority; Due Execution. .......................42
    Section 4.03.     Instruments of Further Assurance ........................................................42
    Section 4.04.     Recording and Filing; Further Instruments ..........................................42
    Section 4.05.     Tax Covenants. ...................................................................................43
    Section 4.06.     No Disposition of Trust Estate, Project or Project Revenues.................43
    Section 4.07.     Access to Books ...................................................................................44
    Section 4.08.     Trustee To Retain Information. ...........................................................44

i

**ARTICLE V**    DEPOSIT OF BOND PROCEEDS; FUNDS AND ACCOUNTS; REVENUES .............. 45

Section 5.01.    Creation of Funds and Accounts. ....................................................................45
Section 5.02.    Deposit of Proceeds. .......................................................................................45
Section 5.03.    Disbursements From the Project Fund. ...........................................................46
Section 5.04.    Revenue Fund. .................................................................................................46
Section 5.05.    Bond Fund. .......................................................................................................48
Section 5.06.    Debt Service Reserve Fund. ............................................................................49
Section 5.07.    Rebate Fund. ....................................................................................................50
Section 5.08.    Operating Fund. ...............................................................................................50
Section 5.09.    Operations and Maintenance Reserve Fund. ...................................................51
Section 5.10.    Insurance and Tax Escrow Fund. ....................................................................51
Section 5.11.    Repair and Replacement Fund. ........................................................................52
Section 5.12.    Administration Fund. .......................................................................................52
Section 5.13.    Surplus Fund. ...................................................................................................53
Section 5.14.    Bonds Not Presented for Payment. .................................................................54
Section 5.15.    Money Held in Trust. .......................................................................................54
Section 5.16.    Payment to the Borrower. ................................................................................54
Section 5.17.    Deposit of Extraordinary Revenues. ...............................................................54
Section 5.18.    Subordination of Subordinate Bonds. .............................................................55

**ARTICLE VI**    INVESTMENTS ...............................................................................................56

**ARTICLE VII**    DEFEASANCE ..................................................................................................57

**ARTICLE VIII**    DEFAULTS AND REMEDIES ..........................................................................58

Section 8.01.    Events of Default. ............................................................................................58
Section 8.02.    Acceleration; Other Remedies. .......................................................................58
Section 8.03.    Restoration to Former Position. ......................................................................60
Section 8.04.    Cure by Holders. ..............................................................................................60
Section 8.05.    Controlling Holders' Right To Direct Proceeding. .........................................61
Section 8.06.    Limitation on Holders' Right To Institute Proceedings. .................................61
Section 8.07.    No Impairment of Right To Enforce Payment. ...............................................61
Section 8.08.    Proceedings by Trustee Without Possession of Bonds. ..................................61
Section 8.09.    No Remedy Exclusive. .....................................................................................61
Section 8.10.    No Waiver of Remedies. ..................................................................................62
Section 8.11.    Application of Money. .....................................................................................62
Section 8.12.    Severability of Remedies. ................................................................................63
Section 8.13.    Notice of Event of Default. .............................................................................64
Section 8.14.    Costs and Expenses. ........................................................................................64

**ARTICLE IX**    TRUSTEE ..........................................................................................................65

Section 9.01.    Acceptance of Trusts. ......................................................................................65
Section 9.02.    No Responsibility for Recitals. ........................................................................68
Section 9.03.    Limitations on Liability. ..................................................................................68
Section 9.04.    Compensation, Expenses and Advances. .........................................................69
Section 9.05.    Notice of Events of Default. ............................................................................69
Section 9.06.    Action by Trustee. ...........................................................................................69
Section 9.07.    Good Faith Reliance. .......................................................................................69
Section 9.08.    Dealings in Bonds or with the Authority or the Borrower. .............................70
Section 9.09.    Resignation of Trustee. ....................................................................................70
Section 9.10.    Removal of Trustee. .........................................................................................70

ii

| | | |
|---|---|---|
| Section 9.11. | Appointment of Successor Trustee. | 70 |
| Section 9.12. | Qualifications of Trustee. | 71 |
| Section 9.13. | Judicial Appointment of Successor Trustee. | 71 |
| Section 9.14. | Acceptance of Trusts by Successor Trustee. | 71 |
| Section 9.15. | Successor by Merger or Consolidation. | 71 |
| Section 9.16. | Intervention in Litigation of the Authority. | 71 |
| Section 9.17. | Paying Agent. | 72 |
| Section 9.18. | Qualifications of Paying Agent; Resignation; Removal. | 72 |
| Section 9.19. | Several Capacities: Duty To Cooperate. | 72 |
| Section 9.20. | Additional Duties. | 72 |
| Section 9.21. | Notice to Rating Agency. | 72 |
| Section 9.22. | Covenants Relating to the Tax-Exempt Bonds. | 73 |
| Section 9.23. | Survival. | 73 |
| ARTICLE X OF BONDS | EXECUTION OF INSTRUMENTS BY HOLDERS AND PROOF OF OWNERSHIP | 74 |
| ARTICLE XI | MODIFICATION OF BOND DOCUMENTS | 75 |
| Section 11.01. | Limitations. | 75 |
| Section 11.02. | Supplemental Indentures Without Holder Consent. | 75 |
| Section 11.03. | Supplemental Indentures Requiring Holders' Consent. | 75 |
| Section 11.04. | Amendment of Borrower's Documents Without Holder Consent. | 76 |
| Section 11.05. | Amendment of Borrower's Documents Requiring Holders' Consent. | 77 |
| Section 11.06. | Procedures for Amendments. | 77 |
| Section 11.07. | Opinions; Certificate. | 78 |
| Section 11.08. | Effect of Amendments; Other Consents. | 78 |
| ARTICLE XII | MISCELLANEOUS | 79 |
| Section 12.01. | Successors of the Authority. | 79 |
| Section 12.02. | Parties in Interest. | 79 |
| Section 12.03. | Severability. | 79 |
| Section 12.04. | No Personal Liability. | 79 |
| Section 12.05. | Counterparts. | 79 |
| Section 12.06. | Governing Law. | 79 |
| Section 12.07. | Notices. | 79 |
| Section 12.08. | Holidays. | 81 |
| EXHIBIT A – | FORM OF SERIES 2016A BONDS | A-1 |
| EXHIBIT B – | FORM OF SUBORDINATE SERIES 2016B BONDS | B-1 |

## TRUST INDENTURE

**THIS TRUST INDENTURE** is made and entered into as of July 1, 2016, by and between the **PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT** (together with its successors and assigns, the "Authority"), a public body corporate and politic organized under the Act (as hereinafter defined) and **WILMINGTON TRUST, NATIONAL ASSOCIATION**, a national banking association organized and existing under the laws of the United States of America and being qualified to accept and administer the trusts hereby created, as Trustee (the "Trustee"). All capitalized terms used in this Indenture and not otherwise defined herein have the meanings ascribed to them in Section 1.01 of this Indenture.

## R E C I T A L S :

**WHEREAS**, the Authority is authorized by Act of August 23, 1967, P.L. 251, as amended, knows as the Economic Development Financing Law (the "Act") to issue its revenue bonds, and lend the proceeds thereof, to finance the costs of certain Project;

**WHEREAS**, Pavilion Apartments Penn LLC, a Pennsylvania limited liability company (the "Borrower"), has requested that the Authority provide financial assistance to the Borrower in order to enable the Borrower to acquire a long-term leasehold interest in, and renovate and equip, a 295-unit multifamily residential rental housing facility located in the City of Philadelphia, Pennsylvania (the "City"), known as The Pavilion (the "Project"); and

**WHEREAS**, pursuant to and in accordance with the Act, the Authority desires to provide funds to finance the acquisition, renovation and equipping of the Project by issuing, pursuant to this Indenture, its Senior Housing Revenue Bonds (The Pavilion) Series 2016A in the aggregate principal amount of $27,410,000 (the "Series 2016A Bonds") and its Senior Housing Revenue Bonds (The Pavilion) Subordinate Series 2016B in the aggregate principal amount of $2,205,000 (the "Series 2016B Bonds" and together with the Series 2016A Bonds, the "Series 2016 Bonds"; the Series 2016 Bonds and any Additional Bonds that may be issued hereunder are referred to herein as the "Bonds"); and

**WHEREAS**, the Authority has determined that the purpose of the Act in providing for the acquisition, renovation and equipping of the Project will be realized by the issuance of the Series 2016 Bonds, and the loan of the proceeds of such Series 2016 Bonds pursuant to a Loan Agreement dated as of even date herewith (the "Loan Agreement") between the Authority and the Borrower, and therefore the Authority has agreed to issue the Series 2016 Bonds and lend the proceeds thereof to the Borrower (the "Loan");

**WHEREAS**, the Borrower has agreed to (i) apply the proceeds of the Loan, together with other available funds of the Borrower, to pay the cost of the acquisition of a long-term leasehold interest in, renovation and equipping of the Project, to fund separate accounts in the a debt service reserve fund for the Series 2016A Bonds and the Series 2016B Bonds and pay the costs of issuance of the Series 2016 Bonds, (ii) make payments sufficient to pay the principal of and interest on the Bonds when due (whether at maturity, by redemption, acceleration or otherwise), and (iii) observe the other covenants and agreements and make the other payments set forth therein; and

**WHEREAS**, the Borrower has delivered to the Authority its promissory note dated the date of issuance of the Series 2016 Bonds in an original principal amount equal to the aggregate original principal amount of the Series 2016 Bonds (as amended, modified or supplemented from time to time, the "Series 2016 Note") evidencing its obligation to repay the Loan, and the Authority has made the Loan to the Borrower, subject to the terms and conditions of the Loan Agreement and this Indenture; and

**WHEREAS**, all acts and proceedings required by law necessary to make the Bonds, when executed by the Authority, authenticated and delivered by the Trustee and duly issued as provided in this Indenture, the valid, binding and legal limited obligations of the Authority, and to constitute this Indenture a valid and binding agreement for the uses and purposes herein set forth, in accordance with its terms, have been done and taken; and the execution and delivery of this Indenture have been in all respects duly authorized.

[Remainder of page intentionally left blank]

PHI 317575632v7

## GRANTING CLAUSES

**NOW, THEREFORE,** the Authority, in consideration of the premises and the acceptance by the Trustee of the trusts hereby created and of the purchase and acceptance of the Bonds by the Holders thereof, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, to secure the payment of the principal of, premium, if any, and interest on the Bonds according to their tenor and effect and to secure the performance and observance by the Authority of all the covenants expressed or implied herein and in the Bonds, does hereby bargain, sell, convey, mortgage, assign, pledge and grant, a security interest in the Trust Estate to the Trustee, and its successors in trust and assigns forever, for the securing of the performance of the obligations of the Authority hereinafter set forth, including all of the Authority's right, title and interest in and to the following property:

### GRANTING CLAUSE FIRST

Except for the Reserved Rights, all right, title and interest of the Authority in the Loan Agreement, the Notes, the HAP Assignment, the Mortgage, the Collateral Assignment of Documents and the Land Use Restriction Agreement, including all extensions and renewals of the terms thereof, if any, including, but not limited to, Loan Payments made by the Borrower pursuant to the Loan Agreement and the present and continuing right to make claim for, collect, receive and receipt for any of the sums, amounts, income, revenues, issues and profits and any other sums of money payable or receivable under the Loan Agreement, the Notes, the HAP Assignment, the Mortgage and the Land Use Restriction Agreement, to bring actions and proceedings thereunder or for the enforcement thereof, and to do any and all things which the Authority is or may become entitled to do under the Loan Agreement, the Notes, the HAP Assignment, the Mortgage and the Land Use Restriction Agreement;

### GRANTING CLAUSE SECOND

All money and securities and interest earnings from time to time held by the Trustee under the terms of this Indenture (except amounts on deposit in the Rebate Fund and except that money and securities on deposit in the Funds and Accounts established with respect to the Bonds shall be held solely for the Holders of the Bonds);

### GRANTING CLAUSE THIRD

Except for the Reserved Rights, any and all other property rights and interests of every kind and nature from time to time hereafter by delivery or by writing of any kind granted, bargained, sold, alienated, demised, released, conveyed, assigned, transferred, mortgaged, pledged, hypothecated or otherwise subjected hereto, as and for additional security for the payment of the Bonds, by the Authority or any other person on its behalf or with its written consent, and the Trustee is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof; and

### GRANTING CLAUSE FOURTH

All the right, title, and interest of the Authority in and to all proceeds (cash and noncash) of any or all of the foregoing, including, without limiting the generality of the foregoing, all inventory, accounts, chattel paper, documents, equipment, instruments, farm products, consumer goods, and general intangibles constituting proceeds acquired with cash proceeds of any or all of the foregoing.

**TO HAVE AND TO HOLD** all and singular the Trust Estate, whether now owned or hereafter acquired, to the Trustee and its respective successors in trust and assigns forever;

**IN TRUST NEVERTHELESS,** upon the terms and trusts herein set forth for the equal and proportionate benefit, security and protection of all present and future Holders of the Senior Bonds; second, for the equal and proportionate benefit, security and protection of all present and future Holders of the Subordinate Bonds which are subordinate to the Senior Bonds issued and secured under this Indenture;

**PROVIDED, HOWEVER,** that if the Authority, its successors or assigns, shall well and truly pay, or cause to be paid, the principal of, premium, if any, and interest on the Bonds due or to become due thereon, at the times and in the manner mentioned in the Bonds and as provided in Article VII hereof according to the true intent and meaning thereof, and shall cause the payments to be made as required under Article IV hereof, or shall provide, as permitted hereby, for the payment thereof in accordance with Article VII hereof, and shall well and truly keep, perform and observe all the covenants and conditions pursuant to the terms of this Indenture to be kept, performed and observed by it, and shall disburse or cause to be disbursed to the Trustee all sums of money due or to become due in accordance with the terms and provisions hereof, then upon such final payments or deposits as provided in Article VII hereof, this Indenture and the rights hereby granted shall cease, terminate and be void.

**THIS TRUST INDENTURE FURTHER WITNESSETH,** and it is expressly declared, that all Bonds issued and secured hereunder are to be issued, authenticated and delivered and all of the Trust Estate is to be dealt with and disposed of, under, upon and subject to the terms, conditions, stipulations, covenants, agreements, trusts, uses and purposes hereinafter expressed, and the Authority has agreed and covenanted, and does hereby agree and covenant, with the Trustee and with the respective Holders, from time to time, of the Bonds, or any part thereof, as follows:

[Remainder of page intentionally left blank]

4

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

### Section 1.01.   Definitions.

Unless the context otherwise requires, the following words and phrases shall, for all purposes of this Indenture and of the Loan Agreement and of any supplement or amendment hereto or thereto, have the following meanings:

"Account" or "Accounts" means any one or more, as the case may be, of the named and unnamed accounts established within any Fund.

"Act" means Act of August 23, 1967, P.L. 251, as amended, known as the Economic Development Financing Law.

"Additional Bonds" means the additional parity Bonds authorized to be issued by the Authority pursuant to the terms and conditions of Section 2.13 of this Indenture.

"Additional Loan Payments" means that portion of the Loan Payments described in subsection (b)(ii) of Section 3.2 of the Loan Agreement.

"Administration Expenses" means (a) the Ordinary Trustee's Fees and Expenses and the Additional Loan Payments described in Section 3.02(b)(ii)(1) of the Loan Agreement, (b) the Dissemination Agent Fee, (c) the Rebate Analyst Fee, and (d) the Rating Agency Fee.

"Administration Fund" means the trust fund by that name established pursuant to Section 5.01 hereof.

"Advanced Funds" has the meaning provided in Section 8.04 hereof.

"Affiliate" means any Person (a) directly or indirectly controlling, controlled by, or under common control with the Borrower; or (b) a majority of the members of the Governing Body of which are members of the Governing Body of the Borrower. For purposes of this definition, control means with respect to: (i) a corporation having stock, the ownership, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation; (ii) a not for profit corporation not having stock, having the power to elect or appoint, directly or indirectly, a majority of the members of the Governing Body of such corporation; or (iii) any other entity, the power to direct the management of such entity through the ownership of at least a majority of its voting securities or the right to designate or elect at least a majority of the members of its Governing Body, by contract or otherwise. For the purposes of this definition, "Governing Body" means with respect to: (A) a corporation having stock, such corporation's board of directors and owners, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation (both of which groups will be considered a Governing Body); (B) a not for profit corporation not having stock, such corporation's members if the members have complete discretion to elect the corporation's directors, or the corporation's directors if the corporation's members do not have such discretion; or (C) any other entity, its governing body or board. For the purposes of this definition, all references to directors and members will be deemed to include all entities performing the function of directors or members however denominated.

5

"Amend" or "Amendment," as used in Article XI hereof, refer to any amendment, modification, alteration or supplement to any Bond Document, or any waiver of any provision thereof.

"Annual Debt Service" means, for any period of a calendar year, the amount of the scheduled principal and interest payment required with respect to all Outstanding Bonds, or all Outstanding Bonds of one or more Series, or Parity Indebtedness, as applicable, for such period.

"Annual Evaluation Date" means each December 31, beginning December 31, 2016.

"Audited Financial Statements" means the financial statements prepared for each Fiscal Year for the Project prepared in accordance with generally accepted accounting principles and examined by a Certified Public Accountant.

"Architect" means any architect, engineer or firm of architects or engineers which is Independent and which is appointed by the Borrower for the purpose of passing on questions relating to the design and construction of any particular facility, has all licenses and certifications necessary for the performance of such services, and has a favorable reputation for skill and experience in performing similar services in respect of a facility of a comparable size and nature of the Project.

"Asset Manager" means PF Holdings Management LLC, a New York limited liability company, and any subsequent asset manager under any Asset Management Agreement which subsequent asset manager satisfies the requirements of Section 4.7 of the Loan Agreement.

"Asset Management Agreement" means the Asset Management Agreement, dated as of July 1, 2016, between the Sole Member and the Asset Manager, or any substitute agreement, in each case as it may be amended and supplemented from time to time.

"Authority" means the Philadelphia Authority for Industrial Development, its successors and assigns.

"Authority Representative" means any person designated by resolution of the Authority (whether such resolution is adopted in connection with the issuance of the Bonds or otherwise) as an "Authorized Officer" empowered to, among other things, execute and deliver on behalf of the Authority this Indenture, the Bond Documents and the Bonds.

"Authorized Denominations" means $5,000 principal amount and any integral multiple in excess thereof.

"Available Money" means (a) money held by the Trustee under this Indenture for a period of at least 123 days and not commingled with any money so held for less than said period and during which period no petition in bankruptcy was filed by or against, and no receivership, insolvency, assignment for the benefit of creditors or other similar proceedings has been commenced by or against, the Authority or the Borrower, unless such petition or proceeding was dismissed and all applicable appeal periods have expired without an appeal having been filed, (b) Project Revenues held by the Trustee (c) investment income derived from the investment of money described in clauses (a) and (b), (d) proceeds of obligations issued to refund the Bonds, or (e) any money with respect to which an opinion of Bond Counsel or nationally recognized bankruptcy counsel has been received by the Trustee to the effect that payments by the Trustee in respect of the Bonds, as provided in this Indenture, derived from such money should not constitute transfers avoidable under 11 U.S.C. § 547(b) and recoverable from the Holders under 11 U.S.C. § 550(a) should the Authority or the Borrower be the debtor in a case under Title 11 of the United States Code, as amended.

6

"Basic Loan Payments" means that portion of the Loan Payments described in Subsection 3.2(b)(i) of the Loan Agreement.

"Beneficial Owner" means with respect to the Bonds, the Person owning the Beneficial Ownership Interest therein, as evidenced to the satisfaction of the Trustee.

"Beneficial Ownership Interest" means the right to receive payments and notices with respect to the Bonds held in a Book-Entry System.

"Bond Counsel" means (a) Greenberg Traurig, LLP or (b) any Independent Counsel of nationally recognized standing in matters pertaining to the validity of, and exclusion from gross income for federal income tax purposes of interest on, obligations issued by states and political subdivisions, familiar with the transactions contemplated under this Indenture appointed by the Borrower and reasonably acceptable to the Authority.

"Bond Documents" means this Indenture and the Borrower's Documents.

"Bond Fund" means each trust fund by that name created pursuant to Section 5.01 hereof.

"Bond Obligation" means the then outstanding principal amount of the Bonds.

"Bond Payment Date" means any Interest Payment Date, any Principal Payment Date and any other date on which the principal of, premium, if any, or interest on the Bonds is to be paid to the Holders thereof, whether upon redemption, at maturity or upon acceleration of maturity of the Bonds.

"Bond Year" means the period from and including the date of issuance of the Series 2016 Bonds through June 30, 2016, and thereafter each year beginning on July 1 and ending on the earlier of the following June 30, as applicable, or the maturity of the Series 2016 Bonds (whether by redemption, acceleration or otherwise).

"Bonds" means collectively the Series 2016 Bonds and any Additional Bonds.

"Book-Entry Form" or "Book-Entry System" means, with respect to the Bonds, a form or system, as applicable, under which (a) physical Bond certificates in fully registered form are issued only to a Depository or its nominee, with the physical Bond certificates "immobilized" in the custody of the Depository and (b) the ownership of book-entry interests in Bonds and Debt Service thereon may be transferred only through a book-entry made by others than the Authority or the Trustee. The records maintained by others than the Authority or the Trustee constitute the written record that identifies the owners, and records the transfer, of book-entry interests in those Bonds and Debt Service thereon.

"Borrower" means Pavilion Apartments Penn LLC, and its authorized successors and assigns.

"Borrower's Documents" means, collectively, the Loan Agreement, the Mortgage, the Series 2016 Note, the Land Use Restriction Agreement, the Continuing Disclosure Agreement, the Tax Agreement, the HAP Contract, the HAP Assignment, the Management Agreement, the Development Services Agreement, the Asset Management Agreement, the Collateral Assignment of Documents, the Lease Agreement and the SNDA together with all other documents or instruments executed by the Borrower evidencing or securing the Borrower's obligations under the Loan Agreement, in each case as originally executed or as it may thereafter be amended or supplemented in accordance with its respective terms.

7

"Borrower's Representative" means each person at the time designated to act on behalf of the Borrower, by written certificate furnished to the Authority and the Trustee on behalf of the Borrower, containing the specimen signature of such person and any designated alternates.

"Budget" means the budget described in Section 6.8 of the Loan Agreement.

"Business Day" means any day other than a (a) Saturday, (b) Sunday, (c) day on which banking institutions in (i) any city in which the designated corporate trust or principal operations offices of the Trustee (such city being initially Dallas, Texas) are located, (ii) the Commonwealth or (iii) the City of New York, New York, are authorized or obligated by law or executive order to be closed, or (d) day on which the New York Stock Exchange is closed.

"Certified Public Accountant" means any Person who is Independent, appointed by the Borrower, actively engaged in the business of public accounting and duly licensed as a certified public accountant under the laws of the Commonwealth of Pennsylvania.

"Closing Date" means the date of initial issuance and delivery of the Series 2016 Bonds.

"Code" means the Internal Revenue Code of 1986, the applicable regulations (whether proposed, temporary or final) under that Code or the statutory predecessor of that Code, and any amendments of, or successor provisions to, the foregoing and any official rulings, announcements, notices and procedures regarding any of the foregoing. Unless otherwise indicated, reference to a Section of the Code means that Section of the Code, including such applicable regulations, rulings, announcements, notices and procedures.

"Collateral Assignment of Documents" means, with respect to the Project, together the (i) Collateral Assignment of Documents, dated as of July 1, 2016, between the Borrower and the Trustee and consented to by the Developer, as in effect on the Closing Date and as it may thereafter to be amended or supplemented from time to time in accordance with its terms; and the (ii) Collateral Assignment of Documents, dated as of July 1, 2016, between the Sole Member and the Trustee and consented to by the Asset Manager, as in effect on the Closing Date and as it may thereafter to be amended or supplemented from time to time in accordance with its terms.

"Commonwealth" means the Commonwealth of Pennsylvania.

"Compliance Certificate" means a certificate of a Borrower's Representative stating that, as of the date of such certificate, the Borrower is in compliance with all requirements of the Borrower's Documents.

"Condemnation Award" means the total condemnation proceeds paid by the condemner as a result of condemnation or eminent domain proceedings with respect to all or any part of the Project or of any settlement or compromise of such proceedings.

"Confirmation of Rating" means a written confirmation, obtained prior to the event or action under scrutiny, from the Rating Agency then rating any Outstanding Bonds to the effect that, following the proposed action or event under scrutiny at the time such confirmation is sought, the rating or ratings of the Rating Agency with respect to all Bonds then Outstanding and then rated by the Rating Agency will not be downgraded, suspended, qualified or withdrawn as a result of such action or event.

8

*PHI 317575632v7*

"Consultant" means a Person who is Independent, appointed by the Borrower, and who is nationally recognized as being expert as to matters for which its certificate or advice is required or contemplated.

"Continuing Disclosure Agreement" means the Continuing Disclosure Agreement dated as of July 1, 2016 between the Borrower and the Dissemination Agent, as in effect on the Closing Date and as it may thereafter be amended or supplemented from time to time in accordance with its terms.

"Controlled Group" means a group of entities directly or indirectly controlled by the same entity or group of entities. An entity or group of entities (the "controlling entity") directly controls another entity (the "controlled entity"), in general, if it possesses either of the following rights or powers and the rights or powers are discretionary and non-ministerial: (a) the right or power both to approve and to remove without cause a controlling portion of the governing body of the controlled entity; or (b) the right or power to require the use of funds or assets of the controlled entity for any purpose of the controlling entity. A controlling entity indirectly controls all entities controlled, directly or indirectly, by an entity controlled by such controlling entity.

"Controlling Holders" means, as of any date, in the case of consent or direction to be given hereunder, the Holders of the majority in aggregate principal amount of the then Outstanding Senior Bonds.

"Costs of Issuance" means all fees, costs and expenses payable or reimbursable directly or indirectly by the Authority or the Borrower and related to the authorization, issuance and sale of the Bonds.

"Costs of Issuance Account" means the account by that name in the Project Fund created pursuant to Section 5.01 hereof.

"Costs of the Project" means those costs and expenses in connection with the acquisition, rehabilitation, furnishing, and equipping of the Project permitted by the Act to be paid or reimbursed from Bond proceeds including, but not limited to, the following:

(a)    payment of (i) the cost of the preparation of plans and specifications (including any preliminary study or planning of the Project, the renovations to the Project or any aspect thereof), (ii) the cost of acquisition, construction and rehabilitation of the Project and all acquisition, construction, rehabilitation and installation expenses required to provide utility services or other facilities and all real or personal properties deemed necessary in connection with the Project (including development, architectural, engineering, and supervisory services with respect to any of the foregoing), and (iii) interest on the Bonds during the rehabilitation of the Project, and (iv) any other costs and expenses relating to the Project;

(b)    payment of the purchase price of the Project, improvements thereon, and the Equipment, and any fixtures to be incorporated into the Project, including all costs incident thereto, payment for labor, services, materials, and supplies used or furnished in site improvement and in the rehabilitation, furnishing and equipping of the Project, including all costs incident thereto, payment for the cost of the construction, rehabilitation, acquisition, and installation of utility services or other facilities, payment for all real and personal property deemed necessary in connection with the Project, payment of consulting and development fees payable to the Borrower or others, and payment for the miscellaneous expenses incidental to any of the foregoing items including the premium on any surety bond;

9

(c)    payment to the Trustee, as such payments become due, of the reasonable fees and expenses of the Trustee, including attorneys' fees, other than its initial fee (as Trustee, bond registrar, dissemination agent and paying agent) and of any paying agent properly incurred under this Indenture that may become due during the rehabilitation and equipping of the Project;

(d)    to such extent as they are not paid by a contractor for construction or installation with respect to any part of the Project, payment of the premiums on all insurance required to be taken out and maintained during the period of rehabilitation and equipping of the Project;

(e)    payment of the taxes, assessments, and other charges, if any, that may become payable during the period of construction or rehabilitation of the Project;

(f)    payment of expenses incurred in seeking to enforce any remedy against any contractor or subcontractor in respect of any default under a contract relating to the Project;

(g)    payment of the fees or out-of-pocket expenses of the Borrower, if any, including, but not limited to, architectural, engineering, and supervisory services with respect to the Project;

(h)    payment of the fees or out-of-pocket expenses, if any, of those providing services with respect to the Project, including, but not limited to, architectural, engineering, and supervisory services;

(i)    payment to the Borrower of such amounts, if any, as are necessary to reimburse the Borrower in full for all advances and payments made by it for any of the items set forth in (a) through (h) above; and

(j)    payment of any other costs and expenses relating to the Project that would constitute a "cost" or "expense" permitted to be paid by the Authority under the Act.

