# Exhibit B

**LOAN AGREEMENT**

Dated as of July 1, 2016

by and between

**PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT**

and

**PAVILION APARTMENTS PENN LLC**

as Borrower

Relating to

$27,410,000
Philadelphia Authority for Industrial Development
Senior Housing Revenue Bonds
(The Pavilion)
Series 2016A

And

$2,205,000
Philadelphia Authority for Industrial Development
Senior Housing Revenue Bonds
(The Pavilion)
Subordinate Series 2016B

The interest of the Philadelphia Authority for Industrial Development in this Loan Agreement (except for the Reserved Rights) has been assigned to Wilmington Trust, National Association (the "Trustee") under the Trust Indenture of even date herewith, and is subject to the security interest of the Trustee.

**TABLE OF CONTENTS**

Page

RECITALS ....................................................................................................................1

ARTICLE I DEFINITIONS AND INTERPRETATION.................................................2

    Section 1.1    Definitions. ......................................................................................2
    Section 1.2    Rules of Construction. ....................................................................2

ARTICLE II REPRESENTATIONS...............................................................................3

    Section 2.1    Representations and Covenants of the Authority. .........................3
    Section 2.2    Representations and Covenants of the Borrower. ..........................3
    Section 2.3    Special Purpose Entity Covenants...................................................6
    Section 2.4    Special Arbitrage Certifications. .....................................................7
    Section 2.5    Tax Exempt Status of Tax-Exempt Bonds. .....................................7
    Section 2.6    Land Use Restriction Agreement. ....................................................8

ARTICLE III ISSUANCE OF BONDS; LOAN TO BORROWER; RELATED OBLIGATIONS.............9

    Section 3.1    Issuance of Series 2016 Bonds; Deposit of Proceeds....................9
    Section 3.2    The Loan; Basic Loan Payments; and Additional Payments. ................9
    Section 3.3    Obligations Unconditional; Limited Recourse. ..............................12
    Section 3.4    Assignment of Authority's Rights....................................................13
    Section 3.5    Amounts Remaining in Funds. ........................................................13
    Section 3.6    Borrower Required To Pay if Project Fund Insufficient. .................13
    Section 3.7    Security for Payments Under the Bonds. .........................................13
    Section 3.8    Warranty of Title..............................................................................14
    Section 3.9    Title Insurance..................................................................................14
    Section 3.10   Borrower's Covenants Regarding Title............................................14
    Section 3.11   Limited Obligation of Issuer ...........................................................15

ARTICLE IV THE PROJECT ........................................................................................16

    Section 4.1    Acquisition of the Project.................................................................16
    Section 4.2    Disbursement of Project Fund. ........................................................16
    Section 4.3    Operating Expenses..........................................................................16
    Section 4.4    Rate Covenant; Coverage. ...............................................................17
    Section 4.5    Failure To Meet Rate Covenant; Retention of Management Consultant. ...........17
    Section 4.6    Maintenance and Modification of Project; Removal of Equipment....................18
    Section 4.7    Management of the Project................................................................20
    Section 4.8    Forbearance and Subordination of Fees. .........................................20
    Section 4.9    Taxes and Impositions......................................................................21
    Section 4.10   Utilities. ............................................................................................22
    Section 4.11   Hazardous Waste Covenant. ............................................................22
    Section 4.12   Needs Assessment Analysis. ...........................................................23
    Section 4.13   HAP Contract. ..................................................................................23

ARTICLE V INSURANCE; DAMAGE, DESTRUCTION AND CONDEMNATION; USE OF
NET PROCEEDS.....................................................................................................25

    Section 5.1    Required Insurance...........................................................................25
    Section 5.2    Delivery of Insurance Policies; Payment of Premiums....................26

i

Section 5.3       Insurance Proceeds. Casualty and Condemnation............................................27
Section 5.4       Disbursement of Insurance Proceeds and Condemnation Awards.......................28
Section 5.5       Report of Insurance Consultant; Insurance Commercially Unavailable. ............30
Section 5.6       Obligation to Continue Payments..........................................................................30
Section 5.7       Insufficiency of Net Proceeds................................................................................30
Section 5.8       Cooperation of Authority and Trustee....................................................................31

ARTICLE VI OTHER AGREEMENTS ......................................................................................32

Section 6.1       Assignment, Selling and Leasing. .........................................................................32
Section 6.2       Continued Existence. .............................................................................................33
Section 6.3       Indemnification. .....................................................................................................33
Section 6.4       Recording and Filing. .............................................................................................34
Section 6.5       Nonrecourse to Representatives of Authority. .......................................................35
Section 6.6       Amendment of Borrower's Documents ..................................................................35
Section 6.7       Financial Statements and Reports. .........................................................................35
Section 6.8       Budget. ...................................................................................................................36
Section 6.9       Notices of Certain Events.......................................................................................37
Section 6.10      Inspection of Project Books; Right of Access.......................................................37
Section 6.11      Other Indebtedness.................................................................................................37
Section 6.12      Advances By Trustee...............................................................................................39
Section 6.13      Continuing Disclosure............................................................................................39
Section 6.14      Related Party Transactions.....................................................................................39
Section 6.15      Purchase of Tax-Exempt Bonds. ...........................................................................39
Section 6.16      Release of Certain Land and Subordination; Granting of Easements. .................40

ARTICLE VII DEFAULTS AND REMEDIES...........................................................................42

Section 7.1       Defaults. .................................................................................................................42
Section 7.2       Notice of Default: Opportunity to Cure.................................................................43
Section 7.3       Remedies. ...............................................................................................................43
Section 7.4       No Remedy Exclusive.............................................................................................44
Section 7.5       Attorney's Fees and Expenses................................................................................45
Section 7.6       No Additional Waiver Implied by One Waiver. ....................................................45
Section 7.7       Authority's Rights Not Impaired. ..........................................................................45

ARTICLE VIII OPTIONS TO TERMINATE AGREEMENT....................................................46

Section 8.1       Grant of Option To Terminate................................................................................46
Section 8.2       Exercise of Option To Terminate............................................................................46

ARTICLE IX MISCELLANEOUS ............................................................................................48

Section 9.1       Confidential Information........................................................................................48
Section 9.2       Entire Agreement. ..................................................................................................48
Section 9.3       Notices....................................................................................................................48
Section 9.4       Assignments. ..........................................................................................................48
Section 9.5       Severability..............................................................................................................48
Section 9.6       Execution of Counterparts......................................................................................48
Section 9.7       Rights of Trustee ....................................................................................................48
Section 9.8       Amendments, Changes and Modifications.............................................................48
Section 9.9       Governing Law........................................................................................................48
Section 9.10      Term of Agreement .................................................................................................48
Section 9.11      No Liability of Authority's Officers.......................................................................49
Section 9.12      Receipt of and Compliance With Indenture. ..........................................................49

ii

Section 9.13   Usury; Total Interest..........................................................................49
Section 9.14   Survival. ..........................................................................................50
Section 9.15   Tax Agreement Controls. ..................................................................50

EXHIBIT A     Description of the Project and Property Description  ................................. A-1
EXHIBIT B     Form of Requisition  .............................................................................B-1
EXHIBIT C     Form of Release Certificate ..................................................................C-1
EXHIBIT D     Form of Multifamily Promissory Note.....................................................D-1
EXHIBIT E     Form of Disbursement Request for Operating Expenses.............................E-1

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of July 1, 2016 (this "Loan Agreement"), is by and between the **PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT** (together with its successors and assigns, the "Authority") a public body corporate and politic organized under the Act (as defined in the Indenture defined below) and **PAVILION APARTMENTS PENN LLC**, a Pennsylvania limited liability company (the "Borrower"), the sole member of which is JPC Charities, an Ohio nonprofit corporation (the "Sole Member") described in Section 501(c)(3) of the Code (as defined in the Indenture described below) and exempt from federal income taxation under Section 501(a) of the Code, and its successors and assigns.

### RECITALS:

**WHEREAS,** the Borrower has requested the assistance of the Authority to finance the acquisition of a long-term leasehold interest in, and the renovation and equipping of, a 295-unit multifamily residential rental housing facility located in the City of Philadelphia, Pennsylvania (the "City"), known as The Pavilion Apartments (the "Project"); and

**WHEREAS,** in order to provide such assistance, the Authority has provided for the issuance, pursuant to a Trust Indenture dated the date hereof (the "Indenture"), between the Authority and Wilmington Trust, National Association, as trustee (the "Trustee") of the Series 2016 Bonds consisting of the Series 2016A Bonds and the Series 2016B Bonds, all as identified in the Indenture; and

**WHEREAS,** under and pursuant to this Loan Agreement, the Authority will lend the proceeds of the Series 2016 Bonds to the Borrower and the Borrower is obligated to make loan payments in amounts sufficient to pay the principal of, premium, if any, and interest on the Series 2016 Bonds; and

**WHEREAS,** in order to evidence the obligation to make loan payments sufficient to pay the principal of, premium, if applicable, and interest on the Series 2016 Bonds pursuant to this Loan Agreement, the Borrower has agreed to execute and deliver to the Authority and endorse to the Trustee its promissory note in an original principal amount equal to the aggregate principal amount of the Series 2016 Bonds, in substantially the form attached hereto as *Exhibit D* (the "Series 2016 Note");

**NOW, THEREFORE,** for and in consideration of the mutual agreements hereinafter contained, and for other consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

[Remainder of page intentionally left blank]

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

**Section 1.1**     **Definitions.**  All capitalized terms used herein and defined in the Indenture shall have the meanings ascribed to them in the Indenture.

**Section 1.2**     **Rules of Construction.**  In this Loan Agreement, unless the context otherwise requires:

(a)     The singular form of any word used herein, including the terms defined in Section 1.01 of the Indenture, shall include the plural, and vice versa.  The use herein of a word of any gender shall include correlative words of all genders.

(b)     Unless otherwise specified, references to Articles, Sections and other subdivisions of this Loan Agreement are to the designated Articles, Sections and other subdivisions of this Loan Agreement as originally executed.  The words "hereof," "herein," "hereunder" and words of similar import refer to this Loan Agreement as a whole.

(c)     The headings or titles of the several articles and sections, and the table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect of the provisions hereof.

(d)     The parties acknowledge that each party to this Loan Agreement and their respective counsel has participated in the drafting and revision of this Loan Agreement and the other Bond Documents. Accordingly, the parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Loan Agreement, any of the other Bond Documents or any amendment or supplement or exhibit hereto or thereto.

[End of Article I]

## ARTICLE II

## REPRESENTATIONS

**Section 2.1      Representations and Covenants of the Authority.**   The Authority represents and covenants that:

(a)      The Authority a body corporate and politic of the Commonwealth.  Pursuant to a resolution adopted by the Governing Body of the Authority, the Authority has authorized the execution and delivery of the Bonds, the Indenture and the other Bond Documents to which it is a party, and the performance by the Authority of all of its obligations hereunder and under the other Bond Documents to which it is a party.

(b)      The Authority has complied with all of the provisions of the laws of the Commonwealth relating to the Bond Documents, including the Act, and has full power and authority to consummate all transactions contemplated by the Bonds, the Bond Documents and any and all other agreements relating thereto, and to perform all of its obligations hereunder and thereunder.

(c)      The Bond Documents to which it is a party constitute valid, legally binding and enforceable obligations of the Authority (subject to bankruptcy, insolvency or creditor's rights laws generally, and principles of equity generally).

(d)      The Authority has not pledged and covenants that it will not pledge the amounts derived from this Loan Agreement other than to secure the Bonds (except for Reserved Rights, which the Authority retains).

(e)      The Authority hereby directs Bond Counsel to duly and timely file Internal Revenue Form 8038 which shall contain the information required to be filed pursuant to Section 149 of the Code.

**Section 2.2      Representations and Covenants of the Borrower.**

The Borrower hereby represents and covenants as follows:

(a)      The Borrower is a limited liability company created and existing under the laws of the Commonwealth, is in good standing and is duly qualified to transact business in the Commonwealth, is not in violation of any provision of its Organizational Documents, has power to enter into the Borrower's Documents and has duly authorized the execution and delivery of the Borrower's Documents.

(b)      Neither the execution and delivery of the Borrower's Documents, the consummation of the transactions contemplated hereby and thereby, nor the fulfillment of or compliance with the terms and conditions thereof conflict with or result in a breach of the terms, conditions, or provisions of the Borrower's Organizational Documents or any restriction or any agreement or instrument to which the Borrower is now a party or by which the Borrower is bound, or constitutes a default under any of the foregoing, or results in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of the property or assets of the Borrower under the terms of any instrument or agreement.  The Borrower agrees to fully and faithfully comply with and perform under the terms and conditions of the Borrower's Documents.

3

(c)     There is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, pending or, to the best knowledge of the Borrower, threatened against or affecting the Borrower, nor to the best of the knowledge of the Borrower is there any basis therefor, wherein an unfavorable decision, ruling, or finding would materially and adversely affect the transactions contemplated by the Bond Documents or which would adversely affect, in any way, the validity or enforceability of the Bonds or the Bond Documents or any material agreement or instrument to which the Borrower is a party used or contemplated for use in the consummation of the transactions contemplated hereby.

(d)     The Borrower will not take or permit to be taken any action which would have the effect, directly or indirectly, of subjecting interest on any of the Tax-Exempt Bonds to federal income taxation.

(e)     The Borrower will use due diligence to cause the Project to be acquired, renovated, equipped, and operated in accordance with the laws, rulings, regulations and ordinances of the Commonwealth and the departments, agencies and political subdivisions thereof. The Borrower has obtained or will cause to be obtained all requisite approvals of the Commonwealth and of other federal, State, regional and local governmental bodies for the acquisition, rehabilitation, equipping and operation of the Project. The Borrower has good title to the Project.

(f)     The Borrower agrees to fully and faithfully perform all the duties and obligations which the Authority has covenanted and agreed in the Indenture to cause the Borrower to perform and any duties and obligations which the Borrower or the Authority is required by the Indenture to perform. The foregoing shall not apply to any duty or undertaking of the Authority which by its nature cannot be delegated or assigned.

(g)     The Borrower agrees to provide to the Authority all information necessary to enable the Authority to complete and file all forms and reports required by the laws of the Commonwealth and the Code in connection with the Project and the Bonds.

(h)     The Borrower acknowledges, represents and warrants that it understands the nature and structure of the transactions relating to the financing of the Project; that it is familiar with the provisions of all of the documents and instruments relating to such financing to which it or the Authority is a party or of which it is a beneficiary; that it understands the risks inherent in such transactions, including without limitation the risk of loss of the Project; and that it has not relied on the Authority for any guidance or expertise in analyzing the financial or other consequences of such financing transactions or otherwise relied on the Authority in any manner except to issue the Bonds in order to provide funds to lend to the Borrower.

(i)     The Borrower represents that the Sole Member, which is the Borrower's sole member, is an organization described in Section 501(c)(3) of the Code and that the Sole Member is an Ohio nonprofit corporation. The Borrower represents that the Sole Member has received a determination from the Internal Revenue Service to the effect that it is described in Section 501(c)(3) of the Code, that such determination has not been modified, limited or revoked, that the Sole Member was and is in compliance with all terms, conditions, and limitations, if any, contained in such determination applicable to it, that the facts and circumstances which form the basis of such determination as represented to the Internal Revenue Service continue substantially to exist, including, specifically, with regard to the acquisition, rehabilitation, equipping and operation of the Project, and that the Sole Member is exempt from federal income taxation under Section 501(a) because it is an organization described in Section 501(c)(3) of the Code. The

4

Borrower and the Sole Member agree that they shall not perform any acts or enter into any agreement which shall adversely affect the Sole Member's federal income tax status nor shall either carry on or permit to be carried on at the Project or permit the Project to be used in or for any trade or business or by any person if such activity would generate unrelated trade or business income that would adversely affect the federal income tax status of interest on the Bonds or if such activity would adversely affect the Sole Member's federal income tax status under Section 501(c)(3) of the Code.

(j)     The Borrower is a single asset limited liability company and was and will continue to be organized for the sole purpose of owning and operating the Project, has not and will not engage in any business transaction unrelated to the ownership of the Project, and has not and will not have any other assets than those related to the Project.

(k)     The Borrower and the Sole Member agree that they shall not perform any acts or enter into any agreement which shall adversely affect the Sole Member's federal income tax status nor shall either carry on or permit to be carried on at the Project or permit the Project to be used in or for any trade or business or by any person if such activity would generate unrelated trade or business income that would adversely affect the federal income tax status of interest on the Tax-Exempt Bonds or if such activity would adversely affect the Sole Member's federal income tax status under Section 501(c)(3) of the Code.

(l)     The Borrower (i) has no knowledge of any material liability that has been incurred or is expected to be incurred by the Borrower that is or remains unsatisfied for any taxes or penalties with respect to any employee benefit plan, within the meaning of Section 3(3) of ERISA, or any "plan," within the meaning of Section 4975(e)(1) of the Internal Revenue Code or any other benefit plan (other than a multiemployer plan) maintained, contributed to, or required to be contributed to by the Borrower or by any entity that is under common control with the Borrower within the meaning of ERISA Section 4001(a)(14) (a "Plan") or any plan that would be a Plan but for the fact that it is a multiemployer plan within the meaning of ERISA Section 3 (37); and (ii) has made and shall continue to make when due all required contributions to all such Plans, if any. Each such Plan has been and will be administered in compliance with its terms and the applicable action shall be taken or fail to be taken that would result in the disqualification of loss of tax-exempt status of any such Plan intended to be qualified and/or tax-exempt.

(m)     The Borrower has no known material contingent liabilities.

(n)     The Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement, or other agreement or instrument to which the borrower is a party or by which the Borrower or the Project is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Project and other than obligations under the Mortgage, the Ground Lease and the other Bond Documents.

(o)     The Borrower has not borrowed or received other debt financing that has not been heretofore repaid in full.

(p)     The Borrower is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation that purports to restrict or regulate its ability to borrow money.

(q)     The Project is not located in a flood hazard area as defined by the Federal Insurance Administration.

(r)     There is no proceeding threatened or pending for the total or partial condemnation, appropriation, or recapture of any material portion of the Project that would materially affect such Borrower's performance under the Borrower's Documents, or the use, value, or operation of the Project.

(s)     All security deposits collected in connection with the Project are being and will be held (i) in accordance with all applicable laws and (ii) in a segregated eligible account.

(t)     To the Borrower's knowledge, the Project is (a) free and clear of any damage that would materially and adversely affect the use or value of the Project as security for the Loan, (b) in good repair and condition so as not to materially and adversely affect the use or value of the Project as security for the Loan, and (c) all building systems contained therein are in good working order so as not to materially and adversely affect the use or value of the Project as security for the Loan.

