### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILMINGTON TRUST, N.A., AS TRUSTEE OF THE $29,615,000 PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT SENIOR HOUSING REVENUE BONDS, <br><br> *Plaintiff,* <br><br> v. <br><br> PAVILION APARTMENTS PENN LLC, et al., <br><br> *Defendants.* | CIVIL ACTION <br> NO. 22-3985 |

**PAPPERT, J.**                                            **January 13, 2023**

### <u>MEMORANDUM</u>

Wilmington Trust, N.A., as Trustee of the $29,615,000 Philadelphia Authority for Industrial Development Senior Housing Bonds, filed a mortgage foreclosure action against Pavilion Apartments PENN LLC ("Pavilion").[1]  (ECF 25.)  Wilmington Trust subsequently moved to appoint a receiver to manage the mortgaged property, a low-income senior housing project.  (ECF 13.)  The Court held an evidentiary hearing on the Motion, (ECF 43), and on January 3, 2023, entered an order granting it.  (ECF 45.)  This Memorandum explains the Court's decision.

I

A

Wilmington Trust is the trustee under a July 1, 2016, Trust Indenture between the Philadelphia Authority for Industrial Development ("PAID") and Wilmington Trust.

---

[1]        The original Complaint was amended, as a means of consolidation, to include claims against Kiryat Greenbriar, LP which were initially asserted in a separate action.

(Ex. P-101).  PAID issued two series of Senior Housing Revenue Bonds, in a principal amount totaling $29,615,000, which PAID loaned to Pavilion for use in acquiring a leasehold interest in, renovating, and operating a low-income senior housing project (the "Project").  (Hrg. Tr. 29–32, ECF 43.)  The Project, known as the Pavilion Apartments, is a 295-unit apartment building in Philadelphia.  (*Id.* at 30:11–14.)  It is situated on land owned by Kiryat Greenbriar, and Pavilion has a long-term leasehold interest in the land under a ground lease with Greenbriar.  (*Id.* at 102:22–103:1.)

Rita Marie Ritrovato, a default administrator employed by Wilmington Trust, credibly discussed the loan documents and the parties' responsibilities thereunder.  To evidence the loan, PAID and Pavilion signed a loan agreement, (Ex. P-102), and Pavilion executed a Multifamily Promissory Note, (Ex. P-103), in favor of PAID, which PAID then assigned to Wilmington Trust.  The Note is secured by a Leasehold Mortgage on Pavilion's interest in the leasehold estate and the Project, in favor of Wilmington Trust.  (Hrg. Tr. 37; Ex. P-104 at 2.)  The bonds are paid from the project revenues, which Pavilion must remit to Wilmington Trust each month.  (Hrg. Tr. 29:17–30:6.)  Ms. Ritrovato testified that all the loan documents are cross-defaulting—a default under one is a default under the others.  (*Id.* at 44.)  Additionally, a default under the ground lease is also a default under the leasehold mortgage and loan agreement.  (*Id.* at 43–44.)

While Wilmington Trust alleges a number of violations of the loan documents in support of its Motion, Pavilion's default under the ground lease is most relevant to the need for a receiver.  Additionally, Wilmington Trust argues that a receiver is justified because, if one is not appointed, the City of Philadelphia's Department of Licenses and

Inspections ("L&I") will require the Project to cease operations due to outstanding electrical code violations.

B

Under the ground lease, Pavilion must pay Greenbriar monthly ground rent and its share of the previous month's utility bill.  (Third Amendment of Lease § 3, Ex. P-105; Second Amendment of Lease § 8(c), Ex. P-106.)  Joseph Yeh, president of Greenbriar's corporate general partner and property manager for the Greenbriar Club Apartments, explained why Pavilion pays Greenbriar for its utilities rather than the utility provider.  The Pavilion Apartments and the Greenbriar Club Apartments are on the same parcel of land—3901 Conshohocken Avenue.  (Hrg. Tr. 111:21–22.)  The original landowner constructed the Greenbriar Apartments first "and therefore established electric, gas, and water service through the meters located in Greenbriar with utilities."  (*Id.* at 111:23–25.)  Several years later, the landowner constructed the Pavilion Apartment building.  (*Id.* at 112:1.)  Because the utility provider would not set up multiple meters for a single address,[2] the Pavilion Apartments were "granted an easement on Greenbriar's land for their utility cables and . . . pipes to run," and submeters were installed in the Pavilion Apartments.  (*Id.* at 112:1–12.)