"Counsel" means an attorney or firm of attorneys duly admitted to practice law before the highest court of any state and not unsatisfactory to the Trustee or the Authority.

"Coverage Test" means that the Debt Service Coverage Ratio for the relevant period was equal to or greater than 1.20 to 1 on all Outstanding Senior Bonds and all Senior Parity Indebtedness and 1.10 to 1 on all Outstanding Senior Bonds and Subordinate Bonds and all Senior Parity Indebtedness and Subordinate Parity Indebtedness.

"Dated Date" means the date of issuance and delivery of the Bonds.

"Debt Service" means the principal and redemption price of and interest due on the Bonds on any given Interest Payment Date.

"Debt Service Coverage Ratio" means, for any period, the ratio obtained by dividing Net Income Available for Debt Service for such period by the Debt Service Requirements for such period for a Series of Bonds, expressed as a percentage, in each case, as calculated by the Borrower and certified to the Trustee in writing and supported by the Audited Financial Statements described in Section 6.8 of the Loan Agreement.

"Debt Service Requirements" means for a specified period:  (a) amounts needed to pay scheduled payments of principal of the Bonds during such period, including payments for mandatory sinking fund

10

redemption pursuant to Section 3.03 hereof; (b) amounts needed to pay interest on the Bonds payable during such period; and (c) to the extent not duplicative of (a) or (b) above, amounts paid during such period to restore the amounts on deposit in the Debt Service Reserve Fund to the Debt Service Reserve Requirement.

"Debt Service Reserve Account" means, as applicable, (i) the trust account by that name for the Senior Bonds in the Debt Service Reserve Fund created pursuant to Section 5.01 hereof or (ii) the trust account for the Subordinate Bonds by that name in the Debt Service Reserve Fund created pursuant to Section 5.01 hereof.

"Debt Service Reserve Fund" means the trust fund of that name created with respect to the Series 2016 Bonds pursuant to Section 5.01 hereof.

"Debt Service Reserve Requirement" means, with respect the Senior Bonds, the amount of $721,534.24 (approximately one-half of the Maximum Annual Debt Service on the Senior Bonds), and, with respect to the Subordinate Bonds, the amount of $58,043.89 (approximately one-half of the Maximum Annual Debt Service on the Subordinate Bonds); provided, however, that the foregoing amount shall be reduced on a pro-rata basis to the extent of any reduction in Annual Debt Service on the aggregate principal amount of the Senior Bonds Outstanding and Subordinate Bonds Outstanding, as applicable, if any Bonds are redeemed other than pursuant to mandatory sinking fund redemption.

"Default" or "Event of Default" under the Loan Agreement means any of the events described in Section 7.1 of the Loan Agreement.

"Default Rate" with respect to the Loan and Bonds, means the interest rate on the applicable Loan or the applicable Series of Bonds plus 2% per annum, and with respect to any other amounts due means 10% per annum, but in no case in excess of the maximum rate allowed under Commonwealth law.

"Depository" means, with respect to the Bonds, DTC, until a successor Depository shall have become such pursuant to the applicable provisions of this Indenture, and thereafter, Depository shall mean the successor Depository. Any Depository shall be a securities depository that is a clearing agency under a federal law operating and maintaining, with its participants or otherwise, a Book-Entry System to record ownership of book-entry interests in Bonds or Debt Service thereon, and to effect transfers of book-entry interests in Bonds.

"Designated Office" means, when referring to the Trustee or any Paying Agent, means the office where the Trustee or Paying Agent, as applicable, maintains its designated corporate trust department, which as of the date of this Indenture, shall be the address provided in Section 12.07.

"Developer" means PF Holdings LLC, a New Jersey limited liability company and its successors and assigns.

"Development Services Agreement" means the Acquisition Services Agreement, dated as of July 1, 2016, among the Borrower, the Sole Member and the Developer, or any substitute agreement providing for the consulting services relating to the Project, in each case as it may be amended and supplemented form time to time.

"Dissemination Agent" means Disclosure Advisors, LLC, or any successor thereto, acting as Dissemination Agent under the Continuing Disclosure Agreement.

"Dissemination Agent Fee" means a fee payable to the Dissemination Agent in an annual amount set forth in the then current Budget payable semi-annually in advance on the Closing Date (pro-rated to the initial Interest Payment Date) and on each Interest Payment Date thereafter; provided such fee shall not exceed $750 annually, as compensation for its services and expenses in performing its obligations under the Continuing Disclosure Agreement.

"DTC" means The Depository Trust Company (a limited purpose trust company), New York, New York, and its successors or assigns.

"DTC Participant" means any participant contracting with DTC under its Book-Entry system and includes securities brokers and dealers, banks and trust companies and clearing corporations.

"Eligible Tenants" means, with respect to the dwelling units in the Project covered by the HAP Contract, persons who qualify for housing assistance under Section 8 of the United States Housing Act of 1937, as amended, in accordance with published standards of HUD and who qualify for housing assistance at the Project pursuant to the HAP Contract.

"Environmental Laws" means Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), Public Law No. 96-510, 94 Stat. 1613; the Resource Conservation and Recovery Act ("RCRA"), the National Environmental Policy Act of 1969, as amended (42 U.S.C. § 4321 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.); RCRA; the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.; the Clean Water Act; the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.); the Federal Coastal Zone Management Act, as amended (16 U.S.C. §§ 1451 et seq.); the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.); the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300(f) et seq.); and any other federal, state, or local law, statute, ordinance, and regulation, now or hereafter in effect, and in each case as amended or supplemented from time to time, and any applicable judicial or administrative interpretation thereof, including, without limitation, any applicable judicial or administrative order, consent decree, or judgment applicable to the Project relating to the regulation and protection of human health and safety and/or the environment and natural resources (including, without limitation, ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species, and/or vegetation), including all amendments to such Acts, and any and all regulations promulgated thereunder, and all analogous local or state counterparts or equivalents, and any transfer of ownership notification or approval statutes, and any federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, regulating, relating to or imposing liability or standards of conduct concerning any petroleum, petroleum byproduct (including but not limited to, crude oil, diesel oil, fuel oil, gasoline, lubrication oil, oil refuse, oil mixed with other waste, oil sludge, and all other liquid hydrocarbons, regardless of specific gravity) natural or synthetic gas, products and/or hazardous substance or material, toxic or dangerous waste, substance or material, pollutant or contaminant, as may now or at any time hereafter be in effect.

"Equipment" means the equipment, machinery, furnishings and other personal property located on the Site and all replacements, substitutions, and additions thereto

"Event of Default" means any occurrence or event specified in Section 8.01 hereof.

"Extraordinary Expenses" means all reasonable expenses properly incurred by the Trustee and any Co-Trustee under this Indenture, other than Ordinary Expenses.

12

"Extraordinary Services" means all reasonable services rendered by the Trustee and any Co-Trustee under this Indenture, other than Ordinary Services.

"Extraordinary Trustee's Fees and Expenses" means the fees, expenses and disbursements payable to the Trustee and Paying Agent pursuant to Section 9.04 hereof during any Fiscal Year in excess of Ordinary Trustee's Fees and Expenses, including but not limited to, reasonable counsel fees and expenses, reasonable fees of other third party professionals, and any costs of sending notices pursuant to the terms and conditions of the Bond Documents, including but not limited to, Section 3.06 hereof.

"Favorable Opinion of Bond Counsel" means, with respect to any action the taking of which requires such an opinion, an opinion of Bond Counsel addressed to the Authority and the Trustee to the effect that such action will not, in and of itself, cause interest on the Tax-Exempt Bonds to be includible in gross income for federal income tax purposes (subject to the inclusion of any exceptions contained in the opinion delivered upon the original issuance of the Tax-Exempt Bonds).

"Fiduciary" means the Trustee and any Paying Agent.

"Fiscal Year" means a period of 12 consecutive months ending on December 31, except that the first Fiscal Year shall begin on the Closing Date and end on December 31, 2016.

"Fitch" means Fitch Ratings, Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns.

"Force Majeure" means (a) the following: acts of nature; strikes or other industrial disturbances; acts of public enemies; orders or restraints of any kind of the government of the United States of America or of the Commonwealth or of any of their subdivisions, departments, agencies or officials, or of any civil or military authority; insurrections; riots; landslides; earthquakes; fires; floods; explosions, but only to the extent that any such cause or event is not within the control of the Borrower; and (b) any other cause or event not reasonably within the control of the Borrower.

"Fund" or "Funds" means any one or more, as the case may be, of the separate trust funds created and established in Article V of this Indenture.

"GAAP" means generally accepted accounting principles consistently applied.

"Governing Body" means (a), with respect to the Authority, the Board of Directors of the Authority, or any governing body that succeeds to the functions of the Board of Directors of the Authority, and (b) with respect to a Borrower, the Board of Directors of the Sole Member.

"Government Obligations" means direct obligations of, and obligations the principal of and interest on which are unconditionally guaranteed as to timely payment by, the United States of America.

"HAP Administrator" means the administrator of the HAP Contract.

"HAP Assignment" means the Assignment of Housing Assistance Payments Contract and Payments, dated as of the date of this Indenture, between the Borrower and the Trustee, as in effect on the Closing Date and as it may thereafter be supplemented or amended, pledging and assigning to the Trustee certain rights and interests under the HAP Contract.

"HAP Contract" means the Section 8 Housing Assistance Payments Contract, PA26-M000-112, relating to the Project, as amended, renewed, and supplemented and assigned to the Borrower.

13

"HAP Payments" means those monies payable under the HAP Contract with respect to the Project.

"Hazardous Substances" means any petroleum or petroleum products and their by-products, flammable explosives, radioactive materials, toxic chemicals and substances, radon, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and polychlorinated biphenyls (PCB), asbestos-containing materials (ACMs), lead-containing or lead-based paint (LBP), radon, medical waste and other bio-hazardous materials and any chemicals, pollutants, materials or substances defined as or included in the definition of "hazardous substances" as defined pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act, "regulated substances" within the meaning of subtitle I of the federal Resource Conservation and Recovery Act and words of similar import under applicable Environmental Laws.

"Holder" or "Bondholder" means the Person or Persons in whose name any Bond is registered on the registration records for the Bonds maintained by the Trustee as registrar.

"HUD" means the United States Department of Housing and Urban Development and its successors and assigns.

"Indebtedness" means (a) all indebtedness, whether or not represented by bonds, debentures, notes or other securities, for the repayment of money borrowed, (b) all deferred indebtedness for the payment of the purchase price of properties or assets purchased, (c) all guaranties, endorsements (other than endorsements in the ordinary course of business), assumptions, and other contingent obligations in respect of, or to purchase or to otherwise acquire, indebtedness of others, (d) all indebtedness secured by a mortgage, or secured by a pledge, security interest, or lien existing on property owned which is subject to a mortgage, pledge, security interest, or lien, whether or not the indebtedness secured thereby has been assumed, (e) all capitalized lease obligations, (f) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under the credit facility, (g) all amounts required to be paid by the Borrower as a guaranteed payment to partners or members or a preferred or special dividend, including any mandatory redemption of shares or interests, (h) all unfunded pension funds, or welfare or pension benefit plans or liabilities, and (i) all obligations (calculated on a net basis) of the Borrower under derivatives in the form of interest rate swaps, credit default swaps, total rate of return swaps, caps, floors, collars and other interest hedge agreements, in each case whether the Borrower is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations the Borrower otherwise assures a creditor against loss; provided, however, that for the purpose of computing Indebtedness, there will be excluded any particular Indebtedness if, upon or prior to the maturity thereof, there has been deposited with the proper depository in trust the necessary funds (or Government Obligations not callable or pre-payable by the Authority thereof) for the payment, redemption, or satisfaction of such Indebtedness, and thereafter such funds and such Government Obligations so deposited will not be included in any computation of the assets of the Borrower and the income derived from such funds and such direct obligations of the United States of America so deposited will not be included in any computation of the income of the Borrower.

"Indenture" means this Trust Indenture, as in effect on the Closing Date and as it may thereafter be amended or supplemented from time to time in accordance with Article XI hereof.

"Independent" means, with respect to Counsel or any Consultant, a person who is not a member of the Governing Body of the Authority or the Borrower and is not an officer or employee of the Authority or the Borrower and which is not a partnership, corporation or association having a partner, director, officer, member or substantial stockholder who is a member of the Governing Body of the Authority or the Borrower or who is an officer or employee of the Authority or the Borrower; provided,

14

however, that the fact that such person is retained regularly by or transacts business with the Authority shall not make such person an employee within the meaning of this definition.

"Insurance and Tax Escrow Fund" means the trust fund by that name established pursuant to Section 5.01 hereof.

"Insurance Consultant" means a Consultant having the skill and expertise necessary to evaluate the insurance needs of multifamily rental housing and which may be a broker or agent with which the Borrower or the Authority transacts business.

"Insurance Proceeds" means the total proceeds of insurance paid by an insurance company under the policies of property insurance required to be procured by the Borrower pursuant to the Loan Agreement.

"Interest Account" means, as applicable, (i) the trust account by that name for the Senior Bonds in the Bond Fund created with respect to the Bonds pursuant to Section 5.01 hereof or (ii) the trust account by that name for the Subordinate Bonds in the Bond Fund created pursuant to Section 5.01 hereof.

"Interest Payment Date" means each June 1 and December 1, commencing December 1, 2016, until the final Principal Payment Date of the Bonds.

"Interest Period" for any Bonds means initially the period from the Dated Date to but not including the first Interest Payment Date and thereafter the period from and including each Interest Payment Date to but not including the next Interest Payment Date or other date on which interest is required to be paid on such Bonds.

"Interest Requirement" for any Bonds means an amount equal to the interest that would be due and payable on such Bonds on the Interest Payment Date next succeeding the date of determination (assuming that no principal of such Bonds is paid or redeemed between such date and the next succeeding Interest Payment Date) multiplied by a fraction the numerator of which is one and the denominator of which is the number of whole calendar months in the Interest Period in which such date occurs.

"Investment Securities" means any of the following obligations or securities, to the extent permitted by applicable law:

(a) Bonds or obligations of the Commonwealth or other states, or of counties, municipal corporations, or political subdivisions of the Commonwealth;

(b) Bonds or other obligations of the United States or of subsidiary corporations of the United States Government which are fully guaranteed by such government;

(c) Obligations of and obligations guaranteed by agencies or instrumentalities of the United States Government, including those issued by the Federal Home Loan Bank and any other such agency or instrumentality; provided, however, that all such obligations shall have a current credit rating from a nationally recognized rating service of at least one of the three highest rating categories available and have a nationally recognized market;

(d) Bonds or other obligations issued by any public housing agency or municipal corporation in the United States, which such bonds or obligations are fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual

15

contributions contract or contracts with the United States Government, or project notes issued by any public housing agency, urban renewal agency, or municipal corporation in the United States which are fully secured as to payment of both principal and interest by a requisition, loan, or payment agreement with the United States government;

(e)     Certificates of deposit of national or state banks located within the Commonwealth which have deposits insured by the Federal Deposit Insurance Corporation and certificates of deposit of federal savings and loan associations and state building and loan associations located within the Commonwealth which have deposits insured by the Savings Association Insurance Fund of the Federal Deposit Insurance Corporation or the Georgia Credit Union Deposit Insurance Corporation, including the certificates of deposit of any bank, savings and loan association, or building and loan association acting as depositary, custodian, or trustee for any such bond proceeds. The portion of such certificates of deposit in excess of the amount insured by the Federal Deposit Insurance Corporation, the Savings Association Insurance Fund of the Federal Deposit Insurance Corporation or the Georgia Credit Union Deposit Insurance Corporation, if any, shall be secured by deposit, with the Federal Reserve Bank of New York, or with any national or state bank or federal savings and loan association or state building and loan or savings and loan association located within the Commonwealth or with a trust office within the Commonwealth, of one or more the following securities in an aggregate principal amount equal at least to the amount of such excess; direct and general obligations of the Commonwealth or other states or of any county or municipal corporation in the Commonwealth, obligations of the United States or subsidiary corporations included in paragraph (c) hereof, obligations of the agencies and instrumentalities of the United States Government included in paragraph (d) hereof, or bonds, obligations, or project notes of public housing agencies, urban renewal agencies, or municipalities included in paragraph (e) hereof;

(f)     Securities of or other interests in any no load, open end management type investment company or investment trust registered under the Investment Company Act of 1940, as from time to time amended, or any common trust fund maintained by any bank or trust company which holds such proceeds as trustee or by an affiliate thereof so long as:

        1. the portfolio of such investment company or investment trust or common trust fund is limited to the obligations referenced in paragraph (c)  and (d) hereof and repurchase agreements fully collateralized by any such obligations;

        2.  such investment company or investment trust or common trust fund takes delivery of such collateral either directly or through an authorized custodian;

        3.  such investment company or investment trust or common trust fund is managed so as to maintain its shares at a constant net asset value;

        4.  securities of or other interests in such investment company or investment trust or common trust fund are purchased and redeemed only through the use of national or state banks having corporate trust powers and located within the Commonwealth; and

        5. such investment shall carry an investment grade rating from S&P;

(g)     Interest-bearing time deposits, repurchase agreements, reverse repurchase agreements, rate guarantee agreements, or other similar banking arrangements with a bank or trust company having capital and surplus aggregating at least $50 million or with any

16

government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York having capital aggregating at least $50 million or with any corporation which is subject to registration with the Board of Governors of the Federal Reserve System pursuant to the requirements of the Bank Holding Company Act of 1956, provided that each such interest-bearing time deposit, repurchase agreement, reverse repurchase agreement, rate guarantee agreement, or other similar banking arrangement shall permit the money so placed to be available for use at the time provided with respect to the investment of reinvestment of such moneys, and provided, further that such investment shall carry an investment grade rating from S&P; and

(h)    Any other investments to the extent at the time permitted by then applicable law for the investment of public funds; provided, however, that such investment shall carry an investment grade rating from S&P.

"Land" means the real property upon which the Project is located.

"Land Use Restriction Agreement" means the Tax Regulatory Agreement, dated the Closing Date, among the Authority, the Borrower, and the Trustee, as it may thereafter be amended and supplemented from time to time in accordance with its terms.

"Lease Agreement" means that certain Lease Agreement between the Borrower (as successor tenant) and the Lessor (as successor landlord) pertaining to the Land, dated November 23, 1973, as amended by the Amendment to Lease, dated September 28, 1983, the Second Amendment to Lease, dated as of December 1, 2002 and the Third Amendment to Lease dated on or about July 5, 2016.

"Lease Payments" means those payments made by the Borrower to the Lessor pursuant to the Lease Agreement.

"Lessor" means Kiryat Greenbriar, a Pennsylvania limited partnership and its successors and assigns, as the owner of the Land.

"Loan" means the loan evidenced by the Series 2016 Note from the Borrower to the Authority and assigned to the Trustee, financed by the Authority with proceeds of the Series 2016 Bonds in the aggregate principal amount of $29,615,000.

"Loan Agreement" means the Loan Agreement of even date herewith between the Authority and the Borrower, as in effect on the Closing Date and as it may thereafter be amended and supplemented from time to time in accordance with its terms.

"Loan Payments" means, collectively, the "Basic Loan Payments" and the "Additional Loan Payments."

"Long-Term Indebtedness" means any Indebtedness other than Short-Term Indebtedness.

"Mail" means either (a) first class mail by the United States Postal Service, postage prepaid, to the Holders at their respective addresses which appear on the registration books of the Paying Agent on the date of mailing, or (b) actual delivery to the Holders or their representatives evidenced by receipt signed by such Holders or their representatives.

"Management Agreement" means any agreement for the management, maintenance and operation of the Project, between the Manager and the Borrower, or any substitute agreement providing for the

17

management, maintenance and operation of the Project, in each case as it may be amended and supplemented from time to time.

"Management Consultant" means a Consultant possessing significant management consulting experience in matters pertaining to owning and operating multifamily residential rental housing facilities similar to the Project.

"Management Fee" means any and all compensation payable to the Manager under and pursuant to the Management Agreement.

"Manager" means any property manager under any Management Agreement which subsequent manager satisfies the requirements of Section 4.7 of the Loan Agreement as manager of the Project.

"Material Adverse Effect" means (a) a material adverse change in the financial condition of the Borrower or the Project; or (b) any event or occurrence of whatever nature which would materially and adversely change (i) the Borrower's ability to perform its obligations under the Loan Agreement or any other Borrower's Documents; or (ii) the Holders' or the Trustee's security interests in the security pledged hereunder.

"Maximum Annual Debt Service" means as of any date of calculation the highest principal and interest requirements with respect to all Outstanding Bonds of the applicable Series for any succeeding Fiscal Year, but excluding the period ending on the final Principal Payment Date of the Bonds.

"Modifications" means modifications, repairs, renewals, improvements, replacements, alterations, additions, enlargements, or expansions in, on, or to the Project (other than routine repair or maintenance), including any and all machinery, furnishings, and equipment therefor.

"Moody's" means Moody's Investors Service, a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns.

"Mortgage" means, the Open End Leasehold Mortgage and Assignment of Leases and Rents and Security Agreement, dated the Closing Date, from the Borrower in favor of the Trustee, securing the repayment of the Loan and the Series 2016 Note and certain additional amounts due and owing under the Loan Agreement, as in effect on the Closing Date and as it may thereafter be amended and supplemented from time to time in accordance with its terms.

"Mortgaged Property" means the real property and all improvements thereon on which the Project is located which is subject to the lien of the Mortgage and this Indenture, as more specifically described in Exhibit A to the Mortgage.

"Needs Assessment Analysis" means the analysis and report required as set forth in Section 4.12 of the Loan Agreement.

"Net Income Available for Debt Service" means, for any period of determination thereof, Project Revenues for such period, plus all interest earnings on money held in Funds and Accounts which are transferred to the Revenue Fund pursuant to Article VI hereof, minus (a) total Operating Expenses incurred on a GAAP basis by the Borrower for such period, (b) all required deposits to the Insurance and Tax Escrow Fund and the Repair and Replacement Fund for such period, (c) any profits or losses which would be regarded as extraordinary items under generally accepted accounting principles, (d) gain or loss on the extinguishment of Indebtedness, (e) contributions, (f) proceeds of Additional Bonds and any other Permitted Indebtedness, (g) Net Proceeds of any Insurance Proceeds or Condemnation Award, (h) the

proceeds of any sale, transfer or other disposition of all or any portion of the Project by the Borrower and (i) with respect to Net Income Available for Debt Service as it relates to the Subordinate Bonds, the Debt Service Reserve Requirement for the Senior Bonds and debt service due on any Senior Parity Indebtedness for such period.

"Net Proceeds," when used with respect to any Insurance Proceeds or Condemnation Award, means the gross proceeds from such Insurance Proceeds or Condemnation Award, less all expenses (including reasonable attorneys' fees of the Borrower or the Trustee and any extraordinary fees and expenses of the Trustee) incurred in the realization thereof.

"Notes" means the Series 2016 Note and any promissory note issued in connection with Additional Bonds.

"Operating Account" means, the demand deposit bank account maintained by the Borrower pursuant to Section 4.3 of the Loan Agreement on which the Borrower or its authorized agent writes checks to pay Operating Expenses.

"Operating Expenses" means, for any period, cash expenses paid or accrued in connection with the operation, maintenance and current repair of the Project (determined on a cash basis) during such period including without limitation, the costs of any utilities necessary to operate the Project, advertising and promotion costs, payroll expenses, insurance premiums, Lease Payments, deposits to the Insurance and Tax Escrow Fund and to the Repair and Replacement Fund in the amount of the Repair and Replacement Reserve Requirement, any Rebate Amount to the extent that it is not paid from the Rebate Fund, the Management Fee, administrative and legal expenses of the Borrower relating to the Project, labor, executive compensation, the cost of materials and supplies used for current operations of the Project, taxes and charges for accumulation of appropriate reserves for current expenses not annually recurrent but which are such as may reasonably be expected to be incurred in connection with the Project and in accordance with sound accounting practice. "Operating Expenses" does not include (a) Debt Service Requirements, (b) any loss or expense resulting from or related to any extraordinary and nonrecurring items, (c) any losses or expenses related to the sale of assets, the proceeds of which sale are not included in Project Revenues pursuant to clause (b) of the definition thereof, (d) expenses paid from operational reserves including any Operations and Maintenance Reserve Requirement, (e) expenses paid from the Repair and Replacement Fund, (f) any Rebate Amount to the extent that it is paid from the Rebate Fund, (g) deposits in the Repair and Replacement Fund in excess of the Repair and Replacement Reserve Requirement, (h) any allowance for depreciation or replacements of capital assets of the Project or amortization of financing costs, or (i) disbursements from the Surplus Fund.

"Operating Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Operating Requirement" means all Operating Expenses, exclusive of amounts to be deposited to or payable from the Administration Fund, Insurance and Tax Escrow Fund, Operations and Maintenance Reserve Fund or Repair and Replacement Fund, projected to be payable in such month in accordance with the Budget.

"Operations and Maintenance Reserve Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Operations and Maintenance Reserve Requirement" means an amount equal to $0.

19

"Ordinary Expenses" means those reasonable expenses incurred in the ordinary course of business, by a trustee, a registrar, an authenticating agent and a paying agent under instruments similar to this Indenture, but excluding Extraordinary Expenses.

"Ordinary Services" means those services normally rendered by a trustee, a registrar, an authenticating agent and a paying agent under instruments similar to this Indenture, excluding Extraordinary Services.

"Ordinary Trustee's Fees and Expenses" means (i) a fee for Ordinary Services in an annual amount set forth in the then current Budget payable semi-annually in advance on the Closing Date (pro-rated to the initial Interest Payment Date) and on each Interest Payment Date thereafter; provided such fee shall not exceed $4,500 annually and (ii) the expenses and disbursements for Ordinary Expenses.

"Organizational Documents" means the documents under which the Borrower or the Sole Member is organized and governed, including its Articles of Organization or Code of Regulations, respectively, as such documents are in effect on the Closing Date and as they may be thereafter amended or supplemented from time to time in accordance with their terms.

"Outstanding" or "outstanding" with respect to Bonds means, as of any given date, all Bonds which have been authenticated and delivered by the Trustee under this Indenture, except: (a) Bonds cancelled at or prior to such date or delivered to or acquired by the Trustee or Paying Agent on or prior to such date for cancellation; (b) Bonds deemed to be paid in accordance with Article VII of this Indenture; and (c) Bonds in lieu of which other Bonds have been authenticated under Section 2.08 or 2.09 hereof.

"Parity Indebtedness" means the Indebtedness permitted to be secured by the Borrower pursuant to Section 6.12 of the Loan Agreement.

"Paying Agent" means the Trustee or any successor or additional Paying Agent appointed hereunder that satisfies the requirements of Section 9.18 hereof.