(u)     The Project constitutes one or more separate tax parcels.

(v)     Each component of the Project is, or when acquired will be, located within the limits of the Authority.

(w)     All material information given by the Borrower to the Authority concerning the Project and the Borrower and any related parties to the Borrower was and is on the date of execution of this Loan Agreement true and correct.

(x)     The Permitted Encumbrances do not and will not materially and adversely affect (1) the ability of the Borrower to pay in full the principal and interest on the Note in a timely manner or (2) the use of the Project for the use currently being made thereof, the operation of the Project as currently being operated or the value of the Project.

(y)     The Project has adequate rights of access to public ways and is served by utilities, including, without limitation, adequate water, sewer, electricity, gas, telephone, sanitary sewer, and storm drain facilities. All public utilities necessary to the continued use and enjoyment of the Project as presently used and enjoyed are located in the public right-of-way abutting the Project, and all such utilities are connected so as to serve the Project without passing over other property. All roads necessary for the full utilization of the Project for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities or are the subject of access easements for the benefit of the Project.

(z)     Except as disclosed in the title insurance policy, there are no pending or, to the knowledge of the Borrower, proposed special or other assessments for public improvements or otherwise affecting the Project, nor, to the knowledge of the Borrower, are there any contemplated improvements to the Project that may result in such special or other assessments.

**Section 2.3     Special Purpose Entity Covenants.**

The Borrower agrees as follows:

(a)     To maintain books and records separate from any other person or entity.

6

(b)     To maintain its accounts separate from any other person or entity.

(c)     Not to commingle its assets with those of any other entity.

(d)     To conduct its own business in its own name.

(e)     To maintain separate financial statements.

(f)     To pay its own liabilities out of its own funds.

(g)     To observe all material business organization formalities.

(h)     To pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations.

(i)     Not to guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of others.

(j)     Not to acquire obligations of its partners, members or shareholders.

(k)     To allocate fairly and reasonably any overhead for shared office space.

(l)     To use separate stationery, invoices and checks.

(m)     Not to pledge its assets for the benefit of any other entity or make any loans or advances to any entity.

(n)     To hold itself out as a separate entity.

(o)     To correct any known misunderstanding regarding its separate identity.

**Section 2.4     Special Arbitrage Certifications.**  The Authority covenants not to knowingly cause or direct any money on deposit in any Fund or Account under the Indenture to be used in a manner which would cause the Tax-Exempt Bonds to be classified as "arbitrage bonds" within the meaning of Section 148 of the Code, and the Borrower certify and covenant to and for the benefit of the Authority and the Holders that so long as there are any Tax-Exempt Bonds Outstanding, money on deposit in any Fund or Account under the Indenture in connection with the Tax-Exempt Bonds, whether such money was derived from the proceeds of the sale of the Tax-Exempt Bonds or from any other source, will not be used in a manner which will cause the Tax-Exempt Bonds to be classified as "arbitrage bonds" within the meaning of Section 148 of the Code. In furtherance of this covenant, the Authority, the Borrower and the Sole Member have entered into the Tax Agreement and covenant to comply with all of the terms and conditions thereof.

**Section 2.5     Tax Exempt Status of Tax-Exempt Bonds.**  The Borrower hereby represents, warrants and agrees that it will not take or permit, or omit to take or cause to be taken, any action that would adversely affect the exclusion from gross income of the recipients thereof of the interest on the Tax-Exempt Bonds for federal income tax purposes and, if they should take or permit, or omit to take or cause to be taken, any such action, the Borrower shall take or cause to be taken all lawful actions necessary to rescind or correct such actions or omissions promptly upon having knowledge thereof. In furtherance of this covenant, the Authority, the Borrower and the Sole Member have entered into the Tax Agreement and covenant to comply with all of the terms and conditions thereof.

7

**Section 2.6     Land Use Restriction Agreement.**  In order to maintain the exclusion of interest on the Tax-Exempt Bonds from gross income for purposes of federal income taxation and to assure compliance with the Act and certain additional requirements of the Authority, the Borrower hereby agrees that it shall, concurrently with or before the execution and delivery of the Bonds, execute and deliver and cause to be recorded the Land Use Restriction Agreement with respect to the Project. The Borrower shall comply with the terms of the Land Use Restriction Agreement. The Borrower agrees to cause any amendments to the Land Use Restriction Agreement to be recorded in the appropriate official public records.

[End of Article II]

*PHI 317575633v5*

## ARTICLE III

### ISSUANCE OF BONDS; LOAN TO BORROWER;
### RELATED OBLIGATIONS

**Section 3.1     Issuance of Series 2016 Bonds; Deposit of Proceeds.**  To provide funds to assist the Borrower in financing the Project, the Authority, concurrently with the execution and delivery of this Loan Agreement, and upon satisfaction of the conditions to the delivery of the Series 2016 Bonds set forth in Section 2.07 of the Indenture, will issue, sell and deliver the Series 2016 Bonds and will deposit the proceeds of the Series 2016 Bonds with the Trustee in accordance with Section 5.02 of the Indenture.

**Section 3.2     The Loan; Basic Loan Payments; and Additional Payments.**

(a)     The Loan.  The Authority agrees, upon the terms and conditions herein, to lend to the Borrower the proceeds received by the Authority from the sale of the Series 2016 Bonds by causing such proceeds to be deposited with the Trustee for disposition as provided in the Indenture. The obligation of the Authority to make the Loan shall be deemed fully discharged upon the deposit of the proceeds of the Series 2016 Bonds with the Trustee. The Loan shall be evidenced by the Series 2016 Note.

(b)     Deposit of Project Revenues; Loan Payments; Basic Loan Payments; and Additional Loan Payments. The Borrower shall cause all Project Revenues to be deposited with the Trustee upon receipt by the Borrower or the Manager.  In addition, the Borrower shall instruct the HAP Administrator or other appropriate party to deposit the revenues generated pursuant to the HAP Contract to be wired directly from the HAP Administrator to the Trustee for deposit into the Revenue Fund.  The Project Revenues shall be used to pay the Basic Loan Payments and the Additional Loan Payments, as provided in this Section 3.2(b), in such lawful money of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

(i)     Basic Loan Payments.  The Project Revenues shall be used to pay, as Basic Loan Payments, the following amounts:

(1)     on or before the 12th day of each month, commencing July 12, 2016, until such time as the principal of and the premium, if any, and interest on, the Bonds shall have been paid in full, or provisions made for such full payment in accordance with the provisions of the Indenture, to the Trustee for deposit in the Interest Account in the Bond Fund provided for in the Indenture, a sum equal to the Interest Requirement on then Outstanding Bonds for such month; and

(2)     on or before the 12th day of each month, commencing July 12, 2016, to the Trustee for deposit in the Principal Account in the Bond Fund, a sum equal to the Principal Requirement on then Outstanding Bonds for such month.

The monthly installments of Basic Loan Payments described in (1) and (2) above payable by the Borrower under this Loan Agreement shall in any event be equal in the aggregate to an amount that, with other funds in the respective Accounts in the Bond Fund then available for the payment of principal and interest on the Bonds, shall be sufficient to provide for the payment in full of the interest on, premium, if any, and principal on the Bonds as they become due and payable.

9

Except as otherwise provided in the Indenture, the Project Revenues shall also be used to pay, as Basic Loan Payments, to the Trustee for deposit in the Bond Fund, such amounts as shall, together with any other money available therefor, be sufficient to pay all amounts, if any, required to redeem each Series of Bonds pursuant to the provisions of Article III of the Indenture as and when they become subject to redemption pursuant thereto, together with any related redemption premium associated therewith, with all such payments to be made by the Borrower to the Trustee, for deposit into the Bond Fund Accounts on or before the date such money is required by said provisions of the Indenture.

(ii)     Additional Loan Payments.    The Borrower shall cause the Project Revenues to be remitted to the Trustee from time to time in amounts fully sufficient to timely pay, in addition to the Basic Loan Payments, the following costs and expenses (to the extent such costs and expenses are not paid from the proceeds of the sale of the Bonds), which are the Additional Loan Payments:

(1)     the Ordinary Trustee's Fees and Expenses and Extraordinary Trustee's Fees and Expenses, and all other fees and other costs of the Trustee, including without limitation, reasonable fees and expenses of counsel to the Trustee, payable to the Trustee for services or indemnity under the Indenture and the Borrower's Documents (including services in connection with the administration and enforcement thereof and compliance therewith);

(2)     all fees and other costs incurred for services of such agents, attorneys and independent accountants as are employed by the Authority, the Borrower, the Sole Member or the Trustee to perform services required pursuant to this Loan Agreement, the other Borrower's Documents or the Indenture;

(3)     the Authority's Fees and Expenses and all other fees and costs of the Authority, including without limitation reasonable fees and expenses of counsel to the Authority, not otherwise paid under this Loan Agreement, the Land Use Restriction Agreement or the Indenture, related to the issuance of the Bonds or in connection with its administration and enforcement of, and compliance with or interpretation of, the Indenture or any of the Borrower's Documents, or otherwise in connection with the Project and the Bonds;

(4)     all amounts advanced by the Authority or the Trustee under authority of the Indenture or any of the Borrower's Documents that the Borrower is obligated to repay;

(5)     any amounts required to be deposited in the respective Debt Service Reserve Accounts in order to satisfy the applicable Debt Service Reserve Requirement pursuant to Section 5.04 of the Indenture; and should funds be withdrawn from a Debt Service Reserve Account, the Borrower shall restore the difference between the amount on deposit in the applicable Debt Service Reserve Account and the related Debt Service Reserve Requirement from the next available deposits of Project Revenues and other deposits to the Revenue Fund made in accordance with the Indenture;

(6)     amounts sufficient to maintain balances in the Repair and Replacement Fund, the Insurance and Tax Escrow Fund and the Operations and Maintenance Reserve Fund, equal to the amounts required pursuant to the Indenture;

(7)    all fees and expenses of the Rebate Analyst to provide the rebate calculations required under the Tax Agreement, and if a deposit is required to be made to the Rebate Fund as a result of any calculation made pursuant to the Tax Agreement, the Borrower shall cause to be paid from Project Revenues the amount of such deposit in accordance with the terms of the Indenture;

(8)    amounts required to be deposited in the Operating Fund sufficient to pay the Operating Expenses of the Project, as provided for in the Budget and in the Indenture;

(9)    the Dissemination Agent Fee payable in accordance with and as provided under the Indenture and Continuing Disclosure Agreement;

(10)    the Rating Agency Fee; and

(11)    the costs and expenses associated with any audit of the Tax-Exempt Bonds by the Internal Revenue Service.

(iii)    <u>Revenue Fund</u>.  As security for its obligations to make the payments required in subsections (i) and (ii) above, the Borrower shall pay (or cause the Manager or HUD to pay) all Project Revenues from the Project to the Trustee for deposit in the Revenue Fund in accordance with the first paragraph of this Section 3.2(b).

All Additional Loan Payments shall be made by the Borrower to the Trustee for deposit by the Trustee into the Revenue Fund, to be used by the Trustee for payment to the Person or Persons entitled to such payments and in the order specified in Section 5.04 of the Indenture.

(iv)    <u>Miscellaneous</u>.  In the event the Borrower shall fail to pay, or fail to cause to be paid, any Loan Payments as required by this Section 3.2(b) (except to the extent amounts due under Section 3.2(b) are paid from amounts on deposit in the Debt Service Reserve Fund, the Repair and Replacement Fund or the Surplus Fund), the payment not paid shall continue as an obligation hereunder of the Borrower until the unpaid amount shall have been fully paid, and the Borrower shall pay, or cause to be paid, the same with interest thereon from the date of non-payment until the date so paid at the Default Rate. The requirement that interest be paid at the Default Rate shall be in addition to and not in lieu of any other remedy that may exist for the failure of the Borrower to make the payments required in this Section 3.2.

(c)    <u>Default</u>.  Upon occurrence of a Default and except as may be provided herein or in the Indenture, the Trustee shall apply, or cause to be applied, all Project Revenues and any sums or amounts received pursuant to this Loan Agreement, including but not limited to payment under any policy of insurance, or as rents or income of the Project or otherwise, to the payment of principal and interest of the Bonds or other amounts payable under the Indenture in such manner and order as the Trustee is permitted under the Indenture. The receipt, use or application of any such sums by the Trustee hereunder shall not be construed to affect any of the rights or powers of the Trustee under the terms of the Bond Documents or any of the obligations of the Borrower under the Bond Documents.

The Borrower shall pay, or cause to be paid, in accordance with the terms of this Section 3.2, the Loan Payments without any further notice thereof.

11

The Borrower shall be permitted to distribute, free and clear of any and all liens or encumbrances on, or right to recovery of, such funds hereunder, to the Sole Member or any other Person any funds properly disbursed to the Borrower from the Surplus Fund subject to the terms and provisions of the Indenture.

**Section 3.3     Obligations Unconditional; Limited Recourse.**   The obligations of the Borrower to make the payments required in Section 3.2 and other Sections hereof and to perform and observe the other agreements contained herein shall be absolute and unconditional and shall not be subject to any defense or any right of setoff, counterclaim or recoupment arising out of any breach by the Authority or the Trustee of any obligation to the Borrower whether hereunder or otherwise, or out of any Indebtedness or liability at any time owing to the Borrower by the Authority or the Trustee. Until such time as the principal of, premium, if any, and interest on the Bonds, and any costs incidental thereto, shall have been fully paid or provision for the payment thereof shall have been made in accordance with the Indenture, the Borrower (a) will not suspend or discontinue any payments provided for in Section 3.2 hereof, (b) will perform and observe all other agreements contained in this Loan Agreement, and (c) except as provided in Article VIII hereof, will not terminate this Loan Agreement for any cause, including, without limiting the generality of the foregoing, failure of the Borrower to complete the acquisition, rehabilitation and equipping of the Project, the occurrence of any acts or circumstances that may constitute failure of consideration, destruction of or damage to the Project, the taking by eminent domain of title to or temporary use of any or all of the Project, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the Commonwealth or any political subdivision of either or any failure of the Authority or the Trustee to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with this Loan Agreement or otherwise.

Nothing contained in this Section shall be construed to release the Authority from the performance of any of the agreements on its part herein contained, and in the event the Authority or the Trustee fails to perform any such agreement on its part, the Borrower may institute such action against the Authority or the Trustee as the Borrower may deem necessary to compel performance so long as such action does not abrogate the obligations of the Borrower contained in the first sentence of this Section. The Borrower may, at their own cost and expense and in their name with proper notice to the Authority, prosecute or defend any action or proceeding or take any other action involving third persons which the Borrower deem reasonably necessary in order to secure or protect the Borrower's right of possession, occupancy and use of the Project, and in such event the Authority hereby agrees to cooperate fully with the Borrower, at the Borrower's sole cost and expense and to take all action necessary to effect the substitution of the Borrower for the Authority in any such action or proceeding if the Borrower shall so request.

Notwithstanding the foregoing or any other provision or obligation to the contrary contained in this Loan Agreement or any other Bond Document, with the exception of any and all indemnities provided in the Bond Documents, which such indemnities shall be a general obligation of the Borrower, (a) the liability of the Borrower under this Loan Agreement and the other Bond Documents to any person or entity, including, but not limited to, the Trustee or the Authority and their successors and assigns, is limited to the Borrower's interest in the Project, the Project Revenues and the amounts held in the Funds and Accounts created under the Indenture or other Bond Documents or any rights of the Borrower under any guarantees relating to the Project, and such persons and entities shall look exclusively thereto, to such other security as may from time to time be given for the payment of obligations arising out of this Loan Agreement or any other agreement securing the obligations of the Borrower under this Loan Agreement; and (b) from and after the date of this Loan Agreement, no deficiency or other personal judgment, nor any order or decree of specific performance (other than pertaining to this Loan Agreement, any agreement pertaining to the Project or any other agreement securing the Borrower's obligations under this Loan

12

Agreement), shall be rendered against the Borrower nor any member of the Borrower, the assets of the Borrower (other than the Borrower's interest in the Project, this Loan Agreement, amounts held in the Funds and Accounts created under the Indenture, any rights of the Borrower under the Bond Documents, their officers, directors or members (including specifically the Sole Member) or their respective heirs, personal representatives, successors, transferees assigns, as the case may be, in any action or proceeding arising out of this Loan Agreement and the Indenture or any agreement securing the obligations of the Borrower under this Loan Agreement, or any judgment, order or decree rendered pursuant to any such action or proceeding.

**Section 3.4    Assignment of Authority's Rights.**  As security for the payment of the Bonds, the Authority in the Indenture assigns to the Trustee certain of the Authority's rights under this Loan Agreement, including the right to receive payments hereunder (except for any deposits to the Rebate Fund and the Reserved Rights), and the Borrower hereby assent to such assignment and agree to make payments directly to the Trustee, without defense or set off by reason of any dispute between the Borrower and the Authority or the Trustee. By virtue of such assignment and certain obligations of the Borrower to the Trustee, the Authority shall have no obligation to, and instead the Trustee shall have the right without further direction from the Authority, to enforce the obligations of the Borrower hereunder (except for the Reserved Rights), subject to the limitations hereof, including the limitations in Section 3.3.

**Section 3.5    Amounts Remaining in Funds.**  It is agreed by the parties hereto that after (a) payment in full of the Bonds, or provision for such payment having been made as provided in the Indenture, (b) payment of all reasonable fees, charges and expenses of the Trustee in accordance with the terms of the Indenture, and (c) payment of all other amounts required to be paid under this Loan Agreement and the Indenture, any amounts remaining in the Funds and Accounts held by the Trustee under the Indenture, subject to the application of money in the Rebate Fund as provided in the Tax Agreement, shall be applied by the Trustee as provided in Section 5.16 of the Indenture. The Authority shall have no claim to such amounts.

**Section 3.6    Borrower Required To Pay if Project Fund Insufficient.**  In the event the money in the Project Fund available for payment of the amounts described in Section 5.03 of the Indenture is insufficient to pay such amounts in full, the Borrower agrees to pay such insufficiency. The Authority does not make any warranty, either express or implied, that the money which will be paid into the Project Fund and which, under the provisions of this Loan Agreement, will be available for payment of the Costs of the Project, will be sufficient to pay all the costs which will be incurred in that connection. The Borrower agrees that if, after exhaustion of the money in the Project Fund, the Borrower pay any portion of the such Costs of the Project pursuant to the provisions of this Section, they will not be entitled to any reimbursement therefor from the Authority or from the Trustee or from the Holders of any of the Bonds, nor will they be entitled to any diminution of the loan payments payable under Section 3.2 hereof. The obligation of the Borrower to complete the acquisition and renovation of the Project will survive any termination of this Loan Agreement.