---

[2]     Robert Parissi, L&I's Chief Electrical Inspector, confirmed that the arrangement exists because the electric provider, PECO, "will not provide . . . more than one electric service to a property."  (Hrg. Tr. 166:10–12.)  Inspector Parissi noted, however, that after Pavilion acquired its interest in the Project, L&I worked with PECO to split the address—assigning "3901 Conshohocken A" to the Greenbriar Apartments and "3901 Conshohocken B" to the Pavilion Apartments—so that work could begin to construct cables bringing electrical service directly to the Project.  (*Id.* at 166:13–18.)

C

Mr. Yeh testified that for the first four years after Pavilion took over the ground lease, Pavilion "consistently" paid its ground rent and utilities when due. (*Id.* at 108:18–21.) But "[b]eginning in the latter half of 2020, they began to pay their rent later and later each month. Until early 2021, where they had stopped paying rent entirely." (*Id.* at 108:24–109:1.) In May of 2021, Greenbriar and Pavilion negotiated a forbearance agreement so Pavilion could bring its account current and avoid termination of the ground lease. (*Id.* at 143.) Pavilion paid as required while the agreement was in place. But as soon as the forbearance period ended in November of 2021, it immediately fell behind again. Pavilion did not make its December and January payments until the end of January of 2022, and has not made any payments since. (*Id.* at 109:1–10, 110:11.) Mr. Yeh testified that Greenbriar "attempted to contact" Pavilion to discuss another forbearance agreement "once they fell behind again" in 2022, but "they were not responsive." (*Id.* at 122:24–25.) As of October 5, 2022, Pavilion owed Greenbriar over $422,000 in arrearages. (*Id.* at 111:9–11; Summary of Arrearages, Ex. P-111.) That amount continues to increase with each month Pavilion defaults on the payments.

On August 16, 2022, Greenbriar notified Pavilion that it was in default on its obligations and that Greenbriar intended to terminate the ground lease, effective October 16, 2022. (August 16, 2022, Letter, Ex. P-110; Hrg. Tr. 114:20–23.) A copy of the letter was also sent to Wilmington Trust, as mortgagee. Pavilion never responded to the letter, but Wilmington Trust did. (Hrg. Tr. 115:11–22, 125:6–7.) Mr. Yeh testified that Greenbriar held off on the termination because Wilmington Trust

4

proposed seeking the appointment of a receiver who would work to resolve the defaults. If a receiver is not appointed, however, Greenbriar will terminate the ground lease because "Pavilion has been completely unresponsive to any of [Greenbriar's] attempts to contact [it]" in 2022 and Greenbriar has "lost faith that Pavilion . . . will ever make good on" its "responsibilities under the lease." (*Id.* at 126:9–15.)

### D

Around the time Greenbriar issued its notice of termination, Pavilion's working relationship with L&I also deteriorated due to its failure to remedy a years-long electrical code violation.

At the hearing, Inspector Parissi described the "campus-style" design for the electrical system at 3901 Conshohocken Avenue: PECO supplies 15,000 volts of electricity directly to the main electrical cabin at the Greenbriar Apartments. From there, the electricity is distributed to an electrical room under Greenbriar's parking garage, and then, until 2018, to the Pavilion Apartments via an underground wire. (*Id.* at 176–77.)