"Permitted Encumbrances" means, with respect to the Project, the Mortgage and (a) the lien of current real property taxes (if any), ground rents, water charges, sewer rents and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record, none of which, individually or in the aggregate, materially interferes with the current use of the Project or the security intended to be provided by the Mortgage, (c) the Land Use Restriction Agreement, (d) the exceptions (general and specific) set forth in the Title Policy or appearing of record, none of which, individually or in the aggregate, materially interferes with the current use of the Project or the security intended to be provided by the Mortgage, (e) the Lease Agreement and (f) those permitted encumbrances set forth on Exhibit B to the Mortgage.

"Permitted Indebtedness" means (a) payment and other liabilities payable under the Loan Agreement or the Series 2016 Note, (b) liabilities of the Borrower under the Mortgage, and (c) Indebtedness of the Borrower allowed pursuant to Section 6.11 of the Loan Agreement incurred in the ordinary course of business.

"Person" or "person" means an individual, a corporation, a partnership, an association, a joint stock company, a trust, any unincorporated organization, a governmental body, any other political subdivision, municipality or authority or any other group or entity.

"Potential Default" means any event which with the passage of time or the giving of notice, or both, would constitute an Event of Default under this Indenture or a Default under the Loan Agreement.

20

"Principal Account" means, as applicable, (i) the trust account by that name for the Senior Bonds within the Bond Fund created with respect to the Senior Bonds pursuant to Section 5.01 hereof or (ii) the trust account by that name for the Subordinate Bonds within the Bond Fund for the Subordinate Bonds pursuant to Section 5.01 hereof.

"Principal Payment Date" means each maturity date of the Bonds and any date for mandatory sinking fund redemption of the Bonds pursuant to Section 3.03 hereof.

"Principal Requirement" for any Bonds means an amount equal to the regularly scheduled principal that is due and payable on such Bonds on the Bond Payment Date next succeeding the date of determination, whether by maturity or by mandatory sinking fund redemption pursuant to Section 3.03 hereof, multiplied by a fraction the numerator of which is one and the denominator of which is the number of whole calendar months in the period commencing on the last date of payment of regularly scheduled principal (or the date of issuance of such Bonds, if no principal has been paid) and ending on the next Bond Payment Date for payment of regularly scheduled principal.

"Project" means the Site, together with the improvements constructed thereon, consisting of three residential rental facilities and related support facilities, including all buildings, structures and improvements now or hereafter constructed thereon, and all fixtures, machinery, equipment, furniture, furnishings and other personal property hereafter attached to, located in, or used in connection with any such structures, buildings or improvements, and all additions, substitutions and replacements thereto, whether now owned or hereafter acquired. The term "Project" does not include property owned by Persons other than the Borrower, including the Asset Manager, the Manager, the Sole Member or residents of the Project.

"Project Fund" means the trust fund by that name created pursuant to Section 5.01.

"Project Revenues" means for any period, all cash operating and nonoperating revenues of the Project, including rental payments, HAP Payments and Unrestricted Contributions, less (a) any extraordinary and nonrecurring items (including any real property tax refunds), (b) income derived from the sale of assets not in the ordinary course of business which is permitted under the Bond Documents, (c) security, cleaning or similar deposits of tenants until applied or forfeited, (d) Net Proceeds of Insurance Proceeds or Condemnation Awards and (e) any amount disbursed to the Borrower from the Surplus Fund, but including as Project Revenues (i) any such Net Proceeds resulting from business interruption insurance or other insurance or condemnation proceeds retained by the Borrower and (ii) amounts received by the Borrower or the Trustee pursuant to any payment guaranty, operating guaranty or similar agreement with respect to the Project.

"Qualified Insurer" has the meaning provided in Section 5.2 of the Loan Agreement.

"Rating Agency" means S&P, Moody's or Fitch, or any other nationally recognized rating agency if such agency currently has a rating in effect with respect to any Series of the Bonds. The initial Rating Agency shall be S&P.

"Rating Agency Fee" means any fee required to be paid to a Rating Agency to maintain a rating on the Bonds, and initially means the annual surveillance fee of $1,500 payable by the Borrower to the initial Rating Agency.

"Rebate Analyst" means a Certified Public Accountant, financial analyst, law firm or Bond Counsel, or any firm of the foregoing, or a financial institution (which may include the Trustee) experienced in making the arbitrage and rebate calculations required pursuant to Section 148 of the Code

21

and retained by the Borrower to make the computations and give the directions required pursuant to the Tax Agreement.

"Rebate Analyst Fee" means a fee paid for each rebate calculation (which are to be made every fifth year, if required).

"Rebate Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Record Date" means the fifteenth day (whether or not a Business Day) of the calendar month preceding any applicable Interest Payment Date.

"Related Person" means any member of the same Controlled Group as the Authority or the Borrower.

"Repair and Replacement Fund" means the trust fund by that name established pursuant to Section 5.01 hereof.

"Replacement Reserve Requirement" means an amount equal to the greater of (a) $300 per unit per year or (b) the amount required by the HAP Contract, as increased pursuant to any Needs Assessment Analysis required by Section 4.12 of the Loan Agreement.

"Reserved Rights" of the Authority means (a) the right of the Authority to amounts payable to it pursuant to Section 3.2(b)(ii)(3) of the Loan Agreement, (b) all rights which the Authority or its officers, officials, agents, attorneys or employees may have under this Indenture and the Borrower Documents to indemnification by the Borrower and by any other persons and to payments and reimbursements for fees or expenses incurred by the Authority itself, or its officers, officials, agents, attorneys or employees; (c) the right of the Authority to receive notices, reports or other information, make determinations and grant approvals hereunder and under the other Bond Documents, including rights to notice and reporting requirements and restrictions on transfer of ownership of the Project or the Bonds, and its right to inspect and audit the books, records and premises of the Borrower and the Project; (d) all rights of the Authority to enforce the representations, warranties, covenants and agreements of the Borrower pertaining in any manner or way, directly or indirectly, to the requirements of the Act or of the Authority, and set forth in any of the Bond Documents, in the Tax Agreement or in any other certificate or agreement executed by the Borrower; (e) all rights of the Authority in connection with the approval, execution and delivery of any amendment to or modification of the Bond Documents; (f) all enforcement remedies of the Authority with respect to the foregoing; and (g) the right of the Authority to inspect the project.

"Responsible Officer," when used with respect to the Trustee, means any corporate trust officer or assistant corporate trust officer or any other officer of the Trustee within its corporate trust department customarily performing functions similar to those performed by any of the above designated officers, and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of such person's knowledge of and familiarity with the particular subject.

"Restoration" means the restoration, replacement, repair or rebuilding of the Project as a result of an event for which Condemnation Awards or Insurance Proceeds are received with respect to the Project, as provided in Section 5.3 of the Loan Agreement.

"Restoration Plans" has the meaning provided in Section 5.3 of the Loan Agreement.

"Revenue Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"S&P" means Standard & Poor's Rating Services, a Standard & Poor's Financial Services, LLC business, its successors and assigns.

"Senior Bonds" means the Series 2016A Bonds and any additional Bonds issued on a parity therewith.

"Senior Parity Indebtedness" means any Parity Indebtedness properly incurred on parity with the Senior Bonds as provided for in the Loan Agreement.

"Series" means any series of Bonds issued pursuant to this Indenture.

"Series 2016 Bonds" means the Series 2016A Bonds and the Series 2016B Bonds.

"Series 2016A Bonds" means $27,410,000 aggregate principal amount of the Authority's Senior Housing Revenue Bonds (The Pavilion) Series 2016A, which Bonds are senior in lien and priority to the Series 2016B Bonds.

"Series 2016B Bonds" means $2,205,000 aggregate principal amount of the Authority's Senior Housing Revenue Bonds (The Pavilion) Subordinate Series 2016B, which are subordinate in lien and priority to the Series 2016A Bonds.

"Series 2016 Note" means the note executed by the Borrower in favor of the Authority on behalf of the Holders evidencing the Loan of the proceeds of the Series 2016 Bonds and endorsed to the Trustee.

"Short-Term Indebtedness" means any Indebtedness maturing not more than 365 days after it is incurred or which is payable on demand, except for any such Indebtedness which is renewable or extendable at the sole option of the debtor to a date more than 365 days after it is incurred, or any such Indebtedness which, although payable within 365 days, constitutes payments required to be made on account of Indebtedness expressed to mature more than 365 days after it was incurred.

"Site" means the real property on which the Project is located.

"SNDA" means the Subordination, Attornment and Nondisturbance Agreement among the Trustee, the Lessor, the Borrower and Fannie Mae relating to the Project.

"Sole Member" means JPC Charities, an Ohio nonprofit corporation described in Section 501(c)(3) of the Code and exempt from federal income taxation under Section 501(a) of the Code, as Sole Member of the Borrower, and its successors and assigns.

"Special Redemption Account" means each trust account by that name within the Bond Fund created with respect to a Series of Bonds pursuant to Section 5.01 hereof.

"Subordinate Bonds" means the Series 2016B Bonds and any Additional Bonds issued on parity therewith.

"Subordinate Parity Indebtedness" means any Parity Indebtedness properly incurred on parity with the Subordinate Bonds as provided in Section 6.12 of the Loan Agreement.

"Supplemental Indenture" means any Amendment to this Indenture entered into in accordance with Article XI hereof.

"Surplus Cash" means the amount on deposit in the Surplus Fund that may be distributed to the Borrower pursuant to Section 5.13(b) hereof.

"Surplus Fund" means the trust fund by that name created pursuant to Section 5.01 hereof.

"Tax Agreement" means together, the Arbitrage and Tax Certificate of the Authority, the Sole Member and the Borrower, dated the Closing Date, as the same may be supplemented or amended from time to time in accordance with its terms.

"Tax-Exempt Bonds" means the Series 2016A Bonds, the Series 2016B Bonds and any Additional Bonds that as originally issued were the subject of an opinion of Bond Counsel to the effect that the interest thereon is excluded from the gross income of the Holders thereof for federal income tax purposes.

"Test Period" means the Fiscal Year ending on an Annual Evaluation Date.

"Title Policy" means title insurance in the form of an ALTA mortgagee's Title Policy issued by a title insurance company acceptable to the Underwriter in the face amount of at least the principal amount of Series 2016 Bonds insuring that the Trustee has a first priority valid lien in the Mortgaged Property subject only to Permitted Encumbrances.

"Trust Estate" means the property conveyed to the Trustee hereunder, including all of the Authority's right, title and interest in and to the property described in the Granting Clauses hereof.

"Trustee" means Wilmington Trust, National Association or any successors or assigns hereunder.

"Underwriter" means Stifel Nicolaus & Company, Incorporated, and its successors and assigns.

"Unrestricted Contributions" means contributions that are not restricted in any way that would prevent their application to the payment of Debt Service on Indebtedness of the Borrower.

**Section 1.02.     Rules of Construction.**

In this Indenture, unless the context otherwise requires:

(a)      The singular form of any word used herein, including the terms defined in Section 1.01, shall include the plural, and vice versa, unless the context otherwise requires.  The use herein of a pronoun of any gender shall include correlative words of the other genders.

(b)      All references herein to "Articles," "Sections" and other subdivisions hereof are to the corresponding Articles, Sections or subdivisions of this Indenture as originally executed; and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or subdivision hereof.

(c)      The table of contents and the headings or titles of the several Articles and Sections hereof, and any table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect, of this Indenture.

(d)      The parties acknowledge that the Authority, the Trustee, the Borrower, and their respective counsel have participated in the drafting of this Indenture and the other Bond

24

Documents. Accordingly, the parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Indenture or any of the other Bond Documents or any amendment or supplement or exhibit hereto or thereto.

(e)     References to the Tax-Exempt Bonds as "tax-exempt" or to the "tax-exempt status" of the Tax-Exempt Bonds, refer to the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes pursuant to Section 103(a) of the Code, irrespective of such forms of taxation as alternative minimum tax, environmental tax, or branch profits tax on foreign corporations, as is consistent with the approach taken in Section 59(i) of the Code.

**Section 1.03.    Content of Certificates and Opinions.**

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or the Loan Agreement shall include (a) a statement that the person or persons making or giving such certificate or opinion have read such covenant or condition and the definitions herein relating thereto; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (c) a statement that, in the opinion of the signers, they have made or caused to be made such examination or investigation as is necessary to enable them to express an informed opinion as to whether or not such covenant or condition has been complied with; and (d) a statement as to whether, in the opinion of the signers, such condition or covenant has been complied with.

Any such certificate or opinion made or given by an officer of the Authority may be based, insofar as it relates to legal matters, upon a certificate or opinion of or representations by counsel, unless such officer knows that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should have known that the same were erroneous. Any such certificate or opinion made or given by counsel may be based, insofar as it relates to factual matters (with respect to which information is in the possession of the Authority), upon the certificate or opinion of or representations by an officer of the Authority, unless such counsel knows that the certificate or opinion or representations with respect to the matters upon which his or her opinion may be based as aforesaid are erroneous, or in the exercise of reasonable care should have known that the same were erroneous.

**Section 1.04.    Authority's Performance.**

None of the provisions of this Indenture shall require the Authority to expend or risk its own funds or otherwise to incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder, unless payable from the funds or moneys pledged for their payment in accordance with the Indenture, or unless the Authority shall first have been adequately indemnified to its satisfaction against the cost, expense, and liability which may be incurred thereby. The Authority shall not be under any obligation hereunder to perform any administrative service with respect to the Bonds or the Project (including, without limitation, record keeping and legal services), it being understood that such services shall be performed or provided by the Trustee or the Borrower. The Authority covenants that it will faithfully perform at all times any and all covenants, undertakings, stipulations, and provisions expressly contained in this Indenture, the Loan Agreement, and any and every Bond executed, authenticated and delivered under the Indenture; provided, however, that the Authority shall not be obligated to take any action or execute any instrument pursuant to any provision hereof unless and until it shall have (i) been requested to do so by the Borrower, the Trustee or the Holders of the Bonds; (ii) received from the party requesting such action or execution assurance satisfactory to the Authority that

the Authority's reasonable expenses incurred or to be incurred in connection with taking such action or executing such instrument have been paid or will be paid or reimbursed to the Authority; and (iii) if applicable, received in a timely manner the instrument or document to be executed, in form and substance satisfactory to the Authority.  In complying with any provision herein or in the Loan Agreement requiring the Authority to "cause" another Person to take or omit any action, the Authority shall be entitled to rely conclusively (and without independent investigation or verification) on the faithful performance by the Trustee or the Borrower, as the case may be, of their respective obligations hereunder and under the Loan Agreement.  In acting, or in refraining from acting under this Indenture or the Loan Agreement, the Authority may conclusively rely on the advice of its counsel.

[Remainder of page intentionally left blank]

## ARTICLE II

## THE SERIES 2016 BONDS

**Section 2.01.    Authority for and Issuance of Series 2016 Bonds; Interest on the Series 2016 Bonds.**

There is hereby authorized under this Indenture the Series 2016A Bonds and the Series 2016B Bonds.  The total combined aggregate principal amount of Series 2016 Bonds that may be issued and Outstanding hereunder is expressly limited to $29,615,000, except as provided in Section 2.08 hereof. The Series 2016 Bonds: (i) shall be designated "Philadelphia Authority for Industrial Development Senior Housing Revenue Bonds (The Pavilion) Series 2016A" and "Philadelphia Authority for Industrial Development Senior Housing Revenue Bonds (The Pavilion) Subordinate Series 2016B"; (ii) shall be issuable only in fully registered form and substantially as set forth in Exhibit A and Exhibit B attached hereto; (iii) shall be exchangeable only for Bonds of authorized denominations, as provided herein; (iv) shall be numbered in a manner determined by the Trustee which will distinguish each Bond from each other Bond; (v) shall be in Authorized Denominations; (vi) shall be dated the Dated Dates; (vii) shall be subject to optional redemption as provided in Article III hereof; (viii) shall mature on the Maturity Dates set forth in the tables below and shall be subject to mandatory redemption as provided in Article III hereof; and (ix) shall bear interest at the interest rate set forth in the table below, payable on the Interest Payment Date from the Interest Payment Date to which interest has been paid or duly provided for, or, if no interest has been paid or duly provided for, from the Dated Date.  Principal of and interest on the Bonds shall be payable without deduction for the services of the Trustee or any paying agent.

Series 2016A Bonds – Term Bonds

| Maturity Date | Amount | Interest Rate |
|---|---|---|
| December 1, 2029 | $6,600,000 | 3.000% |
| December 1, 2036 | 4,845,000 | 3.500 |
| December 1, 2046 | 9,560,000 | 4.000 |
| December 1, 2051 | 6,405,000 | 4.000 |

Series 2016B Bond – Term Bond

| Maturity Date | Amount | Interest Rate |
|---|---|---|
| December 1, 2051 | $2,205,000 | 4.750% |

The principal of and premium, if any, on the Bonds shall be payable, when due, in lawful money of the United States of America at the Designated Office of the Trustee upon presentation and surrender of the Bonds.  Payment of interest on the Bonds shall be made on each Interest Payment Date to the Holder thereof as of the Record Date, by check or draft mailed by the Trustee on such Interest Payment Date to the Holder at its address as it appears on the registration books maintained by or on behalf of the Trustee or at such other address as is furnished to the Trustee in writing by such Holder prior to such Record Date.  Payment of interest on any Bonds may, upon written request to the Trustee of any Holder of Bonds in an aggregate principal amount of at least $100,000, be transmitted by wire transfer of immediately available funds on the Interest Payment Date to such Holder to the bank account number at a bank located within the continental United States on file with the Trustee as of the Record Date.  Any such wire transfer request shall continue in force until revoked in writing by such Holder to the Trustee,

27

and to be effective as to any interest payment such revocation must be received by the Trustee prior to the applicable Record Date.

### Section 2.02.   Interest on Bonds.

Interest accrued on the Bonds during each Interest Period shall be paid on the following Interest Payment Date.  Interest on the Bonds shall be computed on the basis of a 360-day year comprised of twelve 30-day months.

### Section 2.03.   Execution.

The Bonds shall be executed on behalf of the Authority with the manual or facsimile signature of an Authority Representative and shall have impressed or imprinted thereon, by facsimile or otherwise, the official seal of the Authority.

The facsimile, electronic or digital signature of any Authority Representative shall be deemed to be the legal equivalent of a manual signature on specified documents or on all documents and valid and binding for all purposes.  If any Authority Representative whose signature, countersignature or attestation appears on a Bond or Bond Document ceases to be an officer or director before delivery of the Bonds, his or her signature, countersignature or attestation appearing on the Bonds and any Bond Document is valid and sufficient for all purposes to the same extent as if he or she had remained in office until delivery of the Bonds.

### Section 2.04.   Limited Obligations.

The Bonds and the interest thereon are special, limited obligations of the Authority payable solely from the Trust Estate (other than Reserved Rights).  The Bonds shall not be deemed to constitute a debt or liability of the Commonwealth, the City or of any political subdivision thereof, within the meaning of any state constitutional provision or statutory limitation and shall not constitute a pledge of the faith and credit of the Commonwealth, the City or of any political subdivision thereof, but shall be payable solely from the funds provided for herein and in the Loan Agreement.  The issuance of the Bonds shall not, directly, indirectly or contingently obligate the Commonwealth, the City or any political subdivision thereof to levy any taxes or to make any appropriation for their payment.  The Authority has no taxing power.

### Section 2.05.   Authentication.

No Bond shall be valid or obligatory for any purpose or be entitled to any security or benefit under this Indenture unless and until a certificate of authentication on such Bond substantially in the forms included in Exhibits A and B hereto shall have been duly executed by the Trustee, and such executed certificate of the Trustee upon any such Bond shall be conclusive evidence that such Bond has been authenticated and delivered under this Indenture.  The Trustee's certificate of authentication on any Bond shall be deemed to have been executed by it if signed by an authorized officer or signatory of the Trustee, but it shall not be necessary that the same officer or signatory sign the certificate of authentication on all of the Bonds issued hereunder.

### Section 2.06.   Form of Bonds.

The Series 2016 Bonds shall be substantially in the forms set forth in Exhibit A and Exhibit B, respectively, hereto with such variations, omissions and insertions as are permitted or required by this Indenture.

**Section 2.07.    Delivery of Series 2016 Bonds.**

Upon the execution and delivery of this Indenture, the Authority shall execute and deliver the Series 2016 Bonds to the Trustee, and the Trustee shall authenticate the Series 2016 Bonds and shall deliver them to the original purchasers thereof as directed by the Authority in the request described in (c) below.

Prior to the delivery of any of the Series 2016 Bonds against payment therefor, the Trustee shall have received the following:

(a)    A copy, duly certified by an Authority Representative, of the resolution of the Authority authorizing the issuance of the Series 2016 Bonds and the execution and delivery of this Indenture;

(b)    Original executed counterparts of this Indenture, the Loan Agreement, the Mortgage, the Series 2016 Note, the Land Use Restriction Agreement, the HAP Assignment, the Tax Agreement, the Asset Management Agreement, the Development Services Agreement, the Collateral Assignment of Documents, the Lease Agreement, the SNDA and the Continuing Disclosure Agreement;

(c)    A request and authorization to the Trustee on behalf of the Authority and signed by an Authority Representative to authenticate and deliver the Series 2016 Bonds as set forth therein;

(d)    Receipt of the Title Policy or a commitment to issue the Title Policy, in form and substance acceptable to the Underwriter;

(e)    Evidence of insurance coverage required by Section 5.1 of the Loan Agreement;

(f)    The rating letter from the Rating Agency, showing the rating of "A" for the Series 2016A Bonds and "BBB" for the Series 2016B Bonds, and which rating is in effect on the Closing Date;

(g)    Opinion of Counsel to the Authority in form and substance satisfactory to the Underwriter and Bond Counsel;

(h)    Opinion of Counsel to the Borrower in form and substance satisfactory to the Underwriter, Bond Counsel, the Trustee and the Authority; and

(i)    An approving opinion of Bond Counsel addressed to the Authority, the Underwriter and the Trustee.

**Section 2.08.    Mutilated, Lost, Stolen or Destroyed Bonds.**

In the event any Bond is mutilated, lost, stolen or destroyed, the Authority may execute and the Trustee may authenticate and deliver a new Bond of the same Series and of like date, maturity and denomination as the Bond mutilated, lost, stolen or destroyed; provided that, in the case of any mutilated Bond, such mutilated Bond shall first be surrendered to the Trustee, and, in the case of any lost, stolen or destroyed Bond, there shall be first furnished to the Trustee evidence of such loss, theft or destruction satisfactory to the Trustee, together with indemnity for the Authority and the Trustee satisfactory to the Trustee, in its sole discretion.  In the event any such Bond shall be about to mature or have matured or

29

been called for redemption, instead of issuing a duplicate Bond, the Authority may pay the same without surrender thereof.  The Authority and the Trustee may charge the Holder of such Bond their reasonable fees and expenses incurred pursuant to this Section.

All duplicate Bonds issued and authenticated pursuant to this Section 2.08 shall constitute original, contractual obligations of the Authority to the extent provided in this Indenture (whether or not lost, stolen or destroyed Bonds be at any time found by anyone) and shall be entitled to equal and proportionate rights and benefits hereunder as all other Outstanding Bonds issued hereunder.

**Section 2.09.    Registration and Transfer of Bonds; Persons Treated as Holders.**

The Authority shall cause books for the registration and for the transfer of the Bonds as provided in this Indenture to be kept by the Trustee.  At reasonable times and under reasonable regulations established by the Trustee and subject to applicable law providing to the contrary, such list may be inspected and copied by the Authority, the Borrower or the Holders of $1,000,000 or more in aggregate Bond Obligation, or a designated representative of such Holders.

Promptly following surrender for transfer of any Bond at its Designated Office, the Trustee shall enter the name and address of the transferee upon the registration books of the Authority and shall deliver to the transferee a new fully authenticated and registered Bond or Bonds in the name of the transferee, such new Bond or Bonds of the same Series, of Authorized Denominations and of the same maturity and for the aggregate principal amount which the new Holder is entitled to receive.  In addition, promptly following surrender of any Bond at the Designated Office of the Trustee, duly endorsed in blank, such Bond may at the option of the Holder thereof, be exchanged for a Bond or Bonds of the same Series in an equal aggregate principal amount of Authorized Denominations and of the same form and tenor of the Bond being exchanged.

All Bonds presented for transfer, exchange, redemption or payment shall (if so required by the Authority or the Trustee) be accompanied by a written instrument or instruments of transfer, in form and with guaranty of signature as set forth in the form of Bond of the applicable Series or as may be satisfactory to the Trustee, duly executed by the Holder.

The Trustee also may require payment from the Holder of a sum sufficient to cover any tax or other governmental fee or charge that may be imposed in relation thereto.  Such taxes, fees and charges shall be paid before any such new Bond shall be delivered.  The cost of printing Bonds and any services rendered or expenses incurred by the Trustee in connection with any transfer shall be paid by the Borrower.

The Authority and the Trustee shall not be required (a) to issue or register the transfer of any Bonds during any period beginning on a Record Date with respect thereto and ending at the close of business on the Business Day preceding the next Interest Payment Date or (b) to transfer any Bonds selected, called or being called for redemption in whole or in part.

Bonds delivered upon any transfer as provided herein, or as provided in Section 2.08 hereof, shall be valid limited obligations of the Authority payable solely from the Trust Estate, evidencing the same debt as the Bonds surrendered, shall be secured by this Indenture and shall be entitled to all of the security and benefits hereof to the same extent as the Bonds surrendered.

The Authority, the Borrower and the Trustee shall treat the person in whose name a Bond is registered on the registration books maintained by the Trustee as the absolute owner thereof for all

purposes, whether or not such Bond shall be overdue, and shall not be bound by any notice to the contrary.

### Section 2.10. <u>Cancellation of Bonds.</u>

Whenever any Outstanding Bond shall be delivered to the Trustee for cancellation pursuant to this Indenture, upon payment of the principal amount thereof and interest thereon, for replacement pursuant to Section 2.08 hereof, for transfer or exchange pursuant to Section 2.09 hereof or otherwise, the Trustee shall cancel and destroy the Bond it has received in accordance with its retention policy then in effect.

### Section 2.11. <u>Temporary Bonds.</u>

Pending preparation of definitive Bonds, there may be executed, and upon request of the Authority, the Trustee shall authenticate and deliver, in lieu of definitive Bonds and subject to the same limitations and conditions, temporary typewritten, printed, engraved or lithographed bonds, in the form of registered Bonds without coupons in Authorized Denominations, substantially in the respective forms of Exhibits A and B hereto.

If temporary Bonds shall be issued, the Authority shall cause the definitive Bonds to be prepared and to be executed, authenticated and delivered to the Trustee not later than 14 days following the delivery or reissuance of such temporary Bonds, and the Trustee, upon presentation to it at its Designated Office of any temporary Bond, shall cancel the same and deliver in exchange therefor at the place designated by the Holder, without charge to the Holder, a definitive Bond or Bonds of the same Series in an equal aggregate principal amount, of the same maturity and bearing interest at the same rate or rates as the temporary Bond surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefit and security of this Indenture as the definitive Bonds of such Series to be issued and authenticated hereunder.

### Section 2.12. <u>Book-Entry Form.</u>

Notwithstanding any provision of this Indenture to the contrary, the Authority may direct that all Bonds issued hereunder shall be initially issued in a Book-Entry System, registered in the name of a Depository or its nominee as registered owner of the Bonds, and held in the custody of that Depository. Unless otherwise requested by a Depository, a single certificate will be issued and delivered to the Depository for each maturity of Bonds. Beneficial Owners of Bonds in a Book-Entry System will not receive physical delivery of Bond certificates except as provided hereinafter. For so long as a Depository shall continue to serve as securities depository for the Bonds as provided herein, all transfers of Beneficial Ownership Interests will be made by book-entry only, and no investor or other party purchasing, selling or otherwise transferring Beneficial Ownership Interests of Bonds is to receive, hold or deliver any Bond certificate; provided, that, if a Depository fails or refuses to act as securities depository for the Bonds, the Authority shall take the actions necessary to provide for the issuance of Bond certificates to the Holders of such Bonds.