**Section 3.7    Security for Payments Under the Bonds.**  Contemporaneously with the issuance of the Series 2016 Bonds, as security for the payment of the Bonds, the Authority will execute and deliver the Indenture, under the terms of which all of the right, title, interest, and remedies of the Authority in this Loan Agreement (except the Reserved Rights), the Series 2016 Note and the Mortgage, together with all revenues and amounts to be received and all property to be held by the Authority thereunder, will be assigned and will be the subject of a grant of a security interest to the Trustee and will be pledged as security for, among other things, the payment of the Bonds. The Borrower hereby consent to such assignment and grant of a security interest and hereby agrees that their obligations to make all payments under this Loan Agreement will be absolute and will not be subject to any defense, except payment, or to any right of setoff, counterclaim, or recoupment arising out of any breach by the Authority

13

of any obligation to the Borrower, whether hereunder or otherwise, or arising out of any Indebtedness or liability at any time owing to the Borrower by the Authority. The Borrower further agrees that all Basic Loan Payments required to be made under this Loan Agreement will be paid directly to the Trustee for the account of the Authority. The Trustee will have all rights and remedies herein accorded to the Authority (except for the Reserved Rights), but shall not have assumed any obligation of the Authority hereunder or under any of the Bond Documents, and any reference herein to the Authority will be deemed, with the necessary changes in detail, to include the Trustee, and the Trustee and the Bondholders are deemed to be and are third party beneficiaries of the representations, covenants, and agreements of the Borrower (but not any obligation of the Authority) herein contained. Pursuant to the Indenture, the lien on the real property included in the Project and the security interest in the personal property included in the Project granted to the Authority (if any) pursuant to the Mortgage will be assigned to the Trustee as security for the payment of the Bonds.

**Section 3.8     Warranty of Title.**  The Borrower warrant that (a) simultaneously with the issuance of the Series 2016 Bonds, the Borrower holds or will acquire, good and indefeasible leasehold title to the Mortgaged Property, (b) the Borrower is or will be the legal owner of all real and personal property included in the Project and (c) the Project is and will be free from all adverse claims, security interests, and encumbrances, other than Permitted Encumbrances.

**Section 3.9     Title Insurance.**  The Borrower, prior to or simultaneously with the issuance of the Series 2016 Bonds, will furnish the Title Policy to the Trustee and the Underwriter. The Borrower will furnish within the time limit specified in any binder an original of the Title Policy to the Trustee. The mortgagee's Title Policy will insure that the Trustee has a valid lien on the real property described in Exhibit "A" to the Mortgage subject only to Permitted Encumbrances. There will be deleted from the Title Policy the standard exceptions for discrepancies, encroachments, overlaps, conflicts in boundary lines, servitudes, shortages in area, or other matters which would be disclosed by an accurate survey and inspection of the Mortgaged Property, for mechanics' and materialmen's liens, or for rights or claims of parties in possession and easements or claims of easements not shown by the public records. The Title Policy will contain the standard zoning endorsement and will not contain an exception for matters shown by a current survey. In lieu of the standard zoning endorsement, the Borrower may provide an opinion of Independent Counsel to the effect that the Project are properly zoned or evidence of proper zoning from appropriate government officials. Any Net Proceeds payable either to the Trustee or the Borrower under the Title Policy will be subject to the lien of the Indenture, and held by the Trustee in the Project Fund, and, at the Borrower's written direction, will be either (a) used to acquire or construct replacement or substitute property for that to which title has been lost, provided that the Borrower receive prior written consent from the Trustee and a Favorable Opinion of Bond Counsel that such action will not affect the excludability of interest from income of the Tax-Exempt Bonds, or (b) used to redeem Bonds pursuant to Section 3.01 of the Indenture. Any proceeds of the Title Policy remaining after the Bonds are no longer Outstanding will be paid to the Borrower. The Trustee has no duty to review the Title Policy to determine the sufficiency thereof.

**Section 3.10     Borrower's Covenants Regarding Title.**  The Borrower agrees, at its sole expense, to protect, preserve, and defend its interest in the Project and its title thereto, to appear and defend such interest and title in any action or proceeding affecting or purporting to affect the Project, the liens of the Mortgage thereon, or any of the rights of the Trustee thereunder, and to pay on demand all costs and expenses reasonably incurred by the Trustee in or in connection with any such action or proceeding, including reasonable attorneys' fees, whether any such action or proceeding progresses to judgment and whether brought by or against the Trustee. The Trustee will be reimbursed for any such costs and expenses in accordance with the provisions of Section 6.3 hereof. If the Borrower does not take the action contemplated herein, the Trustee or the Authority may, but will not be under any obligation to, appear or intervene in any such action or proceeding and retain counsel therein and defend the same or

14

otherwise take such action therein as it may be advised and may settle or compromise the same and, in that behalf and for any of such purposes, may expend and advance such sums of money as it may deem necessary, and such sums will be an advance payable in accordance with Section 6.12 hereof.

       **Section 3.11   Limited Obligation of Authority.**   The Bonds and the interest thereon are special, limited obligations of the Authority payable solely from the Trust Estate (other than Reserved Rights). The Bonds shall not be deemed to constitute a debt or liability of the Commonwealth, the City or of any political subdivision thereof within the meaning of any state constitutional provision or statutory limitation and shall not constitute a pledge of the faith and credit of the Commonwealth, the City or of any political subdivision thereof, but shall be payable solely from the funds provided for herein and in the Loan Agreement. The issuance of the Bonds shall not, directly, indirectly or contingently obligate the Commonwealth, the City or any political subdivision thereof to levy any taxes or to make any appropriation for their payment. The Authority has no taxing power.

       **Section 3.13   Limited Liability of Authority.**   The liability of the Authority under this Loan Agreement shall be enforceable solely from the Trust Estate and there shall be no other recourse against any other assets of the Authority.

[End of Article III]

## ARTICLE IV

## THE PROJECT

**Section 4.1    Acquisition of the Project.** The Borrower's interest in any land, buildings and equipment acquired with the proceeds of the Bonds or amounts deposited in the Project Fund shall be a part of the Project, shall belong to and be the property of the Borrower, and shall be subject to this Loan Agreement. The Borrower agree that it will acquire the Project immediately upon issuance of the Bonds, substantially in accordance with the descriptions set forth in Exhibit A hereto, and the Borrower agrees to use its best efforts to cause the acquisition of the Project to be completed as of the Closing Date and rehabilitation and equipping of the Project to be completed as soon as practicable and with all reasonable dispatch following the Closing Date.

**Section 4.2    Disbursement of Project Fund.** Amounts in the Project Fund shall be disbursed by the Trustee as provided in the Indenture, upon delivery by the Borrower to the Trustee of a requisition, substantially in the form attached hereto as Exhibit B, executed by the Borrower's Representative setting forth the nature of the amounts to be paid and the name of the payee and certifying that the amounts being paid are Costs of the Project. The execution of each requisition submitted for disbursements by the Borrower shall constitute the certification, warranty, and agreement of the particular Borrower as follows:

(a)    the Project is free and clear of all liens and encumbrances except Permitted Encumbrances;

(b)    all evidence, statements, and other writings required to be furnished under the terms of this Loan Agreement and the Indenture are true and omit no material fact, the omission of which may make them misleading;

(c)    all monies previously disbursed from the Project Fund have been used solely to pay for Costs of the Project, and the Borrower has written evidence to support this item of warranty;

(d)    none of the items for which payment is requested have formed the basis for any payment previously made from the Project Fund; and

(e)    all bills for labor, materials, and fixtures used, or on hand and to be used, in the rehabilitation or equipping of the Project has been paid.

**Section 4.3    Operating Expenses.** The Borrower agrees to pay when due all Operating Expenses. The Borrower agrees to review and approve invoices for Operating Expenses on a timely basis. The Borrower's Representative, the Asset Manager or the Manager shall be entitled to request in writing, in the form attached hereto as Exhibit E, the disbursement from the Operating Fund of the monthly Operating Requirements by the Trustee to fund the costs of operating the Project as provided pursuant to Section 5.08 of the Indenture.

The Borrower shall establish and maintain the Operating Account in a federally insured financial institution. Money provided to the Borrower from the Operating Fund pursuant to Section 5.08 of the Indenture shall be held in the Operating Account and used by the Borrower, the Asset Manager or the Manager to pay Operating Expenses. On each Interest Payment Date, amounts on deposit in the Borrower's Property Operating Account in excess of the amount needed to pay or be reserved to pay actual Operating Expenses shall be transferred by the Borrower to the Trustee for deposit in the Revenue Fund. Any balance in the Operating Account at such time that transfers from the Operating Fund to the

Operating Account are not permitted pursuant to Section 5.08 of the Indenture shall be promptly transferred by the Borrower to the Trustee for deposit in the Operating Fund.

If actual Operating Expenses and other actual disbursements with respect to the Project in any month exceed amounts budgeted therefor for that month, the Borrower's Representative, the Asset Manager or the Manager may requisition from the Operations and Maintenance Reserve Fund or the Surplus Fund the amount of such excess in the manner provided in Section 5.09 or Section 5.13, respectively, of the Indenture. However, if there are two such requests by the Borrower, the Asset Manager or the Manager in any fiscal quarter that are in excess of 10% of the amounts budgeted therefor in any month, then (i) the Borrower must notify the Trustee, the Underwriter and the Rating Agency; and (ii) the Borrower must prepare or cause the Manager or the Asset Manager to prepare a report that describes the reasons for the additional expenses and the circumstances surrounding the additional expenses.

If the Borrower ascertains that the actual expenses with respect to the Project in any month will continue to exceed amounts budgeted therefor for that month, then the Borrower will prepare or cause the Manager or the Asset Manager to prepare a revised Budget for the Project for the upcoming 12-month period which reflects the actual Operating Expenses in connection with the Project.

**Section 4.4     Rate Covenant; Coverage.**  The Borrower shall fix, charge and collect, or cause to be fixed, charged and collected rents, fees and charges in connection with the operation and maintenance of the Project such that for each Fiscal Year, ending on or after December 31, 2017, the Debt Service Coverage Ratio will not be less than the applicable Coverage Test, determined as of the end of each such Fiscal Year based on and supported by Audited Financial Statements.

**Section 4.5     Failure To Meet Rate Covenant; Retention of Management Consultant.**  If the Coverage Test in any Fiscal Year ending on or after December 31, 2017, as set forth in the certificate delivered pursuant to Section 6.7(a) hereof, is not satisfied, the Borrower shall retain a Management Consultant. Payment of the fees of the Management Consultant shall be deemed an Operating Expense. The Management Consultant shall prepare recommendations with respect to the operations of the Project and the sufficiency of the rates, fees and charges imposed by the Borrower.

The Management Consultant's report shall (a) include the projection of the Project Revenues, Operating Expenses and Net Income Available for Debt Service on a quarterly basis for not less than the next two Fiscal Years, and (b) make such recommendations to the Borrower as the Management Consultant believes are appropriate to enable the Borrower to increase the Debt Service Coverage Ratio to satisfy the Coverage Test for the current calendar year. If, in the judgment of the Management Consultant, it is not possible for the Borrower to meet such requirements, the report of the Management Consultant shall so indicate and shall project the Debt Service Coverage Ratio which could be achieved if the recommendations of the Management Consultant are followed. Continuous retention of a Management Consultant during the years that are the subject of the Management Consultant's report shall not be required, however, if the Borrower Representative delivers a certificate to the Trustee, within 45 days after the end of each calendar quarter, setting forth the actual results for such quarter (which may be based on unaudited financial statements) and such results show that the Debt Service Coverage Ratio is projected by the Management Consultant is being met. The Borrower shall, to the extent lawful and feasible and consistent with the preservation of the Sole Member's 501(c)(3) status and compliance with the Land Use Restriction Agreement, follow the recommendations of the Management Consultant.

Failure of the Borrower to satisfy the Coverage Test covenant constitutes a Default under this Loan Agreement only if (a) the Borrower fails to engage the Management Consultant or, (b) to the extent that the Rating Agency agrees with such recommendations, the Borrower fails to implement its

17

reasonable recommendations, to the extent possible and to the extent consistent with the charitable mission of the Sole Member, as required by this Loan Agreement.

**Section 4.6      Maintenance and Modification of Project; Removal of Equipment.**  The Borrower agrees that during the term of this Loan Agreement it will at its own expense (i) keep the Project in a safe condition, (ii) keep the buildings and all other improvements forming a part of the Project in good repair and in good operating condition, making from time to time, subject to the provisions of this Section 4.6, all necessary and proper repairs thereto and renewals and replacements thereof, including external and structural repairs, renewals, and replacements, and (iii) use the Equipment in the regular course of its business only, within the normal capacity of the Equipment, without abuse, and in a manner contemplated by the manufacturer thereof.  The Borrower may, also at its own expense, from time to time make any Modifications to the Project it may deem desirable for its business purposes that do not, in the opinion of an Independent Architect filed with the Trustee, adversely affect the operation or value of the Project, and provided further, that such Modifications (other than any modifications made to the Project with the proceeds of the Bonds) shall not cause the Debt Service Coverage Ratio to fall below the required Coverage Test for any Series of Bonds. Modifications to the Project so made by the Borrower will be on the Mortgaged Property, will become a part of the Project, and will become subject to the lien of the Mortgage. Any contract for such Modifications which is in an amount in excess of $500,000 will be made only by a contractor who furnishes performance and labor and material payment bonds in the full amount of such contract, made by the contractor thereunder as the principal and a surety company or companies rated "A" or higher by A. M. Best & Company, Inc. Such bonds must name the Borrower, the Authority, and the Trustee as obligees, and all Net Proceeds received under such bonds will be paid over to the Trustee and deposited in the Project Fund to be applied to the completion of the Modifications. Such money held by the Trustee in the Project Fund will be invested from time to time, as provided in Article VI of the Indenture.

The Borrower will execute a conditional assignment directing the architect who has prepared any plans and specifications for any Modifications to make available to the Trustee a complete set of the plans and specifications, which assignment will be effective only upon an Event of a Default hereunder by the Borrower. Each construction contract executed by the Borrower for construction of any Modifications must contain a provision that, or by separate agreement such contractors must agree that, upon an Event of Default by the Borrower hereunder and foreclosure under the Mortgage, such contracts with the contractors and/or subcontractors will be deemed assigned to the Trustee for the benefit of the Holders. The Borrower covenants to include such conditional assignments in all contracts and subcontracts executed for work to be performed on the Mortgaged Property.

The Borrower further agrees that at all times during the construction of Modifications (other than any modifications made to the Project with the proceeds of the Bonds) which cost in excess of $100,000, the construction contract for such Modifications must be on a "fixed" or "guaranteed maximum price" basis and the Borrower must maintain or cause to be maintained in full force and effect Builder's Risk-Completed Value Form insurance to the full insurable value of such Modifications. The Borrower will not permit any mechanics' or materialmen's or other statutory liens to be perfected or remain against the Project for labor or materials furnished in connection with any Modifications so made by the Borrower, provided that it will not constitute an Event of Default hereunder upon such lien being filed, if the Borrower notifies promptly the Trustee, in writing, of any such liens, and the Borrower in good faith and in accordance with applicable law contests promptly such liens in the same manner as is provided for the contest of Impositions in Section 4.9 hereof; and in such event the Borrower may permit the items so contested to remain undischarged and unsatisfied during the period of such contest and any appeal therefrom.

18

The Borrower will not do or permit others under its control to do any work in or about the Project or related to any repair, rebuilding, restoration, replacement, alteration of, or addition to the Project, or any part thereof, unless the Borrower has first procured and paid for all requisite municipal and other governmental permits and authorizations. All such work must be done in a good and workmanlike manner and in compliance with all applicable building, zoning, and other laws, ordinances, governmental regulations, and requirements and in accordance with the requirements, rules, and regulations of all insurers under the policies required to be carried under the provisions of Article V hereof.

If no Event of Default under this Loan Agreement has happened and is continuing, in any instance where the Borrower in its discretion determines that any items of Equipment or parts thereof have become inadequate, obsolete, worn out, unsuitable, undesirable, or unnecessary, the Borrower may remove such items of Equipment or parts thereof from the Mortgaged Property and sell, trade in, exchange, or otherwise dispose of them (as a whole or in part) without any responsibility or accountability to the Authority therefor, provided that the Borrower will:

(a)     Substitute and install anywhere in the Project items of replacement equipment or related property having equal or greater value or utility (but not necessarily having the same function) in the operation of the Project for the purpose for which it is intended, provided such removal and substitution will not impair the nature of the Project, all of which replacement equipment or related property will be free of all liens, security interests, and encumbrances (other than Permitted Encumbrances), will become subject to the security interest of the Mortgage, and will be held by the Borrower on the same terms and conditions as the items originally constituting Equipment, or

(b)     In the case of: (i) the sale of any such Equipment, (ii) the trade-in of such Equipment for other machinery, furnishings, equipment, or related property not to become part of the Equipment and subject to the security interest of the Mortgage, or (iii) any other disposition thereof, the Borrower will pay to the Trustee the proceeds of such sale or disposition or an amount equal to the credit received upon such trade-in for deposit into the applicable Special Redemption Account of the Bond Fund. In the case of the sale, trade-in, or other disposition of any such Equipment to the Borrower, or an Affiliate, the Borrower will pay to the Trustee an amount equal to the greater of the amounts and credits received therefor or the fair market value thereof at the time of such sale, trade-in, or other disposition (as certified by the Borrower, with evidence of the basis therefor) for deposit into the applicable Special Redemption Account of the Bond Fund.

Except to the extent that amounts are deposited into the Bond Fund as provided in the preceding subsection (b), the removal from the Project of any portion of the Equipment pursuant to the provisions of this Section will not entitle the Borrower to any abatement or diminution of the Basic Loan Payments payable under Section 3.2 hereof.

If prior to such removal and disposition of items of Equipment from the buildings and the Mortgaged Property, the Borrower has acquired and installed machinery, furnishings, equipment, or related property with its own funds which become part of the Equipment and subject to the security interest of the Indenture and the Mortgage and which have equal or greater utility, but not necessarily the same functions, as the Equipment to be removed, the Borrower may take credit to the extent of the amount so spent by it against the requirement that it either substitute and install other machinery and equipment having equal or greater value or that it make payment to the Trustee for deposit into the applicable Special Redemption Account of the Bond Fund.