In 2018, the underground cable supplying electricity from Greenbriar to the Pavilion Apartments failed. (*Id.* at 131:5–6.) A temporary, above-ground cable was installed, connecting Greenbriar's main electrical room to the Pavilion Apartment building.[3] Pavilion is still relying on this setup for electricity even though the City code permits the use of temporary wiring for just ninety days, unless on an active

---

[3]     The 15,000-volt cable runs "out of the electrical room in Greenbriar, across the ceiling of Greenbriar parking garage, out the building, and just below a railing. Tied it across that. . . . Then it came across the driveway, attached to the Pavilion building, ran across the Pavilion building, runs down the side of the Pavilion building, all the way along the back of the Pavilion building, into the electrical room through a set of ventilation louvers." (Hrg. Tr. 167:24–168:10.)

construction site.  Inspector Parissi testified that the current wiring is a danger to life safety:  the cable is accessible to the public, and any "nonqualified personnel" who accidentally or intentionally cut the 15,000-volt wire will be killed.  (*Id.* at 168.)

Although Inspector Parissi had been aware for years that the Project was using temporary wiring, he did not write up a violation notice until the summer of 2022. Until that point he believed Pavilion was working to resolve the issue.  (*Id.* at 164:14–21.)  He testified that Pavilion's representative "assured" him that "they were going to get the work done."  (*Id.* at 165:14–21, 189:8–11; P-115 at 9.)  Inspector Parissi also knew that Pavilion was in contact with its electricians to "negotiat[e] a price for the project," and that the electricians were "already geared up to start this project" and "had submitted quite a few proposals to Pavilion."  (*Id.* at 180:12–16, 189:8–11.)  But Pavilion "never pulled the trigger on [the repair].  They kept putting it off and putting it off and putting it off," so Parissi issued the violation notice.  (*Id.* at 189:8–11.)

Pavilion did not respond to the notice, nor did it begin work on the electrical project.  On October 6, 2022, L&I notified Pavilion that it would issue a Cease Operations on January 4, 2023, unless work was underway to remedy the violation. (Ex. P-118; Hrg. Tr. 170:22–172:2.)  If a Cease Operations issues, all tenants will have to evacuate the Project and the City will take over the building.  (Hrg. Tr. 172:14–16.) Pavilion has not responded to the notice, nor has electrical work commenced.  (*Id.* at 172:1–11.)  Inspector Parissi testified that the City is willing to briefly postpone the Cease Operations if a receiver takes over the Project and begins to remedy the issues, but it will move forward with the Cease Operations on January 4, 2023, if there is no attempt to remedy the violation by then.  (*Id.* at 172:23–173:7.)

Pavilion now argues that it was withholding utility and rental payments from Greenbriar because it believed Greenbriar was obligated to undertake the electrical repairs.  But both Mr. Yeh and Inspector Parissi testified that Pavilion never told them about the dispute, and that its course of dealing indicated that Pavilion believed it was responsible for the repairs.  For example, in negotiating the forbearance agreement, Pavilion requested—and Greenbriar granted it—an easement across Greenbriar's property to construct a new electrical line.  (*Id.* at 117:20–24.)

## II

The Federal Rules of Civil Procedure "govern an action in which the appointment of a receiver is sought."  Fed. R. Civ. P. 66.  Federal courts sitting in diversity apply federal law to determine whether to appoint a receiver.  *Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 610 (D.N.J. 2012).

District courts have "broad discretion in appointing a receiver."  *Id.* at 614.  The Court of Appeals for the Third Circuit has cautioned, however, that receivership is a "drastic" remedy which courts should hesitate to impose if "milder measures" will adequately protect the movant's interests.  *Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942).  "The Third Circuit has not yet endorsed a set of factors that district courts should consider in determining whether to appoint a receiver." *Wilmington Tr., N.A. v. 1800 16th St., LLC*, No. 19-2601, 2020 WL 703653, at *2 (E.D. Pa. Feb. 11, 2020).  District courts in this Circuit commonly adopt the formulation from *CCC Atlantic*, 905 F. Supp. 2d at 614, *id.*, which is consistent with the general approach taken by federal courts in this country.  *See generally* 12 Wright & Miller, FED. PRAC. &

PROC. CIV. § 2983 (3d ed.); 13 MOORE'S FED. PRAC.—CIV. § 66.04 (2022).  No one factor is dispositive, nor is the list of factors exhaustive.  *See CCC Atl.*, 905 F. Supp. 2d at 614.