With respect to Bonds registered in the name of a Depository, the Authority, the Borrower and the Trustee shall have no responsibility or obligation to any participant therein or to any Person on whose behalf any participant holds an interest in the Bonds. Without limiting the immediately preceding sentence, neither the Authority, the Borrower nor the Trustee shall have any responsibility or obligation with respect to (a) the accuracy of the records of the Depository or any participant therein or any other Person, other than a registered owner of the Bonds, as shown in the Register, or any notice with respect to the Bonds or (b) the payment to any participant in the Depository or any other Person, other than a

31

registered owner of the Bonds, as shown in the Register, of any amount with respect to principal of or interest on or purchase price of the Bonds.

Replacement Bonds may be issued directly to Beneficial Owners of Bonds other than a Depository, or its nominee, but only in the event that (a) the Depository determines not to continue to act as securities depository for the Bonds (which determination shall become effective no less than 90 days after written notice to such effect to the Authority and the Trustee); or (b) the Authority has advised a Depository of its determination (which determination is conclusive as to the Depository and Beneficial Owners of the Bonds) that the Depository is incapable of discharging its duties as securities depository for the Bonds; or (c) the Authority has determined (which determination is conclusive as to the Depository and the Beneficial Owners of the Bonds) that the interests of the Beneficial Owners of the Bonds might be adversely affected if such book-entry only system of transfer is continued. Upon occurrence of any of the foregoing events, the Authority and the Borrower shall use commercially reasonable efforts to attempt to locate another qualified securities depository. If the Authority and the Borrower fail to locate another qualified securities depository to replace the Depository, the Authority and the Borrower, at the Borrower's expense, shall cause to be authenticated and delivered replacement Bonds, in certificate form, to the Beneficial Owners of the Bonds. In the event that the Authority makes the determination noted in (b) or (c) above (provided that the Authority undertakes no obligation to make any investigation to determine the occurrence of any events that would permit the Authority to make any such determination), and has made provisions to notify the Beneficial Owners of Bonds of such determination by mailing an appropriate notice to the Depository, the Authority and the Borrower shall cause to be issued replacement Bonds in certificate form to Beneficial Owners of the Bonds as shown on the records of the Depository provided to the Authority.

Upon the written consent of 100% of the Beneficial Owners of the Bonds, the Trustee shall withdraw the Bonds from any Depository and authenticate and deliver Bonds fully registered to the assignees of that Depository or its nominee. If the request for such withdrawal is not the result of any Issuer action or inaction, such withdrawal, authentication and delivery shall be at the cost and expense (including costs of printing, preparing and delivering such Bonds) of the persons requesting such withdrawal, authentication and delivery; otherwise such withdrawal, authentication and delivery shall be at the cost and expense of the Borrower.

Whenever, during the term of the Bonds, the beneficial ownership thereof is determined by a book-entry at a Depository, (a) the requirements in this Indenture of holding, delivering or transferring Bonds shall be deemed modified to require the appropriate Person or entity to meet the requirements of the Depository as to registering or transferring the book-entry to produce the same effect and (b) delivery of the Bonds will be in accordance with arrangements among the Authority, the Trustee and the Depository notwithstanding any provision of this Indenture to the contrary.

The Trustee and the Authority shall enter into any letter of representation with a Depository to implement the Book-Entry System of Bond registration described above.

In the event the Bonds, are no longer rated in one of the three highest rating categories by a Rating Agency, the book-entry system may also be discontinued with respect to the Bonds, at the direction of the Authority or the Borrower, and at the Borrower's expense, and the Authority and the Trustee will cause the delivery of Bond certificates to such Beneficial Owners of the Bonds, registered in the names of such Beneficial Owners as are specified to the Trustee by the Depository in writing.

When the book-entry system is not in effect, all references herein to the Depository will be of no further force or effect.

**Section 2.13.   Additional Bonds.**

So long as no Event of Default has then occurred and is continuing, the Authority at the request of a Borrower's Representative may, but shall not be required to, issue Additional Bonds for the purpose of (i) financing the costs of making such Modifications as the Borrower may deem necessary or desirable, (ii) financing the cost of completing any Modifications, (iii) refunding any Bonds, and (iv) in each such case, paying the costs of the issuance and sale of the Additional Bonds, paying capitalized or funded interest and such other costs reasonably related to the financing as shall be agreed upon by the Borrower and the Authority.  The terms of such Additional Bonds, the purchase price to be paid therefor, and manner in which the proceeds therefrom are to be disbursed shall be determined by the Borrower and the sale of any Additional Bonds shall be the sole responsibility of the Borrower.  The Borrower  and the Authority shall enter into an amendment to the Loan Agreement to provide for additional Basic Loan Payments in an amount at least sufficient to pay principal of, premium, if any, and interest on the Additional Bonds when due and to provide for any additional terms or changes to the Loan Agreement required because of such Additional Bonds.  The Authority and the Trustee shall enter into such amendments or supplements to this Indenture as are required to effect the issuance of the Additional Bonds.  An amount equal to any increase in the Debt Service Reserve Requirement attributable to issuance of the Additional Bonds shall be deposited in the applicable account of the Debt Service Reserve Fund at the time of delivery of the Additional Bonds.

As a condition for the issuance of Additional Bonds, (i) such Additional Bonds shall be rated in a rating category that is not lower than the underlying rating (i.e., the rating of the respective Outstanding Bonds without giving effect to any credit enhancement) of the Series of Bonds of the same parity as such Additional Bonds, and (ii) prior to the issuance of such Additional Bonds, the Rating Agency then rating the Outstanding Bonds shall deliver a Confirmation of Rating stating that the issuance of the Additional Bonds will not result in a qualification, downgrade or withdrawal of the then current ratings on the Series 2016 Bonds.

**Section 2.14.   Delivery of Additional Bonds.**

Upon the execution and delivery in each instance of an appropriate indenture supplemental hereto, the Authority shall execute and deliver to the Trustee and the Trustee shall register and authenticate Additional Bonds and deliver them to the purchaser or purchasers as may be directed by the Authority, as hereinafter in this Section 2.14 provided.  Prior to the delivery by the Trustee of any such Additional Bonds, there shall be filed with the Trustee:

      (a)   a valid and effective amendment to the Loan Agreement, pursuant to Section 11.04 hereof, providing for the inclusion within the Project of any real estate and interests therein and any buildings, structures, facilities, machinery, equipment, and related property to be acquired by purchase or construction from the proceeds of the Additional Bonds and providing for an adjustment to in the Basic Loan Payment obligations of the Borrower to cover the Debt Service Requirement of all the Bonds that will be Outstanding after the issuance of the Additional Bonds, which shall be evidenced by a promissory note of the Borrower, and providing any other changes in connection with the issuance of Additional Bonds;

      (b)   a valid and effective supplemental indenture providing for the issuance of such new series of Additional Bonds and securing such Additional Bonds by the lien and security interest of the Trust Estate;

      (c)   a valid and effective amendment to the Mortgage subjecting to the lien of the Mortgage any and all real estate and interests therein and any buildings, structures, facilities, and

33

related property acquired by purchase or construction from proceeds of such Additional Bonds and assigning and pledging to the Authority and the Trustee the Borrower's interest in the leases, rents, issues, profits, revenues, income, receipts, money, royalties, rights and benefits thereof and therefrom and granting a security interest to the Trustee, as assignee of the Authority, in the Borrower's interest in the machinery, equipment, and related property acquired by purchase or construction from the proceeds of the Additional Bonds, in any inventory then or thereafter located at the real estate or interests therein and any buildings, structures, facilities, and related property to be acquired by purchase or construction from the proceeds of the Additional Bonds, and in the accounts, documents, chattel paper, instruments, and general intangibles arising in any manner from the Borrower's operation of any real estate or interests therein and any buildings, structures, facilities, machinery, equipment, and related property to be acquired by purchase or construction from the proceeds of the Additional Bonds;

(d)    a copy, duly certified by an Authority Representative, of a resolution of the Governing Body of the Authority theretofore adopted and approved authorizing the execution and delivery of the supplemental indenture, amendment to the Loan Agreement, promissory note, and issuance of the Additional Bonds;

(e)    a request and authorization to the Trustee on behalf of the Authority, signed by an Authority Representative or such other officers of the Authority as are designated by the Governing Body of the Authority, to authenticate and deliver the Additional Bonds to the purchaser or purchasers therein identified upon payment to the Trustee, for the account of the Authority, of a specified sum plus any accrued interest; the proceeds of the Additional Bonds shall be paid over to the Trustee and deposited to the credit of the Bond Fund or to such other funds as are provided and created by the supplemental indenture;

(f)    a certificate signed by the Borrower's Representative to the effect that no Event of Default under this Indenture or any Borrower's Document has then occurred and is continuing;

(g)    certification from the Borrower and proforma calculations demonstrating that all Coverage Tests will continue to be satisfied after giving effect to the issuance of the Additional Bonds;

(h)    a Favorable Opinion of Bond Counsel with respect to the Outstanding Tax-Exempt Bonds and, if issued as Tax-Exempt Bonds, the Additional Bonds, addressed to the Authority and the Trustee;

(i)    the items required by Section 2.13 of this Indenture;

(j)    an endorsement of the Title Policy, which endorsement includes any additional real property made subject to the Mortgage and increases the face amount of the policy to an amount equal to the principal amount of the Outstanding Bonds and the Additional Bonds; and

(k)    such other documents as the Trustee may require to evidence compliance with any of the Bond Documents.

**Section 2.15.    Parity Indebtedness.**

The Authority and Trustee acknowledge that pursuant to Section 6.11 of the Loan Agreement, under certain circumstances the Borrower is permitted to incur Parity Indebtedness that is secured by a

lien on and security interests in all or any portion of the Project or the Project Revenues, secured on an equal and ratable basis with the then Outstanding Bonds under the Mortgage.

### Section 2.16.    Subordination of Series 2016B Bonds.

The Senior Bonds shall be secured by the assignment of and payments made in respect of the Series 2016 Note and further secured by the Mortgage on a senior lien basis prior in all respects to the payment of the Subordinate Bonds.  The Subordinate Bonds shall be secured by the assignment of and any payments made in respect of the Series 2016 Note and further secured by the Mortgage, but on a subordinated lien basis in all respects to the payment of the Senior Bonds.

[Remainder of page intentionally left blank]

# ARTICLE III

## REDEMPTION OR PURCHASE OF SERIES 2016 BONDS

### Section 3.01.   Mandatory Redemption of Series 2016 Bonds.

Series 2016 Bonds shall be called for redemption (a) in whole or in part in the event the Project or any portion thereof is damaged or destroyed or taken in a condemnation proceeding and Net Proceeds resulting therefrom are to be applied to the payment of the Series 2016 Note as provided in Section 5.3 of the Loan Agreement, which Net Proceeds are to be used to redeem Series 2016 Bonds at the election of the Borrower made pursuant to Section 5.3 of the Loan Agreement, (b) in whole in the event the Borrower exercises its option to terminate the Loan Agreement pursuant to Article VIII thereof (and cause all of the Series 2016 Bonds to be redeemed as provided in this Article III), (c) in whole or in part from proceeds of the Title Policy pursuant to Section 3.9 of the Loan Agreement, or (d) in whole in the event the Borrower is required to prepay the Loan following a "Default" under the Loan Agreement.

If called for redemption at any time pursuant to (a) through (d) above, the Series 2016 Bonds of a Series to be redeemed shall be subject to redemption by the Authority (in accordance with the provisions of Section 3.06 hereof) prior to maturity, in whole at any time or (in the case of redemption pursuant to clause (a) or (c) above) in part at any time (less than all of such Series 2016 Bonds to be selected in accordance with the provisions of Section 3.05 hereof) at a redemption price equal to 100% of the principal amount thereof plus accrued interest to the redemption date; such redemption date, to be a date determined by the Borrower and in the case of redemption pursuant to (d) above, to be the earliest practicable date, following acceleration of amounts due under the Loan.

No Subordinate Bonds may be redeemed as described in this Section 3.01 if any Senior Bonds remain Outstanding except that the Subordinate Bonds may only be redeemed on any Interest Payment Date if the principal and interest due on the Senior Bonds at such time has been paid in full.

### Section 3.02.   Optional Redemption of Series 2016 Bonds.

The Series 2016A Bonds are subject to optional redemption by the Authority, at the direction of the Borrower, in whole or in part at any time, on the respective dates at the respective redemption prices set forth below, as a percentage of the outstanding principal amount thereof plus accrued interest to the date of redemption:

| Redemption Date | Redemption Price |
|---|---|
| December 1, 2021 through November 30, 2022 | 105% |
| December 1, 2022 through November 30, 2023 | 104% |
| December 1, 2023 through November 30, 2024 | 103% |
| December 1, 2024 through November 30, 2025 | 102% |
| December 1, 2025 through November 30, 2026 | 101% |
| December 1, 2026 and thereafter | 100% |

No Series 2016B Bonds, or any portion thereof, may be redeemed pursuant to optional redemption if any Senior Bonds remain Outstanding except that Series 2016B Bonds may only be redeemed pursuant to optional redemption, in whole or in part at any time, on the respective dates at the respective redemption prices set forth below, as a percentage of the outstanding principal amount thereof plus accrued interest to the date of redemption, if the principal and interest due on the Senior Bonds at such time has been paid in full:

| Redemption Date | Redemption Price |
|---|---|
| December 1, 2021 through November 30, 2022 | 105% |
| December 1, 2022 through November 30, 2023 | 104% |
| December 1, 2023 through November 30, 2024 | 103% |
| December 1, 2024 through November 30, 2025 | 102% |
| December 1, 2025 through November 30, 2026 | 101% |
| December 1, 2026 and thereafter | 100% |

The Borrower shall give the Trustee written notice of optional redemption pursuant to Section 8.1(d) of the Loan Agreement and, upon delivery of such written notice, the Authority shall be deemed, without the necessity of any action on the Authority's part, to have exercised its option to redeem the Series 2016B Bonds under this Section 3.02. A copy of such notice shall be provided to the Authority, but failure or delay in providing such copy to the Authority shall not affect the validity of such notice or redemption.

Money used to pay premium, if any, on the Series 2016 Bonds to be redeemed must constitute Available Money.

No Subordinate Bonds may be redeemed as described in this section if any Senior Bonds remain Outstanding except that the Subordinate Bonds may only be redeemed on any Interest Payment Date if the principal and interest due on the Senior Bonds at such time has been paid in full.

[Remainder of page intentionally left blank]

37

**Section 3.03.    Mandatory Sinking Fund Redemption.**

(a)        The Series 2016A Bonds are subject to mandatory sinking fund redemption at a redemption price equal to 100% of the principal amount thereof plus accrued interest on June 1 and December 1 of each year and in the principal amounts shown below:

Series 2016A Bonds Maturing December 1, 2029

| Date | Amount | Date | Amount |
|---|---|---|---|
| 12/1/2016 | - | 12/1/2023 | $255,000 |
| 6/1/2017 | $210,000 | 6/1/2024 | 255,000 |
| 12/1/2017 | 210,000 | 12/1/2024 | 265,000 |
| 6/1/2018 | 215,000 | 6/1/2025 | 265,000 |
| 12/1/2018 | 220,000 | 12/1/2025 | 270,000 |
| 6/1/2019 | 225,000 | 6/1/2026 | 275,000 |
| 12/1/2019 | 225,000 | 12/1/2026 | 275,000 |
| 6/1/2020 | 230,000 | 6/1/2027 | 280,000 |
| 12/1/2020 | 230,000 | 12/1/2027 | 290,000 |
| 6/1/2021 | 235,000 | 6/1/2028 | 290,000 |
| 12/1/2021 | 240,000 | 12/1/2028 | 295,000 |
| 6/1/2022 | 240,000 | 6/1/2029 | 305,000 |
| 12/1/2022 | 250,000 | 12/1/2029 | 300,000 |
| 6/1/2023 | 250,000 |  |  |

Series 2016A Bonds Maturing December 1, 2036

| Date | Amount | Date | Amount |
|---|---|---|---|
| 6/1/2030 | $315,000 | 12/1/2033 | $345,000 |
| 12/1/2030 | 310,000 | 6/1/2034 | 355,000 |
| 6/1/2031 | 320,000 | 12/1/2034 | 360,000 |
| 12/1/2031 | 325,000 | 6/1/2035 | 370,000 |
| 6/1/2032 | 330,000 | 12/1/2035 | 370,000 |
| 12/1/2032 | 335,000 | 6/1/2036 | 380,000 |
| 6/1/2033 | 345,000 | 12/1/2036 | 385,000 |

Series 2016A Bonds Maturing December 1, 2046

| Date | Amount | Date | Amount |
|---|---|---|---|
| 6/1/2037 | $395,000 | 6/1/2042 | $485,000 |
| 12/1/2037 | 400,000 | 12/1/2042 | 485,000 |
| 6/1/2038 | 410,000 | 6/1/2043 | 505,000 |
| 12/1/2038 | 415,000 | 12/1/2043 | 505,000 |
| 6/1/2039 | 430,000 | 6/1/2044 | 525,000 |
| 12/1/2039 | 430,000 | 12/1/2044 | 525,000 |
| 6/1/2040 | 445,000 | 6/1/2045 | 545,000 |
| 12/1/2040 | 450,000 | 12/1/2045 | 545,000 |
| 6/1/2041 | 465,000 | 6/1/2046 | 565,000 |
| 12/1/2041 | 465,000 | 12/1/2046 | 570,000 |

38

Series 2016A Bonds Maturing December 1, 2051

| Date | Amount | Date | Amount |
|---|---|---|---|
| 6/1/2047 | $590,000 | 12/1/2049 | $640,000 |
| 12/1/2047 | 590,000 | 6/1/2050 | 665,000 |
| 6/1/2048 | 615,000 | 12/1/2050 | 665,000 |
| 12/1/2048 | 615,000 | 6/1/2051 | 695,000 |
| 6/1/2049 | 640,000 | 12/1/2051 | 690,000 |

(b)　　The Series 2016B Bonds are subject to mandatory sinking fund redemption at a redemption price equal to 100% of the principal amount thereof plus accrued interest on June 1 and December 1 of each year and in the principal amounts shown below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| 12/1/2016 | - | 12/1/2034 | 30,000 |
| 6/1/2017 | $10,000 | 6/1/2035 | 25,000 |
| 12/1/2017 | 15,000 | 12/1/2035 | 35,000 |
| 6/1/2018 | 10,000 | 6/1/2036 | 30,000 |
| 12/1/2018 | 15,000 | 12/1/2036 | 30,000 |
| 6/1/2019 | 15,000 | 6/1/2037 | 30,000 |
| 12/1/2019 | 15,000 | 12/1/2037 | 35,000 |
| 6/1/2020 | 10,000 | 6/1/2038 | 35,000 |
| 12/1/2020 | 20,000 | 12/1/2038 | 35,000 |
| 6/1/2021 | 15,000 | 6/1/2039 | 35,000 |
| 12/1/2021 | 15,000 | 12/1/2039 | 35,000 |
| 6/1/2022 | 15,000 | 6/1/2040 | 35,000 |
| 12/1/2022 | 15,000 | 12/1/2040 | 40,000 |
| 6/1/2023 | 15,000 | 6/1/2041 | 40,000 |
| 12/1/2023 | 20,000 | 12/1/2041 | 40,000 |
| 6/1/2024 | 15,000 | 6/1/2042 | 40,000 |
| 12/1/2024 | 20,000 | 12/1/2042 | 40,000 |
| 6/1/2025 | 15,000 | 6/1/2043 | 40,000 |
| 12/1/2025 | 20,000 | 12/1/2043 | 45,000 |
| 6/1/2026 | 15,000 | 6/1/2044 | 45,000 |
| 12/1/2026 | 25,000 | 12/1/2044 | 45,000 |
| 6/1/2027 | 20,000 | 6/1/2045 | 45,000 |
| 12/1/2027 | 20,000 | 12/1/2045 | 50,000 |
| 6/1/2028 | 25,000 | 6/1/2046 | 50,000 |
| 12/1/2028 | 20,000 | 12/1/2046 | 50,000 |
| 6/1/2029 | 20,000 | 6/1/2047 | 55,000 |
| 12/1/2029 | 25,000 | 12/1/2047 | 50,000 |
| 6/1/2030 | 20,000 | 6/1/2048 | 55,000 |
| 12/1/2030 | 25,000 | 12/1/2048 | 55,000 |
| 6/1/2031 | 20,000 | 6/1/2049 | 60,000 |
| 12/1/2031 | 30,000 | 12/1/2049 | 55,000 |
| 6/1/2032 | 25,000 | 6/1/2050 | 60,000 |
| 12/1/2032 | 25,000 | 12/1/2050 | 60,000 |
| 6/1/2033 | 25,000 | 6/1/2051 | 60,000 |
| 12/1/2033 | 30,000 | 12/1/2051 | 65,000 |
| 6/1/2034 | 25,000 | | |

39

**Section 3.04.   Selection of Bonds to Be Redeemed.**

Bonds may be redeemed only in Authorized Denominations.  If less than all of the Bonds are being redeemed: (a) the principal amount and Series of the Bonds to be redeemed shall be designated by a Borrower's Representative in writing to the Trustee and (b) the particular Bonds of the Series or portions thereof to be redeemed shall be selected by DTC or any successor depository in accordance with its procedures, or, if the book-entry system is discontinued, by the Trustee by lot.  If it is determined that less than all of the principal amount represented by any Bond is to be called for redemption, then, following notice of intention to redeem such principal amount, the Holder thereof shall surrender such Bond to the Trustee on or before the applicable redemption date for (i) payment on the redemption date to such Holder of the redemption price of the amount called for redemption and (ii) delivery to such Holder of a new Bond or Bonds of such Series in the aggregate principal amount of the unredeemed balance of the principal amount of such Bond, which shall be an Authorized Denomination.  A new Bond of such Series representing the unredeemed balance of such Bond shall be issued to the Holder thereof, without charge therefor.  Such provision shall not apply to scheduled mandatory sinking fund redemptions.  If the Holder of any Bond or integral multiple of the Authorized Denomination selected for redemption shall fail to present such Bond to the Trustee for payment and exchange as aforesaid, such Bond shall, nevertheless, become due and payable on the date fixed for redemption to the extent of the amount called for redemption (and to that extent only), and interest shall cease to accrue from the date fixed for redemption.

**Section 3.05.   Notice of Redemption.**

(a)   In the event any of the Bonds are called for redemption, the Trustee shall give notice, in the name of the Authority, of the redemption of such Bonds, which notice shall (i) specify the Bonds to be redeemed, the redemption date, the redemption price and the place or places where amounts due upon such redemption will be payable (which shall be the Designated Office of the Trustee) and, if less than all of the Bonds are to be redeemed, the numbers of the Bonds, and the portions of the Bonds, to be so redeemed, (ii) state any condition to such redemption, including but not limited to a statement that redemption is conditional upon receipt by the Trustee of sufficient moneys to redeem the Bonds, including any redemption premium and (iii) state that on the redemption date the Bonds to be redeemed shall cease to bear interest.  Such notice may set forth any additional information relating to such redemption.  Such notice shall be given by Mail to the Holders of the Bonds to be redeemed, at least 30 days but no more than 60 days prior to the date fixed for redemption.  If a notice of redemption shall be unconditional, or if the conditions of a conditional notice of redemption shall have been satisfied, then upon presentation and surrender of the Bonds so called for redemption at the place or places of payment, such Bonds shall be redeemed.

(b)   Any notice mailed as provided in this Section shall be conclusively presumed to have been duly given, whether or not the Holders receive the notice.

(c)   Failure by the Trustee to give notice pursuant to the preceding paragraph of this Section shall not affect the sufficiency of the proceedings for redemption.  Failure of the Trustee to give notice to a Holder or any defect in such notice shall not affect the validity of the proceedings for redemption of the Bonds of any Holder to whom notice shall have been properly given.  The Trustee may give any other or additional redemption notice as it deems necessary or desirable, but it is not obligated to give or provide any additional notice or information.

(d)   Any Bonds which have been duly selected for redemption and which are deemed to be paid in accordance with Article VII hereof shall cease to bear interest on the specified redemption date.

40

**Section 3.06.    Payment of Redemption Price.**

For the redemption of any of the Bonds of a Series, the Trustee shall cause to be deposited in the Special Redemption Account of the Bond Fund, whether out of Project Revenues or any other money constituting the Trust Estate, including Net Proceeds of any Insurance Proceeds or Condemnation Awards available for such purpose pursuant to Article VIII of the Loan Agreement, or otherwise, an amount sufficient to pay the principal of, premium, if any, and interest to become due on the date fixed for such redemption.  The obligation of the Trustee to cause any such deposit to be made hereunder shall be reduced by the amount of money in the Special Redemption Account available for and used on such redemption date for payment of the principal of, premium, if any, and accrued interest on the Bonds to be redeemed.

**Section 3.07.    No Partial Redemption After Event of Default.**

Anything herein to the contrary notwithstanding, if there has occurred and is continuing an Event of Default described in Section 8.01(a) or (b) hereof, there shall be no redemption of less than all of the Bonds Outstanding.

**Section 3.08.    Effect of Notice of Redemption.**

If notice of redemption has been given in the manner provided in this Article, and money for the redemption is held by the Trustee for that purpose, the Bonds so called for redemption shall become due and payable on the redemption date, and interest thereon shall cease to accrue on such date; and such Bonds shall thereafter no longer be entitled to any security or benefit under this Indenture except to receive payment of the redemption price thereof.

If any Bond called for redemption shall not be so paid on the redemption date upon proper surrender of the Bond for redemption, the redemption price and, to the extent lawful, interest thereon shall, until paid, bear interest from the redemption date at the rate borne by the Bond immediately before the redemption date.

Notwithstanding the foregoing, with respect to optional redemptions only, if the Trustee does not have funds in its possession on the redemption date sufficient to pay the redemption price (including interest accruing to the redemption date) of all of the Bonds to be optionally redeemed for any reason (including, but not limited to, failure to issue any refunding obligations intended for such purpose on or prior to the redemption date), then the purported optional redemption and such notice of redemption shall be void.  Such event shall not constitute an Event of Default hereunder.

[Remainder of page intentionally left blank]

## ARTICLE IV

## GENERAL COVENANTS

**Section 4.01.    Payment of Bonds; Limited Obligations.**

(a)    The Authority covenants that it will promptly pay the principal of, premium, if any, and interest on every Bond issued under this Indenture at the place, on the dates and in the manner provided herein and in the Bonds, provided that the principal, premium, if any, and interest on the Bonds are payable by the Authority solely from the Trust Estate, and nothing in the Bonds or this Indenture shall be considered as assigning or pledging any other funds or assets of the Authority other than the Trust Estate.

(b)    Each and every covenant made herein by the Authority is predicated upon the condition that neither the Authority, the Commonwealth nor any political subdivision of the Commonwealth shall in any event be liable for the payment of the principal of, premium, if any, or interest on any of the Bonds or for the performance of any pledge, obligation or agreement undertaken by the Authority except to the extent that money pledged herein are sufficient therefor.

**Section 4.02.    Performance of Covenants; Authority; Due Execution.**

Subject to Section 1.04 hereof, the Authority covenants that it will faithfully perform or cause to be performed at all times any and all covenants, undertakings, stipulations and provisions to be performed by the Authority contained in this Indenture and the other Bond Documents, in any and every Bond executed, authenticated and delivered hereunder and in all of its proceedings pertaining hereto. The Authority is duly authorized under the laws of the Commonwealth, including particularly the Act, to issue the Bonds, to execute this Indenture and to pledge the amounts hereby pledged in the manner and to the extent herein set forth. The Authority further covenants that all action on its part for the issuance of the Bonds and the execution and delivery of the Bond Documents have been duly and effectively taken, and that the Bonds in the hands of the Holders thereof are and will be valid and enforceable obligations of the Authority according to the terms thereof and hereof.