19

The Borrower will promptly provide written notice to the Trustee regarding each such removal, substitution, sale, or other disposition referred to in subsection (b) of this Section and will pay to the Trustee such amounts as are required by the provisions of subsection (b) of this Section to be paid promptly into the Bond Fund after the sale, trade-in, or other disposition requiring such payment; provided, that no such report and payment need be made until the amount to be paid into the applicable Special Redemption Account of the Bond Fund on account of all such sales, trade-ins, or other dispositions not previously reported in the aggregate has a value of at least $50,000. All amounts deposited in the Bond Fund pursuant to this Section 4.6 will be used to redeem Bonds pursuant to Section 3.02 of the Indenture on the earliest date Bonds can be redeemed at par. The Borrower will not remove, or permit the removal of, any of the Equipment from the buildings or Mortgaged Property except in accordance with the provisions of this Section 4.6. The Trustee is not responsible for verifying or validating any amounts received pursuant to this Section 4.6.

**Section 4.7    Management and Asset Management of the Project.**  The Borrower shall initially retain the Asset Manager identified in the Indenture to provide asset management services with respect to the Project pursuant to the Asset Management Agreement.  The fees of the Asset Manager and any Manager shall be payable solely from available money in the Revenue Fund established in the Indenture and from other money of the Borrower.  No Person shall be engaged by the Borrower as the Asset Manager or the Manager (other than the initial Manager named in the Indenture) unless such Person or a principal officer (or in the case of a limited liability company, manager) thereof (a) shall have at least 5 years of demonstrated experience in the management and leasing or, in the case of the Asset Manager, asset management services of affordable residential rental housing facilities, including having (or in the case of such an officer or manager, overseeing) not less than 500 units under management subject to restrictions similar to those contained in the Land Use Restriction Agreement and (b) shall have its employees bonded for not less than the $500,000 as required by Section 5.1(h) hereof. The Borrower shall instruct the Manager that all Project Revenues collected by the Manager shall be remitted to the Trustee not later than three Business Days following receipt thereof. In the event any Management Agreement is terminated, the Borrower shall manage the Project itself until such time as it can engage a qualified successor Manager to manage the Project in accordance with the provisions of this Section. The Borrower shall so engage a successor Manager or Asset Manager on the earliest practicable date. Any successor Management Agreement shall have substantially the same terms, and fee structure as the Management Agreement originally entered into with the Manager identified in the Indenture, and shall be subject to the provision of Section 4.8 hereof regarding forbearance of fees. Prior to entering into a contract with any successor Manager or Asset Manager, the Borrower must first deliver to the Trustee (i) a Favorable Opinion of Bond Counsel regarding the proposed Management Agreement or Asset Management Agreement and (ii) a certificate of the proposed successor manager or asset manager stating that it has reviewed, understands, and will comply with the restrictions contained in a Land Use Restriction Agreement and the Indenture.

**Section 4.8    Forbearance and Subordination of Fees.**  The Borrower hereby agrees that it, the Sole Member, and any Manager or Asset Manager which is an Affiliate of the Borrower or the Sole Member, shall forbear from taking any management, administration, development or other fees, or any portions thereof, in the event and to the extent that money in the Revenue Fund are insufficient in any month to make all current and deferred deposits (other than deposits to the Surplus Fund) provided in the Indenture, and that the payment of such fees be made and in accordance with Section 5.04 of the Indenture. The Borrower agrees that any Management Agreement or Asset Management Agreement entered into with respect to the Project during the term of this Loan Agreement shall be subject to this Section and shall contain provisions consistent herewith.

20

**Section 4.9    Taxes and Impositions.**

(a)    Subject to paragraph (c) of this Section 4.9, the Borrower agrees to pay, prior to delinquency, all real property taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever, which are assessed or imposed upon the Project, or become due and payable, and which create, may create or appear to create a lien upon the Project, or any part thereof, or upon any personal property, equipment or other facility used in the operation or maintenance thereof (all of which taxes, assessments and other governmental and non-governmental charges of like nature are hereinafter referred to as "Impositions"); provided, however, that if, by law, any such Imposition is payable, or may at the option of the taxpayer be paid, in installments, the Borrower may pay the same together with any accrued interest on the unpaid balance of such Imposition in installments as the same become due and before any fine, penalty, interest or cost may be added thereto for the nonpayment of any such installment and interest. Payments made by the Trustee on behalf of the Borrower from funds held under the Indenture in the Insurance and Tax Escrow Fund shall, to the extent of such payments, discharge the Borrower's obligations hereunder.

(b)    If at any time after the date hereof there shall be assessed or imposed (i) a tax or assessment on the Project in lieu of or in addition to the Impositions payable by the Project pursuant to subparagraph (a) hereof or (ii) a license fee, tax or assessment imposed on the Trustee and measured by or based, in whole or in part, upon the amount of the outstanding Note, then all such taxes, assessments or fees shall be deemed to be included within the term "Impositions," as defined in subparagraph (a) hereof, and the Borrower shall pay and discharge the same as herein provided with respect to the payment of Impositions.

(c)    Subject to the applicable State law provisions, the Borrower shall have the right before any delinquency occurs to contest or object to the amount or validity of any Imposition by appropriate legal proceedings, but this shall not be deemed or construed in any way as relieving, modifying, or extending the Borrower's covenant to pay any such Imposition at the time and in the manner provided in this Section 4.9, unless the Borrower has given prior written notice to the Trustee of the Borrower's intent to so contest or object to an Imposition, and unless, at the Trustee's sole option, (i) the Borrower shall demonstrate to the Trustee's satisfaction that the legal proceedings shall conclusively operate to prevent the sale of the Project, or any part thereof, to satisfy such Imposition prior to final determination of such proceedings; (ii) the Borrower shall furnish a good and sufficient bond or surety in the amount of such Impositions; or (iii) the Borrower shall have provided a good and sufficient undertaking as may be required or permitted by law to accomplish a stay of such proceedings.

(d)    The Borrower shall deposit with the Trustee amounts sufficient to pay the annual Impositions as set forth in the Budget to be next due on the Project, in accordance with the provisions of the Indenture. The Borrower further agrees to cause all bills, statements or other documents relating to Impositions to be sent or mailed directly to the Trustee. Upon receipt of such bills, statements or other documents, and provided the Borrower has deposited sufficient funds pursuant to this Section 4.9(d), the Trustee shall, so long as no Event of Default has occurred, pay such amounts as may be due thereunder out of the funds so deposited. If any time and for any reason the funds so deposited are or will be insufficient to pay such amounts as may then or subsequently be due, the Trustee shall notify the Borrower, and the Borrower shall immediately deposit an amount equal to such deficiency with, or as directed by, the Trustee. If the Borrower fails to deposit sums sufficient to fully pay such Impositions at least 30 days before delinquency thereof, the Trustee may, at the Trustee's election, but without any obligation to do so, advance any amounts required to make up the deficiency from the Revenue Fund, which

21

advances, if any, shall be secured by the Mortgage and shall be repayable to the Trustee as herein elsewhere provided.

(e)     The Borrower covenants and agrees not to suffer, permit or initiate the joint assessment of the real and personal property or any other procedure whereby the lien of the real property taxes and the lien of the personal property taxes shall be assessed, levied or charged to the related Project as a single lien.

**Section 4.10     Utilities.**  The Borrower shall pay, or cause to be paid, when due, all utility charges which are incurred for the benefit of the Project or which may become a charge or lien against the Project for gas, electricity, water or sewer services furnished to the Project and all other taxes, assessments or charges of a similar nature, whether public or private, affecting the Project or any portion thereof, whether or not such taxes, assessments or charges are liens thereon.

**Section 4.11     Hazardous Waste Covenant.**  In addition to and without limitation of all other representations, warranties and covenants made by the Borrower under this Loan Agreement, the Borrower further represents, warrants and covenants that the Borrower will not use Hazardous Substances on, from or affecting the Project in any manner which violates Environmental Laws, and that to the best of the Borrower's knowledge, no tenant, subtenant, prior tenant or prior subtenant or the Ground Lessor have used Hazardous Substances on, from, or affecting the Project in any manner which violates any Environmental Law. Without limiting the foregoing, the Borrower shall not cause or permit the Project or any part thereof to be used to generate, manufacture, refine, transport, treat, store, handle, dispose of, transfer, produce or process Hazardous Substances, except in compliance with all Environmental Laws, nor shall the Borrower cause or knowingly permit, as a result of any intentional act or omission on the part of the Borrower or any tenant or subtenant, a release of Hazardous Substances onto the Project. The Borrower shall comply with and require compliance by all tenants and subtenants and the Ground Lessor with all Environmental Laws and shall obtain and comply with, and require that all tenants and subtenants obtain and comply with, any and all approvals, registrations or permits required thereunder. The Borrower shall conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other action required by a governmental authority under any applicable Environmental Law to clean up and remove all Hazardous Substances on, from or affecting the Project in accordance with all applicable federal, State and local laws, ordinances, rules and regulations. The Borrower shall defend, indemnify and hold harmless the Authority, the Underwriter, and the Trustee from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, contingent or otherwise, arising out of, or in any way related to, (a) the presence, disposal, release or threatened release of any Hazardous Substances which are on or from the Project which affect the soil, water, vegetation, buildings, personal property, persons, animals or otherwise, (b) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substances on or from the Project, and/or (c) any violation of laws, orders, regulations, requirements or demands of government authorities, or written requirements of the Authority and the Trustee, which are based upon or in any way related to such Hazardous Substances, including, without limitation, reasonable attorney and consultant fees, investigation and laboratory fees, court costs and litigation expenses. In the event the Project is foreclosed upon, or a deed in lieu of foreclosure is tendered, the Borrower shall deliver the Project in a manner and condition that shall conform with all applicable federal, state and local laws, ordinances, rules or regulations affecting the Project. The provisions of this paragraph shall be in addition to any and all other obligations and liabilities the Borrower may have to the Authority and the Trustee at common law or under the Bond Documents, and shall survive the termination of this Loan Agreement and defeasance of the Bonds.

22

The indemnifications and protections set forth in this Section shall be extended to any of the respective directors, officers, employees, agents and persons under the control or supervision of the Authority, the Trustee and the Underwriter, respectively.

Anything to the contrary in this Loan Agreement notwithstanding, the covenants of the Borrower contained in this Section shall remain in full force and effect after the termination of this Loan Agreement and the defeasance of the Bonds until the later of (a) the expiration of the period stated in the applicable statute of limitations during which a claim or cause of action may be brought and (b) payment in full or the satisfaction of such claim or cause of action and of all expense and charges incurred by the Authority or the Trustee relating to the enforcement of the provisions herein specified.

For the purposes of this Section, the Borrower shall not be deemed an employee, agent or servant of the Authority or person under the Authority's control or supervision.

Section 4.12    Needs Assessment Analysis.    The Borrower will contract for a Needs Assessment Analysis to be prepared with respect to the Project every 5 years from the date of this Loan Agreement and then will submit copies of the report to the Trustee and the Rating Agency. The Needs Assessment Analysis must be conducted and prepared by a consulting engineer that in the objective and reasonable opinion of the Borrower, is experienced in conducting needs assessment analysis for multifamily residential rental Projects. Each Needs Assessment Analysis shall identify the major maintenance requirements (including the replacement of machinery and appliances), for the next 5 years and the estimated costs thereof and include recommendations for (a) the monthly amount to be deposited to the Repair and Replacement Fund and (b) the Replacement Reserve Requirement. The Borrower shall revise the Replacement Reserve Requirement (and advise the Trustee in writing of the revised Replacement Reserve Requirement) based on the recommendation of the consulting engineer and the Borrower shall promptly implement any recommendations contained in each Needs Assessment Analysis to the maximum extent practicable.

Section 4.13    HAP Contract.

(a)    The Borrower agrees to (i) comply with the terms and provisions of the HAP Contract; (ii) allow all renewal options of the HAP Contract to go into effect automatically as provided therein and waive the right to cancel the HAP Contract to the extent necessary to keep the HAP Contract in force for the term of the HAP Contract; (iii) apply promptly for "Special Additional Adjustments" of "Contract Rents" under the HAP Contract to the extent that the Borrower incur increased actual and necessary expenses of operating and maintaining the Project and are entitled to such adjustments; (iv) not consent to a modification or amendment of the HAP Contract (other than an amendment to increase rents) without the prior written approval of the Trustee (any such approval to be granted if such modification or amendment does not, in the judgment of the Trustee in reliance on an opinion of counsel, impair the security for the Bonds); (v) operate the units in the Project that are subject to the HAP Contract exclusively for Eligible Tenants, as that term is defined in the HAP Contract, and in compliance with all HUD rules and regulations which are or may become applicable to the Project; and (vi) use its best efforts to keep the units in the Project which are covered by the HAP Contract occupied by Eligible Tenants in order to avoid any reduction in the HAP Payments under the HAP Contract. The Borrower further covenant that they will take all actions necessary to maintain, assign and seek extensions of the HAP Contract including, but not limited to, any actions necessary to assign and assume the HAP Contract in the event of a voluntary or involuntary (e.g., trustee sale, foreclosure sale and deed in lieu of foreclosure) transfer of the Project.  To this end, the Borrower agrees to assign and affirm in writing the HAP Contract in form satisfactory to HUD simultaneously with

23

any such transfer and to immediately furnish to the Trustee a copy of such written assignment and assumption.

(b)     The Borrower covenants to submit appropriate forms to the counterparty to the HAP Contract by the twentieth day of each month requesting HAP Payments pursuant to the HAP Contract for the next calendar month and the Trustee agrees to cooperate with the Borrower requests in this regard.  The Borrower will direct that such payments be made directly to the Trustee, and the Trustee will deposit such payments into the Revenue Fund.  The Borrower will furnish a written copy of each request to the Trustee at the time it is submitted.

(c)     The Borrower covenants to seek all available renewal options under the terms of the HAP Contract.

(d)     The Borrower represents and warrants that:

(i)     The Borrower has no HUD enforcement actions outstanding (as defined by Section 516 of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA")).

(ii)     The Borrower will notify the Rating Agency of the results of any HUD REAC inspection within 10 days of receipt of results.

(iii)     The Borrower will notify the Rating Agency of the results of annual OCAF (or budget based if used as a substitute) rent level adjustments within 10 days of receipt of rent level adjustments from HUD.

(iv)     The Borrower will notify the Rating Agency of the results of five year "mark to market" rent level adjustments within 10 days of receipt of such adjustments from HUD.

(v)     The Borrower will notify the Rating Agency of any HUD disciplinary enforcement actions against it not cured within 30 days.

(vi)     The Borrower will notify the Rating Agency upon the submission of an application for a HUD Section 8 Renewal contract or extension of the existing HAP Contract within 10 days of such submission.

(vii)     The Borrower will notify the Rating Agency of the receipt of notices from HUD regarding the decision of HUD to renew or not to renew the HAP Contract within 10 days of such receipt.

[End of Article IV]

PHI 317575633v5

ARTICLE V

INSURANCE; DAMAGE, DESTRUCTION AND CONDEMNATION;
USE OF NET PROCEEDS

**Section 5.1     Required Insurance.** The Borrower shall procure and maintain continuously in effect during the term of this Loan Agreement policies of insurance with respect to the Project insuring against such hazards and risks and in such amounts as are customary for a prudent owner of properties comparable to those comprising the Project. Without limiting the generality of the foregoing, the Borrower shall maintain the following insurance with one or more reputable insurance companies meeting the requirements set forth in Section 5.2 hereof with respect to the Project:

(a)     insurance against loss or damage to the Project by fire and any of the risks covered by insurance of the type now known as "fire and extended coverage" in an aggregate amount not less than the greater of (i) the full replacement cost of the Project and or (ii) the outstanding principal amount of the Bonds, and with a deductible from the loss payable for any casualty; the policies of insurance carried in accordance with this paragraph (a) shall contain the "Replacement Cost Endorsement;"

(b)     business interruption or loss of rent insurance in an aggregate amount equal to the greater of: (i) an amount equal to the maximum scheduled principal and interest payments on the Note during any twelve month period, or (ii) the aggregate gross amount of annual income projected (or, if greater, actual) for the Project based upon the projected (or, if greater, actual) occupancy of the Project; provided that such coverage shall be adjusted annually on each anniversary date of the policy to comply with the provisions with this Section 5.1(b);

(c)     comprehensive general liability insurance (including coverage for elevators and escalators, if any, on the Project and, if any construction of new improvements occurs after execution of this Loan Agreement, completed operations coverage for two years after construction of any improvements has been completed) on an "occurrence basis" against claims for "personal injury," including, without limitation, bodily injury, death or property damage occurring on, in or about the Project and the adjoining streets, sidewalks and passageways, such insurance to afford immediate minimum protection to a limit in no event less than $1,000,000 with respect to personal injury or death to any one or more persons or damage to property;

(d)     workers' compensation insurance (including employer's liability insurance) for all employees of the Borrower engaged on or with respect to the Project in such amount as is required by law;

(e)     during the course of any construction or repair of the Project, builder's completed value risk insurance against "all risks of physical loss" during construction or repair, with deductibles as are common in similar policies obtained by prudent owners of property similar in use to the Project and located in the same area in which the Project is located, in non-reporting form, at the Borrower's option covering the total value of work performed and equipment, supplies and materials furnished; such policy of insurance shall contain the "permission to occupy upon completion of work or occupancy" endorsement;

(f)     boiler and machinery insurance covering pressure vessels, air tanks, boilers, machinery, pressure piping, heating, air conditioning and elevator equipment and escalator equipment, provided any improvements contain equipment of such nature, and insurance against loss of occupancy or use arising from any breakdown of the same, in such amounts as are

25

commonly obtained by prudent owners of property similar in use to the Project and located in the same area in which the Project is located;

(g)     flood insurance if the Project is in an area identified as a special flood hazard area pursuant to the Flood Disaster Protection Act of 1973, as amended, or other applicable law, unless the Project has been removed from the area by application, with such insurance to be at least the amount available under the National Flood Insurance Act of 1968;

(h)     fidelity bonds or employee dishonesty insurance in an amount not less than $500,000 covering all officers, agents, and employees of the Borrower responsible for causing the proceeds of Bonds to be disbursed and covering all officers, agents, and employees of the Manager responsible for handling Project Revenues; and

(i)     such other insurance, in such amounts and against such hazards and risks, as is commonly obtained by prudent owners of property similar in use to the Project and located in the same area in which the Project is located.

All policies of insurance required by the terms of this Loan Agreement shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy, notwithstanding any act or negligence of the Borrower which might otherwise result in forfeiture of said insurance and the further agreement of the insurer waiving all rights of setoff, counterclaim or deductions against the Borrower.