In the mortgage foreclosure context, the Court will consider whether "the property is inadequate security for the loan; the mortgage contract contains a clause granting the mortgagee the right to a receiver; the continued default of the mortgagor; and the misuse of project funds by the mortgagor."  *Id.* (quotation omitted) (cleaned up).  In addition, when the receiver will manage the property as well as collect rent, the Court will assess "the danger of waste; . . . the defendant's fraudulent conduct; imminent danger that property will be lost, concealed, injured, diminished in value, or squandered; the inadequacy of available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property."  *Id.* at 614–15 (quotation omitted) (cleaned up).

A

Following an "Event of Default," the leasehold mortgage gives Wilmington Trust the "strict . . . right to the appointment on ex parte application and without notice to Mortgagor . . . of a receiver" to manage the "Collateral."  (Open End Leasehold Mortgage and Assignment of Leases and Rents and Security Agreement § 3.03(a), Ex. P-104.)  Provisions granting a right to the appointment of a receiver weigh heavily in favor of appointing one, though they do not usurp the Court's discretion.  *See Wilmington Tr., N.A., as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2019-C50, Commercial Mortgage Pass-*

*Through Certificates, Series 2019-C50 v. M.P. Mgmt. LLC*, No. 21-5498, 2021 WL 4786117, at *7 (D.N.J. Oct. 14, 2021) (provisions which merely permit mortgagee to *apply for* appointment are "relevant but not dispositive," whereas a "full, self-executing consent to appointment of a receiver for any and all purposes upon default" is given "considerable weight"). "The importance of these contractual provisions" in the Court's decision to appoint a receiver "cannot be underestimated." *CCC Atl.*, 905 F. Supp. 2d at 615. "[W]here the parties have agreed *ex ante* that, in the event of a default, the lender has the right to all rent payments and to the appointment of a receiver. . . . appointment of a receiver is not such a drastic remedy." *Id.* at 616.

B

Wilmington Trust's interest in its primary collateral for the loan is in imminent danger of being lost or diminished in value, either by Greenbriar's termination of the ground lease or L&I's issuance of a Cease Operations for the property.

The evidence at the hearing showed that Greenbriar has both the ability and the firm intention to terminate the ground lease, and that such action would immediately extinguish Pavilion's interest in the property. The ground lease gives Greenbriar the option to terminate if Pavilion fails to pay ground rent or other required payments within fifteen days of receiving notice that the payment is overdue. (Second Am. to Ground Lease § 5(c), P-106.) Contrary to Pavilion's insistence that any attempt to terminate the lease would involve lengthy litigation, the ground lease does not require Greenbriar to initiate legal proceedings prior to termination. Once the lease is

9

terminated, Greenbriar does not need Pavilion's cooperation to obtain a judgment in ejection and writ of execution or possession.[4]

The process to terminate the leasehold interest is already in motion.  When the forbearance period ended, Pavilion quickly fell behind on its obligations, and has not paid Greenbriar since January of 2022.  (Hrg. Tr. 109:8–10, 110:11.)  Greenbriar tried to get Pavilion to enter a second forbearance agreement, but Pavilion was unresponsive.  (*Id.* at 122:21–123:1.)  In August of 2022, Greenbriar notified Pavilion that it intended to terminate the ground lease, effective October 16, 2022.  (*Id.* at 114:20–23; P-110.)  Mr. Yeh testified that Greenbriar has held off on the termination because Wilmington Trust proposed a receivership as a less "extreme" alternative.  (*Id.* at 115:11–22.)  But Pavilion still has not communicated with Greenbriar about the default, and Yeh testified that Greenbriar will terminate the ground lease if a receiver is not appointed.  (*Id.* at 126:9–21.)