**Section 4.03.    Instruments of Further Assurance.**

Subject to Section 1.04 hereof, the Authority covenants that it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such indentures supplemental hereto and such further acts, instruments and transfers as the Trustee may require for the better assuring, transferring, pledging, assigning and confirming to the Trustee all and singular the rights assigned hereby and the amounts pledged hereby to the payment of the principal of, premium, if any, and interest on the Bonds. The Authority covenants and agrees that, except as herein and in the Mortgage provided, it will not sell, convey, assign, pledge, encumber or otherwise dispose of any part of the Trust Estate.

**Section 4.04.    Recording and Filing; Further Instruments.**

(a)    The Borrower shall cause to be recorded or filed, at the Borrower's expense, all necessary initial financing statements, related to this Indenture, the Land Use Restriction Agreement and the Mortgage and all supplements hereto and thereto, and such other documents as may be necessary to be kept and filed in such manner and in such places as may be required by law in order to perfect, preserve and protect fully the security of the Holders and the rights of the Trustee hereunder. The Trustee shall file, at the Borrower's expense, all necessary continuation

42

statements to continue in effect such financing statements. At the written request of the Trustee, the Borrower shall provide evidence to the Trustee that all necessary filings required by this paragraph have been made.

(b)     Subject to Section 1.04 hereof, the Authority shall (or shall cause the Borrower to, in each case at the expense of the Borrower), upon the reasonable request of the Trustee, from time to time execute and deliver such further instruments and take such further action as may be reasonable and as may be required to effectuate the purposes of this Indenture or any provision hereof.

### Section 4.05.   Tax Covenants.

The Authority shall not knowingly use or permit the use of any proceeds of Bonds and shall not knowingly use or permit the use of the Project Revenues in any manner, and shall not take or permit to be taken any other action or actions, which would cause any Tax-Exempt Bond to be an "arbitrage bond" within the meaning of Section 148 of the Code, or which would otherwise affect, the exclusion of interest on the Tax-Exempt Bonds from gross income of the recipients thereof for federal income tax purposes.

Subject to Section 1.04, the Authority shall at all times do and perform all acts and things permitted by law and necessary or desirable to assure that interest paid by the Authority on the Tax-Exempt Bonds shall, for federal income tax purposes, be excluded from the gross income of the recipients thereof. In furtherance of this covenant, the Authority, the Borrower and the Sole Member shall execute, deliver and perform the Tax Agreement, which is by this reference incorporated herein and made a part hereof as if set forth herein in full, and by its acceptance of this Indenture, the Trustee acknowledges receipt of the Tax Agreement and acknowledges its incorporation herein by reference.

Notwithstanding any provision of this Indenture, the Land Use Restriction Agreement or the Loan Agreement to the contrary, unless otherwise specifically agreed in the Tax Agreement or in a separate written agreement, neither the Trustee nor the Authority shall be liable or responsible for any calculation or determination which may be required in connection with, or for the purpose of complying with, Section 148 of the Code, or any successor statute or any regulation, ruling or other judicial or administrative interpretation thereof, including, without limitation, the calculation of amounts required to be paid to the United States of America or the determination of the maximum amount which may be invested in nonpurpose obligations having a yield higher than the yield on the Bonds, and the Trustee shall not be liable or responsible for monitoring the compliance by the Borrower or the Authority with any of the requirements of Section 148 of the Code or any applicable regulation, ruling or other judicial or administrative interpretation thereof, or any other provision of the Tax Agreement, except as specifically provided in the Tax Agreement.

### Section 4.06.   No Disposition of Trust Estate, Project or Project Revenues.

Except as permitted by this Indenture (including specifically in connection with the discharge of the lien of this Indenture in accordance with Article VII hereof), the Authority shall not sell, lease, pledge, assign or otherwise encumber or dispose of its interest in the Trust Estate. Except as described in the Loan Agreement and the Mortgage, the Authority and the Trustee will not, and will not permit the Borrower to, sell, lease, pledge, assign or otherwise encumber or dispose of the Project or Project Revenues.

43

**Section 4.07.    Access to Books.**

All books and documents in the possession of the Authority or the Trustee relating to the Project, the Project Revenues and the Trust Estate shall at all reasonable times be open to inspection by the Trustee, the Authority, the Borrower and the Holders of at least $100,000 of the Bonds.

**Section 4.08.    Trustee To Retain Information.**

So long as any of the Bonds shall be outstanding, and thereafter so long as any right or obligation of the Authority, the Trustee or the Borrower hereunder or under the Loan Agreement shall survive, the Trustee shall retain all certificates, requisitions, financial statements and other written information furnished to it by or on behalf of the Borrower or any other person under the Loan Agreement and any other agreement or instrument pertaining to the Bonds and shall make such documentation available to the Authority, the Borrower, the Rating Agency, or any Holder for review after reasonable written notice during regular business hours at the Designated Office of the Trustee.  The Trustee shall permit such reviewers to take copies of all or any part of such documentation, subject to their payment of such copying and handling charges as the Trustee may impose.

[Remainder of page intentionally left blank]

44

## ARTICLE V

## DEPOSIT OF BOND PROCEEDS;
## FUNDS AND ACCOUNTS; REVENUES

**Section 5.01.    Creation of Funds and Accounts.**

There are hereby created by the Authority and ordered established the following Funds and Accounts to be held by the Trustee:

(a)    A Bond Fund and therein (i) a Principal Account, an Interest Account and a Special Redemption Account with respect to the Senior Bonds and (ii) a Principal Account, an Interest Account and a Special Redemption Account with respect to the Subordinate Bonds;

(b)    A Debt Service Reserve Fund, and therein (i) a Debt Service Reserve Account with respect to the Senior Bonds and (ii) a Debt Service Reserve Account with respect to the Subordinate Bonds;

(c)    A Project Fund and therein a Costs of Issuance Account;

(d)    A Revenue Fund;

(e)    A Rebate Fund;

(f)    An Operating Fund;

(g)    An Operations and Maintenance Reserve Fund;

(h)    An Insurance and Tax Escrow Fund;

(i)    A Repair and Replacement Fund;

(j)    An Administration Fund; and

(k)    A Surplus Fund.

**Section 5.02.    Deposit of Proceeds.**

Upon initial execution and delivery of the Bonds, the proceeds of the Bonds and other funds contributed by the Borrower shall be deposited as follows:

(a)    $25,900,000.00 received from the sale of the Series 2016A Bonds shall be deposited in the Project Fund;

(b)    $721,534.24 received from the sale of the Series 2016A Bonds shall be deposited in the Debt Service Reserve Account for the Senior Bonds;

(c)    $0 from the sale of the Series 2015A Bonds shall be deposited in the Operations and Maintenance Reserve Fund;

(d)    $2,028,000.00 received from the sale of the Series 2016B Bonds shall be deposited in the Project Fund;

45

(e)     $58,043.89 received from the sale of the Series 2016B Bonds shall be deposited in the Debt Service Reserve Account for the Subordinate Bonds;

(f)     $152,024.20 received from the sale of the Series 2016B Bonds shall be deposited in the Costs of Issuance Account of the Project Fund; and

(g)     $300,000.00 representing an equity contribution from the Borrower shall be deposited in the Costs of Issuance Account of the Project Fund.

**Section 5.03.    <u>Disbursements From the Project Fund.</u>**

(a)     The Trustee shall disburse money in the Costs of Issuance Account in the Project Fund to pay the Costs of Issuance upon receipt of a written requisition of the Borrower or a closing memorandum prepared by the Underwriter and signed by the Borrower or a closing statement to the Trustee which states (i) that such amount is to be paid to persons, firms or corporations identified therein, and (ii) that such amount is properly payable as a Cost of Issuance hereunder.   On the six month anniversary of the Closing Date, the Trustee shall pay any remaining balance in the Costs of Issuance Account to the Project Fund.

(b)     Amounts on deposit in the Project Fund shall be applied to payment of the Costs the Project and paying the costs of issuing the Bonds by disbursement thereof in accordance with one or more requisitions of the Borrower to the Trustee within 30 days of receipt of such requisition substantially in the form set forth as Exhibit B to the Loan Agreement.

(c)     For purposes of complying with the requirements of this Section 5.03, the Trustee may conclusively rely and shall be protected in acting or refraining upon the form of requisition of the Borrower, which may be submitted by facsimile or email (pdf format).   The Trustee shall not be bound to make an investigation into the facts or matters stated in any form of requisition of the Borrower.   The Trustee shall not be responsible for determining whether the funds on hand in the Project Fund are sufficient to complete the Costs of the Project.   The Trustee shall not be responsible for collecting lien waivers.

(d)     Net Proceeds of any Insurance Proceeds or Condemnation Awards deposited in the Project Fund pursuant to Section 5.4 of the Loan Agreement shall be applied as provided in Section 5.3 and 5.4 of the Loan Agreement.

(e)     Any amounts remaining in the Project Fund on the date that is three (3) years from the Closing Date (in the case of original and investment proceeds of the Series 2016 Bonds, or the date of deposit of such amounts into the Project Fund, in the case of other amounts) shall be deposited in the Interest Account of the Bond Fund with respect to the Senior Bonds unless otherwise required by the Tax Agreement.

**Section 5.04.    <u>Revenue Fund.</u>**

(a)     There shall be deposited in the Revenue Fund (i) all Loan Payments and other amounts paid to the Trustee under the Loan Agreement (other than prepayments required to redeem Bonds pursuant to Sections 3.01 or 3.02 hereof, which shall be deposited in the Special Redemption Account), (ii) all other amounts required to be so deposited pursuant to the terms hereof or of the Tax Agreement, including investment earnings to the extent provided in Article VI, (iii) any amounts derived from the Loan Agreement or the Mortgage to be applied to payment of amounts intended to be paid from the Revenue Fund, (iv) all Project Revenues, and (v) such

46

other money as is delivered to the Trustee by or on behalf of the Authority or the Borrower with written directions for deposit of such money in the Revenue Fund.

(b)    Money on deposit in the Revenue Fund shall be disbursed on the 15th day of each month in the following order of priority:

(1)    To the Interest Account for the Senior Bonds, the applicable Interest Requirement for the Senior Bonds for that calendar month, together with an amount equal to any unfunded Interest Requirement for the Bonds for any prior month and, at the written direction of a Borrower's Representative, to the holder of any Senior Parity Indebtedness an amount, as certified by a Borrower's Representative, equal to the interest due in such month, together with an amount, as certified by a Borrower's Representative, equal to any unfunded interest for any prior month;

(2)    To the Principal Account for the Senior Bonds, an amount equal to the Principal Requirement for the Senior Bonds for that calendar month, together with an amount equal to any unfunded Principal Requirement for the Senior Bonds from any prior month and, at the written direction of a Borrower's Representative, to the holder of any Senior Parity Indebtedness an amount, as certified by a Borrower's Representative, equal to the principal due in such month, together with an amount equal to any unfunded principal for any prior month;

(3)    To the Debt Service Reserve Account for the Senior Bonds, the amount, if any, required to be paid into the Debt Service Reserve Account for the Senior Bonds pursuant to the Loan Agreement to restore the amount on deposit therein to the Debt Service Reserve Requirement;

(4)    To the Interest Account for the Subordinate Bonds, an amount equal to the Interest Requirement for the Subordinate Bonds, together with an amount equal to any unfunded Interest Requirement for the Subordinate Bonds for any prior month and, to the holder of any Subordinate Parity Indebtedness, an amount equal to the interest due in such month, together with an amount equal to any unfunded interest for any prior month;

(5)    To the Principal Account for the Subordinate Bonds, an amount equal to the Principal Requirement for the Subordinate Bonds, together with an amount equal to any unfunded Principal Requirement for the Subordinate Bonds for any prior month and, to the holder of any Subordinate Parity Indebtedness, an amount equal to the principal due in such month, together with an amount equal to any unfunded principal for any prior month;

(6)    To the Debt Service Reserve Account for the Subordinate Bonds, the amount, if any, required to be paid into such Debt Service Reserve Account pursuant to the Loan Agreement to restore the amounts on deposit therein to the Debt Service Reserve Requirement for the Subordinate Bonds;

(7)    Subject to Section 5.10 hereof, for transfer to the Insurance and Tax Escrow Fund, an amount equal to one-twelfth of the amount set forth by the Borrower in the Budget for the current year for annual premiums for insurance required to be maintained pursuant to the Loan Agreement and for annual real estate taxes (if any), or other charges for governmental services for the current year, as provided in the Budget, provided that distribution by the Trustee to the Insurance and Tax Escrow Fund in respect

47

of the first date or dates on which premiums for insurance and taxes or other payments described above are payable will be made in amounts equal to the respective quotients obtained by dividing the sum of (i) the amount of such premiums and (ii) the amount of such taxes or other charges, by the respective number of months, including the month of computation, to and including the month prior to the month in which such premiums or taxes are payable;

(8)     To the Operating Fund, an amount equal to such month's Operating Requirement, as provided in the Budget, together with such additional Operating Expenses requested in writing by a Borrower's Representative pursuant to and after satisfaction of the conditions specified in Section 4.3 of the Loan Agreement;

(9)     Subject to the provisions of Section 5.11 hereof, for transfer to the Repair and Replacement Fund, commencing with the month of January, 2017, an amount equal to the one-twelfth of the Replacement Reserve Requirement;

(10)   Subject to the provisions of Section 5.12 hereof, for transfer to the Administration Fund, an amount equal to one-sixth (1/6) of the Administration Expenses scheduled to be due and payable on or before the next succeeding Interest Payment Date;

(11)   To the Rebate Fund, to the extent of any deposit required to be made thereto pursuant to the Tax Agreement;

(12)   To the Manager, the Management Fee; and

(13)   To the Surplus Fund, all remaining amounts.

In the event that, for any month, there are insufficient funds in the Revenue Fund to fund any one or more of the uses set forth in clauses (1) through (12) above, the amount not funded in such month due to such insufficiency of revenues shall be added to the amount to be funded in subsequent months under the same clause until such amount has been in fact funded.  Failure to deposit sufficient Project Revenues to make the deposits described above shall not, in itself, constitute an Event of Default hereunder.

Additionally, any amounts funded directly by the Borrower pursuant to Section 5.10 and 5.11 hereof will not be added to the amount to be funded in subsequent months to the extent already paid under such sections by the Borrower.

**Section 5.05.     Bond Fund.**

(a)     There shall be deposited into the respective Principal Accounts of the Bond Fund (i) money transferred to such Principal Account from the Revenue Fund pursuant to Section 5.04 hereof; (ii) money transferred from the Surplus Fund, the Operations and Maintenance Reserve Fund, the Repair and Replacement Fund, the Debt Service Reserve Fund and the Operating Fund pursuant to Section 5.05(f) hereof in respect of principal payable on the Senior Bonds and Subordinate Bonds, and (iii) any other amounts deposited with the Trustee with written directions from the Borrower's Representative to deposit the same in the applicable Principal Account of the Bond Fund.

(b)     There shall be deposited into the respective Interest Accounts of the Bond Fund (i) all accrued interest, if any, on the sale and delivery of the Bonds; (ii) money transferred to such Interest Account from the Revenue Fund pursuant to Section 5.04 hereof; (iii) money

48

transferred from the Surplus Fund, the Operations and Maintenance Reserve Fund, the Repair and Replacement Fund, the applicable Debt Service Reserve Account of the Debt Service Reserve Fund and the Operating Fund pursuant to Section 5.05(f) hereof in respect of interest payable on the Bonds; and (iv) any other amounts deposited with the Trustee with written directions from the Borrower's Representative to deposit the same in the applicable Interest Account of the Bond Fund.

(c)     There shall be deposited in the applicable Special Redemption Account of the Bond Fund (i) any Net Proceeds of Insurance Proceeds or Condemnation Award to be transferred to a Special Redemption Account pursuant to Section 5.17 hereof; and (ii) all other payments made by or on behalf of the Authority with respect to the redemption of Bonds pursuant to Section 3.01 or 3.02 hereof. Amounts on deposit in each Special Redemption Account shall be used to pay the redemption price of Bonds of the related Series being redeemed.

(d)     Except as otherwise provided herein, money in the Principal Accounts shall be used for the payment of principal of the Bonds of the applicable Series as the same shall become due and payable on any Principal Payment Date, including a Principal Payment Date resulting from the redemption of the Bonds pursuant to Section 3.03 hereof.

(e)     Except as otherwise provided herein, money in the Interest Accounts shall be used for the payment of interest on the Bonds as the same becomes due and payable on any Bond Payment Date.

(f)     If on any Interest Payment Date, the amount on deposit in the Interest Account or a Principal Account is insufficient to make the payments or deposits described in (a) or (b) above, the Trustee shall make up any such shortfall by transferring amounts from the following Funds in the following order:

(1)     the Surplus Fund;

(2)     the Repair and Replacement Fund;

(3)     the respective Debt Service Reserve Account, provided, however, that amounts may be transferred from the Debt Service Reserve Account for the Senior Bonds only in connection with shortfalls on the Senior Bonds and amounts may be transferred from the Debt Service Reserve Account for the Subordinate Bonds only in connection with shortfalls on the Subordinate Bonds; and

(4)     the Operating Fund.

(g)     Any balance in the Principal Account and the Interest Account of the Bond Fund on each Interest Payment Date after making the transfers required above in this Section 5.05 shall be transferred to the Revenue Fund.

**Section 5.06.     Debt Service Reserve Fund.**

(a)     There shall be deposited in the Debt Service Reserve Fund (i) all money transferred to such Debt Service Reserve Fund pursuant to Section 5.02 hereof, (ii) money transferred from the Revenue Fund pursuant to Section 5.04 hereof, and (iii) any other money

49

received by the Trustee with directions from such party to deposit the same in the Debt Service Reserve Fund.

(b)     Amounts on deposit in the Debt Service Reserve Fund shall be used to make the payments required pursuant to Section 5.04(b)(1) or (2) after the transfer of any amounts from the Surplus Fund and the Repair and Replacement Fund pursuant to Section 5.05(f) hereof, if the amounts on deposit in the Revenue Fund are insufficient therefor.

(c)     Amounts on deposit in the applicable Debt Service Reserve Accounts shall be transferred to the applicable Principal Accounts of the Bond Fund at the written direction of the Borrower's Representative for the purpose of paying the last maturing principal of the Senior Bonds or Subordinate Bonds, as applicable, on a Principal Payment Date or, if all of a series of the Bonds are being redeemed, to the applicable Special Redemption Accounts of the Bond Fund for redemption of Bonds; provided, however, that amounts may be transferred from the Debt Service Reserve Account for the Senior Bonds only in connection with shortfalls on the Senior Bonds and amounts may be transferred from the Debt Service Reserve Account for the Subordinate Bonds only in connection with shortfalls on the Subordinate Bonds.

(d)     If the Debt Service Reserve Requirement for the Senior Bonds or the Subordinate Bonds is reduced or eliminated in accordance with the definition thereof, the amounts on deposit in the applicable Debt Service Reserve Account in excess of the applicable Debt Service Reserve Requirement shall, at the written direction of a Borrower's Representative delivered to the Trustee, be either (i) transferred to the applicable Special Redemption Account to be used to redeem Bonds pursuant to Section 3.02 hereof, (ii) transferred to the related Principal or Interest Account to pay the principal of and/or interest on the Bonds as it becomes due, or (iii) if no Bonds remain outstanding, either transferred to the Revenue Fund and applied as provided in Section 5.04 hereof, or used for any other purpose directed in writing by a Borrower's Representative, which, in the opinion of a Favorable Opinion of Bond Counsel delivered to the Authority and the Trustee, complies with the Act and will not adversely affect the exclusion from gross income of the recipients thereof of the interest on the Tax-Exempt Bonds for federal income tax purposes.

(e)     All interest income derived from the investment of amounts on deposit in the applicable Debt Service Reserve Accounts shall be retained in the applicable Debt Service Reserve Accounts until the amount on deposit therein shall be equal to the Debt Service Reserve Fund Requirement for the Senior Bonds or the Subordinate Bonds, respectively, and thereafter shall be deposited into the Revenue Fund.

**Section 5.07.     Rebate Fund.**

Amounts shall be deposited in the Rebate Fund and shall be applied as provided in the Tax Agreement.

**Section 5.08.     Operating Fund.**

The Trustee shall deposit in the Operating Fund (i) money transferred from the Revenue Fund in the amounts and on the dates described in Section 5.04 hereof, (ii) any transfers from the Operating Account received by the Trustee for deposit in the Operating Fund, (iii) any transfers from the Operations Maintenance Reserve Fund and (iv) any other amounts required to be deposited into the Operating Fund hereunder or under the Loan Agreement or the Mortgage and delivered to the Trustee with written instructions to deposit the same therein.

50

Except when an Event of Default under Section 8.01(a) or 8.01(b) of this Indenture or a Default under the Loan Agreement has occurred and is continuing, the Trustee shall transfer amounts deposited in the Operating Fund to the Operating Account promptly following such deposits in accordance.

If an Event of Default under this Indenture has occurred and is continuing, the Trustee may in its sole discretion and shall, if so directed by the Controlling Holders in accordance with Section 8.05 hereof, not make such transfers to the Operating Account, in which case (i) the Borrower will not be entitled to request withdrawals from funds on deposit in the Operating Fund, and (ii) the Trustee may determine to pay Operating Expenses of the Project directly, without receipt of direction from a Borrower's Representative and in such event is to rely on the annual Budget prepared by the Borrower in connection with the Project.

**Section 5.09.    Operations and Maintenance Reserve Fund.**

The Trustee shall deposit in the Operations and Maintenance Reserve Fund (i) money transferred from the Surplus Fund, if any, in the amounts and on the dates described in Section 5.13 hereof and (ii) any other amounts required to be deposited into the Operations and Maintenance Reserve Fund hereunder or under the Loan Agreement and delivered to the Trustee with instructions to deposit the same therein.

Amounts on deposit in the Operations and Maintenance Reserve Fund shall be used to pay (i) maintenance and repair costs to the Project which are not capital expenditures payable from the Repair and Replacement Fund, (ii) Operating Expenses in excess of amounts specified in the Budget, (iii) certain costs of repair and replacement in accordance with Section 5.11(b) hereof, (iv) shortfalls in any Interest Account or Principal Account in accordance with Section 5.05(f) hereof and (v) for any other legal purposes. The Borrower may also transfer monies from the Operations and Maintenance Reserve Fund to the Repair and Replacement Fund upon providing written direction to the Trustee. The Trustee shall disburse money in the Operations and Maintenance Reserve Fund upon receipt of a written direction of the Borrower Representative which states the purpose for such disbursement and the persons to which such amounts are to be paid. All interest income derived from the investment of amounts on deposit in the Operations and Maintenance Reserve Fund shall be deposited into the Revenue Fund.

**Section 5.10.    Insurance and Tax Escrow Fund.**

(a)    The Trustee shall deposit in the Insurance and Tax Escrow Fund (i) money transferred from the Revenue Fund in the amounts and on the dates described in Section 5.04 hereof and (ii) any other amounts required to be deposited into the Insurance and Tax Escrow Fund hereunder or under the Loan Agreement or the Mortgage and delivered to the Trustee with instructions to deposit the same therein. Money on deposit in the Insurance and Tax Escrow Fund shall be disbursed by the Trustee to the Borrower to pay, or as reimbursement for the payment of, taxes, assessments, and insurance premiums with respect to the Project, as hereinafter provided. Excess amounts may be disbursed to the Revenue Fund upon written direction of the Borrower if actual costs are below budgeted amounts.

(b)    Upon presentation to the Trustee by a Borrower's Representative of a requisition accompanied by copies of bills or statements for the payment of such taxes, assessments, and premiums, when due, the Trustee will, not more frequently than once a month, pay to the Borrower to provide for the payment of, or as reimbursement for the payment of, such taxes, assessments and premiums, from money then on deposit in the Insurance and Tax Escrow Fund. If the total amount on deposit in the Insurance and Tax Escrow Fund shall not be sufficient to pay to or to pay or reimburse the Borrower in full for the payment of such taxes, assessments and

51

premiums, then the Borrower shall pay the excess amount of such taxes, assessments and premiums directly.

**Section 5.11.   Repair and Replacement Fund.**

(a)     The Trustee shall deposit into the Repair and Replacement Fund (i) money transferred from the Revenue Fund in the amounts and on the dates described in Section 5.04 hereof and (ii) any other amounts required to be deposited into the Repair and Replacement Fund hereunder or under the Loan Agreement or the Mortgage and delivered to the Trustee with instructions to deposit the same therein.  The Trustee shall apply money on deposit in the Repair and Replacement Fund upon request of a Borrower's Representative, but no more frequently than once a month, to pay to or to reimburse the Borrower for paying the cost of replacements or items of extraordinary maintenance or repair which may be required to keep the Project in sound condition, including but not limited to, replacement of appliances, major floor covering replacement, replacement or repair of any roof or other structural component of the Project, maintenance (including painting) to exterior surfaces and major repairs to or replacements of heating, air conditioning, plumbing and electrical systems, landscaping, storm water drainage, repairs to common area amenities and any other extraordinary costs required for the repair or replacement of the Project not properly payable from the Revenue Fund for the Operations and Maintenance Reserve Fund but in any case only if there are no funds available in the Project Fund for such purpose.

(b)     Upon presentation to the Trustee by a Borrower's Representative of a requisition accompanied by a summary of the amount for which payment or reimbursement is sought and, for requests for a particular line item of disbursement in excess of $25,000, copies of bills or statements for the payment of the costs of such repair and replacement (provided that the Trustee shall have no duty or obligation to review or approve such bills or statements), the Trustee will pay to the Borrower the amount of such repair and replacement costs from money then on deposit in the Repair and Replacement Fund, provided no Event of Default shall then exist hereunder.  If the total amount on deposit in the Repair and Replacement Fund shall not be sufficient to pay all of such repair and replacement costs when they shall become due, then funds in the Operations and Maintenance Reserve Fund may be disbursed until exhausted, and then the Borrower shall pay the excess amount of such costs directly (which Borrower's monies may be reimbursed from monies available in the Repair and Replacement Fund at a later date when they become available).

(c)     The Repair and Replacement Fund will also be used to remedy any deficiency in the Bond Fund on any Interest Payment Date after exhaustion of the Surplus Fund and the Operations and Maintenance Reserve Fund, without any prior consents, as provided in Section hereto 5.05(f).

**Section 5.12.   Administration Fund.**

The Trustee shall deposit in the Administration Fund (i) money transferred from the Revenue Fund pursuant to Section 5.04 hereof, and (ii) any other amounts required to be deposited in the Administration Fund hereunder or under the Loan Agreement or the Mortgage with written instructions to deposit the same therein.  The Trustee shall disburse amounts in the Administration Fund necessary for payment of Administration Expenses then due automatically to the parties due such payment upon presentation of an invoice for payment from such requesting party without any approval of the Borrower. The Trustee shall disburse amounts in the Administration Fund necessary for payment of Extraordinary Trustee's Fees and Expenses upon presentation of an invoice for payment from the Trustee approved by

52

the Borrower, which approval shall not be unreasonably withheld and which shall not be required in the event an Event of Default under the Indenture has occurred and is then continuing.