**Section 5.2     Delivery of Insurance Policies; Payment of Premiums.**   All policies of insurance provided for in Section 5.1 shall be issued by companies licensed to do business in the Commonwealth, and such insurance companies must have a rating from the Rating Agency of no less than "BBB" by S&P (a "Qualified Insurer"). Such policies shall be at least in amounts as required by the provisions of this Loan Agreement. All policies of insurance shall name the Trustee as a named or an additional insured and shall have (i) attached thereto a lender's loss payable endorsement for the benefit of the Trustee, which endorsement indicates that all insurance proceeds in excess of $25,000 are payable directly to the Trustee and (ii) a clause in favor of the Trustee stating that there can be no changes, including modifications, amendments or cancellations, to the respective policy without 30 days written notice to the Trustee. The Borrower shall furnish the Trustee with an original or certified copies of certificates of insurance for all required insurance.

The Borrower shall not obtain (i) any umbrella or blanket liability or casualty insurance policy unless, in each case, the Trustee's interest is included therein as provided in this Loan Agreement and such policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 5.1 to be furnished by, or which may be reasonably required to be furnished by, the Borrower.  In the event the Borrower obtains separate insurance or an umbrella or a blanket policy, the Borrower shall notify the Trustee of the same and shall cause certified copies of each policy to be delivered as required in Section 5.1.  Any blanket policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate policy insuring only the Project in compliance with the provisions of Section 5.1.

Prior to the expiration of each such policy, the Borrower shall furnish the Trustee with written evidence of the reissuance of the existing policy or the issuance of a new policy continuing insurance in force, as required by this Loan Agreement.  All such policies shall contain a provision that such policies will not be canceled or materially amended in any manner, including without limitation, amended to reduce the scope or limits of coverage, without 20 days' prior written notice to the Trustee.  In all cases,

26

the Borrower shall immediately give notice to the Trustee of any notice received by the Borrower of any expiration, cancellation or modification of, or material reduction of coverage under, any such policy. The Borrower shall not consent to any material amendment to or the cancellation of any such policy.

In the event the Borrower fails to provide, maintain, keep in force or deliver and furnish to the Trustee the certificates of insurance required by this Loan Agreement or make the deposits required hereunder, the Trustee may, but is not required to do so, procure such insurance as provided for in Section 5.1, and the Borrower will immediately pay all premiums thereon promptly upon demand by the Trustee (to the extent such amounts are not paid from money in the Insurance and Tax Escrow Fund held under the Indenture), and, until such payment is made by the Borrower, the amount of all such premiums shall be secured by this Loan Agreement.

The Borrower shall deposit with the Trustee, in accordance with Sections 5.04 and 5.10 of the Indenture, amounts sufficient to pay when due estimated aggregate annual insurance premiums on all policies of insurance required by this Loan Agreement. Such amounts shall be disbursed as provided in the Indenture.

### Section 5.3    Insurance Proceeds. Casualty and Condemnation.

(a)    After the occurrence of any casualty to the Project, or any part thereof, the Borrower shall give prompt written notice thereof to the Trustee and each insurer and promptly submit a claim to insurer for payment of insurance proceeds; the Borrower shall provide the Trustee with a copy of such claim.

(b)    All Insurance Proceeds with respect to the Project shall be paid to the Trustee, and each insurer is hereby authorized and directed to make payment for any such loss directly to the Trustee instead of payment to the Borrower. Any Insurance Proceeds shall be applied as provided in this Section 5.3 and Section 5.17 of the Indenture. Damage or destruction of the Project shall not affect the lien of the Mortgage or the obligations of the Borrower hereunder, and the Trustee is authorized, at the Trustee's option, to compromise and settle all loss claims on said policies if not adjusted promptly by the Borrower.

(c)    Notwithstanding the application of Insurance Proceeds to the payment of a portion of the Bonds pursuant to the Indenture, any unpaid portion of the Bonds shall remain in full force and effect, and the Borrower shall not be excused in the payment thereof. If any act or occurrence of any kind or nature on which insurance was not obtained or obtainable shall result in damage to or loss or destruction of the Project, the Borrower shall give immediate notice thereof to the Trustee and, unless otherwise so instructed by the Trustee, shall promptly, at the Borrower's sole cost and expense, whether or not the Insurance Proceeds are adequate to cover such cost and expense, restore, repair, replace and rebuild the Project as nearly as possible to its value, condition and character immediately prior to such damage, loss or destruction, in accordance with plans and specifications submitted to and approved by the Trustee, provided that such Restoration, repair, replacement and rebuilding is permitted by law.

(d)    Except as provided below, nothing contained in this Loan Agreement shall be deemed to excuse the Borrower from repairing or maintaining the Project, as provided herein. The application or release by the Trustee of any Insurance Proceeds shall not cure or waive any Default or notice of default under this Loan Agreement or invalidate any act done pursuant to such notice. If the Insurance Proceeds are not applied to the Restoration of the Project, the Borrower shall not be required to restore, rebuild, replace or repair the portion of the Project

27

damaged or destroyed, and the failure to do so shall not constitute a Default under this Loan Agreement.

(e)     All Net Proceeds of Insurance shall be applied at the option of the Borrower either (i) to the payment of the Bonds in accordance with the Indenture, or (ii) to the Restoration of the Project (if permitted by law, and to the extent not permitted by law, such Insurance Proceeds shall be applied to the payment of the Bonds), except that (A) the proceeds of any loss of rents insurance shall be deposited in the Revenue Fund under the Indenture and applied as therein provided and (B) any surplus proceeds shall be applied to the payment of the Bonds.

(f)     Unless the Borrower exercises its option to apply the Insurance Proceeds to the payment of the Bonds in accordance with the provisions of the Indenture, and so long as any Bonds shall be Outstanding and unpaid, and whether or not Insurance Proceeds are sufficient or available therefor, the Borrower shall promptly commence and complete with all reasonable diligence that Restoration of the Project as nearly as possible to the same value and revenue producing capacity which existed immediately prior to such loss or damage in accordance with plans and specifications prepared by an Independent Architect and approved by HUD (so long as the HAP Contract is in effect) ("Restoration Plans"), and in compliance with all legal requirements. Any Restoration shall be effected in accordance with procedures to be first submitted to and approved by the Trustee as provided in Section 5.1 hereof. The Borrower shall pay all costs of such Restoration to the extent not paid from net proceeds of Insurance Proceeds available therefor pursuant to Section 5.1 hereof. If such Restoration is not permitted by law, the Insurance Proceeds shall be applied to the payment of the Bonds.

(g)     To exercise the option provided in paragraph (e) above, within thirty (30) days following the deposit of Insurance Proceeds or awards in accordance with the provisions of the Indenture, the Borrower shall give written notice of the option it has selected to the Trustee. If such notice is to exercise the option of prepaying the Bonds, the Trustee shall apply the Net Proceeds of such Insurance Proceeds in the manner provided in Section 5.17 of the Indenture. If such notice is to exercise the option of Restoration or if no such notice is received, the provisions of paragraph (e) above shall control.

**Section 5.4     Disbursement of Insurance Proceeds and Condemnation Awards.**

(a)     All Net Proceeds of Insurance Proceeds received by the Trustee as provided in Section 5.3 hereof and/or Condemnation Awards shall be applied as provided in this Section.

(b)     If no Default shall exist hereunder and if the Borrower has elected Restoration and such Restoration is permitted by law, all Net Proceeds shall be deposited in the Project Fund and disbursed in accordance with the provisions of Section 5.03 of the Indenture to pay or reimburse the Borrower for the payment of the costs, fees and expenses incurred for the Restoration of the Project as required under Section 5.3 hereof; provided that no distribution of Net Proceeds for Restoration shall be made until the Trustee shall have received the following:

(i)     Restoration Plans and procedures for the Restoration of the Project as required by Section 5.3(e) hereof.

(ii)     Evidence satisfactory to the Trustee that the Project Revenues (including the proceeds of any loss of rent insurance and other funds irrevocably committed to the payment of such amounts) to be received during, and after completion of, the Restoration of the Project in accordance with the approved Restoration Plans, will be sufficient and

28

available to make all payments and deposits when due hereunder, including without limitation to pay all principal, premium, if any, and interest on the Bonds when due, to make all required deposits into the Funds and Accounts required by Section 5.04 of the Indenture, to pay all other Operating Expenses of the Project, and to pay the debt service on any Indebtedness (other than the Bonds) then outstanding or to be incurred in connection with such Restoration.

(iii)    Construction schedules and budgets and independently verified estimates and other evidence (including stipulated sum or guaranteed maximum cost construction contracts) to establish the total amount of the costs, fees and expenses necessary to complete the Restoration of the Project in accordance with the approved Restoration Plans, and of the time period required to complete such Restoration.

(iv)    A certificate from an independent architect or contractor appointed by the Borrower and acceptable to the Trustee upon which the Trustee may conclusively rely that the Net Proceeds available therefor together with funds deposited with the Trustee, or irrevocably committed by or on behalf of the Borrower, shall be sufficient to fully pay all costs, fees and expenses necessary for the Restoration of the Project in accordance with the approved Restoration Plans and all legal requirements, free and clear of all mechanic's liens and other liens or claims for lien which are not Permitted Encumbrances.

(v)    A waiver of any rights of subrogation from any insurer under any Insurance Policy which, at any time claims that no liability exists as to the Borrower or the owner or insured under such Insurance Policies.

(vi)    Such architect's and engineer's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, surveys, opinions of counsel and such other evidences of cost, payment and performance as the Trustee may reasonably require and upon which it may conclusively rely.

(c)    If, within 60 days after the receipt of such Net Proceeds, the Borrower shall fail to furnish sufficient funds and the other items required by paragraph (b) of this Section or if any other Default shall then exist or shall occur hereunder at any time (whether before or after the commencement of such Restoration) the Trustee may declare the entire principal balance of the Bonds or any portion thereof to be immediately due and payable and to avail itself of any and all remedies afforded hereunder upon a Default and whether or not the Bonds shall be so accelerated such Net Proceeds, or any portion thereof, then held by the Trustee or other depository hereunder may be applied as provided in the Indenture.

(d)    No payment made prior to the final completion of the Restoration of the Project in accordance with the approved Restoration Plans shall exceed 90% of the value of the work performed from time to time, as such value shall be evidenced by an Independent architect's or contractor's certificate to that effect, delivered to the Trustee, upon which the Trustee may conclusively rely; and at all times the undisbursed balance of such proceeds remaining in the hand of the Trustee or such other depository, together with funds deposited or irrevocably committed to the satisfaction of the Trustee by or on behalf of the Borrower to pay the cost of such Restoration, shall be sufficient to pay the entire unpaid cost of the Restoration free and clear of all liens or claims for lien, other than any Permitted Encumbrances evidenced by an Independent architect's or contractor's certificate to that effect, delivered to the Trustee, upon which the Trustee may conclusively rely.

29

(e)      Trustee, at Borrower's expense, may hire a construction consultant to monitor the Restoration and compliance with the provisions of this Section 5.4.

(f)      Any surplus which may remain out of such Net Proceeds after payment of all costs, fees and expenses (including expenses of the Trustee and its counsel, agents, experts or other consultants retained in connection with such Restoration) of such Restoration shall be applied to the redemption of Bonds as provided in Section 3.01 of the Indenture.

(g)      The Borrower shall make written monthly progress reports to the Trustee as to the status of construction and compliance with the budget prepared in connection with the Restoration of the Project.

**Section 5.5      Report of Insurance Consultant; Insurance Commercially Unavailable.**

(a)      The insurance required to be maintained pursuant to this Article V shall be subject to the annual review of the Insurance Consultant, and the Borrower agrees that it will follow any recommendations of the Insurance Consultant. In order to establish compliance with this Article V, the Borrower agrees that it will deliver to the Trustee at or prior to the Closing Date and then annually thereafter within five months after the end of each Fiscal Year, a report of the Insurance Consultant setting forth a description of the insurance maintained, or caused to be maintained pursuant to this Article V and then in effect (including any alternative plan as permitted by Section 5.5(b) hereof) and stating whether, in the opinion of the Insurance Consultant, such insurance, the manner of providing such insurance and any reductions or eliminations of the amount of any insurance coverage during the Fiscal Year covered by such report comply with the requirements of this Article V and adequately protect the Project and the Borrower's operations.

(b)      In the event that any insurance required by Section 5.1 hereof is commercially unavailable at a reasonable cost, the Borrower, upon notice to the Trustee, may provide such substitute coverage, if any, as is recommended by the Insurance Consultant at a reasonable cost. The Borrower shall make a continuing good faith effort to secure the insurance required by Section 5.1 hereof, and if the insurance becomes commercially available at a reasonable cost, the Borrower shall acquire such insurance upon expiration of the substitute insurance or as otherwise recommended by the Insurance Consultant.

**Section 5.6      Obligation to Continue Payments.**  If prior to full payment of the Bonds (or provision for payment thereof in accordance with the provisions of the Indenture) the Project or any portion thereof is destroyed (in whole or in part) or is damaged by fire or other casualty, or title to, or the temporary use of, the Project or any portion thereof shall be taken under the exercise of the power of eminent domain by any governmental body or any person, firm or corporation acting under governmental authority, the Borrower shall nevertheless be obligated to continue to pay the amounts specified in Section 3.2 hereof.

**Section 5.7      Insufficiency of Net Proceeds.**  If, in accordance with this Loan Agreement, the Borrower elect to repair, restore or replace the Project and the Net Proceeds are insufficient to pay in full the cost of any Restoration, the Borrower will nonetheless complete the work and will pay any cost in excess of the amount of the Net Proceeds held by the Trustee. The Borrower agrees that if by reason of any such insufficiency of the Net Proceeds, the Borrower shall make any payments pursuant to the provisions of this Section, the Borrower shall not be entitled to any reimbursement therefor from the Authority, the Trustee, or the Holders, nor shall the Borrower be entitled to any diminution of the amounts payable under Section 3.2 hereof.

30

**Section 5.8      Cooperation of Authority and Trustee.**  The Authority (subject to Section 9.16 of this Loan Agreement) and the Trustee, as applicable, shall cooperate fully with the Borrower at the expense of the Borrower in filing any proof of loss with respect to any insurance policy covering the casualties described in Section 5.1 hereof and in the prosecution or defense of any prospective or pending condemnation proceeding with respect to the Project or any part thereof or any property of the Borrower in connection with which the Project are used and will, to the extent it may lawfully do so, permit the Borrower to litigate in any proceeding resulting therefrom in the name and on behalf of the Trustee, as applicable. In no event will the Authority or the Trustee voluntarily settle, or consent to the settlement of, any proceeding arising out of any insurance claim or any prospective or pending condemnation proceeding with respect to the Project or any part thereof without the written consent of the Borrower's Representative.

[End of Article V]

# ARTICLE VI

# OTHER AGREEMENTS

**Section 6.1     Assignment, Selling and Leasing.**   Except as otherwise provided in the Mortgage or permitted under the Land Use Restriction Agreement, after the completion of the acquisition, rehabilitation and equipping of the Project as described in Section 4.1 hereof, this Loan Agreement may be assigned and the Project sold or leased (other than by reason of foreclosure or deed in lieu of foreclosure), as a whole, by the Borrower only as permitted by Section 6.2 hereof or subject to each of the following conditions:

(a)     The assignee, purchaser or lessee shall assume the obligations of the Borrower hereunder and under the other Borrower's Documents, in writing in form and substance reasonably satisfactory to the Trustee to the extent of the interest assigned or sold.

(b)     The assignee, purchaser or lessee shall deliver an opinion of Independent Counsel in form and substance reasonably satisfactory to the Trustee that the assumption described in paragraph (a) above is a valid and enforceable obligation of the assignee, purchaser or lessee.

(c)     The Borrower shall, within 10 days after the delivery thereof, furnish or cause to be furnished to the Authority and the Trustee a true and complete copy of each assignment, assumption of obligation, or contract of sale, as the case may be.

(d)     The Borrower shall provide a Favorable Opinion of Bond Counsel to the effect that such assignment, sale or lease does not adversely affect the exclusion from gross income of the recipients thereof of interest on the Tax-Exempt Bonds for federal income tax purposes.

(e)     No Event of Default with respect to the Bonds Outstanding after such assignment, sale or lease shall have occurred and be continuing hereunder or under any other Borrower Document, unless such Event of Default is cured or waived in connection with such assignment, sale or lease, and the Borrower shall deliver a Compliance Certificate to that effect.

(f)     The delivery to the Trustee of an opinion of Counsel to the effect the successor to the Borrower hereunder will remain (i) a 501(c)(3) organization or a limited liability company whose sole member is a 501(c)(3) organization; and (ii) is duly qualified to transact business in the Commonwealth and obligated to maintain an agent in the Commonwealth on whom service of process may be made in connection with any actions against the Borrower arising out of the Borrower's Documents.

(g)     The Rating Agency shall have provided a Confirmation of Rating on the Bonds with respect to such assignment, sale or lease; and

(h)     The assignee, purchaser or lessee must deliver an opinion of Independent Counsel to the effect that, regardless of the assumption described above, a valid and enforceable first lien on and perfected security interest in the Project and other collateral securing the Bonds will remain and any such assignments and other documents executed for purposes of this Section 6.1 are valid delivered and enforceable obligations of such parties enforceable in accordance with their terms.

32

(i)    The Borrower may lease portions of the Project in the ordinary course of its business, provided such leases comply with the terms of the Mortgage and the Ground Lease. .

It is hereby expressly stipulated and agreed that any disposition of the Project by the Borrower in violation of this Section will be null, void and without effect, will cause a reversion of title to the transferor Borrower, and will be ineffective to relieve the Borrower of their obligations under this Loan Agreement, the Land Use Restriction Agreement and any other document, agreement or instrument evidencing or securing the Borrower's obligations thereunder. The Borrower will include, verbatim or by incorporation by reference, all requirements and restrictions contained in this Loan Agreement and the Land Use Restriction Agreement in any deed or other documents transferring any interest in the Project to any other person or entity to the end that such transferee has notice of and is bound by such restrictions, and will obtain the express written assumption of this Loan Agreement and the Land Use Restriction Agreement by any such transferee.