Mr. Yeh's testimony, and Greenbriar's threat, are credible, particularly given Greenbriar's underlying efforts over an extended period to help Pavilion get back on track.  What is not credible is Pavilion's purported defense that it was justifiably withholding payments because of a dispute over responsibility for electrical repairs.  Pavilion never told Greenbriar that it was withholding payments for this reason, nor

---

[4]     The ground lease provides that "In the event the Lease is terminated prior to the end of the term hereof as a result of Tenant's default as above provided, it shall be lawful for any attorney as attorney for Tenant to file an agreement for entering in any competent court an amicable action and judgment in ejectment against Tenant and all persons claiming under Tenant for the recovery by Landlord of possession of the Premises, for which the Lease and this Second Amendment shall be its sufficient warrant, whereupon, if Landlord so desires, a writ of execution or of possession may issue forthwith without any prior writ or proceedings whatsoever . . . ."  (Second Am. to Ground Lease § 5(c), P-106.)

does its course of dealing through the forbearance period and afterward indicate that it believed there was an ongoing dispute.  (*Id.* at 116:14–16, 119:24–120:11.)

As Ms. Ritrovato explained, the leasehold estate is the collateral securing the bonds.  If Greenbriar terminates the ground lease, Pavilion's interest—and by extension, Wilmington Trust's primary security for a $29 million loan—will dissolve by operation of law.  The parties could not agree on—and did not submit evidence enabling the Court to determine—whether Greenbriar would step into Pavilion's shoes after termination and whether Pavilion would retain a meaningful interest in the building. *See* (*id.* at 257:9–12, 271:18–272:22).  But given that the Project's value to Wilmington Trust is its revenue stream and that Greenbriar and Wilmington Trust are not in contractual privity, it is very likely that termination would significantly diminish, if not extinguish, Wilmington Trust's interest in its primary collateral.

C

In July of 2018, one of the underground wires that provided electricity to Pavilion failed.  A temporary above-ground line was installed.  Such lines are only permitted for ninety days, except on construction sites, because they are out in the open and dangerous to the public—someone who accidentally or intentionally cuts the wire will be killed.  (*Id.* at 168:18–169:6.)  Pavilion's temporary electrical wire has been in place for more than four years.

In September of 2022, Inspector Parissi issued a violation notice for the temporary wire.[5]  He testified that he did not do so before then because Pavilion's

---

[5]     Inspector Parissi credibly testified from personal knowledge as the author of the violation notice that listing Kiryat Greenbriar rather than Pavilion as the "responsible party" was a clerical error.  (Hrg. Tr. 166.)

representatives assured him they would fix the problem, and he was aware that they had been working with an electrician on pricing for the project.  (*Id.* at 165:14–21, 189:8–11; P-115 at 9.)  But again, Pavilion kept putting the repair off.  (Hrg. Tr. 189:8–11.)  Pavilion did not respond to the violation, so on October 6, 2022, L&I sent a notice that if permanent electricity was not installed, it would issue an order for the Project to cease operations, effective January 4, 2023.  (*Id.* at 165:6–11; P-118.)

If a Cease Operations issues, the 295 families living at the Pavilion Apartments will be evacuated, and the City will take control of the building.  (Hrg. Tr. 172:14–16.) Like Greenbriar, L&I is willing to work with a receiver to avoid this drastic step.  But Inspector Parissi credibly testified that L&I is not willing to wait any longer for Pavilion to make the repairs:  "It's been four years.  They've made no attempt to correct anything, and the City will move on the cease" on January 4, 2023.  (*Id.* at 173:6–7.)

A Cease Operations would imperil Wilmington Trust's collateral by cutting off the revenue stream for the Project—the source of the bond payments—while the tenants are unable to occupy their apartments.  (*Id.* at 37:12–15.)  It is also unclear whether and when the Project will be able to resume operations once the repair is made.  Further, the Court cannot ignore the very real risk of serious disruption to the lives of the 295 low-income families who risk displacement due to forces completely outside their control.  Pavilion insists that there is no emergency because removing the tenants will be a months-long process.  But Pavilion confuses eviction with evacuation. In the event of a life safety threat, the City can remove all of the Project's tenants in a single day.  (*Id.* at 197–98.)  And in any event, whether removing these families will be immediate or following a longer notice period, the Court cannot let that process begin,

particularly given that it cannot predict how the process would end once it is put in motion.  (*Id.* at 193–99.)