**Section 5.13.    Surplus Fund.**

(a)    The Trustee shall deposit, into the Surplus Fund, amounts provided in Section 5.04(b)(14) hereof and any other amounts delivered to it with written instructions to deposit the same in the Surplus Fund. Money in the Surplus Fund shall be applied each month, when needed, for the following purposes and in the following manner:

(i)    transferred to the Interest Account for the Senior Bonds to pay interest on the Senior Bonds to the extent amounts on deposit in such Interest Account are insufficient therefor;

(ii)    transferred to a Principal Account for the Senior Bonds to pay principal on the Senior Bonds to the extent amounts on deposit in such Principal Account are insufficient therefor;

(iii)    transferred to the Interest Account for the Subordinate Bonds to pay interest on the Subordinate Bonds to the extent amounts on deposit in such Interest Account are insufficient therefor;

(iv)    transferred to the Principal Account for the Subordinate Bonds to pay principal on the Subordinate Bonds to the extent amounts on deposit in such Principal Account are insufficient therefor;

(v)    transferred to the Revenue Fund to the extent of any deficiency in the amounts needed to fully make all transfers from the Revenue Fund pursuant to Section 5.04 hereof (other than to the Surplus Fund);

(vi)    transferred to or upon the direction of the Borrower's Representative for deposit into the Operating Account for the payment of Operating Expenses when the Borrower's Representative certifies to the Trustee that there are not sufficient money in the Operating Fund or the Operating Account to pay Operating Expenses;

(vii)    paid to the Trustee an amount equal to Extraordinary Trustee's Fees and Expenses then due; and

(viii)    pay any unpaid and due Administrative Expenses.

(b)    If on or after the Annual Evaluation Date, the Trustee receives a certificate signed by the Borrower's Representative stating that the Borrower has satisfied the Coverage Test (as shown in a report by a Certified Public Accountant delivered by the Borrower to the Trustee pursuant to Section 6.7(a) of the Loan Agreement) for the Fiscal Year ending on such Annual Evaluation Date, upon which the Trustee may conclusively rely, no Event of Default, or event which with the passage of time or the giving of notice or both would constitute an Event of Default, has occurred and is continuing, and the Debt Service Reserve Requirement and the required Repair and Replacement Fund and Operations and Maintenance Reserve Fund deposits have been fully funded, then within two Business Days after written request by the Borrower's Representative to the Trustee, the Trustee shall disburse from the Surplus Fund to the Borrower

an amount equal to the lesser of (i) Surplus Cash as of such Annual Evaluation Date or (ii) Surplus Cash available on the date of disbursement.

(c)     Notwithstanding anything to the contrary herein, the Trustee shall not make disbursements to the Borrower pursuant to Section 5.13(b) hereof unless the Trustee has received the financial reports and certificates then due as set forth in Section 6.7 of the Loan Agreement.

**Section 5.14.     Bonds Not Presented for Payment.**

In the event any Bonds shall not be presented for payment when the principal thereof becomes due on any Bond Payment Date, if money sufficient to pay such Bonds are held by the Trustee, the Trustee shall segregate and hold such money in trust, without liability for interest thereon, for the benefit of Holders of such Bonds who shall, except as provided in the following paragraph, thereafter be restricted exclusively to such funds for the satisfaction of any claim of whatever nature on their part under this Indenture or relating to said Bonds.

All money deposited with the Trustee for the payment of principal of, premium, if any, or interest on the Bonds and not claimed for the earlier of (a) two years after they become payable or distributable or (b) one day less than the applicable escheat laws shall be paid by the Trustee to the Authority.  In such event, the Trustee and the Borrower shall be relieved of all liability with respect to such money and payment for such Bonds and the Holder of such Bonds shall look solely to the Authority for such payment.

**Section 5.15.     Money Held in Trust.**

All money required to be deposited with or paid to the Trustee for deposit into any Fund or Account (other than the Rebate Fund) and all money withdrawn from the Bond Fund and held by the Trustee shall be held by the Trustee, in trust, and such money (other than money held pursuant to Section 5.07 hereof) shall, while so held, constitute part of the Trust Estate and be subject to the lien hereof. Money held in an Account in the Bond Fund shall constitute a separate trust fund for the Holders of the related Series and shall not constitute property of the Authority or the Borrower.

**Section 5.16.     Payment to the Borrower.**

After the right, title and interest of the Trustee in and to the Trust Estate and all covenants, agreements and other obligations of the Authority to the Holders shall have ceased, terminated and become void and shall have been satisfied and discharged in accordance with Article VII hereof, and after payment in full of all Administration Expenses and all fees, expenses and other amounts payable to the Trustee and the Authority pursuant to any provision hereof shall have been paid in full, any money remaining in the Funds and Accounts hereunder shall be paid or transferred to the Borrower upon the written request of a Borrower's Representative; provided that amounts on deposit in the Rebate Fund shall be retained therein to the extent required by the Tax Agreement.

**Section 5.17.     Deposit of Extraordinary Revenues.**

(a)     Any money representing Net Proceeds of Insurance Proceeds or Condemnation Awards upon damage to, destruction of or governmental taking of the Project and deposited with the Trustee pursuant to the Loan Agreement shall be deposited by the Trustee in the Project Fund.

(b)     At the direction of the Borrower's Representative, the Trustee shall disburse such money in the Project Fund as provided in Section 5.3 and 5.4 of the Loan Agreement to enable a

Borrower to undertake a restoration of a Project if such restoration is permitted by law; provided that, if a Borrower exercise or is deemed to exercise its option to apply such money to the payment of the Series 2016 Note or the conditions of Sections 5.3 and 5.4 of the Loan Agreement are not satisfied, or an excess of such money exists after restoration of a Project, such money shall be transferred by the Trustee to the applicable Special Redemption Account of the Bond Fund and applied to redeem or prepay the Bonds pursuant to Article III hereof, in a principal amount equal to the amount so transferred or the next lowest Authorized Denomination of the Bonds.

(c)     Title insurance proceeds shall be used to remedy any title defect resulting in the payment thereof or deposited in the Bond Fund for use in redeeming Bonds pursuant to Article III hereof.

(d)     The proceeds of any rental loss, use and occupancy or business interruption insurance shall be deposited in the Revenue Fund.

**Section 5.18.     Subordination of Subordinate Bonds.**

For all purposes of this Article V and other articles, deposits made to the Accounts in the Bond Fund for the Subordinate Bonds and payment of Debt Service on the Subordinate Bonds shall be subordinate to the deposits to be made to the Accounts in the Bond Fund for the Senior Bonds hereunder and to the payment when due of Debt Service on the Senior Bonds.  The Accounts in the Bond Fund for any Bonds have been specifically pledged and set aside to secure or provide for the payment of principal of and interest on such Series of Bonds.

[Remainder of page intentionally left blank]

**ARTICLE VI**

**INVESTMENTS**

Money in all Funds and Accounts established hereunder shall, at the written direction of the Borrower's Representative at least two Business Days before the making of such investment (any oral direction to be promptly confirmed in writing), be invested and reinvested by the Trustee in Investment Securities. Subject to the further provisions of this Article, such investments shall be made by the Trustee as directed and designated by the Borrower's Representative in a certificate of, or telephonic advice promptly confirmed by a certificate of a Borrower's Representative. As long as no Event of Default shall have occurred and be continuing, the Borrower's Representative shall have the right to designate the investments to be sold and otherwise to direct the Trustee in the sale or conversion to cash of the investments made with the money in any Fund or Account. The Borrower will not direct that any investment be made of any funds which would violate the covenants set forth in Section 4.05 hereof. Unless otherwise confirmed in writing, an account statement delivered by the Trustee to the Borrower's Representative shall be deemed written confirmation by the Borrower that the investment transactions identified therein accurately reflect the investment directions given to the Trustee by the Borrower, unless the Borrower's Representative notifies the Trustee in writing to the contrary within 30 days after the date of such statement. In the event that no written direction of the Borrower Representative is provided, the Trustee shall be permitted to invest in Investment Securities described in Section (f) of the definition of Investment Securities until written direction is provided.

Money in any Fund or Account shall be invested in Investment Securities with respect to which payments of principal thereof and interest thereon are scheduled to be paid or are otherwise payable (including Investment Securities payable at the option of the holder) not later than the earlier of (a) the date on which it is estimated that such money will be required by the Trustee, or (b) six (6) months after the date of acquisition thereof by the Trustee.

The Trustee may make any and all such investments through its own banking, trust or investment department or through any affiliate. All income attributable to money deposited in any Fund or Account created hereunder shall be credited to the Revenue Fund, except that income on money (a) in the Project Fund shall be credited to the Project Fund, (b) in the Rebate Fund shall be credited to the Rebate Fund and (c) in the Debt Service Reserve Fund shall be credited to the Debt Service Reserve Fund to the extent provided in Section 5.06(e) hereof. Any net loss realized and resulting from any such investment shall be charged to the particular fund or account for whose account such investment was made. The Trustee is authorized and directed to sell and reduce to cash funds a sufficient amount of such investments whenever the cash balance in any fund or account is insufficient to make any withdrawal therefrom as required under this Indenture. The Trustee shall not be liable for any depreciation of the value of any investment made pursuant to this Article VI or for any loss resulting from any such investment on the redemption, sale and maturity thereof.

Investment Securities held in the Debt Service Reserve Fund shall be valued at cost on each Interest Payment Date.

The Trustee shall at all times maintain accurate records of deposits into each Fund and Account and the sources of such deposits and such records shall be made available to the Borrower upon reasonable written request.

[Remainder of page intentionally left blank]

## ARTICLE VII

## DEFEASANCE

If the Authority shall pay or cause to be paid to the Holder of any Bond the principal of, premium, if any, and interest due and payable, and thereafter to become due and payable, upon such Bond, or any portion of such Bond in any Authorized Denomination thereof, such Bond or portion thereof shall cease to be entitled to any lien, benefit or security under this Indenture. If the Authority shall pay or cause to be paid the principal of, premium, if any, and interest due and payable on all Outstanding Bonds, and thereafter to become due and payable thereon, and shall pay or cause to be paid all other sums payable hereunder by the Authority, including all fees, compensation and expenses of the Trustee and receipt by the Trustee of an opinion of Counsel that all conditions precedent have been complied with, then the right, title and interest of the Trustee in and to the Trust Estate shall thereupon cease, terminate and become void and the Trustee shall release or cause to be released the Trust Estate, the Mortgage and any other documents securing the Bonds or execute such documents so as to permit the Trust Estate, the Mortgage and such other documents to be released.

Any Bond shall be deemed to be paid within the meaning of this Article and for all purposes of this Indenture when (a) payment of the principal of and premium, if any, on such Bond, plus interest thereon to the due date thereof (whether such due date is by reason of maturity or upon redemption as provided herein) either (i) shall have been made or caused to be made in accordance with the terms thereof or (ii) shall have been provided for by any irrevocable deposit with the Trustee in trust and irrevocably set aside exclusively for such payment of, (A) funds sufficient to make such payment and/or (B) Government Obligations maturing as to principal and interest in such amounts and at such times as will insure the availability of sufficient money to make such payment, and (b) all fees, compensation and expenses of the Trustee pertaining to the Bond with respect to which such deposit is made accrued and to accrue until final payment of the Bonds, whether at maturity or upon redemption, shall have been paid or the payment thereof provided for to the satisfaction of the Trustee. At such times as a Bond shall be deemed to be paid hereunder, as aforesaid, such Bond shall no longer be secured by or entitled to the benefits of this Indenture, except for the purposes of any such payment from such funds or Government Obligations.

Notwithstanding the foregoing paragraph, no deposit under clause (a)(ii) of the immediately preceding paragraph shall be deemed a payment of such Bond as aforesaid until the Authority or the Borrower's Representative, on behalf of the Authority, shall have given the Trustee, in form satisfactory to the Trustee, irrevocable written instructions to notify, as soon as practicable, the Holders in accordance with Section 3.06 hereof, that the deposit required by (a)(ii) above has been made with the Trustee and that said Bond is deemed to have been paid in accordance with this Article VII and stating the maturity or redemption date upon which money is to be available for the payment of the redemption price of said Bond, plus interest thereon to the due date thereof; or (b) the maturity of such Bond. In addition to the foregoing, no deposit described in clause (a)(ii) of the immediately preceding paragraph shall be deemed a payment of said Bond until the Borrower has delivered to the Trustee (i) a report of an Independent Certified Public Accountant verifying the sufficiency of the amounts, if any, described in (a)(ii) above to insure payment of such Bond, and (ii) a Favorable Opinion of Bond Counsel addressed to the Authority and the Trustee to the effect that such deposit will not adversely affect the exclusion of interest on the Tax-Exempt Bonds from the gross income of the recipients thereof for federal income tax purposes.

[Remainder of page intentionally left blank]

57

## ARTICLE VIII

## DEFAULTS AND REMEDIES

**Section 8.01.   Events of Default.**

Each of the following events shall constitute a "Default" or an "Event of Default" hereunder with respect to the Bonds:

(a)   While any Senior Bonds are Outstanding:

(1)   a failure to pay the principal of or premium, if any, on any of the Senior Bonds when the same shall become due and payable at maturity or upon redemption;

(2)   a failure to pay an installment of interest on any of the Senior Bonds when the same shall become due and payable;

(b)   If no Senior Bonds are Outstanding:

(1)   a failure to pay the principal of or premium, if any, on any of the Subordinate Bonds when the same shall become due and payable at maturity or upon redemption;

(2)   a failure to pay an installment of interest on any of the Subordinate Bonds when the same shall become due and payable;

(c)   a failure by the Authority to observe and perform any other covenant, condition, agreement or provision (other than as specified in subparagraphs (a) and (b) of this Section) contained in the Bonds or in this Indenture on the part of the Authority to be observed or performed with respect to the Bonds, which failure shall continue for a period of thirty (30) days after written notice is provided by the Trustee specifying such failure and requesting that it be remedied, shall have been given to the Authority by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Controlling Holders, unless the Trustee, or the Trustee and Holders which requested such notice, as the case may be, shall agree in writing to an extension of such period prior to its expiration; provided, however, that the Trustee, or the Trustee and the Holders of such Bonds, as the case may be, shall be deemed to have agreed to an extension of such period if corrective action is initiated by the Authority within such period and is being diligently pursued; provided, further that in no event shall such period be extended for more than 180 days after the date of giving of notice of such failure without the consent of the Controlling Holders; or

(d)   the occurrence of a "Default" under the Loan Agreement or an "Event of Default" under the Mortgage.

**Section 8.02.   Acceleration; Other Remedies.**

Upon the occurrence and continuance of an Event of Default, the Trustee, subject to the provisions of Section 8.04 hereof, may, and at the written request of the Controlling Holders (or in the case of an Event of Default under Section 8.01(c), unanimous written request of the Holders of the Bond Obligation for the Senior Bonds, if any Senior Bonds remain Outstanding or unanimous written request of the Holders of the Bond Obligation for the Subordinate Bonds if no Senior Bonds remain Outstanding)

58

shall, by written notice to the Authority and the Borrower, declare the Bonds to be immediately due and payable, whereupon such Bonds shall, without further action, become and be immediately due and payable, anything in this Indenture or in the Bonds to the contrary notwithstanding, and the Trustee shall give notice thereof to the Authority and the Rating Agency, and shall give notice thereof by Mail to Holders the Bonds.

Notwithstanding any other provision of this Indenture to the contrary, (i) if an Event of Default with respect to the payment of the principal of or interest on the Subordinate Bonds occurs (but an Event of Default does not exist with regard to the Senior Bonds) while any Senior Bonds remain Outstanding, then the Trustee shall not accelerate the Bonds and shall not exercise any of the other remedies available pursuant to this Indenture or applicable law without the consent of the Holders of all of the Senior Bonds.

(a)     The provisions of the preceding paragraph are subject to the condition that if, after the principal of the Bonds shall have been so declared to be due and payable, and before any judgment or decree for the payment of the money due shall have been obtained or entered as hereinafter provided, (i) the Authority shall, but only from any payment received from the Borrower for such purpose, deposit with the Trustee a sum sufficient to pay all matured installments of interest on all Bonds and the principal of any and all Bonds which shall have become due otherwise than by reason of such declaration (with interest on such principal and, to the extent permissible by law, on overdue installments of interest, at the Default Rate) and such amount as shall be sufficient to pay Extraordinary Trustee's Fees and Expenses, and (ii) all Events of Default hereunder with respect to the Bonds other than nonpayment of the principal of such Bonds which shall have become due by said declaration shall have been remedied, then, in every such case, upon the written consent of the Controlling Holders provided to the Trustee, such Event of Default shall be deemed waived and such declaration and its consequences rescinded and annulled, and the Trustee shall promptly give written notice of such waiver, rescission or annulment to the Authority and the Rating Agency, and shall give notice thereof by Mail to all Holders of Bonds; but no such waiver, rescission and annulment shall extend to or affect any subsequent Event of Default or impair any right or remedy consequent thereon.

(b)     Upon the occurrence and continuance of any Event of Default, then and in every such case the Trustee in its discretion may, and upon the written direction of the Controlling Holders and receipt of indemnity to its satisfaction shall, in its own name and as the Trustee of an express trust, perform any or all of the following:

(i)     by mandamus, or other suit, action or proceeding at law or in equity, enforce all rights of the Holders under this Indenture or the applicable Bonds, including without limitation requiring the Authority or the Borrower to carry out any agreements with or for the benefit of the Holders and to perform its or their duties under the Act, the Loan Agreement, the Mortgage, the Land Use Restriction Agreement and this Indenture, provided that any such remedy may be taken only to the extent permitted under the applicable provisions of the Loan Agreement, the Mortgage, the Land Use Restriction Agreement or this Indenture, as the case may be;

(ii)     bring suit upon the Bonds;

(iii)     by action or suit in equity enjoin any acts or things which may be unlawful or in violation of the rights of the Holders of Bonds;

(iv)     foreclose the Mortgage;

(v)     file proofs of claim in any bankruptcy or insolvency proceedings related to the Authority, the Borrower or the Project, necessary or appropriate to protect the interests of the Trustee or the Holders of the Bonds;

(vi)     exercise any rights and remedies with respect to the Trust Estate as may be available to a secured party under the Uniform Commercial Code in effect in the applicable state.

(c)     Notwithstanding anything herein to the contrary, neither the Holders of the Bonds nor the Trustee acting on behalf of the Holders of the Bonds shall have any right, and hereby waive any right, to institute a proceeding under the Bankruptcy Code seeking to adjudge the Authority or the Borrower insolvent or a bankrupt or seeking a reorganization of the Authority or the Borrower.

Upon instituting any such proceeding, the Trustee shall be entitled, as a matter of right, to the appointment of a receiver of the Project and other assets pledged under this Indenture or the Mortgage, pending resolution of such proceeding. The Trustee shall have the right to decline to follow any direction of any Bondholder that in the sole discretion of the Trustee would be unjustly prejudicial to the Trustee, that would expose the Trustee to unreasonable liability or financial exposure or that is not in accordance with law or the provisions of this Indenture. The Trustee shall be entitled to rely without further investigation or inquiry upon any written direction given by the Holders of the majority of the Bonds Outstanding, and shall not be responsible for the propriety of or be liable for the consequences of following any such direction. Notwithstanding anything to the contrary contained herein, the Trustee shall not be required to foreclose the Mortgage or bid on behalf of the Holders at any foreclosure sale (a) if, in the Trustee's sole discretion, such action would subject the Trustee to personal liability for the cost of investigation, removal and/or remedial activity with respect to Hazardous Substances, (b) if the presence of any Hazardous Substances on the property subject to the Mortgage results in such property having no or nominal value or (c) if as a result of any such action, the Trustee would be considered to hold title to or to be a "mortgagee-in-possession," "owner" or "operator" of the Project within the meaning of the Comprehensive Environmental Responsibility Cleanup and Liability Act of 1980, as amended, unless the Trustee has previously determined, based on a report prepared by an environmental audit consultant acceptable to the Trustee, that (i) the Project are in compliance with applicable environment laws and (ii) there are not circumstances present at the Project relating to the use, management or disposal of any Hazardous Substances for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation. It is acknowledged and agreed that the Trustee has no authority to manage, own or operate the Project, or any portion thereof, except as necessary to exercise remedies upon an Event of Default.

### Section 8.03.     Restoration to Former Position.

In the event that any proceeding taken by the Trustee to enforce any rights under this Indenture shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee, then the Authority, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies and powers of the Trustee shall continue as though no such proceeding had been taken.

### Section 8.04.     Cure by Holders.

Any Holder of Bonds may, but shall not be obligated to, cure an Event of Default under this Indenture, including the advancing of funds ("Advanced Funds") to the Trustee for payments required under this Indenture, or to indemnify the Trustee under Sections 9.04 and 9.06 hereof. Any Advanced

Funds are to be applied by the Trustee in accordance with the instructions of the Holder providing the same; provided, however, that such Holder shall not have a right or interest in the Advanced Funds that is superior to any right or interest any other party has under this Indenture.

**Section 8.05.    Controlling Holders' Right To Direct Proceeding.**

Anything in this Indenture to the contrary notwithstanding, the Controlling Holders shall have the right, by an instrument in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all remedial proceedings available to the Trustee under this Indenture or exercising any trust or power conferred on the Trustee by this Indenture.

**Section 8.06.    Limitation on Holders' Right To Institute Proceedings.**

Unless otherwise provided for in this Indenture, no Holder shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust or power hereunder, or any other remedy hereunder or on said Bonds, unless such Holder previously shall have given to the Trustee written notice of an Event of Default as hereinabove provided and unless also the Holders of not less than a majority of the Bonds Outstanding shall have made written request of the Trustee to do so after the right to institute said suit, action or proceeding under Section 8.02 hereof shall have accrued, and shall have afforded the Trustee a reasonable opportunity to proceed to institute the same in either its or their name, and the Trustee shall not have complied with such request within a reasonable time.  No one or more of the Holders of the Bonds shall have any right in any manner whatever by its or their action to affect, disturb or prejudice the security of this Indenture, or to enforce any right hereunder or under the Bonds, except in the manner herein provided, and all suits, actions and proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Holders of Bonds.  Notwithstanding anything to the contrary, the furnishing of indemnity to the Trustee as provided in Section 9.06 hereof is hereby declared in every such case, at the option of the Trustee, to be a condition precedent to the institution of said suit, action or proceeding by the Trustee.

**Section 8.07.    No Impairment of Right To Enforce Payment.**

Notwithstanding any other provision in this Indenture, the right of any Holder of a Bond to receive payment of the principal of and interest on such Bond, on or after the respective due dates expressed therein, or to institute suit for the enforcement of any such payment on or after such respective date, shall not be impaired or affected without the consent of such Holder.

**Section 8.08.    Proceedings by Trustee Without Possession of Bonds.**

All rights of action under this Indenture or under any of the Bonds secured hereby which are enforceable by the Trustee may be enforced by it without the possession of any of the Bonds, or the production thereof at the trial or other proceedings relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the equal and ratable benefit of the Holders of Bonds, subject to the provisions of this Indenture.

**Section 8.09.    No Remedy Exclusive.**

No remedy herein conferred upon or reserved to the Trustee or to Holders is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute; provided, however, that any conditions set forth herein to the taking of any remedy to

61

enforce the provisions of this Indenture or the Bonds shall also be conditions to seeking any remedies under any of the foregoing pursuant to this Section.

### Section 8.10.   No Waiver of Remedies.

No delay or omission of the Trustee or of any Holder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default, or an acquiescence therein; and every power and remedy given by this Article to the Trustee and to the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient.

### Section 8.11.   Application of Money.

(a)     If an Event of Default occurs with respect to the Bonds, any money held in any Fund or Account hereunder (excluding the Rebate Fund) or received by any receiver or by the Trustee, by any receiver or by any Holder pursuant to any right given or action taken under the provisions of this Article, after payment of (i) the fees, expenses, liabilities or advances payable to or incurred or made by the Trustee, the Authority or any Holder, (ii) the costs and expenses of the proceedings resulting in the collection of such money, and (iii) Operating Expenses of the Project as determined to be appropriate by the Trustee (and the Trustee may, in its discretion, rely on the Budget to make such determination), shall be deposited in the Revenue Fund; and all money so deposited in the Revenue Fund during the continuance of an Event of Default (other than money for the payment of Bonds which have matured or otherwise become payable prior to such Event of Default or for the payment of interest due prior to such Event of Default) shall be applied (except as otherwise provided in Section 5.05 hereof with respect to money deposited in a Bond Fund Account for the benefit of the Holders of the Bonds) as follows:

(i)     Unless the principal of all the Bonds shall have been declared due and payable, all such money shall be applied (A) first, together with any amounts on deposit in the Debt Service Reserve Account relating to the Senior Bonds, to the payment to the persons entitled thereto of all installments of interest then due on the Senior Bonds, with interest on overdue installments, if lawful, at the Default Rate, in the order of maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment of interest, then to the payment ratably, according to the amounts due on such installment of interest on the Senior Bonds on a parity and pro rata basis, (B) second, together with any amounts on deposit in the Debt Service Reserve Accounts relating to the Senior Bonds, to the payment to the persons entitled thereto of the unpaid principal of any of the Senior Bonds which shall have become due (other than Senior Bonds called for redemption for the payment of which money is held pursuant to the provisions of this Indenture) with interest on such Senior Bonds at the Default Rate from the respective dates upon which they became due and, if the amount available shall not be sufficient to pay in full Senior Bonds due on any particular date, together with such interest, then to the payment ratably, according to the amount of principal and interest due on such date, in each case to the persons entitled thereto, without any discrimination or privilege, (C) third, together with any amounts on deposit in the Debt Service Reserve Account relating to the Subordinate Bonds, to the payment to the persons entitled thereto of all installments of interest then due on the Subordinate Bonds with interest on overdue installments, if lawful, at the Default Rate, in the order of maturity of the installments of such interest and, if the amount available shall not be sufficient to pay in full any particular installment of interest, then to the payment ratably, according to the amounts due on such installment of interest on the Subordinate Bonds on

62

a parity and pro rata basis; and (D) fourth, together with any amounts on deposit in the Debt Service Reserve Account relating to the Subordinate Bonds, to the payment to the persons entitled thereto of the unpaid principal of any of the Subordinate Bonds which shall have become due (other than the Subordinate Bonds called for redemption the payment of which money is held pursuant to the provisions of this Indenture) with interest on such Subordinate Bonds at the Default Rate from the respective dates upon which they became due and, if the amount available shall not be sufficient to pay in full the Subordinate Bonds due on any particular date, together with such interest, then to the payment ratably, according to the amount of principal and interest due on such date, in each case to the persons entitled thereto, without any discrimination or privilege.

(ii)     If the principal of all the Bonds shall have been declared due and payable, all such moneys shall be applied: (A) first, to the payment of the principal and interest then due and unpaid upon the Senior Bonds, with interest on overdue interest and principal, as aforesaid at the Default Rate, if lawful, without preference or priority of principal over interest or interest over principal, or of any installment of interest over any other installment of interest, or of any Senior Bond over any other Senior Bond ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or privilege and (B) second, to the payment of the principal and interest then due and unpaid upon the Subordinate Bonds, with interest on overdue interest and principal, as aforesaid at the Default Rate, if lawful, without preference or priority of principal over interest or interest over principal, or of any installment of interest over any other installment of interest, or of any Subordinate Bond over any other Subordinate Bond, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or privilege.

(iii)     If the principal of all the Bonds shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article, then, subject to the provisions of clause (ii) of this Section 8.11(a) which shall be applicable in the event that the principal of all the Bonds shall later become due and payable, the money shall be applied in accordance with the provisions of clause (i) of this Section 8.11(a).

(b)     Whenever money is to be applied pursuant to the provisions of this Section, such money shall be applied at such times, and from time to time, as the Trustee shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future. Whenever the Trustee shall apply such funds, it shall fix the date (which shall be an Interest Payment Date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal and interest to be paid on such date shall cease to accrue. The Trustee shall give notice of the deposit with it of any such money and of the fixing of any such date by Mail to all Holders of the Bonds and shall not be required to make payment to any Holder of a Bond until such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

**Section 8.12.   Severability of Remedies.**

It is the purpose and intention of this Article to provide rights and remedies to the Trustee and the Holders which may be lawfully granted under the provisions of the Act, but should any right or remedy

herein granted be held to be unlawful, the Trustee and the Holders shall be entitled, as above set forth, to every other right and remedy provided in this Indenture and by law.