**Section 6.2    Continued Existence.**  The Borrower agrees that during the term of this Loan Agreement it will maintain its existence, will continue to be a limited liability company in good standing in the Commonwealth, will not dissolve or otherwise dispose of all or substantially all of its assets and will not consolidate with or merge into another legal entity or permit one or more other legal entities to consolidate with or merge into it; provided that the Borrower may, without violating the agreement contained in this Section, consolidate with or merge into another legal entity, or permit one or more legal entities to consolidate with or merge into it, or sell or otherwise transfer to another legal entity all or substantially all of its assets as an entirety and thereafter dissolve; provided (a) that a Favorable Opinion of Bond Counsel is provided regarding such acquisition, consolidation, merger or transfer; (b) that if the surviving, resulting or transferee legal entity, as the case may be, is not the Borrower, then such legal entity shall be a legal entity organized and existing under the laws of one of the states of the United States of America, shall be a 501(c)(3) organization or a limited liability company whose sole member is a 501(c)(3) organization shall be qualified to do business in the state where the Project is located, shall be a single purpose entity whose only business operations shall be operation of the Project and whose only assets and liabilities shall be the Project (and assets and liabilities related thereto) and the Borrower's Documents and permitted debt hereunder, and shall assume in writing in form and substance satisfactory to the Authority all of the obligations of the Borrower under this Loan Agreement and the other Borrower's Documents; (c) that in the opinion of Independent Counsel, this Loan Agreement shall be a valid and enforceable obligation of such surviving, resulting or transferee entity; (d) that no Event of Default has occurred and is continuing hereunder; (e) that prior to such acquisition, consolidation, merger or transfer, the Borrower shall furnish a Compliance Certificate to the Authority and the Trustee; and (f) that the Trustee shall have consented to such transfer pursuant to the Land Use Restriction Agreement, unless such consent is not required pursuant to said Section.

**Section 6.3    Indemnification.**  The Borrower agrees to indemnify and hold the Authority, the Trustee, the Underwriter, and the Holders of the Bonds and each of their officers, commissioners, members, agents, directors and employees, free and harmless from, any liability for any loss or damage to property or any injury to or death of any person that may be occasioned by any cause whatsoever pertaining to the Project, except in any case as a result of (i) with respect to the Authority, the willful misconduct of the Authority and (ii) with respect to the Trustee, the Underwriter and the Holders of the Bonds, the gross negligence or willful misconduct of any such party.

The Borrower will indemnify and hold the Trustee and its officers, directors, employees and agents harmless against any loss, claim, damage, liability or expense (including, without limitation, the reasonable fees and expenses of its counsel through all investigations, proceedings and appeals) incurred without negligence or willful misconduct on the Trustee's part, arising out of or in connection with the acceptance or administration of the trust created by the Indenture, including the costs and expenses of

33

defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties thereunder.

The Borrower releases the Authority, the Trustee and the Underwriter from, and covenants and agrees that the Authority and the Trustee shall not be liable for, and covenants and agrees to indemnify and hold harmless the Authority, the Trustee and the Underwriter and their respective officers, directors, commissioners, members, employees and agents from and against, any and all losses, claims, damages, liabilities or expenses, of every conceivable kind, character and nature whatsoever arising out of, resulting from or in any way connected with (1) the Project, or the conditions, occupancy, use, possession, conduct or management of, or work done in or about, or from the planning, design, acquisition, rehabilitation or equipping of the Project or any part thereof; (2) the issuance of any Bonds or any certifications or representations made by anyone other than the Authority, the Trustee and the Underwriter in connection therewith and the carrying out of any of the transactions contemplated by the Bonds and the Bond Documents; (3) the Trustee's acceptance or administration of the trusts under the Indenture, or the exercise or performance of any of its powers or duties under the Indenture or any of the other Bond Documents; (4) except with respect to statements by the Authority, any untrue statement or alleged untrue statement of any material fact or omission or alleged omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in any official statement, placement memorandum or other offering document utilized by the Authority or any underwriter or placement agent or any other person in connection with the sale of any Bonds; (5) the defeasance and/or redemption, in whole or in part, of the Bonds, (6) any declaration of taxability of interest of the Tax-Exempt Bonds, or allegation or regulation inferring that interest on the Bonds is taxable for federal income tax purposes; or (7) any other liability otherwise arising in connection with the Project, the Bonds or the Bond Documents; provided that such indemnity shall not be required for damages that result from negligence or willful misconduct on the part of the party seeking such indemnity. The Borrower further covenants and agrees to pay or to reimburse the Authority, the Trustee and the Underwriter and their respective officers, commissioners, members, employees and agents for any and all costs, reasonable attorneys' fees, liabilities or expenses incurred by any of them or their officers, employees and agents in connection with investigating, defending against or otherwise in connection with any such losses, claims, damages, liabilities, expenses or actions, except to the extent that the same arise out of the willful misconduct of the party claiming such payment or reimbursement.

The provisions of this Section and Section 3.2(b)(ii)(1) and (3) shall survive the retirement of the Bonds and the resignation or removal of the Trustee.

**Section 6.4    Recording and Filing.**

(a)    At the time of the issuance of each Series of Bonds, the Borrower will cause the filing of all financing statements necessary to perfect the security interest of the Trustee and the Authority in the Borrower's Documents.

(b)    The Borrower agrees that it will cause to be filed all necessary continuation statements within the time prescribed by the State Uniform Commercial Code - Secured Transactions in order to continue the financing statements in connection with the security interests identified in this Loan Agreement or the Indenture filed on or before the Closing Date. The Trustee shall have no duty to determine, at any time, whether the financing statements filed in connection with the security interests identified in this Loan Agreement or otherwise were or remain sufficient to perfect such security interests under applicable law.

(c)    Not earlier than 60 days nor later than 30 days before each fifth anniversary date after the Closing Date, the Borrower shall cause an opinion of Counsel to be given to the Trustee

34

to the effect that all security agreements, financing statements, continuation statements, notices and other instruments required by applicable law have been recorded or filed or rerecorded or refiled in such manner and in such places as are required by law in order fully to preserve the rights of the Holders and the Trustee in the assignment to the Trustee of certain rights under this Loan Agreement pursuant to the Indenture and in the Project pursuant to the Mortgage.

(d)     The Borrower and the Authority shall execute and deliver all instruments and shall furnish all information and evidence deemed necessary or advisable by such Counsel in order to enable such Counsel to render the opinion referred to in subsection (c) of this Section 6.4. The Borrower shall file and refile and record and rerecord or cause to be filed and refiled and recorded and rerecorded all instruments required to be filed and refiled and recorded and rerecorded pursuant to the law of the Commonwealth and shall continue or cause to be continued the liens of such instruments for so long as the Bonds shall be outstanding, except as otherwise required in this Loan Agreement.

(e)     The Borrower will not suffer any liens to exist upon the Project as a result of any claims brought against the Borrower pursuant to a right or interest not existing in connection with or as permitted by this Loan Agreement or the Mortgage.

**Section 6.5     Nonrecourse to Representatives of Authority.**   No Authority Indemnified Person shall be individually or personally liable for the payment of any principal premium, if any, or interest on the Bonds or any costs incidental thereto or any sum hereunder or under the Indenture, or subject to any personal liability or accountability by any reason of the execution and delivery of this Loan Agreement or the Indenture.

**Section 6.6     Amendment of Borrower's Documents.**   Neither the Authority nor the Borrower shall amend, supplement, alter, modify or terminate any Borrower Document, except as otherwise provided in such document, without the prior written consent of the Trustee, which may be given only as provided in Article XI of the Indenture. Nothing in this Section shall prohibit any assignment or transfer otherwise permitted by Section 6.1 or 6.2.

**Section 6.7     Financial Statements and Reports.**

(a)     The Borrower shall deliver or cause to be delivered to the Trustee within 180 days after the end of each Fiscal Year of the Borrower, commencing with the fiscal year ending December 31, 2016, Audited Financial Statements of the Borrower prepared on an accrual basis, which shall include a balance sheet, income statement and a statement of sources and uses of funds for the preceding Fiscal Year together with a certificate prepared by the Borrower and the Certified Public Accountants in substantially the form of Exhibit C reporting on said Audited Financial Statements setting forth (A) the calculation of the Debt Service Coverage Ratio for the Fiscal Year (commencing with Fiscal Year 2017) reflected in said Audited Financial Statements, and (B) the Net Income Available for Debt Service, if any, for such Fiscal Year.

(b)     The Audited Financial Statements submitted pursuant to paragraph (a) hereof shall be certified as true and correct by the party submitting such statement and shall be reported upon by a public accounting firm selected by the Borrower.

(c)     The Borrower will deliver to the Authority and the Trustee, within 180 days after the end of each Fiscal Year, a written statement signed by the Borrower Representative stating, as to the signer thereof, that (i) a review of the activities of the Borrower during such year and of performance under this Loan Agreement has been made under their supervision, and (ii) to the

35

knowledge of the Borrower's Representative, based on such review, the Borrower has fulfilled all of its obligations throughout such year in all material respects, or, if there has been a default in the fulfillment of any such obligation, specifying each such Event of Default known to the Borrower's Representative and the nature and status thereof.

(d)     The Borrower shall provide to each Rating Agency with an outstanding rating on the Bonds and to any Holder of more than $500,000 of the Bond Obligation which identifies itself to the Borrower and provides the Borrower with its contact information copies of any financial statements or other information described in paragraphs (a), and (c) of this Section 6.7. Upon the written request of the Trustee, any Holder of more than $500,000 of the Bond Obligation, or any Rating Agency with an outstanding rating on the Bonds, the Borrower promptly and at their own expense shall obtain and furnish to the Trustee, such Holder or such Rating Agency any information which the Borrower may be entitled to request and receive under the Management Agreement or any other agreement or arrangement pertaining to the Project.

(e)     The Borrower shall provide to the Trustee and the Rating Agency, within fifteen (15) days of receipt, a copy of the Management Consultant's report prepared and delivered in accordance with Section 4.3 hereof or otherwise provided for in the Bond Documents.

**Section 6.8     Budget.**

(a)     On the Closing Date and on or before December 1 of each year for the annual period commencing on the following January 1, the Borrower shall prepare a Budget covering the Project of anticipated Project Revenues and Operating Expenses (including, but not limited to, Lease Payments) for the succeeding Fiscal Year, and shall submit a copy of such Budget to the Trustee. Such Budget shall show there to be sufficient income to achieve the Coverage Test provided for in Section 4.4 hereof.

(b)     The Budget shall be prepared on a cash basis and should provide a proposed budget for the next Fiscal Year in sufficient detail including income and expenses, deposits to the Repair and Replacement Fund and any other required funds and payments of principal of, premium (if any) and interest on the Bonds. The Budget shall report income on a 30-day lag period and shall not assume any prepayment on the Bonds. The Budget shall demonstrate sufficient cash flow to pay all required expenses, payments of scheduled interest, principal and premium (if any) on the Bonds and the funding of any reserves as required in the flow of funds in the Indenture prior to the release of any funds from the Surplus Fund. The Budget shall be certified in writing as true and correct by the Borrower.

(c)     The Budget may be amended from time to time, by the Borrower, during the course of the Fiscal Year, and such amendments shall be certified and submitted in the same manner as the Budget. Aggregate increases in a new or amended Budget in the category of costs to be paid or reimbursed from the Revenue Fund shall not exceed 20% on an annual basis unless the Borrower provides to the Trustee a statement of a Certified Public Accountant or Management Consultant to the effect that the increase is reasonable under the circumstances.

(d)     Notwithstanding the foregoing, the failure of the Borrower to maintain the Coverage Test or the Borrower to adopt a Budget showing that such ratios will be achieved, shall not constitute an Event of Default hereunder except as set forth in Section 4.5 hereof.

(e)     Each Budget shall include provision for payment by the Borrower of the costs, fees and expenses payable or incurred under this Loan Agreement and the Indenture including,

36

without limitation, the costs of maintaining the insurance coverage required pursuant to Section 5.1 and all applicable ad valorem taxes (or payment in lieu of taxes), if any, assessed against the Project payable by the Borrower, and all Administration Expenses.

**Section 6.9     Notices of Certain Events.**   The Borrower hereby covenants to notify the Authority and the Trustee in writing of the occurrence of any Event of Default known to it hereunder or any event which, with the passage of time or service of notice, or both, would constitute an Event of Default hereunder, specifying the nature and period of existence of such event and the actions being taken or proposed to be taken with respect thereto. Such notice shall be given promptly, and in no event less than 10 Business Days after the Borrower receives notice or knowledge of the occurrence of any such event. The Borrower further agrees that it will, and will require the Manager to, give prompt written notice to the Trustee if Insurance Proceeds or Condemnation Awards are received with respect to the Project and are not used to repair or replace the Project, which notice shall state the amount of such proceeds or awards.

**Section 6.10     Inspection of Project Books; Right of Access.**   At any time during normal business hours upon not less than two Business Days' notice, the Trustee, the Authority or any Holder of more than $100,000 of the Bond Obligation may have access to the Project and all books and records of the Borrower pertaining to the Project and shall be permitted to inspect the same, discuss the affairs of the Borrower and the Project with appropriate representatives of the Borrower, the Manager and the Borrower's outside accountants and shall be permitted to make copies of any of such records.

**Section 6.11     Other Indebtedness.**

The Borrower shall not incur any Indebtedness with respect to the Project, other than the Loan and other debts permitted or anticipated herein, or incurred in the ordinary course of business which do not give rise to a lien or encumbrance on the Project, except for Permitted Encumbrances. In addition, the Borrower is permitted to incur the following:

> (a)     Indebtedness incurred as a result of the issuance of Additional Bonds;

> (b)     such Short-Term Indebtedness as the Borrower, in its judgment, deems expedient; provided that the aggregate amount of Short-Term Indebtedness outstanding at any time does not exceed ten percent (10%) of the total Operating Expenses of the Borrower for the preceding Fiscal Year; and

> (c)     such Long-Term Indebtedness as the Borrower, in its judgment, deems expedient; provided that prior to incurring, assuming, or guaranteeing any Long-Term Indebtedness, the Borrower must furnish to the Authority and the Trustee (i) a Certificate setting forth the terms of such Long-Term Indebtedness and stating that the incurrence of such Long-Term Indebtedness will not cause the Debt Service Coverage Ratio to fall below the required Coverage Test for any Series of Bonds and (ii) the Confirmation of Rating stating that the incurrence of such Long-Term Indebtedness will not result in a qualification, downgrade or withdrawal of the then current ratings on the Series 2016 Bonds.

The Borrower may secure Indebtedness incurred or assumed pursuant to (c) above by a lien on and security interests in all or any portion of the Project and the Project Revenues, secured on an equal and ratable basis with then Outstanding Senior Bonds or Subordinate Bonds, as applicable; provided, however, the following conditions are satisfied:

(a)     The Indebtedness is being incurred or assumed for any of the same purposes for which Additional Bonds may be issued under Section 2.13 of the Indenture, or for the purpose of refunding or refinancing any Outstanding Bonds or other Indebtedness;

(b)     The Indebtedness (other than Additional Bonds) will not be secured by the money and investments held in any fund established under the Indenture;

(c)     All Modifications to be financed will become part of the Project;

(d)     Any agreement for the repayment of such Indebtedness and instruments evidencing or securing the same must provide --

(i)     that any Default will be an event of default thereunder,

(ii)    that, if any event of default has occurred in respect of such Indebtedness, the holder thereof will be entitled only to such rights to exercise, consent to or direct the exercise of remedies (other than remedies relating to any funds established under the Indenture) as are available to the Trustee, and that all such remedies are, except as otherwise provided in this Loan Agreement, to be exercised solely by the Trustee for the equal and ratable benefit of all Bondholders and all holders of Indebtedness so secured, but subject to the priorities provided in the Indenture with respect to Senior Bonds and Senior Parity Indebtedness and the Subordinate Bonds and Subordinate Parity Indebtedness;

(e)     If the proposed Indebtedness is further secured by liens on properties and revenues other than the Project and/or the Project Revenues, a lien of equal rank and priority will be granted upon the same properties and revenues to secure the Bonds; and

(f)     For the purpose only of being entitled to remedies hereunder and of consenting to or directing actions to be taken in respect to such remedies, the Holders of any such Indebtedness will be treated as Bondholders and the Indebtedness held by such persons will be treated as Additional Bonds.

Any Short-Term Indebtedness or any Long-Term Indebtedness which is incurred for the purpose of providing working capital may be secured by a security interest on the Project Revenues on a parity with the security interest created under the Mortgage with respect to the Bonds, and if so secured, the agreement for the repayment of such Short-Term Indebtedness or Long-Term Indebtedness and instruments evidencing or securing the same shall provide that: (i) any Default shall be an event of default thereunder; and (ii) if any event of default shall have occurred with respect to such Short-Term Indebtedness or Long-Term Indebtedness, the holder thereof shall be entitled only to such rights to exercise, consent to or direct the exercise of remedies as are available to the Trustee, and that all such remedies are, except as otherwise provided in this Loan Agreement, to be exercised solely by the Trustee for the equal and ratable benefit of all holders of Bonds and all holders of Short-Term Indebtedness or Long-Term Indebtedness so secured. Any agreement for the repayment of such Indebtedness and instruments evidencing or securing the same shall provide for notices to be given to the Trustee regarding defaults by the Borrower, and shall specify the rights of the Trustee to pursue remedies upon the receipt of such notice, and the sharing of the rights of the Trustee to control the exercise of remedies with the holder of such Indebtedness.   Short-Term Indebtedness or Long-Term Indebtedness which is incurred for the purpose of providing working capital may also be secured

by a security interest in Project Revenues which is subordinate to the security interest therein created under the Mortgage.

**Section 6.12     Advances By Trustee.**

(a)     In the event the Borrower shall fail to pay, or fail to cause to be paid (including payment from amounts held in the Insurance and Tax Escrow Fund for that purpose), any Impositions required to be paid by the provisions of Section 4.9, or maintain, or cause to be maintained, the full insurance coverage required by the provisions of Section 5.1, the Trustee, without prior notice to the Borrower, may (but shall be under no obligation to) pay such Impositions or obtain or maintain the required policy of insurance from the Revenue Fund, and pay the premium or premiums on the same.

(b)     The Borrower shall notify the Trustee within a reasonable amount of time any time it is aware of any unsafe or dangerous condition existing at the Project.  In the event that the Borrower, any tenant of the Project, or any other Person, shall permit any unsafe or dangerous condition to exist in the Project and the Trustee is notified by any party of such conditions, the Trustee may (but shall be under no obligation to) notify the Borrower in writing of such condition, and if the Borrower shall fail to correct such condition, or cause such condition to be corrected, within 30 calendar days after receipt of such notice, the Trustee may (but shall be under no obligation to) make the required correction, improvement, or repair.