The danger that the collateral will be lost or diminished in value due to termination of the ground lease or an order to cease operations, and the corresponding threat to Wilmington Trust's interest, weigh heavily in favor of appointing a receiver.

## D

Pavilion's continued default and Wilmington Trust's likelihood of success in the underlying mortgage foreclosure action also inform the analysis.  Although Pavilion argued at the hearing that it had cured many technical defaults, (*id.* at 15:1–7), it is still in default on material obligations under the loan documents.  Pavilion has not made any payments to Wilmington Trust, as required under the loan agreement, since October of 2022.  (*Id.* at 34; P-102 § 3.2(b).)  It also remains in monetary default under the ground lease, which is in turn a default under the loan agreement and mortgage. (Hrg. Tr. 43:24–44:12; Loan Agreement § 4.3, P-102; Leasehold Mortgage § 2.07, P-104.)

Based on what the Court read, saw and heard at the hearing, Wilmington Trust is likely to succeed on the merits in the underlying mortgage foreclosure action.  Under Pennsylvania law, "[i]n an action regarding a note secured by a mortgage, the lender 'presents a prima facie case by showing the execution and delivery of the note and its nonpayment.'"  *Wells Fargo Bank, N.A. v. Chun Chin Yung*, 317 F. Supp. 3d. 879, 885 (E.D. Pa. 2018) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1056 (Pa. Super. Ct. 1999)) (cleaned up).  The Multifamily Promissory Note was attached to the Complaint, and Ms. Ritrovato testified that Pavilion has not made a payment under the mortgage since October of 2022.  (Hrg. Tr. 40:1–4.)

Wilmington Trust argues that Pavilion's financial instability weighs in favor of appointing a receiver, but has not submitted sufficient evidence of Pavilion's financial status. The most that can be said based on the record is that Pavilion's failure to satisfy its obligations as they become due suggests that it is unable to pay. The Court finds this factor to be neutral.

### III

Wilmington Trust's witnesses, and concerns over its predicament, were all credible; Pavilion's approach was not. In the face of evidence of defaults, the impending ground lease termination, and the impending order to cease operations, Pavilion's response was to dismiss Wilmington Trust's fears as overblown. *See* (*Id.* at 257–58; Response 16–17, ECF 35). In Pavilion's view, Wilmington Trust's heart needn't be troubled because Pavilion has a solution waiting in the wings—a company called Radiant—which will buy the Project, resolve all these problems, pay off the bondholders, and invest more capital to renovate the Project. All Pavilion claims to need is 120 more days (plus whatever time it takes to obtain HUD's approval) to finalize the transaction. (Hrg. Tr. 267–68.) In that time, Pavilion says it will convince Greenbriar and L&I to push back their compliance deadlines and will quickly resolve the underlying defaults and violations. Pavilion waves off the "manufactured" threat to Wilmington Trust and the tenants, insisting, without legal or evidentiary support, that Greenbriar will simply step into its shoes if the ground lease terminates, and a Cease Operations would take months to effectuate because of restrictions on evicting HUD tenants. (*Id.* at 264–65.) At the hearing, Pavilion's counsel proposed that the Court conditionally deny the Motion and order Pavilion to maintain the property, resolve

14

violations, and close on its sale of the Project to Radiant by a date certain.  If Pavilion

fails to follow through on those requirements, it says, Wilmington Trust will be able to

renew its request for a receiver.  (*Id.* at 266.)