**Section 8.13.**   **Notice of Event of Default.**

If an Event of Default occurs and continues for five (5) Business Days after the Trustee has received written notice of the same as provided in Section 9.05 hereof, then the Trustee shall give notice thereof by Mail to the Holders, the Borrower, the Authority and the Rating Agency.

**Section 8.14.**   **Costs and Expenses.**

When the Trustee or the Authority incurs costs or expenses (including legal fees, costs and expenses) or renders services after the occurrence of an Event of Default, such costs and expenses and the compensation for such services are intended to constitute expenses of administration under any federal or state bankruptcy, insolvency, arrangement, moratorium, reorganization or other debtor relief law.

[Remainder of page intentionally left blank]

PHI 317575632v7

## ARTICLE IX

## TRUSTEE

**Section 9.01.    Acceptance of Trusts.**

The Trustee hereby accepts the trusts imposed upon it by this Indenture, and agrees to perform such trusts, but only upon and subject to the following express terms and conditions set forth in this Article IX:

(a)    The Trustee, before the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.  The Trustee shall not be accountable for the use of any Bonds authenticated or delivered hereunder.  The Trustee may buy, sell, own and deal in any of the Bonds secured hereby with the same rights which it would have were it not the Trustee.

(b)    The Trustee shall not withhold unreasonably its consent, approval or action to any reasonable written request of the Authority, provided that any such consent, approval or action is permitted by this Indenture.  Any action taken by the Trustee pursuant to this Indenture upon the written request or authority or consent of any person who at the time of making such request or giving such authority or consent is the owner of any Bond shall be conclusive and binding upon all future Holders of the same Bond and upon Bonds, issued in exchange therefor or in place thereof.

(c)    As to the existence or nonexistence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate signed by an Authority Representative or a Borrower's Representative as sufficient evidence of the facts therein contained, and before the occurrence of a default of which the Trustee has notice as provided in Section 9.05 hereof, shall also be at liberty to accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may, secure further evidence, but shall not be bound to secure the same.  The Trustee may accept a certificate signed on behalf of the Authority to the effect that a resolution in the form therein set forth has been adopted by the Authority as conclusive evidence that such resolution has been duly adopted, and is in full force and effect.

(d)    The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty, and it shall not be answerable for other than its negligence or willful misconduct.

(e)    At any and all reasonable times the Trustee, and its duly authorized agents, attorneys, experts, engineers, accountants and representatives, shall have the right fully to inspect any and all of the property herein conveyed, including all books, papers and records of the Authority or the Borrower pertaining to the revenues and receipts relating to the Project or the Bonds, and to take such memoranda from and in regard thereto as may be desired.

(f)    The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers hereunder or otherwise in respect of the premises.

65

(g)     The Trustee shall not be under any duty or obligation to perform any act that would cause it to incur any expense or liability or to institute or defend any suit in respect of this Indenture or to advance any of its own money, unless it is provided with indemnification for the reimbursement of all expenses to which it may be put and to protect it against all liability, except all liability which is adjudicated to have resulted from its negligence or willful misconduct by reason of any action so taken.

(h)     The Trustee shall not be required to enter, take possession of or take any other action with respect to the Project or the Site thereof unless it shall have first received assurances and indemnity satisfactory, the Trustee will not be subject to liability for, among other things, the existence of, or contamination by environmentally hazardous substances or other discharges, emissions or releases with respect to the Project or the Site thereof.

(i)     The Trustee shall have no responsibility, opinion or liability with respect to any information, statements or recitals in any offering memorandum or other disclosure material prepared or distributed with respect to the issuance of the Bonds.

(j)     The Trustee's rights to immunities and protection from liability hereunder and its rights to payment of its fees and expenses shall survive its resignation or removal and final payment or defeasance of the Bonds.

(k)     The Trustee shall not be under any obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Borrower, or to report, or make or file claims or proof of loss for, any loss or damage insured against or which may occur. The Trustee may rely on any certification provided by the Borrower pursuant to Section 5.5 of the Loan Agreement with respect to satisfaction of the insurance requirements of the Loan Agreement and the Mortgage, and shall have no responsibility for assuring compliance with such insurance requirements, but shall notify the Authority, the Borrower and the Rating Agency if it has not received the certification required by said Section 5.5 of the Loan Agreement.

(l)     All money received by the Trustee need not be segregated except to the extent required by law or this Indenture.

(m)     The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, and shall be entitled to advice of counsel concerning all matters of the trusts hereof and the actions or duties hereunder, and may in all cases pay such reasonable compensation to all such attorneys, agents, receivers and employees as may be employed in connection with the trusts hereof. The Trustee may act upon the opinion or advice of any attorney who may be the attorney or attorneys for the Authority or the Borrower.

(n)     The Trustee agrees to provide to the Rating Agency all information if reasonably requested by the Rating Agency.

(o)     The Trustee shall provide to the Authority and the Rating Agency copies of written notices it has received or produced with respect to any Event of Default, the occurrence of any casualty or material damage or loss or any condemnation proceedings concerning the Project, the resignation or removal of the Trustee and the appointment of a successor trustee, or any amendments or supplements to this Indenture or the Loan Agreement.

66

(p)     The Trustee shall not be liable for any action taken or omitted by the Trustee at the direction of the Controlling Holders as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(q)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct of, or affecting the liability of, or affording protection to the Trustee shall be subject to the provisions of this Section 9.01.

(r)     The Trustee agrees to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods, provided, however, that the Authority and the Borrower shall provide to the Trustee an incumbency certificate listing designated persons authorized to provide such instructions, which incumbency certificate shall be amended whenever a person is to be added or deleted from the listing. If the Authority and the Borrower elect to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee acts upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Authority and the Borrower agree to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk or interception and misuse by third parties.

(s)     The Trustee acknowledges that the Authority's sole source of money to repay the Bonds will be provided by the funds or moneys pledged for their payment in accordance with this Indenture, and hereby agrees that if such amounts shall ever prove insufficient to pay all principal, premium, if any and interest on the Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then the Trustee shall give notice to the Borrower in accordance with Article VIII of this Indenture to pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal of (or Redemption Price) or interest, including, but not limited to, any deficiency caused by acts, omissions, nonfeasance or malfeasance on the part of the Trustee, the Borrower, the Authority or any third party, subject to any right of reimbursement from the Trustee, the Authority or any such third party, as the case may be, therefor.

(t)     The Trustee may consult with counsel, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered, or omitted by the Trustee hereunder and in reliance thereon.

(u)     The Trustee shall not be accountable for the use or application by the Borrower of any of the Bonds or the proceeds thereof or for the use or application of any money paid over by the Trustee in accordance with the provisions of this Indenture or for the use and application of money received by any paying agent.

(v)     The Trustee shall be protected in acting and relying upon any notice, order, requisition, request, consent, certificate, order, opinion (including an opinion of independent counsel), affidavit, letter, telegram, or other paper or document appearing to have been signed or sent by the proper person or persons.

(w)   Before taking any action under this Indenture relating to an Event of Default or in connection with its duties under this Indenture other than making payments of principal and interest on the Bonds as they become due or causing an acceleration of the Bonds whenever required by the Indenture, the Trustee may require that a satisfactory indemnity bond be furnished for the reimbursement of all expenses to which it may be put and to protect it against all liability, including, but not limited to, any liability arising directly or indirectly under any federal, state or local statute, rule, law or ordinance related to the protection of the environment or hazardous substances and except liability which is adjudicated to have resulted from its negligence or willful default in connection with any action so taken.

(x)   None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(y)   All references in this Article IX to the term "Indenture" shall be deemed to include all of the "Bond Documents."

(z)   The Trustee's immunities and protections from liability and its right to indemnification in connection with the performance of its duties under this Indenture shall extend to the Trustee's officers, directors, agents, attorneys and employees. Such immunities and protections and rights to indemnification, together with the Trustee's right to compensation, shall survive the Trustee's resignation or removal, the discharge of this Indenture, and final payment of the Bonds.

**Section 9.02.   No Responsibility for Recitals.**

The recitals, statements and representations contained in this Indenture or in the Bonds, save only the Trustee's authentication upon the Bonds, shall be taken and construed as made by and on the part of the Authority, and not by the Trustee, and the Trustee does not assume, nor shall it have, any responsibility or obligation for the correctness of any thereof.

**Section 9.03.   Limitations on Liability.**

The Trustee may execute any of the trusts or powers hereof and perform the duties required of them hereunder by or through attorneys, agents, receivers or employees selected by them, and shall be entitled to advice of counsel concerning all matters of trust and its duty hereunder and to obtain the opinion of Counsel acceptable to the Trustee prior to taking action hereunder, and may in all cases pay such reasonable compensation to all such attorneys, agents, receivers or employees as is deemed necessary in connection with the performance of the Trustee's duties under this Indenture, and the Trustee shall not be answerable for the default or misconduct of any such attorney, agent or employee selected by it. The Trustee may act upon the advice of any attorney and the Trustee shall not be responsible for any loss or damage from any action or non-action taken upon such opinion or advice. Without limitation, the Trustee shall be entitled to the benefit of the foregoing sentence with respect to the delegation to the Trustee's duties hereunder with respect to payment of principal, premium, if any, or interest on, or redemption of, the Bonds, the authentication and delivery thereof, and exchange and transfer thereof. The Trustee shall not be answerable for the exercise of any discretion or power under this Indenture or for anything whatsoever in connection with the trust created hereby, except only for its own negligence or willful misconduct.

68

**Section 9.04.** **Compensation, Expenses and Advances.**

The Trustee shall be entitled to reasonable compensation for its services rendered hereunder (not limited by any provision of law in regard to the compensation of the trustee of an express trust) and to reimbursement for its actual out-of-pocket expenses (including counsel fees and expenses and any fees, expenses, payments, indemnification reserves or other security which may be incurred in connection with the appointment or designation of a separate trustee for all or part of the Bonds) reasonably incurred in connection therewith, except as a result of its own negligence or willful misconduct. The Authority agrees that it will, but solely from the Trust Estate as provided herein, pay to the Trustee such compensation and reimbursement of expenses and advances. The Trustee shall have, in addition to any other rights hereunder, a lien and claim, for the payment of its compensation and the reimbursement of its expenses and any advances made by it, as provided in this Section, upon the money which are on deposit in the appropriate funds and accounts created herein, subject to the requirements hereof for other applications of such funds and accounts, and the Trustee may withdraw the same from such funds and accounts when the same become due and payable, to the extent available for such purpose.

**Section 9.05.** **Notice of Events of Default.**

The Trustee shall not be required to take notice, or be deemed to have notice, of any default or Event of Default under this Indenture, other than an Event of Default under clause (a) or (b) of Section 8.01 hereof, unless a Responsible Officer of the Trustee shall have received actual knowledge or shall have been specifically notified in writing of such default or Event of Default by the Authority, the Borrower or by the Holders of at least 25% of the Bond Obligation. The Trustee may, however, at any time, in its discretion, and shall, upon the request of at least 25% of the Bond Obligation, require of the Borrower full information and advice as to the performance of any of the covenants, conditions and agreements contained herein.

**Section 9.06.** **Action by Trustee.**

The Trustee shall be under no obligation to take any action in respect of any default or Event of Default hereunder or toward the execution or enforcement of any of the trusts hereby created, or to institute, appear in or defend any suit or other proceeding in connection therewith, and if such action may tend to involve it in expense or liability, unless furnished, from time to time as often as it may require, with security and indemnity satisfactory to it; but the foregoing provisions are intended only for the protection of the Trustee, and, shall not affect any discretion or power given by any provisions of this Indenture to the Holders or to the Trustee to take action in respect of any default or Event of Default without such notice or request from the Holders, or without such security or indemnity.

**Section 9.07.** **Good Faith Reliance.**

The Trustee shall be protected and shall incur no liability in acting or proceeding in good faith, reasonably exercised, upon any resolution, notice, telex or facsimile transmission, request, consent, waiver, certificate, statement, affidavit, voucher, bond, requisition or other paper or document which it shall appear to have been passed or signed by the proper board, body or person or to have been prepared and furnished pursuant to any of the provisions of this Indenture or the other Bond Documents, or upon the written opinion of any attorney, engineer, accountant or other expert reasonably believed by the Trustee to be qualified in relation to the subject matter, and the Trustee shall be under no duty to make any investigation or inquiry as to the qualification of such person or any statements contained or matters referred to in any such instrument, but may accept and rely upon the same as conclusive evidence of the truth and accuracy of such statements.

69

**Section 9.08.    Dealings in Bonds or with the Authority or the Borrower.**

The Trustee may buy, sell, own, hold and deal in any of the Bonds issued hereunder, and may join in any action which any Holder may be entitled to take with like effect as if it did not act in any capacity hereunder.  The Trustee, in its individual capacity, either as principal or agent, may also engage in or be interested in any financial or other transaction with the Authority or the Borrower, and may act as depositary, trustee or agent for any committee or body of Holders secured hereby or other obligations of the Authority or the Borrower as freely as if it did not act in any capacity hereunder.

**Section 9.09.    Resignation of Trustee.**

The Trustee may resign and be discharged of the trusts created by this Indenture by executing an instrument in writing resigning such trust and specifying the date when such resignation shall take effect, and filing the same with the Authority and the Borrower, and by giving notice of such resignation by Mail, not less than 15 days prior to such resignation date, to all Holders.  Such resignation shall only take effect on the day a successor Trustee shall have been appointed as hereinafter provided.

**Section 9.10.    Removal of Trustee.**

The Trustee may be removed at any time by the Borrower or by the Holders of not less than a majority of the Bond Obligation with the consent of the Borrower (not to be unreasonably withheld), by filing with the Trustee so removed, and with the Authority an instrument or instruments in writing appointing a successor, executed by a Borrower's Representative if the Trustee has been removed by the Borrower (and notice thereof given by Mail to the Holders and the Authority), or executed by said Holders of Bonds if the Trustee was removed by said Holders; provided that the Borrower may not remove the Trustee, and the consent of the Borrower shall not be required (in the case of removal by the Holders), if an Event of Default has occurred and is continuing hereunder or a Default has occurred and is continuing under the Loan Agreement.

**Section 9.11.    Appointment of Successor Trustee.**

If at any time the Trustee shall resign, be removed, or be dissolved, or if its property or affairs shall be taken under the control of any state or federal court or administrative body because of insolvency or bankruptcy, or for any other reason become incapable of acting, then a vacancy shall forthwith and ipso facto exist in the office of Trustee and the Borrower, with written notice to the Authority, shall promptly appoint a successor Trustee.  Any such appointment shall be made by a written instrument executed by a Borrower's Representative.  Copies of such instrument shall be promptly delivered by the Borrower to the predecessor Trustee and to the Trustee so appointed.  The successor Trustee shall give notice of such appointment by Mail, at least once within 30 days of such appointment, to all Holders.

If, in a proper case, no appointment of a successor Trustee shall be made pursuant to the preceding paragraph within 60 days after the receipt by the Authority and the Borrower of the Trustee's notice of resignation given pursuant to Section 9.09 or of removal of the Trustee pursuant to Section 9.10, the retiring Trustee, at the expense of the Borrower, or any Holder may apply to any court of competent jurisdiction to appoint a successor Trustee.  The court may thereupon, after such notice, if any, as such court may deem proper and prescribe, appoint a successor Trustee.

Any new Trustee so appointed as presented in this Section 9.11 shall immediately and without further act be superseded by a Trustee appointed in the manner above provided.

70

**Section 9.12.    Qualifications of Trustee.**

The Trustee and every successor Trustee, if any, (a) shall be a bank or trust company duly organized under the laws of the United States or any state thereof authorized by law to perform all the duties imposed upon it by this Indenture, (b) shall at the time of appointment have trust assets under management of at least $500,000,000, (c) shall be permitted under applicable law to perform the duties of Trustee and (d) shall be acceptable to the Authority.

**Section 9.13.    Judicial Appointment of Successor Trustee.**

If at any time the Trustee shall resign and no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Article prior to the date specified in the notice of resignation as the date when such resignation is to take effect, the resigning Trustee may forthwith apply to a court of competent jurisdiction for the appointment of a successor Trustee.   If no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Article within six (6) months after a vacancy shall have occurred in the office of Trustee, any Holder may apply to any court of competent jurisdiction to appoint a successor Trustee.   Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor Trustee.

**Section 9.14.    Acceptance of Trusts by Successor Trustee.**

Any successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Authority an instrument accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become duly vested with all the estates, property, rights, powers, trusts, duties and obligations of its predecessor in the trust hereunder, with like effect as if originally named Trustee herein.   Upon request of the Trustee and the payment of the predecessor Trustee's fees and expenses hereunder, such predecessor Trustee and the Authority shall execute and deliver an instrument transferring to such successor Trustee all the estates, property, rights, powers and trusts hereunder of such predecessor Trustee and, subject to the provisions of Section 9.04 hereof, such predecessor Trustee shall pay over to the successor Trustee all money and other assets at the time held by it hereunder, and such predecessor Trustee shall assign its beneficial interest in the Mortgage to the successor Trustee and record said assignment in the same manner as the Mortgage were recorded.

**Section 9.15.    Successor by Merger or Consolidation.**

Any entity into which any Trustee hereunder may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which any Trustee hereunder shall be a party, or any entity succeeding to the business of the Trustee, or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such entity meets the qualifications contained in Sections 9.12 or 9.18 hereof, as appropriate, shall be a successor Trustee under this Indenture, without the execution or filing of any paper or any further act on the part of the parties hereto, anything in this Indenture to the contrary notwithstanding.

**Section 9.16.    Intervention in Litigation of the Authority.**

In any judicial proceeding to which the Authority is a party and which in the opinion of the Trustee and its counsel has a substantial bearing on the interests of the Holders, the Trustee, if permitted by the court having jurisdiction in the premises, may intervene and shall intervene, upon receipt of indemnity satisfactory to it, at the written request of Holders of at least a majority of the Bond Obligation.

71

**Section 9.17.   Paying Agent.**

The Authority hereby appoints the Trustee as the Paying Agent for the Bonds.

**Section 9.18.   Qualifications of Paying Agent; Resignation; Removal.**

Any Paying Agent (a) shall be a bank or trust company, duly organized under the laws of the United States of America or any state thereof authorized by law to perform all the duties imposed upon it by this Indenture, (b) shall at the time of appointment have trust assets under management of at least $500,000,000, (c) shall be permitted under applicable law to perform the duties of Paying Agent, and (d) shall be acceptable to the Authority. Any Paying Agent may at any time resign and be discharged of the duties and obligations created by this Indenture by giving at least 60 days' notice to the Authority, the Borrower and the Trustee.  The Paying Agent may be removed at any time at the direction of the Borrower or the Holders of a majority in principal amount of the Bond Obligation with the consent of the Borrower (not to be unreasonably withheld), with written notice to the Authority, by an instrument signed by the Borrower or such Holders, as applicable, and filed with the Paying Agent and the Trustee.  In the event of the resignation or removal of any Paying Agent, such Paying Agent shall pay over, assign and deliver any money held by it in such capacity to its successor or, if there be no successor, to the Trustee. Successor Paying Agents shall be appointed in accordance with the provisions of Section 9.17 hereof.

**Section 9.19.   Several Capacities; Duty To Cooperate.**

Anything in this Indenture to the contrary notwithstanding, the same entity must serve hereunder as the Trustee and the Paying Agent.

**Section 9.20.   Additional Duties.**

Notwithstanding any provisions hereof to the contrary, the Trustee shall have the following duties:

> (a)     The Trustee shall provide the Rating Agency, upon its written request, such information within its possession as the Rating Agency shall reasonably require from time to time in order to maintain the Rating on the Bonds;

> (b)     Subject to Article III hereof, the Trustee shall continue to perform its function hereunder without regard to the insufficiency of payment of its fees, provided that nothing herein shall negate the Trustee's right to compensation and indemnification hereunder and as provided in the Loan Agreement; and

> (c)     The Trustee shall provide to the Underwriter upon its request a list of the names and addresses of the registered Holders of all Bonds then outstanding at the sole cost and expense of the Underwriter or, if the Bonds are held in book-entry form, the special position report (or similar list of Beneficial Owners) from the Depository to the extent available and at the sole cost and expense of the Underwriter.

**Section 9.21.   Notice to Rating Agency.**

The Trustee shall notify the Rating Agency of (a) the occurrence of an Event of Default or a Default of which the Trustee has actual notice, (b) the occurrence of any monetary or other material default under the Loan of which the Trustee has notice, (c) any change in the identity of the Trustee, (d) any amendments, modifications, or changes to this Indenture, the Loan Agreement, the HAP Contract or

the Bonds, including any extension of principal or modification of interest or redemption premium due on any of the Bonds, in each case only in the event the Trustee has actual notice, (e) any draws on the Debt Service Reserve Fund, (f) any damage, destruction or condemnation of the Project of which the Trustee has actual knowledge, (g) any change or proposed change in the structure or identity of the Authority of which the Trustee has actual knowledge, (h) the initiation of any foreclosure action taken with respect to the Project by or on the Trustee's behalf, (i) any unscheduled reduction in HAP Payments, (j) any notifications of proposed terminations of the HAP Contract or reduction in HAP Payments, (k) any partial prepayment of the Loan or the giving of notice of the call for redemption of any Bonds, (l) any change in the investment of funds subject to the lien of this Indenture other than in Investment Securities, (m) any defeasance of the Bonds hereunder, or (n) any change in the Manager of which its Trustee has actual knowledge.

**Section 9.22.     Covenants Relating to the Tax-Exempt Bonds.**

(a)     Notwithstanding any provision of this Indenture or the Loan Agreement to the contrary, the Trustee shall not be liable or responsible for any calculation or determination which may be required in connection with or for the purpose of complying with Section 148 or any applicable Treasury regulation (the "Arbitrage Rules"), including, without limitation, the calculation of amounts required to be paid to the United States under the provisions of the Arbitrage Rules, the maximum amount which may be invested in "nonpurpose obligations" as defined in the Code and the fair market value of any investment made under this Indenture, it being understood and agreed that the sole obligation of the Trustee with respect to investments of funds hereunder shall be to invest the money received by the Trustee pursuant to the written instructions of the Borrower given in accordance with the provisions of this Indenture. The Trustee shall have no responsibility for determining whether or not any investment made pursuant to the written direction of the Borrower or any of the instructions received by the Trustee under this Indenture comply with the requirements of the Arbitrage Rules and shall have no responsibility for monitoring the obligations of the Borrower or the Authority for compliance with the provisions of this Indenture with respect to the Arbitrage Rules.

(b)     Notwithstanding anything contained in this Indenture, or in any other instrument to the contrary, the Trustee shall not be under any duty to evaluate, verify or otherwise independently confirm the compliance of any instruction it receives from the Borrower, the Authority, Bond Counsel or any rebate analyst for compliance with the requirements of Sections 103(a) or 148 of the Code or any applicable provisions of this Indenture.

**Section 9.23.     Survival.**

(a)     The rights of the Trustee to payment under this Indenture shall survive the Trustee's resignation or removal, the discharge of this Indenture and defeasance of the Bonds.

(b)     Notwithstanding anything in this Indenture or any of the Bond Documents to the contrary, the rights, protections, indemnities and immunities afforded to the Trustee hereunder shall survive the resignation or removal of any such party and the payment in full or defeasance of the Bonds.

[Remainder of page intentionally left blank]

73

## ARTICLE X

### EXECUTION OF INSTRUMENTS BY HOLDERS AND
### PROOF OF OWNERSHIP OF BONDS

Any request, direction, consent or other instrument in writing required or permitted by this Indenture to be signed or executed by Holders or on their behalf by an attorney-in-fact may be in any number of concurrent instruments of similar tenor and may be signed or executed by Holders in person or by an agent or attorney-in-fact appointed by an instrument in writing or as provided in the Bonds. Proof of the execution of any such instrument and of the ownership of Bonds shall be sufficient for any purpose of this Indenture and shall be conclusive in favor of the Trustee with regard to any action taken by it under such instrument if made in the following manner:

(a) The fact and date of the execution by any person of any such instrument may be proved by the certificate of any officer in any jurisdiction who, by the laws thereof, has power to take acknowledgments within such jurisdiction, to the effect that the person signing such instrument acknowledged before him the execution thereof, or by an affidavit of a witness to such execution.

(b) The ownership of Bonds shall be proved by the registration books kept under the provisions of Section 2.09 hereof.

Nothing contained in this Article shall be construed as limiting the Trustee to such proof, it being intended that the Trustee may accept any other evidence of matters herein stated which it may deem necessary or sufficient. Any request, consent of, or assignment by any Holder shall bind every future Holder of the same Bond or any Bond or Bonds issued in lieu thereof in respect of anything done by the Trustee or the Authority in pursuance of such request or consent.

[Remainder of page intentionally left blank]

PHI 317575632v7

## ARTICLE XI

## MODIFICATION OF BOND DOCUMENTS

**Section 11.01.  Limitations.**

Neither this Indenture nor any of the Borrower's Documents shall be amended in any respect subsequent to the Closing Date except as provided in and in accordance with and subject to the provisions of this Article.  Notwithstanding any provisions of this Article, the Tax Agreement and the Land Use Restriction Agreement may be amended pursuant to the provisions thereof, and the Tax Agreement and the Land Use Restriction Agreement shall be amended to the extent required by such documents.

**Section 11.02.  Supplemental Indentures Without Holder Consent.**

The Authority and the Trustee may, from time to time and at any time, without the consent of, but with prompt notice to, the Holders and the Rating Agency, enter into Supplemental Indentures as follows:

(a)     to cure any formal defect, omission, inconsistency or ambiguity in this Indenture;

(b)     to add to the covenants and agreements of the Authority in this Indenture other covenants and agreements, or to surrender any right or power reserved or conferred upon the Authority if such surrender shall not, in the judgment of the Trustee, materially adversely affect the interests of the Holders, the Trustee being authorized to rely on an opinion of Counsel with respect thereto;

(c)     to confirm, as further assurance, any pledge of or lien on the Loan Agreement or of any other money, securities or funds subject to the lien of this Indenture;

(d)     to comply with the requirements of the Trust Indenture Act of 1939, as from time to time amended;

(e)     to preserve the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes, as set forth in a Favorable Opinion of Bond Counsel;

(f)     to make changes to obtain, maintain or restore the rating on the Bonds from the Rating Agency;

(g)     to provide for any amendment specifically authorized or required by any provision of this Indenture;

(h)     in connection with any Additional Bonds or Parity Indebtedness; or

(i)     with respect to any other Amendment which does not have a material adverse effect on the Holders of the Bonds.

**Section 11.03.  Supplemental Indentures Requiring Holders' Consent.**

Except for any Supplemental Indenture entered into pursuant to Section 11.02 hereof, subject to the terms and provisions contained in this Section and not otherwise, Holders of not less than a majority of the Bond Obligation affected thereby shall have the right from time to time to consent to and approve the execution and delivery by the Authority and the Trustee of any Supplemental Indenture deemed necessary or desirable by the Authority for the purposes of modifying, altering, amending, supplementing

75

or rescinding, in any particular, any of the terms or provisions contained in this Indenture; provided, however, that, unless approved in writing by all Holders of Bonds affected thereby, nothing herein contained shall permit, or be construed as permitting, (i) a change in the times, amounts or currency of payment of the principal of or interest on any Outstanding Bond or a reduction in the principal amount or redemption price of any Outstanding Bond or the rate of interest borne thereon (ii) the creation of a claim or lien upon, or a pledge of, the Trust Estate ranking prior to or on a parity with the claim, lien or pledge created by this Indenture, (iii) a reduction in the aggregate Bond Obligation the consent of the Holders of which is required for any such Supplemental Indenture or which is required, under Section 11.05 hereof, for any modification, alteration, amendment or supplement to any Borrower's Documents, and provided further that if the Supplemental Indenture subjects additional property to the lien of this Indenture the Trustee shall have been provided with an opinion of Counsel that such Supplemental Indenture is duly authorized in accordance with the terms or (iv) any change to Section 5.18 hereof relating to the subordination of the Subordinate Bonds.