(c)     All amounts so advanced by any Person authorized by this Loan Agreement, the Mortgage or the Indenture to make such advances and pursuant to subsection (a) or (b) of this Section shall be promptly reimbursed by the Borrower to the Person making the advance with interest at the Default Rate.

**Section 6.13     Continuing Disclosure.**  The Borrower and Dissemination Agent have entered into the Continuing Disclosure Agreement. While this Loan Agreement is in effect, the Borrower shall at all times remain party to the Continuing Disclosure Agreement, or if the Continuing Disclosure Agreement terminates, it shall enter into a similar agreement to provide for the dissemination of the financial statements and notices required by Rule 15c2-12 under the Securities Exchange Act of 1934, as amended.  The Borrower agrees that while the Bonds are Outstanding, it will perform its obligations under the Continuing Disclosure Agreement. The Borrower shall cause copies of any filings and/or disclosures which are required to be made pursuant to the terms of the Continuing Disclosure Agreement to be delivered to the Authority within five (5) Business Days of any such filing or disclosure. Notwithstanding any other provision of this Loan Agreement, failure of the Borrower to comply with the Continuing Disclosure Agreement shall not be a Default.

**Section 6.14     Related Party Transactions.**  The Borrower shall not enter into any transaction, including, without limitation, the purchase, sale, lease, or exchange of property or the rendering of any service, with any Affiliate except in the ordinary course of business and pursuant to the reasonable requirements of the Borrower's business and upon terms found by the Governing Body of the Sole Member to be fair and reasonable and no less favorable to the Borrower than would be obtained in a comparable arm's length transaction with a Person not an Affiliate.

**Section 6.15     Purchase of Tax-Exempt Bonds.**  Neither the Borrower nor any "related person" to the Borrower (within the meaning of Section 147(a)(2) of the Code), pursuant to any arrangement, formal or informal, will purchase any of the Bonds, unless the Borrower or such Related Person delivers a Favorable Opinion of Bond Counsel to the Trustee and the Authority.

39

**Section 6.16    Release of Certain Land and Subordination; Granting of Easements.**  The parties hereto reserve the right at any time and from time to time to (a) effect the release and removal from the Mortgage of any part (or interest in such part) of the Mortgaged Property with respect to which the Borrower proposes to convey fee title to a public utility or public body in order that utility services or public services may be provided to the Project, or to effect the subordination of the lien of the Mortgage to rights granted to a public utility or public body in order that utility services or public services may be provided to the Project, (b) grant easements, licenses, rights of way (including the dedication of public highways), and other rights or privileges in the nature of easements with respect to any property included in the Project, free from the lien of the Mortgage, or (c) release existing easements, licenses, rights of way, and other rights or privileges with or without consideration; provided, that if at the time any such release, removal, or grant is made any of the Bonds are Outstanding and unpaid, the Borrower must deposit with the Trustee the following:

（a）    a copy of the such amendment as executed,

（b）    a resolution or action of the Governing Body of the Borrower (i) giving an adequate legal description of that portion of the Mortgaged Property to be released or subordinated, (ii) stating the purpose for which the Borrower desires the release or subordination, (iii) requesting such release or subordination, and (iv) approving an appropriate amendment to the Mortgage,

（c）    a certificate of the Borrower to the effect that the Borrower is not in default under any of the provisions of this Loan Agreement and that neither any building nor any other improvement constituting part of the Project are located on a portion of the Mortgaged Property with respect to which the release or subordination is to be granted, accompanied by a plat of survey of the Mortgaged Property certified by a registered surveyor depicting (i) the boundaries of the portion of the Mortgaged Property with respect to which the release or subordination is to be granted, (ii) all improvements located on the property surveyed and the relation of the improvements by distances to the boundaries of the portion of such property with respect to which the release or subordination is to be granted, and (iii) all easements and rights of way with recording data and instruments establishing the same,

（d）    a copy of the instrument conveying the title to or subordinating the lien of the Mortgage in favor of a public utility or public body, and

（e）    a certificate of an architect, dated not more than 60 days prior to the date of the release or subordination and stating that, in the opinion of the person signing such certificate, (i) the portion of the Mortgaged Property so proposed to be released or with respect to which the subordination is proposed or with respect to which an easement, license or right of way is proposed to be granted is necessary or desirable in order to obtain utility services or public services to benefit the Project and (ii) the release or subordination so proposed to be made will not impair the usefulness of the Project as a multifamily housing facility for seniors and will not destroy the means of ingress thereto and egress therefrom.

If such release or subordination relates to a part of the Mortgaged Property on which transportation or utility facilities are located, the Borrower will retain an easement to use such transportation or utility facilities to the extent necessary for the efficient operation of the Project as a multifamily housing facility for seniors. Any money consideration received in connection with the release of any portion of the Mortgaged Property or the subordination of the lien of the Mortgage pursuant to this Section 6.16 will be deposited in a Special Redemption Account of the Bond Fund and used to redeem Bonds pursuant to Section 3.01 of the Indenture on the earliest date Bonds can be redeemed at par.

If all of the conditions of this Section are met, the Trustee is authorized to release any such property from the lien of the Mortgage or subordinate such lien or execute and deliver any instrument necessary or appropriate to confirm and grant or release any such easement, license, right of way, or other right or privilege.

No release or conveyance effected under the provisions of this Section will entitle the Borrower to any abatement or diminution of the Loan Payments payable under Section 3.2 hereof.

[End of Article VI]

41

## ARTICLE VII

## DEFAULTS AND REMEDIES

**Section 7.1     Defaults.** Each of the following shall constitute a "Default" or "Event of Default" hereunder:

(a)     Failure by the Borrower to pay any Basic Loan Payments, subject to any applicable cure periods; provided that failure to make a Basic Loan Payment shall not constitute a Default to the extent that the amounts on deposit in the Surplus Fund, the Bond Fund, the Repair and Replacement Fund and the Debt Service Reserve Fund are sufficient and available to pay principal, premium (if any) and interest due on the related Series of Bonds on the next Bond Payment Date; and provided further that failure to pay the portion of the Loan related to the Subordinate Bonds shall not constitute a Default hereunder while any Senior Bonds are Outstanding.

(b)     Failure by the Borrower to make, or cause to be made, any Additional Loan Payment or amounts required to be paid under Sections 3.2(b)(ii), 4.3, 4.9, 4.10, 5.1 and 6.12 on or before the date due.

(c)     Failure by the Borrower to meet the Coverage Test covenant if (a) the Borrower fails to engage a Management Consultant or (b) to the extent that the Rating Agency, if any agrees with such recommendations, the Borrower fails to implement any of the Management Consultant's reasonable recommendations to the extent possible, and to the extent consistent with the charitable mission of the Sole Member, as provided in this Loan Agreement.

(d)     Failure by the Borrower or the Sole Member to perform or observe any of its covenants or agreements contained in this Loan Agreement, the Tax Agreement, or the Land Use Restriction Agreement other than as specified in paragraphs (a) through (c) of this Section 7.1, and such failure shall continue for the period and after the notice specified in Section 7.2 hereof.

(e)     The dissolution or liquidation of the Borrower or the filing by the Borrower of a voluntary petition in bankruptcy, or adjudication of the Borrower as a bankrupt, or assignment by the Borrower for the benefit of its creditors or the entry by the Borrower into an agreement of composition with its creditors, or the approval by a court of competent jurisdiction of a petition applicable to the Borrower in any proceeding instituted under the provisions of State law or the federal bankruptcy statute, as amended, or under any similar act which may hereafter be enacted. The term "dissolution or liquidation of the Borrower," as used in this Section 7.1(e), shall not be construed to include the cessation of the existence of the Borrower resulting either from a merger or consolidation of the Borrower into or with another entity or a dissolution or liquidation of the Borrower following a transfer of all or substantially all of its assets as an entirety, under the conditions permitting such actions contained in Section 6.2 hereof.

(f)     The occurrence or continuance of a "default," a "Default," an "event of Default" or "Event of Default" under the Mortgage, the HAP Assignment, the Land Use Restriction Agreement or the Indenture.

The provisions of paragraph (d) of this Section are subject to the following limitation: if by reason of Force Majeure the Borrower is unable in whole or in part to carry out any of its agreements contained herein (other than its obligations contained in Article III hereof), the Borrower shall not be deemed in Default during the continuance of such inability, if, but only if such default is cured as

42

provided in Section 7.2. The Borrower agrees, however, to remedy with all reasonable dispatch the cause or causes preventing the Borrower from carrying out its agreements, provided that, subject to the preceding sentence, the settlement of strikes and other industrial disturbances shall be entirely within the discretion of the Borrower and the Borrower shall not be required to make settlement of strikes, lockouts and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is in the judgment of the Borrower unfavorable to the Borrower.

The Trustee shall not be deemed to have knowledge of any Default hereunder other than a Default under paragraph (a) or (b) hereof, unless a Responsible Officer of the Trustee shall have been specifically notified in writing of such Default by the Authority, the Borrower or by the Holders of at least 25% of the Bonds Outstanding.

**Section 7.2     Notice of Default: Opportunity to Cure.**  Except as provided below, no default under Section 7.1(d) hereof shall constitute a Default hereunder until:

(a)     The Trustee or the Authority, by Mail, shall give notice to the Borrower of such default specifying the same; and

(b)     The Borrower shall have had 30 days after receipt of such notice to correct the Default and shall not have corrected it or, if such Default cannot be corrected within 30 days, shall have failed to initiate and diligently pursue appropriate corrective action, provided, that in any event such Default must be remedied within 120 days after the date of occurrence thereof.

**Section 7.3     Remedies.**  Whenever any Default under Section 7.1 hereof shall have happened and be continuing, any or all of the following remedial steps shall be available:

(a)     The Trustee may, and at the written request of the Controlling Holders of the Bonds shall, declare the outstanding principal balance and interest accrued on the Loan and all payments required to be made by the Borrower under Section 3.2 hereof with respect to the Bonds for the remainder of the term of this Loan Agreement to be immediately due and payable, whereupon the same shall become immediately due and payable. Upon any such acceleration of the Loan, the Bonds shall be subject to mandatory redemption as provided in Section 3.01(d) of the Indenture.

(b)     The Trustee, for and on behalf of the Authority, may, and with the consent of the Controlling Holders of the Bonds shall, take whatever action at law or in equity may appear necessary or desirable to collect the payments required to be made by the Borrower under Section 3.2 hereof then due and thereafter to become due, including, without limitation, pursuing remedies under the appropriate Mortgage and the remedies under Section 8.02 of the Indenture.

(c)     The Authority or the Trustee may take whatever action at law or in equity as may be necessary or desirable to enforce performance and observance of any obligation, agreement or covenant of the Borrower under this Loan Agreement.

The provisions of clause (a) of the preceding paragraph, however, are subject to the condition that if, at any time after the Loan shall have been so declared due and payable, and before any judgment or decree for the payment of the money due shall have been obtained or entered, there shall have been deposited with the Trustee a sum sufficient to pay all the principal of the Bonds matured prior to such declaration and all matured installments of interest (if any) upon all the Bonds, with interest on such overdue installments of principal as provided herein, and the reasonable expenses of the Trustee, and any and all other Defaults known to the Trustee (other than in the payment of principal of and interest on the

Loan due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Trustee or provision deemed by the Trustee to be adequate shall have been made therefor, then, and in every such case, the Controlling Holders of the Bonds by written notice to the Authority and to the Trustee, may, on behalf of the Holders of all the Bonds, rescind and annul such declaration and its consequences and waive such default; provided that no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

In case the Trustee or the Authority shall have proceeded to enforce its rights under this Loan Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or the Authority, then, and in every such case, the Borrower, the Trustee and the Authority shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Borrower, the Trustee and the Authority shall continue as though no such action had been taken, subject to the results of any such proceedings or any settlement thereof.

The Borrower covenants that, in case a Default shall occur with respect to the payment of the Loan payable under Section 3.2(a) hereof, then, upon demand of the Trustee, the Borrower will pay to the Trustee the whole amount that then shall have become due and payable under said Section, with interest, to the extent permitted by law, on the amount then overdue at the Default Rate until such amount has been paid.

In case the Borrower shall fail forthwith to pay such amounts upon such demand, the Trustee shall be entitled and empowered to institute any action or proceeding at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Borrower and collect in the manner provided by law the money adjudged or decreed to be payable.

In case proceedings shall be pending for the bankruptcy or for the reorganization of the Borrower under the federal bankruptcy laws or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Borrower or in the case of any other similar judicial proceedings relative to the Borrower, or the creditors or property of the Borrower, then the Trustee shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to this Loan Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee allowed in such judicial proceedings relative to the Borrower, its creditors or its property, and to collect and receive any money or other property payable or deliverable on any such claims, and to distribute such amounts as provided in the Indenture after the deduction of its charges and expenses. Any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized to make such payments to the Trustee, and to pay to the Trustee any amount due it for compensation and expenses, including expenses and fees of counsel incurred by it up to the date of such distribution.

**Section 7.4    No Remedy Exclusive.** No remedy herein conferred upon or reserved to the Authority is intended to be exclusive of any other available remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Loan Agreement or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Authority to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be required in this Article. Such rights and remedies as

44

are given the Authority hereunder shall also extend to the Trustee, and the Trustee and the Holders, subject to the provisions of the Indenture, shall be entitled to the benefit of all covenants and agreements herein contained.

       **Section 7.5**    **Attorney's Fees and Expenses.**  If a Default hereunder occurs and if the Authority or the Trustee, or the representative or agent of either, should employ attorneys or incur expenses for the enforcement of any obligation or agreement of the Borrower contained herein or in the other Borrower's Documents, the Borrower on demand will pay to the Authority or the Trustee, as the case may be, the reasonable fees of such attorneys and the reasonable expenses so incurred, including all costs of any and all investigations, proceedings and court appeals.

       **Section 7.6**    **No Additional Waiver Implied by One Waiver.**  In the event any agreement contained in this Loan Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

       **Section 7.7**    **Authority's Rights Not Impaired.**  Nothing in this Loan Agreement shall be deemed or construed to limit, impair or affect in any way, the Authority's (or any other Authority Indemnified Person's) right to enforce the Reserved Rights, regardless of whether there is then existing an Event of Default (including, without limitation, a payment default), or any action based thereon or occasioned by an Event of Default or alleged Event of Default, and regardless of any waiver or forbearance granted by the Trustee or any Holder in respect thereof. Any default or Event of Default in respect of the Reserved Rights may only be waived by the Authority in writing.

[End of Article VII]

## ARTICLE VIII

## OPTIONS TO TERMINATE AGREEMENT

**Section 8.1      Grant of Option To Terminate.**  The Borrower shall have, and is hereby granted, the option to terminate this Loan Agreement as a whole at any time the Borrower declares it will cease to use the Project by reason of:

(a)      the damage or destruction of all or a significant portion of the Project (with property damage equal to at least $100,000) to such extent that, in the reasonable opinion of the Borrower, the Restoration thereof would not be economical;

(b)      the condemnation of all or part of the Project or the taking by condemnation of such part, use or control of the Project (with the value of the property so taken or condemned equaling at least $100,000) as to render it unsatisfactory to the Borrower for its  intended use, provided that any temporary taking by condemnation shall not give rise to the option unless, in the Borrower's reasonable opinion, such temporary taking shall render the Project unsatisfactory to the Borrower for its intended use for a period of at least six months;

(c)      any changes in the Constitution of the Commonwealth of Pennsylvania or the Constitution of the United States or of legislative or administrative action (whether state, federal, or local), by which this Loan Agreement shall become void or unenforceable or impossible of performance in accordance with the intent and purposes hereof; or

(d)      the Borrower may also prepay the Loan in whole and terminate this Loan Agreement if the Loan is prepaid in whole and in amounts necessary to redeem the Bonds pursuant to Section 3.02 of the Indenture upon delivery of written notice by the Borrower's Representative to the Trustee delivered not less than 45 days prior the prepayment date.

**Section 8.2      Exercise of Option To Terminate.**  To exercise such options, the Borrower shall, within 90 days following the event authorizing such termination, if any, give written notice to the Authority and the Trustee, and shall specify therein the date of termination, which date shall be not less than 50 days nor more than 90 days from the date such notice is mailed, and shall make arrangements satisfactory to the Trustee for the giving of the required notice of redemption of all of the Bonds. In order to exercise such option, the Borrower shall pay, or cause to be paid, on or prior to the applicable redemption date, to the Trustee, an amount equal to the sum of the following:

(a)      An amount of money which, when added to the amounts then on deposit under the Indenture and available for such purpose will be sufficient to retire and redeem all the Outstanding Bonds on the earliest possible redemption date after notice as provided in the Indenture, including, without limitation, the principal amount thereof, all interest to accrue to said redemption date; plus

(b)      An amount of money equal to the Ordinary Trustee's Fees and Expenses and Extraordinary Trustee's Fees and Expenses under the Indenture accrued and to accrue until such final payment and redemption of the Bonds, including fees and expenses related to such redemption; plus

46

(c)     An amount of money equal to the Authority's Fees and Expenses under this Loan Agreement accrued and to accrue until such final payment and redemption of the Bonds.

[End of Article VIII]

47

**ARTICLE IX**

**MISCELLANEOUS**

**Section 9.1    Confidential Information.**  The Borrower shall not be required to disclose, or to permit the Authority, the Trustee or others to acquire access to, any trade secrets of the Borrower or any other processes, techniques or information reasonably deemed by the Borrower to be proprietary or confidential, except as may be appropriate under the state law for the prosecution or defense of any legal or equitable action arising hereunder or for the collection of a judgment or to insure compliance with the Bond Documents.

**Section 9.2    Entire Agreement.**  The Bond Documents together constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, between the Authority and the Borrower with respect to the subject matter hereof.

**Section 9.3    Notices.**  All notices, certificates or other communications shall be sufficiently given and shall be deemed given on the second day following the date on which the same have been mailed by first class mail, postage prepaid, addressed as provided in the Indenture. A duplicate copy of each notice, certificate or other communication given hereunder by either the Authority or the Borrower to the other shall also be given to the Trustee, the Asset Manager and the Manager.

**Section 9.4    Assignments.**  This Loan Agreement may not be assigned by either party without consent of the other except that the Authority shall assign to the Trustee its rights under this Loan Agreement (except its Reserved Rights) and the Borrower may assign their rights under this Loan Agreement as provided by Sections 6.1 and 6.2 hereof.

**Section 9.5    Severability.**  If any provision of this Loan Agreement shall be held or deemed to be or shall, in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative, or unenforceable to any extent whatever.