        As a preliminary matter, the Court doubts its authority to order L&I, a

nonparty, to refrain from taking whatever actions it deems required to protect citizen

safety, particularly given Pavilion's track record.  Even if it could, giving Pavilion more

time to remedy the defaults and violations would be futile.  Everyone seeking or

supporting the appointment of a receiver has tried to avoid ending up in this position by

giving Pavilion more time, to no avail.  Greenbriar entered into a forbearance

agreement, but as soon as it ended, Pavilion defaulted again and has continually

ignored Greenbriar's requests.  Mr. Yeh testified that even if additional time would

enable Pavilion to make its overdue payments, it would not prevent Pavilion from

falling right back into its old habits.  (*Id.* at 131.)  Similarly, L&I has waited four

years—and given 90 days' notice of the Cease Operations—with no attempt by Pavilion,

contrary to its past representations, to fix the problem.  Pavilion admits in its Response

that a Cease Operations would be a "strong basis to appoint" a receiver, (ECF 35 at 17),

yet requests an order setting deadlines for it to resolve issues that have festered for

years and, if it doesn't, suggests Wilmington Trust can renew its motion.  This all

sounds too good to be true—because it is.  Based on Pavilion's conduct to this point, the

request for additional time to work with L&I and Greenbriar is more of a stall tactic

than a serious proposal.

        Far from the panacea Pavilion says it is, the purported sale to Radiant is not a

credible proposal and does not address, much less resolve, Wilmington Trust's concerns.

Sale of the Project requires approval by both HUD and the bondholders.  (Hrg. Tr. 23.)
As of the morning of the hearing, all Wilmington Trust's counsel had received from
Pavilion was a "high-level proposed offer letter, but just with very general terms" and
Pavilion had not responded to Wilmington Trust's request to talk to Radiant. (*Id.* at
12:21–25.)  Moreover, the proposed sale price is only $21.5 million—an eight-million-
dollar haircut for the bondholders—and Pavilion has not been transparent about what,
if anything, it did to shop the offer.  (*Id.* at 230.)  The proposed purchase agreement
itself was not in evidence at the hearing, and Pavilion did not present any witnesses to
testify to its terms or feasibility.  Although Pavilion does not bear the burden of
showing a receiver is unwarranted, nothing in the record dispels the Court's impression
that a sale to Radiant is ephemeral.

 After the hearing, Wilmington Trust attached a copy of the purchase agreement
to one of its filings.[6]  (ECF 38-2.)  First of all, the bondholders have rejected Radiant's
proposal, (Plaintiff's Response and Objections to Proposed Order of Defendant Pavilion
Apartments PENN, LLC at 2, ECF 38), nipping the purported sale in the bud.  Even if
they hadn't, the purchase agreement subjects the sale to numerous conditions, many of
which are contingent on things that have not been done and have no prospect of being
fulfilled.  For example, Pavilion represents in the agreement that "[t]he Property has no
material physical or mechanical defects . . . and neither the Property nor the operation
thereof violate in any material way any health and safety or building codes or any other
laws, regulations or ordinances pertaining to the Property."  (Purchase Agreement
§ 10.A, ECF 38-2.)  Pavilion also says that "[t]here is no pending . . . or threatened . . .

---

[6]     Pavilion's counsel also emailed the Court a copy.

change in the availability of utilities." (*Id.* § 10.D.)  But the temporary wiring violates

the City's electrical code, and the Project can no longer use its existing electrical

setup—it must either re-wire the property or cease operations.  Pavilion also warrants

that "[t]he Ground Lease is in full force and effect and there remains no uncured

notices of default thereunder" and "[t]here is no litigation or other proceeding pending

(or to Seller's knowledge threatened), which would affect Seller or the Property or its

operation." (*Id.* §§ 10.E, 10.H.)  Pavilion's defaults under the ground lease abound and

this lawsuit will affect Pavilion, the Project and its operation.

IV

In light of the contractual provision for a receiver, almost all the factors

applicable to this case—especially the imminent threat that lease termination or a

Cease Operations will destroy the value of the collateral—favor appointing a receiver.

At this point, the Court sees no less drastic alternative that will prevent the harm to

Wilmington Trust's interests.  A receiver will provide a meaningful benefit by working

with Greenbriar and L&I to resolve the defaults and violations and avoid future

problems—something Pavilion failed to do.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.

17