Unless approved in writing by a majority of the Holders of the Outstanding Subordinate Bonds, nothing herein contained shall permit, or be construed as permitting a Supplemental Indenture which further subordinates the priority of the Holders of the Subordinate Bonds to the payment of the Senior Bonds.

If, at any time, the Authority and the Trustee propose to enter into any such Supplemental Indenture for any of the purposes specified in this Section, the Trustee shall, subject to Section 11.07 and upon being satisfactorily indemnified with respect to expenses by the Borrower, cause notice of the proposed execution of such Supplemental Indenture to be mailed, postage prepaid, to all Holders affected thereby. Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that copies thereof are on file at the Designated Trust Office of the Trustee for inspection by all Holders affected thereby. If, within 60 days or such longer period as shall be prescribed by the Trustee following the mailing of such notice, the Holders of not less than a majority of the Bond Obligation affected thereby at the time of execution of any such Supplemental Indenture shall have consented to and approved the execution thereof as herein provided, no Holder of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or the Authority from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such Supplemental Indenture as in this Section is permitted and provided, this Indenture shall be deemed to be and shall be modified and amended in accordance therewith. The Trustee and the Authority may rely upon an opinion of Bond Counsel as conclusive evidence that the execution and delivery of a Supplemental Indenture has been effected in compliance with the provisions of this Article.

Anything herein to the contrary notwithstanding, so long as no Event of Default under the Loan Agreement with respect to the Borrower has occurred and is continuing, a Supplemental Indenture under this Article shall not become effective unless and until the Borrower shall have consented to the execution and delivery of such Supplemental Indenture. In this regard, the Trustee shall cause notice of the proposed execution and delivery of any such Supplemental Indenture to be mailed by certified or registered mail to the Borrower at least 20 days prior to the proposed date of execution and delivery of any Supplemental Indenture.

**Section 11.04.   Amendment of Borrower's Documents Without Holder Consent.**

Without the consent of but with notice to the Holders, the Trustee may consent to any Amendment of any Borrower's Document from time to time as follows:

76

(a)     to cure any formal defect, omission, inconsistency or ambiguity in such Borrower's Document;

(b)     to add to the covenants and agreements of the Authority or the Borrower in such document other covenants and agreements, or to surrender any right or power reserved or conferred upon the Authority or the Borrower, if such surrender shall not, in the judgment of the Trustee, materially adversely affect the interests of the Holders, the Trustee being authorized to rely on an opinion of Counsel with respect thereto;

(c)     to confirm, as further assurance, any lien on or pledge of the Project or the revenues therefrom or of any other property, money, securities or funds subject to the Mortgage or any other security for the Loan Agreement;

(d)     to preserve the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes, as set forth in an opinion of Bond Counsel;

(e)     to make changes required to obtain or maintain the rating on the Bonds from the Rating Agency;

(f)     to provide for any amendment specifically authorized or required by any provision of any Borrower's Document;

(g)     in connection with any Additional Bonds or Parity Indebtedness; or

(h)     with respect to any other Amendment which does not have a material adverse effect on the Holders of the Bonds.

### Section 11.05.   Amendment of Borrower's Documents Requiring Holders' Consent.

Except in the case of Amendments referred to in Section 11.04 hereof, the Authority and the Trustee shall not enter into, and shall not consent to, any amendment of the Borrower's Documents without the written approval or consent of the Holders of the Bonds then Outstanding, given and procured as provided in Section 11.03 hereof; provided that the foregoing will not permit or be construed as permitting any change referred to in Section 11.03(i) (substituting for such purpose the word "Note" for the word "Bond") without the consent of all Holders given and obtained in the manner set forth in Section 11.03 hereof. If at any time the Authority requests the consent of the Trustee to any such proposed modification, alteration, amendment or supplement, the Trustee will cause notice thereof to be given in the same manner as provided by Section 11.06 hereof with respect to Supplemental Indentures. Such notice will briefly set forth the nature of such proposed modification, alteration, amendment or supplement and will state that copies of the instrument embodying the same are on file at the Designated Office of the Trustee for inspection by all Holders. The Authority and the Trustee may enter into, or may consent to, any such proposed modification, alteration, amendment or supplement subject to the same conditions and with the same effect as provided in Section 11.03 hereof with respect to Supplemental Indentures.

### Section 11.06.   Procedures for Amendments.

If at any time the Trustee shall be requested to enter into any Supplemental Indenture pursuant to Section 11.03 or to consent to any Amendment pursuant to Section 11.05, the Trustee shall cause notice of the proposed Supplemental Indenture or other amendment to be given by Mail to all Holders. Such notice shall set forth with particularity the nature of the proposed Supplemental Indenture or other

amendment and shall state that a copy thereof is on file at the office of the Trustee for inspection by all Holders. Within 2 months after the date of the first giving of such notice, the Authority and the Trustee may enter into such Supplemental Indenture or the Trustee may consent to such Amendment in substantially the form described in such notice, but only if there shall have first been delivered to the Trustee (i) the required consents, in writing, of Holders and (ii) the opinion of Bond Counsel required by Section 11.07 hereof.

If Holders of not less than the amount of Bond Obligation required by Section 11.03 or 11.05, as applicable, shall have consented to and approved the execution and delivery thereof as herein provided, no Holder shall have any right to object to the execution and delivery of such Supplemental Indenture or other Amendment, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution and delivery thereof, or to enjoin or restrain the Authority or the Trustee from executing and delivering or consenting to the same or from taking or permitting any action pursuant to the provisions thereof.

**Section 11.07.  Opinions; Certificate.**

The Trustee shall not enter into or consent to any Amendment of any provision of any Bond Document unless there shall have been delivered to the Authority and the Trustee an opinion of Bond Counsel stating that such Amendment is authorized or permitted by the applicable Bond Documents and such Amendment will not adversely affect the exclusion of interest on the Tax–Exempt Bonds from the gross income of the recipients thereof for federal income tax purposes. In addition, the Trustee (i) may obtain, and shall be protected in relying on, an opinion of Counsel to the effect that such Amendment is authorized or permitted by this Indenture and complies with the terms hereof; and (ii) may require, as a condition to entering into or consenting to any such Amendment, a Compliance Certificate from the Borrower.

**Section 11.08.  Effect of Amendments; Other Consents.**

Upon the execution and delivery of any Supplemental Indenture or any Amendment to a Borrower's Document pursuant to the provisions of this Article, this Indenture or such Borrower's Document shall be, and be deemed to be, modified and amended in accordance therewith, and the respective rights, duties and obligations under the Bond Documents of the Authority, the Trustee, the Borrower and all Holders shall thereafter be determined, exercised and enforced under the Bond Documents subject in all respects to such modifications and amendments.

Notwithstanding anything herein to the contrary, (i) the Trustee shall not be required to enter into or consent to any Amendment of any Bond Document which, in the sole judgment of the Trustee, might adversely affect the rights, obligations, powers, privileges, indemnities, immunities or other security provided the Trustee herein or therein; and (ii) except as otherwise required hereby, the Trustee shall not enter into or consent to any Amendment of any Bond Document which affects the rights or obligations of the Borrower or the Authority unless the Borrower or the Authority enters into or consents to such Amendment.

[Remainder of page intentionally left blank]

## ARTICLE XII

## MISCELLANEOUS

**Section 12.01.  Successors of the Authority.**

In the event of the dissolution or transfer of functions of the Authority, all the covenants, stipulations, promises and agreements in this Indenture contained, by or on behalf of, or for the benefit of, the Authority, shall bind or inure to the benefit of the successors of the Authority from time to time and any entity, officer, board, commission, agency or instrumentality to whom or to which any power or duty of the Authority shall be transferred.

**Section 12.02.  Parties in Interest.**

Except as herein otherwise specifically provided, nothing in this Indenture expressed or implied is intended or shall be construed to confer upon any person, firm or corporation other than the Authority, the Borrower, the Trustee and the Holders any right, remedy or claim under or by reason of this Indenture, this Indenture being intended to be for the sole and exclusive benefit of the Authority, the Borrower, the Trustee and the Holders.

**Section 12.03.  Severability.**

In case any one or more of the provisions of this Indenture or of any Borrower's Document or of the Bonds shall, for any reason, be held to be illegal or invalid, such illegality or invalidity shall not affect any other provisions of this Indenture, such Borrower's Document or such Bonds, and this Indenture, the Borrower's Documents and the Bonds shall be construed and enforced as if such illegal or invalid provisions had not been contained herein or therein.

**Section 12.04.  No Personal Liability.**

No covenant or agreement contained in the Bonds or in this Indenture shall be deemed to be the covenant or agreement of any official, director, officer, member, agent or employee of the Authority or the Trustee in his or her individual capacity, and no neither the members of the Authority or the Trustee nor any official executing the Bonds shall be liable personally on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof.

**Section 12.05.  Counterparts.**

This Indenture may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original; but such counterparts shall together constitute but one and the same Indenture.

**Section 12.06.  Governing Law.**

This Indenture shall be governed by and construed in accordance with the laws of the Commonwealth without regard to conflicts of law principles.

**Section 12.07.  Notices.**

Except as otherwise provided in this Indenture, all notices, certificates, requests, requisitions or other communications by the Authority, the Borrower or the Trustee pursuant to this Indenture shall be in

79

writing and shall be sufficiently given and shall be deemed given when mailed by overnight delivery by a nationally recognized service provider (such as Federal Express or United Parcel Service) registered mail, postage prepaid, or by facsimile transmission which produces receipt of transmission, addressed as follows:

|  |  |
|---|---|
| To the Authority: | Philadelphia Authority for Industrial Development<br>1500 Market Street, Suite 2600 West<br>Philadelphia, PA 19102<br>Attention: Sakinah Rahman<br>Telephone: (215) 496-8160 |
| To the Trustee: | Wilmington Trust, National Association<br>15950 North Dallas Parkway, Suite 550<br>Dallas, TX 75248<br>Attention: Camilla Lindsey<br>Telephone: (972) 383-3151 |
| To the Borrower: | Pavilion Apartments Penn LLC<br>c/o JPC Charities<br>PO Box 234<br>Amlin, OH 43002<br>Attention: Jason Cook<br>Telephone: (440) 552-0872 |
| With a Copy to: | Rosenbeck Law, LLC<br>5701 Tynecastle Loop<br>Dublin, Ohio 43016<br>Attention: Meredith Rosenbeck, Esq.<br>Telephone: (614) 546-8042 |
| To the Asset Manager: | PF Holdings Management, LLC<br>At the address provided by the Borrower |
| To the Underwriter: | Stifel Nicolaus & Company, Inc.<br>3060 Peachtree Road NW, Suite 1700<br>Atlanta, GA 30309<br>Telephone: (404) 504-2785<br>Attention: Public Finance Department |

A copy of any communication given by or to the Borrower shall also be sent, as provided above, to the Manager at the address designated by the Manager in writing to each of the parties listed above. Any of the foregoing may, by notice given hereunder to each of the others, designate any further or different addresses to which subsequent notices, certificates, requests or other communications shall be sent hereunder or under the Loan Agreement.

The Trustee agrees to accept and act upon instructions or directions pursuant to the Bond Documents sent by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods, provided, however, that the Person sending such instructions or directions shall provide to the Trustee an incumbency certificate listing such designated persons, which incumbency certificate shall be amended whenever a person is to be added or deleted from the listing. If the Borrower, the Authority or any Person elects to give the Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Borrower assumes all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties.

**Section 12.08.  Holidays.**

If the date for making any payment or the last date for performance of any act or the exercising of any right, as provided in this Indenture or any of the other Bond Documents, shall not be a Business Day, such payment may, unless otherwise provided in this Indenture, be made or act performed or right exercised on the next succeeding Business Day with the same force and effect as if done on the nominal date provided in this Indenture or any of the other Bond Documents, and no interest shall accrue for the period after such nominal date.

[Signatures to follow]

81

IN WITNESS WHEREOF, the Authority has caused this Indenture to be executed by an authorized officer, and the Trustee has caused this Indenture to be executed on its behalf by its duly authorized officer, all as of the day and year first above written.

**PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT**

By: _____

Name:    Thomas A. K Queenan

Its:       Chairperson

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**

as Trustee

By: _____

Name:    Camilla J. Lindsey

Title::    Vice President

*Signature Page to Trust Indenture*

IN WITNESS WHEREOF, the Authority has caused this Indenture to be executed by an authorized officer, and the Trustee has caused this Indenture to be executed on its behalf by its duly authorized officer, all as of the day and year first above written.

PHILADELPHIA AUTHORITY FOR
INDUSTRIAL DEVELOPMENT

By: _____
Name:    Thomas A. K Queenan
Its:       Chairperson

WILMINGTON TRUST, NATIONAL
ASSOCIATION,
as Trustee

By: _____
Name:    Camilla J. Lindsey
Title::   Vice President

*Signature Page to Trust Indenture*

## EXHIBIT A

### [FORM OF SERIES 2016A BOND]

NOTICE: Unless this certificate is presented by an authorized representative of The Depository Trust Company to the Authority or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co. or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL since the registered owner hereof, Cede & Co., has an interest herein.

AR-__                                                                              $_____

### PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT
### SENIOR HOUSING REVENUE BONDS
### (THE PAVILION)
### SERIES 2016A

| Maturity Date: | Dated Date: | Interest Rate: | CUSIP No.: |
|---|---|---|---|
| ____ 1, 20____ | ____ 1, 20____ | ____% | _____ |

REGISTERED OWNER: CEDE & CO.
PRINCIPAL AMOUNT:

The PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT (together with its successors and assigns, the "Authority"), a public body corporate and politic organized and existing under the laws of the Commonwealth of Pennsylvania (the "Commonwealth"), for value received, promises to pay, subject to the provisions hereof and of the Indenture, to the Registered Owner named above on the Maturity Date specified above, or upon earlier redemption as described herein, the Principal Amount shown above and to pay interest on the unpaid principal amount hereof at the Interest Rate specified above until payment of the principal or redemption price hereof has been made. Interest on this Bond is payable on each June 1 and December 1, commencing December 1, 2016 (each such date being hereinafter referred to as an "Interest Payment Date") and on any other date on which payment of principal of this Bond is due. Interest hereon will be computed on the basis of a 360-day year of twelve 30-day months. Any term used herein as a defined term but not defined herein shall be as defined in the Indenture (hereinafter defined).

This Bond is payable in lawful money of the United States of America. The principal of and premium, if any, on this Bond is payable at the Designated Office of the Trustee, initially in Dallas, Texas, upon presentation and surrender of this Bond.

This Bond is one of a duly authorized issue of revenue bonds of the Authority, aggregating $_____ in principal amount, designated as "Philadelphia Authority for Industrial Development Senior Housing Revenue Bonds (The Pavilion), Series 2016A" (the "Series 2016A Bonds"). Simultaneously with the issuance of the Series 2016A Bonds, the Authority is issuing $_____ aggregate principal amount of its Senior Housing Revenue Bonds (The Pavilion), Subordinate Series 2016B (the "Series 2016B Bonds"), as more fully set forth in the Indenture (the Series 2016A Bonds and the Series 2016B Bonds are collectively referred to as the "Bonds," and each as a "Series"). The Bonds are issued pursuant to a Trust Indenture dated as of July 1, 2016 (as amended and supplemented from time to time, the

A-1

"Indenture"), between the Authority and Wilmington Trust, National Association, as trustee (the "Trustee").

THE BONDS ARE LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE INDENTURE (DEFINED HEREIN) AND, EXCEPT FROM SUCH SOURCE, NONE OF THE AUTHORITY, THE COMMONWEALTH, THE CITY OR ANY POLITICAL SUBDIVISION THEREOF SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS OR ANY COSTS INCIDENTAL THERETO. THE BONDS DO NOT, DIRECTLY, INDIRECTLY OR CONTINGENTLY, OBLIGATE, IN ANY MANNER, THE COMMONWEALTH, THE CITY OR ANY POLITICAL SUBDIVISION THEREOF TO LEVY ANY TAX OR TO MAKE ANY APPROPRIATION FOR PAYMENT OF THE BONDS OR ANY COSTS INCIDENTAL THERETO. NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH, THE CITY, OR ANY POLITICAL SUBDIVISION THEREOF, NOR THE FAITH AND CREDIT OF THE AUTHORITY, SHALL BE PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON, THE BONDS OR ANY COSTS INCIDENTAL THERETO. THE AUTHORITY HAS NO TAXING POWER.

Reference is hereby made to the Indenture for a description of the rights, duties and obligations of the Authority, the Trustee and the Holders of the Bonds, the terms upon which the Bonds are issued, a description of the property and interests pledged for the payment of the Bonds, the relative claims of the various Series of Bonds against such property and interests, the terms upon which such property and interest are pledged and the terms and conditions upon which the Bonds will be deemed to be paid, at or prior to maturity or redemption of the Bonds, if any, upon the making of provision for the payment thereof in the manner set forth in the Indenture. The terms and provisions contained in the Indenture are hereby incorporated herein by reference and the Holder of this Bond, by purchase hereof, assents to all of such terms and provisions.

The Bonds are being issued for the purpose of providing financing for the acquisition of a long-term leasehold interest in, rehabilitation and equipping of a senior residential rental housing project as described in the Indenture (the "Project"), to make deposits to a debt service reserve fund established with respect to the Bonds, and to pay costs in connection with the issuance of the Bonds. The proceeds of the Bonds are being used by the Authority to finance a loan ("Loan") by the Authority to Pavilion Apartments Penn LLC (the "Borrower"), pursuant to a Loan Agreement dated as of July 1, 2016 (as amended and supplemented from time to time, the "Loan Agreement") between the Authority and the Borrower. Pursuant to the Loan Agreement, the Borrower is obligated to make payments sufficient to pay principal of, premium, if any, and interest on the Bonds, which obligation is evidenced by a promissory note (the "Note"). The liability of the Borrower under the Loan Agreement is limited as provided therein.

The Loan is secured by a leasehold mortgage lien on and security interest in the Project (the "Mortgage").

The Bonds are subject to optional and mandatory redemption as provided for in the Indenture.

Reference is hereby made to the Indenture and the Loan Agreement, copies of which are on file with the Trustee, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties and obligations of the Authority, the Borrower, the Trustee and the Holders of the Bonds, the terms upon which this Bond is issued, and the terms and conditions upon which this Bond will be deemed to be paid, at or prior to maturity or prepayment of this Bond, upon the making of provision for the payment hereof in the manner set forth in the Indenture, to all of the terms and conditions of which

the Holder of this Bond hereby assents.  The Holder of this Bond, by the acceptance hereof, is deemed to have agreed and consented to the terms and provisions of the Indenture and the Loan Agreement.

It is hereby certified, recited and declared that all acts, conditions and things required by the Act and laws of the Commonwealth to exist, to have happened and to have been performed, precedent to and in the execution and delivery of the Indenture and the issuance of this Bond, do exist, have happened and have been performed in regular and due form as required by law.

Neither the members of the Governing Body of the Authority nor any person executing this Bond shall be personally liable on this Bond or be subject to any personal liability or accountability by reason of the issuance of this Bond.

This Bond will not be entitled to any security or benefit under the Indenture, or be valid or become obligatory for any purpose, until the Trustee has authenticated this Bond by the execution of the Certificate of Authentication inscribed hereon.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Authority has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of an authorized officer, and has caused its seal or a facsimile thereof to be reproduced hereon.

**PHILADELPHIA AUTHORITY FOR
INDUSTRIAL DEVELOPMENT**

By: _____
Name:
Title:

[Signature Page of Series 2016A Bond]

A-4

CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the Indenture referred to herein.

Date of Authentication: _____

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
as Trustee

By: _____
Name:

Authorized Signatory

A-5

## ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

(Please print or typewrite Name and Address,
including Zip Code, and Federal Taxpayer Identification or
Social Security Number of Assignee)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints

_____

Attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature guaranteed by:

| | |
|---|---|
| NOTICE: Signature must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank or trust company. | NOTICE: The signature to this Assignment must correspond with the name as it appears on the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever. |

A-6

**EXHIBIT B**

**[FORM OF SERIES 2016B BOND]**

NOTICE:  Unless this certificate is presented by an authorized representative of The Depository Trust Company to the Authority or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co. or such other name as requested by an authorized representative of The Depository Trust Company and any payment is made to Cede & Co., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL since the registered owner hereof, Cede & Co., has an interest herein.

BR-_____                                                                                                     $_____

**PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT**
**SENIOR HOUSING REVENUE BONDS**
**(THE PAVILION),**
**SUBORDINATE SERIES 2016B**

| Maturity Date: | Dated Date: | Interest Rate: | CUSIP No.: |
|---|---|---|---|
| _____ 1, 20_____ | _____ 1, 20_____ | _____% | _____ |

REGISTERED OWNER:  CEDE & CO.
PRINCIPAL AMOUNT:

The PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT (together with its successors and assigns, the "Authority"), a public body corporate and politic organized and existing under the laws of the Commonwealth of Pennsylvania (the "Commonwealth"), for value received, promises to pay, subject to the provisions hereof and of the Indenture, to the Registered Owner named above on the Maturity Date specified above, or upon earlier redemption as described herein, the Principal Amount shown above and to pay interest on the unpaid principal amount hereof at the Interest Rate specified above until payment of the principal or redemption price hereof has been made.  Interest on this Bond is payable on each June 1 and December 1, commencing December 1, 2016 (each such date being hereinafter referred to as an "Interest Payment Date") and on any other date on which payment of principal of this Bond is due.  Interest hereon will be computed on the basis of a 360-day year of twelve 30-day months.  Any term used herein as a defined term but not defined herein shall be as defined in the Indenture (hereinafter defined).

This Bond is payable in lawful money of the United States of America.  The principal of and premium, if any, on this Bond is payable at the Designated Office of the Trustee, initially in Dallas, Texas, upon presentation and surrender of this Bond.

This Bond is one of a duly authorized issue of revenue bonds of the Authority, aggregating $_____ in principal amount, designated as "Philadelphia Authority for Industrial Development Senior Housing Revenue Bonds (The Pavilion), Subordinate Series 2016B" (the "Series 2016B Bonds").  Simultaneously with the issuance of the Series 2016B Bonds, the Authority is issuing $_____ aggregate principal amount of its Senior Housing Revenue Bonds (The Pavilion), Series 2016A (the "Series 2016A Bonds").  The Series 2016A Bonds and the Series 2016B Bonds are collectively referred

B-1

to as the "Bonds," and each as a "Series." The Bonds are issued pursuant to a Trust Indenture dated as of July 1, 2016 (as amended and supplemented from time to time, the "Indenture"), between the Authority and Wilmington Trust, National Association, as trustee (the "Trustee").

THE BONDS ARE LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE INDENTURE (DEFINED HEREIN) AND, EXCEPT FROM SUCH SOURCE, NONE OF THE AUTHORITY, THE COMMONWEALTH, THE CITY OR ANY POLITICAL SUBDIVISION THEREOF SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS OR ANY COSTS INCIDENTAL THERETO.  THE BONDS DO NOT, DIRECTLY, INDIRECTLY OR CONTINGENTLY, OBLIGATE, IN ANY MANNER, THE COMMONWEALTH, THE CITY OR ANY POLITICAL SUBDIVISION THEREOF TO LEVY ANY TAX OR TO MAKE ANY APPROPRIATION FOR PAYMENT OF THE BONDS OR ANY COSTS INCIDENTAL THERETO. NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH, THE CITY, OR ANY POLITICAL SUBDIVISION THEREOF, NOR THE FAITH AND CREDIT OF THE AUTHORITY, SHALL BE PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON, THE BONDS OR ANY COSTS INCIDENTAL THERETO. THE AUTHORITY HAS NO TAXING POWER.

Reference is hereby made to the Indenture for a description of the rights, duties and obligations of the Authority, the Trustee and the Holders of the Bonds, the terms upon which the Bonds are issued, a description of the property and interests pledged for the payment of the Bonds, the relative claims of the various Series of Bonds against such property and interests, the terms upon which such property and interest are pledged and the terms and conditions upon which the Bonds will be deemed to be paid, at or prior to maturity or redemption of the Bonds, if any, upon the making of provision for the payment thereof in the manner set forth in the Indenture.  The terms and provisions contained in the Indenture are hereby incorporated herein by reference and the Holder of this Bond, by purchase hereof, assents to all of such terms and provisions.

The Bonds are being issued for the purpose of providing financing for the acquisition of a long-term leasehold interest in, rehabilitation and equipping of a residential rental housing project as described in the Indenture (the "Project"), to make deposits to a debt service reserve fund established with respect to the Bonds, and to pay costs in connection with the issuance of the Bonds.  The proceeds of the Bonds are being used by the Authority to finance a loan ("Loan") by the Authority to Pavilion Apartments Penn LLC (the "Borrower"), pursuant to a Loan Agreement dated as of July 1, 2016 (as amended and supplemented from time to time, the "Loan Agreement") between the Authority and the Borrower. Pursuant to the Loan Agreement, the Borrower is obligated to make payments sufficient to pay principal of, premium, if any, and interest on the Bonds, which obligation is evidenced by a promissory note (the "Note").  The liability of the Borrower under the Loan Agreement is limited as provided therein.

The Loan is secured by a leasehold mortgage lien on and security interest in the Project (the "Mortgage").

The Bonds are subject to optional and mandatory redemption as provided for in the Indenture.

Reference is hereby made to the Indenture and the Loan Agreement, copies of which are on file with the Trustee, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties and obligations of the Authority, the Borrower, the Trustee and the Holders of the Bonds, the terms upon which this Bond is issued, and the terms and conditions upon which this Bond will be deemed to be paid, at or prior to maturity or prepayment of this Bond, upon the making of provision for the payment hereof in the manner set forth in the Indenture, to all of the terms and conditions of which

B-2

the Holder of this Bond hereby assents.  The Holder of this Bond, by the acceptance hereof, is deemed to have agreed and consented to the terms and provisions of the Indenture and the Loan Agreement.

It is hereby certified, recited and declared that all acts, conditions and things required by the Act and laws of the Commonwealth to exist, to have happened and to have been performed, precedent to and in the execution and delivery of the Indenture and the issuance of this Bond, do exist, have happened and have been performed in regular and due form as required by law.

Neither the members of the Governing Body of the Authority nor any person executing this Bond shall be personally liable on this Bond or be subject to any personal liability or accountability by reason of the issuance of this Bond.

This Bond will not be entitled to any security or benefit under the Indenture, or be valid or become obligatory for any purpose, until the Trustee has authenticated this Bond by the execution of the Certificate of Authentication inscribed hereon.

[Remainder of page intentionally left blank]

PHI 317575632v7

IN WITNESS WHEREOF, the Authority has caused this Bond to be executed in its name and on its behalf by the manual or facsimile signature of an authorized officer, and has caused its seal or a facsimile thereof to be reproduced hereon.

PHILADELPHIA AUTHORITY FOR
INDUSTRIAL DEVELOPMENT

By: _____
Name:
Title:

[Signature Page of Series 2016B Bond]

B-4

CERTIFICATE OF AUTHENTICATION

This Bond is one of the Bonds described in the Indenture referred to herein.

Date of Authentication: _____

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Trustee

By:     _____
Name:
                Authorized Signatory

B-5

PHI 317575632v7

## ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

(Please print or typewrite Name and Address,
including Zip Code, and Federal Taxpayer Identification or
Social Security Number of Assignee)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints

_____

Attorney to register the transfer of the within Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature guaranteed by:

| |
|---|
| NOTICE: Signature must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank or trust company. |

| |
|---|
| NOTICE: The signature to this Assignment must correspond with the name as it appears on the face of the within Bond in every particular, without alteration or enlargement or any change whatsoever. |

PHI 317575632v7