**Section 9.6    Execution of Counterparts.**  This Loan Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 9.7    Rights of Trustee.**  The Trustee shall have and be protected by all of the rights, powers, indemnities, privileges, immunities and other protections provided to the Trustee under the Indenture which are hereby incorporated herein by reference.

**Section 9.8    Amendments, Changes and Modifications.**  Subsequent to the issuance of Bonds and prior to their payment in full (or provision for payment thereof having been made in accordance with the provisions of the Indenture), this Loan Agreement may not be effectively amended, supplemented, modified, altered or terminated except by an instrument in writing signed by the parties hereto, and only as permitted in Section 6.6 hereof.

**Section 9.9    Governing Law.**  This Loan Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflicts of law principles.

**Section 9.10    Term of Agreement.**  This Loan Agreement shall be in full force and effect from the date hereof until the later of (a) such time as all the Bonds shall have been fully paid or provision

48

made for such payment pursuant to Article VII of the Indenture, or (b) such time as the Borrower has paid, or caused to be paid, all amounts payable hereunder.

**Section 9.11    No Liability of Authority's Officers.**   No recourse under or upon any obligation, covenant, or agreement contained in this Loan Agreement, or for any claim based thereon, or under any judgment obtained against the Authority, or by the enforcement of any assessment or penalty or otherwise or by any legal or equitable proceeding by virtue of any constitution, rule of law or equity, or statute or otherwise or under any other circumstances, under or independent of the Indenture, shall be had against any member of the Governing Body or officer, as such, past, present, or future of the Authority, or any, for the payment for or to the Authority or any receiver thereof, of any sum that may be due and unpaid by the Authority upon the Bonds. Any and all personal liability of every nature, whether at common law or in equity, or by statute or by constitution or otherwise, of any such member of the Governing Body or officer, as such, to respond by reason of any act or omission on his part or otherwise, for the payment for or to the Authority or any receiver thereof, of any sum that may remain due and unpaid upon the Bonds, is hereby expressly waived and released as a condition of and in consideration for the execution of this Loan Agreement and the issuance of the Bonds.

**Section 9.12    Receipt of and Compliance With Indenture.**   The Borrower acknowledges that it has received an executed copy of the Indenture, and accepts and agrees to the provisions thereof, including, without limitation, the provisions of Section 9.04 of the Indenture with respect to compensation and indemnification of the Trustee, and agrees that it will take all such actions as are required or contemplated of it under the Indenture to preserve and protect the rights of the Trustee, the Authority and of the Holders thereunder and that they will not take any action which would cause a Default or Event of Default thereunder. It is agreed by the Borrower and the Authority that all redemption of Bonds prior to maturity shall be effected as provided in the Indenture. The Borrower hereby agrees that its interest in the Mortgaged Property and its rights hereunder are subject to and subordinated to the interest and rights of the Trustee under the Indenture and acknowledges that the Trustee has entered into the Indenture in reliance upon the assignment to the Trustee of the Authority's rights under this Loan Agreement and the Borrower's provision of indemnity. The Borrower covenants that they will perform all of the Authority's obligations and covenants under the Indenture to the extent that they can be performed by the Borrower thereunder. The Borrower further agrees that it will reimburse the Authority for any expenses incurred in the administration of any of the foregoing agreements and this Loan Agreement and will hold the Authority harmless from any liabilities thereunder. The Borrower further covenants that it will perform all of the duties and obligations of the Borrower that are set forth in the Indenture.

**Section 9.13    Usury; Total Interest.**   This Loan Agreement is subject to the express condition, and it is agreed, that at no time shall Basic Loan Payments hereunder or under the other Bond Documents that are or are construed to be payments of interest on the unpaid principal amount of the Bonds reflect interest that is borne at a rate in excess of the maximum permitted by law. The Borrower shall not be obligated or required to pay, nor shall the Authority be permitted to charge or collect, interest borne at a rate in excess of such maximum rate. If by the terms of this Loan Agreement or the other Bond Documents, the Borrower is required to make such payments reflecting interest borne at a rate in excess of such maximum rate, such payments shall be deemed to be reduced immediately and automatically to reflect such maximum rate. This Loan Agreement is also subject to the condition that amounts paid hereunder representing late payment or penalty charges or the like shall only be payable to the extent permitted by law.

49

**Section 9.14    Survival.**

(a)    The rights of the Trustee to payment under this Loan Agreement shall survive the Trustee's resignation or removal, the discharge of this Loan Agreement and defeasance of the Bonds.

(b)    Notwithstanding anything in this Loan Agreement or any of the Bond Documents to the contrary, the rights, protections, indemnities and immunities afforded to the Trustee hereunder shall survive the resignation or removal of the Trustee and the payment in full or defeasance of the Bonds.

**Section 9.15    Tax Agreement Controls.**  In any matter relating to the exclusion of interest on the Tax-Exempt Bonds from gross income for federal income tax purposes, the terms and provisions of the Tax Agreement shall control in the event of any conflict between this Loan Agreement and the Tax Agreement.

[End of Article IX]

**IN WITNESS WHEREOF**, the parties hereto have executed this Loan Agreement under seal, all as of the day and year first above mentioned.

**PHILADELPHIA AUTHORITY FOR**
**INDUSTRIAL DEVELOPMENT**

By:
Name:   Thomas A. K Queenan
Title:    Chairperson

**PAVILION APARTMENTS PENN LLC, a**
**Pennsylvania limited liability company**
**By:  JPC Charities, an Ohio nonprofit corporation,**
**its Sole Member**

BY:
Name:   Jason Cook
Title:    President

*Signature Page to Loan Agreement*

**IN WITNESS WHEREOF**, the parties hereto have executed this Loan Agreement under seal, all as of the day and year first above mentioned.

**PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT**

By: _____
Name: Thomas A. K Queenan
Title: Chairperson

**PAVILION APARTMENTS PENN LLC, a Pennsylvania limited liability company**
**By:  JPC Charities, an Ohio nonprofit corporation, its Sole Member**

BY: _____
Name: Jason Cook
Title: President

*Signature Page to Loan Agreement*

**EXHIBIT A**

**DESCRIPTION OF THE PROJECT AND PROPERTY DESCRIPTION**

The Project consists of one twelve-story senior apartment building containing 295 units, comprise of 214 studio units and 81 one-bedroom units.  The Project is located on approximately 20.06 acres at 3901 Conshohocken Avenue, Philadelphia, Pennsylvania.  The legal description of the Project is as follows:

ALL THAT CERTAIN lot or piece or ground, Situate in the 52nd Ward of the City of Philadelphia, described according to a ALTA/ACSM Land Title Survey made for Greenbriar Club Apartments by T B I Consulting Engineers, Inc. dated 4/11/2002 and last revised 5/14/2002:

BEGINNING at a point, located the following 2 courses and distances from a point of tangency, said point of tangency being the Southwesterly end of a curve which connects the Northerly side of Conshohocken Avenue (80 feet wide) with the Easterly side of Monument Road (71 feet wide), having a radius of 50 feet and an arc length of 105.015 feet, (1) North 76 degrees 12 minutes 00 seconds East, the distance of 887.903 feet, (2) North 79 degrees 52 minutes 13 seconds East, the distance of 169.805 feet; thence extending North 9 degrees 53 minutes 31 seconds East from said point of beginning, the distance of 297.305 feet to a point; thence extending North 64 degrees 52 minutes 29 seconds West the distance of 331.671 feet to a point in the bed of a variable width Right of Way lot for Drainage Purposes; thence extending North 17 degrees 44 minutes 37 seconds East the distance of 77.052 feet to a point, thence extending North 17 degrees 58 minutes 59.44 seconds East, crossing Neill Drive (State Highway-50 feet wide), the distance of 852.967 feet to a point; thence extending South 65 degrees 51 minutes 53 seconds East, re-crossing said Neill Drive and also re-crossing said variable width Right-of-Way for State Highway purposes and also re-crossing said variable width Right-of-Way for Drainage purposes, the distance of 456.379 feet to a point; thence extending South 65 degrees 49 minutes 30 seconds East the distance of 608.361 feet to a point; thence extending South 30 degrees 21 minutes 40 seconds West, the distance of 436.046 feet to a point; thence extending North 87 degrees 02 minutes 49 seconds West, the distance of 326 feet to a point; thence extending South 11 degrees 17 minutes 48 seconds West, the distance of 471.797 feet to a point on the said Northerly side of Conshohocken Avenue; thence extending South 81 degrees 00 minutes 00 seconds West, the distance of 284.324 feet to a point; thence extending South 79 degrees 52 minutes 13 seconds West, the distance of 91.316 feet to the first mentioned point and place of BEGINNING.

TOGETHER WITH the benefits of the easements appurtenant to the Land as set forth in the below instruments of record:

Declaration of Easements as set forth in Deed Book DCC 515 Page 454. Agreement by and between Kiryat Greenbriar and Pavilion Associates as set forth in Deed Book FHS 1267 Page 198.

BEING Tax Parcel No. 88-1161000

A-1

**EXHIBIT B**

**FORM OF REQUISITION**

Requisition No. _____          Date: _____

To:   Wilmington Trust, National Association, as Trustee (the "Trustee") under the Trust
Indenture dated as of July 1, 2016 (the "Indenture"), relating to Philadelphia Authority
For Industrial Development Senior Housing Revenue Bonds (The Pavilion) Series 2016A
and Subordinate Series 2016B

Attention:  Trust Department

The undersigned Borrower Representative designated pursuant to the terms of the aforesaid
Indenture and a Loan Agreement dated as of July 1, 2016 (the "Agreement"), between the Philadelphia
Authority for Industrial Development and Pavilion Apartments Penn LLC (the "Borrower"), relating to
the Bonds identified above, hereby requests that there be paid from the Project Fund the sum set forth
below, and in that connection with respect to the use of the proceeds of the Bonds, I HEREBY CERTIFY,
as follow:

An obligation in each of the amounts set forth below has been incurred in connection with the
acquisition, rehabilitation and equipping of the Project, constitutes a Cost of the Project, and such
obligation or amount represents a capital cost of the Project and not a cost of issuance of the Bonds.

| Payee<br>Name and Address | Purpose | Amount |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |
| Total | | |

The Borrower hereby certifies that:

(1)   the Project is free and clear of all liens and encumbrances except Permitted
Encumbrances;

(2)   all evidence, statements, and other writings required to be furnished under the terms of
this Loan Agreement and the Indenture are true and omit no material fact, the omission of which may
make them misleading;

(3)   all money previously disbursed has been used solely to pay for Costs of the Project, and
the Borrower has written evidence to support this item of warranty;

(4)   none of the items for which payment is requested have formed the basis for any payment
previously made from the Project Fund; and

(5)   all bills for labor, materials, and fixtures used, or on hand and to be used, in the
construction of the Project have been paid.

B-1

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Indenture.

**PAVILION APARTMENTS LLC, a Pennsylvania limited liability company**
**By: JPC Charities, an Ohio nonprofit corporation, its Sole Member**

BY:      _____
Name:   Jason Cook
Title:    President

B-2

**EXHIBIT C**
**FORM OF RELEASE CERTIFICATE**
for the Period Ended _____, 20__

$27,410,000
Philadelphia Authority for Industrial Development
Senior Housing Revenue Bonds
(The Pavilion)
Series 2016A

And

$2,205,000
Philadelphia Authority for Industrial Development
Senior Housing Revenue Bonds
(The Pavilion)
Subordinate Series 2016B

I, _____, an authorized representative of the Borrower for the above described Bonds (the "Bonds"), do hereby certify that (a) no Event of Default or Potential Default of which the Borrower has knowledge has occurred or is continuing, and (b) the Net Income Available for Debt Service and Debt Service Coverage Ratio calculations for the _____ for the twelve months ending _____, as set forth below, are true and correct. Terms used herein as defined terms have the meanings provided in the Trust Indenture dated as of July 1, 2016 with regard to the Bonds.

Net Income Available for Debt Service

Divided by:  Annual Debt Service:

Debt Service Coverage Ratio:_____

**PAVILION APARTMENTS LLC, a Pennsylvania limited liability company**
**By: JPC Charities, an Ohio nonprofit corporation, its Sole Member**

BY: _____
Name:
Title:

C-1

The undersigned _____, certifies that (a) it has reviewed the audited financial of the Borrower for the period ending _____, (b) the foregoing calculations of the Debt Service Coverage Ratios are correct, and (c) the Net Income Available for Debt Service as of the last day of such Fiscal Year was ____.

**[INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT]**

Dated:

By:     _____
Name:
Title:

C-2

## EXHIBIT D

## FORM OF MULTIFAMILY PROMISSORY NOTE

$_____                                                                July 5, 2016

FOR VALUE RECEIVED, the Borrower executing this Note, and their successors and assigns (the "Borrower"), promises to pay to the Philadelphia Authority for Industrial Development (together with its successors and assigns, the "Authority"), (1) the principal sum of $_____ payable on _____ 1, 20__, or such earlier dates as required in the Indenture or the Loan Agreement (as defined below), and interest accrued on the unpaid portion thereof, from the date hereof at the rate for each day of accrual equal to the rates of interest borne by the bonds of the Authority designated as Senior Housing Revenue Bonds (The Pavilion) Series 2016A ("Series 2016A Bonds") and Subordinate Series 2016B ("Series 2016B Bonds," and together with the Series 2016A Bonds, the "Bonds") at the time Outstanding (as defined in the Indenture) payable on the dates and computed as described in that certain Trust Indenture between Wilmington Trust, National Association, as trustee (the "Trustee") and the Authority, as issuer, dated as of July 1, 2016 (the "Indenture"), and the Loan Agreement, relating to principal and interest on the Bonds, and (2) all other amounts specified in the Indenture and Loan Agreement at the times described in the Indenture and Loan Agreement.

This Note and the payments required to be made hereunder have been irrevocably assigned, without recourse, to the Trustee under the Indenture and such payments will be made directly to the Trustee for the account of the Authority pursuant to such assignment. All the terms, conditions and provisions of the Indenture, the Loan Agreement and the Bonds are hereby incorporated as a part of this Note.

The principal hereof (and premium, if any) and the interest hereon shall be payable at the designated corporate trust office of the Trustee. All such payments shall be in immediately available funds or in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

If the specified date for any such payment shall be a day other than a Business Day (as defined in the Indenture), then such payment may be made on the next succeeding day which is a Business Day without additional interest and with the same force and effect as if made on the specified date for such payment.

All sums due hereon shall be payable at the opening of business of the designated corporate trust office of the Trustee on the date such payments become due.

This Note is executed and delivered by the Borrower pursuant to the Loan Agreement, dated as of July 1, 2016 (the "Loan Agreement"), between the Authority and the Borrower relating to the Bonds, to evidence a loan by the Authority to the Borrower thereunder from proceeds of the Bonds.  To the extent that any provision of this Note contradicts or is inconsistent with the provisions of the Loan Agreement, the provisions of the Loan Agreement shall control and supersede the contradictory or inconsistent provision herein.

The Borrower shall prepay the outstanding principal sum hereof, as a whole or in part, in the same amount and on the same dates, and with the same premiums, if any, as Bonds called for redemption prior to their maturity in accordance with the provisions of the Indenture.  Presentation, demand, protest and notice of dishonor are hereby expressly waived by the Borrower.

This Note is also secured by the Mortgage (as defined in the Indenture).

If an Event of Default, as defined in the Indenture or the Loan Agreement, shall occur, the principal hereof and accrued interest hereon may, at the option of the holder hereof, be declared due and payable in the manner and with the effect provided in the Indenture or the Loan Agreement.

This Note is a contract made under and shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania.

This Note has been executed by the Borrower on the date and year first above written.

**PAVILION APARTMENTS LLC, a Pennsylvania limited liability company**
**By: JPC Charities, an Ohio nonprofit corporation, its Sole Member**


BY:      _____
Name:   Jason Cook
Title:    President


[Signature Page of Promissory Note]

D-3

## ENDORSEMENT

**FOR VALUE RECEIVED**, the Philadelphia Authority for Industrial Development (the "Authority") hereby irrevocably assigns and transfers the foregoing Note, without recourse or warranty, except warranty of good title and warranty that the Authority has not assigned the foregoing Note to a person other than the hereinafter defined Trustee, to the order of Wilmington Trust, National Association (the "Trustee"), Dallas, Texas, trustee under a Trust Indenture, dated as of July 1, 2016, between the Authority and the Trustee.  The Authority hereby directs the maker of the Note, to make all payments with respect to principal of, premium, if any, and interest on the Note and all other payments required thereby directly to the order of the Trustee for the account of the Authority at the Trustee's corporate trust office in Dallas, Texas, or such other place as the Trustee, or its successor in trust, may designate in writing.

Dated and executed on _____, 2016.

**PHILADELPHIA AUTHORITY FOR
INDUSTRIAL DEVELOPMENT**


By:_____
Name: Thomas A. K Queenan
Title: Chairperson

D-4

## ACKNOWLEDGMENT OF ASSIGNMENT

The undersigned hereby acknowledges and agrees to the aforesaid assignment of the Note by the Philadelphia Authority for Industrial Development to Wilmington Trust, National Association, as trustee.

Dated this ___ day of July, 2016.

**PAVILION APARTMENTS LLC, a Pennsylvania limited liability company**
**By: JPC Charities, an Ohio nonprofit corporation, its Sole Member**

BY: _____
Name:   Jason Cook
Title:    President

D-5

**EXHIBIT E**

**FORM OF DISBURSEMENT REQUEST FOR OPERATING EXPENSES**

Requisition No. _____        Date: _____

To: Wilmington Trust, National Association, as Trustee (the "Trustee") under the Trust Indenture dated as of July 1, 2016 (the "Indenture"), relating to Philadelphia Authority for Industrial Development Senior Housing Revenue Bonds (The Pavilion) Series 2016A and Subordinate Series 2016B

Attention: Trust Department

  The undersigned Borrower Representative designated pursuant to the terms of the aforesaid Indenture and a Loan Agreement dated as of July 1, 2016 (the "Agreement"), between the Philadelphia Authority for Industrial Development and Pavilion Apartments Penn LLC (the "Borrower"), hereby requests that there be paid from the Operating Fund the sum set forth below, and in that connection with respect to the use of the proceeds of the Bonds, I HEREBY CERTIFY, as follow:

  An obligation in each of the amounts set forth below has been incurred in connection with the Project and constitutes an Operating Expense.

| Payee<br>Name and Address | Purpose | Amount |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Indenture.

        **PAVILION APARTMENTS LLC, a Pennsylvania limited liability company**
        **By: JPC Charities, an Ohio nonprofit corporation, its Sole Member**

        BY: _____
        Name: Jason Cook
        Title: President

E-1