## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE OF THE $29,615,000 PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT SENIOR HOUSING REVENUE BONDS (THE PAVILION),** | : : : : : : : | **CIVIL ACTION** |
| **Plaintiff,** | : : | **NO. 2:22-cv-03985-GJP** |
| **v.** | : : : | **Judge Gerald J. Pappert** |
| **PAVILION APARTMENTS PENN LLC, KIRYAT GREENBRIAR, L.P., ALOFT MGT, LLC, PF HOLDINGS LLC, ARON PURETZ,** | : : : : : : | |
| **Defendants.** | : | |

## THIRD AMENDED COMPLAINT

Plaintiff, Wilmington Trust, National Association, as Trustee of the $29,615,000 Philadelphia Authority for Industrial Development Senior Housing Revenue Bonds ("Trustee"), for its third amended complaint ("Complaint") against defendants, Pavilion Apartments Penn LLC ("Pavilion" or "Borrower") Kiryat Greenbriar, L.P. ("Greenbriar"), Aloft Mgt, LLC ("Aloft"), PF Holdings LLC ("PF Holdings"), and Aron Puretz avers as follows:

## PARTIES, JURISDICTION AND VENUE

1.      The Trustee is a national banking association with its main office, as designated in its Articles of Association, located in Wilmington, Delaware. The Trustee brings this action not in its individual capacity, but solely as Trustee for the benefit of the holders of the Bonds, as defined below.

2.      Pavilion is a Pennsylvania limited liability company.  Pavilion's sole member is JPC Charities, an Ohio nonprofit corporation with its principal place of business located at 10 Hill Street, Newark, New Jersey, 07102.

3.      Greenbriar is a Pennsylvania limited partnership. Upon information and belief, Greenbriar's general partner is a corporation organized under Pennsylvania law and with its principal place of business in Pennsylvania. Upon information and belief, Greenbriar's limited partners are citizens of Pennsylvania and New Jersey. Upon information and belief, there are no limited partners of Greenbriar that are citizens of Delaware.

4.      Aloft is a New York limited liability company with two last known business addresses: 2365 Nostrand Avenue, Brooklyn, New York, 11210; and 10 Hill Street, Newark, New Jersey, 07102. Upon information and belief, the members of Aloft are Chaim Puretz and Aron Puretz, who are domiciled in and citizens of New Jersey. Upon information and belief, there are no members of Aloft that are citizens of Delaware.

5.      PF Holdings is a New York limited liability company with a last known business address of 10 Hill Street, Newark, New Jersey, 07102. Upon information and belief, the sole member of PF Holdings is Chaim Puretz, who is domiciled in and a citizen of New Jersey. Upon information and belief, there are no members of PF Holdings that are citizens of Delaware.

6.      Aron Puretz is an individual who, upon information and belief, is domiciled in and a citizen of New Jersey.

7.      Pavilion, Aloft, PF Holdings, and Aron Puretz are insiders and affiliates of one another. Specifically, Chaim Puretz and/or Aron Puretz, directly or indirectly, control Pavilion, Aloft, and PF Holdings, as well as myriad additional business entities.

8.     Further, Pavilion's sole member, JPC Charities, a non-profit corporation, has made material misrepresentations in public filings regarding the makeup of its board of directors. In addition, following allegations that it and other related parties had "so deeply violated the public trust that the Attorney General must act to prevent future public harm," JPC Charities agreed through a publicly filed Settlement Agreement and Consent Judgment with the State of Indiana to wind down and dissolve by no later than April 30, 2023.

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter is controversy exceeds $75,000 and the action is between citizens of different states.

10.    Venue exists in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because the real property that is the subject of this action is situated in this district.

## FACTS

**A.     The Loan Transaction**

11.    The Trustee is the trustee under a Trust Indenture dated as of July 1, 2016 between the Philadelphia Authority for Industrial Development ("PAID") and the Trustee (the "Indenture"). A true and correct copy of the Indenture is attached hereto as **Exhibit A**.[1]

12.    Under the Economic Development Financing Law, as amended, PAID is authorized to issue revenue bonds and to use the proceeds from the sale thereof to make loans to finance the acquisition, rehabilitation, and equipping of housing facilities which are intended to promote the creation or retention of employment, the stimulation of economic activity, and the promotion of improvements in the health, safety and welfare of persons in the Project Jurisdiction.

---

[1]     All capitalized terms and words not otherwise defined herein shall have the meaning given to them in the Indenture.

13.     As authorized by the Act, under the Indenture, PAID issued certain Senior Housing Revenue Bonds (The Pavilion), Series 2016A, in the aggregate principal amount of $27,410,000, and certain Senior Housing Revenue Bonds (The Pavilion), Subordinate Series 2016B, in the aggregate principal amount of $2,205,000 (collectively,  the "Bonds") in order to obtain funds to loan to Pavilion to acquire a long-term leasehold interest in, renovate, and equip a 295-unit multifamily residential rental housing facility located in the City of Philadelphia known as The Pavilion (the "Project").

14.     On or about July 1, 2016, PAID issued to Pavilion a loan in the principal amount of $29,615,000 (the "Loan").

15.     The Loan is evidenced by a Loan Agreement between PAID and Pavilion dated as of July 1, 2016 (the "Loan Agreement").   A true and correct copy of the Loan Agreement is attached hereto as **Exhibit B**.

16.     Pavilion also executed a Multifamily Promissory Note (the "Note") dated as of July 5, 2016.  A true and correct copy of the Multifamily Promissory Note is attached hereto as **Exhibit C**.

17.     To secure repayment on the Note, Pavilion executed in favor of the Trustee, *inter alia*, an Open End Leasehold Mortgage and Assignment of Leases and Rents and Security Agreement dated as of July 5, 2016 (the "Leasehold Mortgage"), with respect to real and other property bearing the legal description set forth in Exhibit A to the Leasehold Mortgage and located at 3901 Conshohocken Avenue, Philadelphia, PA 19131.  A true and correct copy of the Leasehold Mortgage is attached hereto as **Exhibit D**.  The Leasehold Mortgage was recorded with the Philadelphia County Recorder of Deeds (the "Recorder") on July 25, 2016, as Document No. 53089394.

18.     In addition, Pavilion, the Trustee, Greenbriar, and Fannie Mae are all parties to a Subordination, Attornment and Nondisturbance Agreement ("SNDA") related to the Project. The SNDA was recorded with the Recorder on July 25, 2016, as Document No. 53089393.

19.     The Indenture, the Loan Agreement, the Leasehold Mortgage, and various other documents executed by Pavilion in favor of PAID and the Trustee with respect to the Loan are collectively referred to herein as the "Bond Documents."

20.     All capitalized terms not otherwise defined in this Complaint are used as defined in the Indenture and Loan Agreement.

**B.     The Ground Lease**

21.     Pavilion's long-term leasehold interest in the land on which the Project is constructed stems from a series of agreements and instruments comprising the "Ground Lease," as described more fully below.

22.     As of July 5, 2016, Greenbriar, as Landlord, and Pavilion, as Tenant, executed a Third Amendment of Lease (the "Third Amended Lease") for the land on which the Project is located. A true and correct copy of the Third Amended Lease is attached hereto as **Exhibit E**. The Third Amended Lease was recorded with the Recorder on July 25, 2016, as Document No. 53089388.

23.     The Third Amended Lease incorporates and modifies prior agreements and instruments comprising the Ground Lease, including but not limited to the Second Amendment of Lease (the "Second Amended Lease") dated as of December 10, 2002 between Greenbriar, as Landlord, and a previous tenant, Pavilion Associates, L.P. ("Pavilion Associates"). A true and correct copy of the Second Amended Lease is attached hereto as **Exhibit F**.

24.     Pavilion Associates assigned its interest in the Ground Lease to Pavilion Preservation, L.P. ("Pavilion Preservation") by way of an Assignment and Assumption Agreement dated December 10, 2002.

25.     In addition to the interest Pavilion acquired under the Third Amended Lease, Pavilion Preservation assigned its interest in the Ground Lease to Pavilion by way of an Assignment and Assumption of Ground Lease (the "Assignment"), dated as of July 5, 2016. A true and correct copy of the Assignment is attached hereto as **Exhibit G**. The Assignment was recorded with the Recorder on July 25, 2016, as Document No. 53089387.

26.     The original iteration of the Ground Lease between the predecessors in interest to Pavilion and Greenbriar was dated as of November 28, 1973.

27.     Accordingly, in its various forms and through its various amendments, the Ground Lease has been in continuous existence for nearly 49 years.

28.     Pursuant to the Third Amended Lease, the term of the Ground Lease is 35 years from the date of the Third Amended Lease, or until July 5, 2051.

29.     Pursuant to the SNDA, the rights and obligations of the "Leasehold Mortgagee" under § 3 of the Second Amended Lease apply to the Trustee as the "Tenant Lender."

**C.     Pavilion defaults under the Bond Documents.**

30.     Pavilion is in default under the Loan Agreement due to its failure to comply with numerous provisions of the Loan Agreement, as set forth further below.

31.     Under § 8.01(d) of the Indenture, the occurrence of a "Default" under the Loan Agreement constitutes an "Event of Default" under the Indenture. An Event of Default under the Indenture likewise constitutes an Event of Default under the Leasehold Mortgage.

32.     The Loan Agreement requires Pavilion to remit all Project Revenues (as defined in the Loan Agreement) to the Trustee in amounts sufficient to pay Basic Loan Payments and Additional Loan Payments. (Loan Agreement § 3.2.)

33.     Since at least October 2019, Pavilion has failed to remit Project Revenues in amounts sufficient to make Additional Loan Payments, in violation of § 3.2 of the Loan Agreement.

34.     The Trustee provided notice on or about February 10, 2021 that Pavilion is in default based on its noncompliance with § 3.2 of the Loan Agreement. A true and correct copy of the February 10, 2021 notice is attached hereto as **Exhibit H**.

35.     The Loan Agreement requires Pavilion to certify its Debt Service Coverage Ratio within 180 days after the end of each Fiscal Year, as part of its annual Audited Financial Statements. (Loan Agreement §§ 4.4, 6.7(a).)

36.     Pavilion has failed to certify its Debt Service Coverage Ratio, in violation of §§ 4.4 and 6.7(a) of the Loan Agreement.

37.     The Trustee provided notice on or about February 4, 2021 that Pavilion is in default based on its noncompliance with §§ 4.4 and 6.7(a) of the Loan Agreement.

38.     The Loan Agreement requires that Pavilion satisfy a Coverage Test, meaning that its Debt Service Coverage Ratio for each period must be equal to or greater than 1.20 to 1 on all Outstanding Senior Bonds and all Senior Parity Indebtedness and 1.10 to 1 on all Outstanding Senior Bonds and Subordinate Bonds and all Senior Parity Indebtedness and Subordinate Parity Indebtedness. (Loan Agreement § 4.4.)

39.     In the event that the Coverage Test is not met, the Loan Agreement requires Pavilion to retain a Management Consultant to prepare recommendations with respect to the

operations of the Project and the sufficiency of the rates, fees, and charges imposed by Pavilion. (Loan Agreement § 4.5.)

40.     Pavilion has failed to satisfy the Coverage Test and retain a Management Consultant, in violation of § 4.5 of the Loan Agreement.

41.     The Trustee provided notice on or about February 4, 2021 that Pavilion is in default based on its noncompliance with § 4.5 of the Loan Agreement.

42.     The Loan Agreement requires Pavilion to deliver to the Trustee annually a report from an Insurance Consultant setting forth a description of the insurance maintained by Pavilion and then in effect, and stating whether, in the opinion of the Insurance Consultant, such insurance complies with the requirements of Article V of the Loan Agreement and adequately projects the Project and Pavilion's operations. (Loan Agreement § 5.5(a).)

43.     Pavilion has failed to deliver the required annual reports from an Insurance Consultant since at least 2020, in violation of § 5.5 of the Loan Agreement.

44.     The Trustee provided notice on or about February 4, 2021 that Pavilion is in default based on its noncompliance with § 5.5 of the Loan Agreement.

45.     The Loan Agreement requires Pavilion to instruct the HAP Administrator or other to deposit the revenues generated pursuant to the HAP Contract to be wired directly from the HAP Administrator to the Trustee for deposit into the Revenue Fund. (Loan Agreement § 3.2(b).)

46.     Pavilion has failed to instruct the HAP Administrator to deposit revenues generated pursuant to the HAP Contract into the Revenue Fund, in violation of § 3.2(b) of the Loan Agreement.

47.     The Trustee provided notice on or about August 16, 2022 that Pavilion is in default based on its noncompliance with § 3.2(b) of the Loan Agreement. A true and correct copy of the August 16, 2022 notice is attached hereto as **Exhibit I**.

48.     The Loan Agreement requires Pavilion to provide a written copy of the monthly HAP Payment request form to the Trustee. (Loan Agreement § 4.13(b).)

49.     Pavilion has failed to provide a written copy of the monthly HAP Payment request form to the Trustee, in violation of § 4.13(b) of the Loan Agreement.

50.     The Trustee provided notice on or about August 16, 2022 that Pavilion is in default based on its noncompliance with § 4.13(b) of the Loan Agreement.

51.     The Loan Agreement requires Pavilion to submit to the Trustee a Needs Assessment Analysis, which includes recommendations for (a) the monthly amount to be deposited to the Repair and Replacement Fund and (b) the Replacement Reserve Requirement. (Loan Agreement § 4.12.)

52.     Pavilion has failed to provide the Trustee a Needs Assessment Analysis, in violation of § 4.12 of the Loan Agreement.

53.     The Trustee provided notice on or about August 16, 2022 that Pavilion is in default based on its noncompliance with § 4.12 of the Loan Agreement.

54.     The Loan Agreement requires Pavilion to deliver to the Trustee Audited Financial Statements. (Loan Agreement § 6.7(a).)

55.     Pavilion has failed to deliver to the Trustee Audited Financial Statements for the Fiscal Years of 2020 and 2021, in violation of § 6.7(a) of the Loan Agreement.

56.     The Trustee provided notice on or about August 16, 2022 that Pavilion is in default based on its noncompliance with § 6.7(a) of the Loan Agreement.

57.     The Loan Agreement requires Pavilion to deliver a statement to the Trustee certifying a review of Pavilion's activities for each Fiscal Year and listing each known default, as applicable. (Loan Agreement § 6.7(c).)

58.     Pavilion has failed to deliver to the Trustee a statement certifying a review of Pavilion's activities, in violation of § 6.7(c) of the Loan Agreement.

59.     The Trustee provided notice on or about August 16, 2022 that Pavilion is in default based on its noncompliance with § 6.7(c) of the Loan Agreement.

60.     The Loan Agreement requires Pavilion to prepare and deliver to the Trustee an annual Budget of anticipated Project Revenues and Operating Expenses. (Loan Agreement § 6.8.)

61.     Pavilion has failed to deliver to the Trustee an annual Budget for the Fiscal Years 2021 and 2022, in violation of § 6.8 of the Loan Agreement.

62.     The Trustee provided notice on or about August 16, 2022 that Pavilion is in default based on its noncompliance with § 6.8 of the Loan Agreement.

63.     As of the date of this Complaint, Pavilion has failed to cure any of the defaults set forth above.

64.     In addition, Pavilion has breached numerous other terms of the Loan Agreement by, among other things:

> a.  Failing to maintain a rental license with the City of Philadelphia, in violation of § 2.2(e) of the Loan Agreement, causing Pavilion to lose the ability to enforce rental agreements and collect unpaid rent from tenants;
>
> b.  Jeopardizing the tax-exempt status of Pavilion's sole member, JPC Charities, by disregarding corporate formalities, failing to file Form 990 tax returns with the IRS, and agreeing to dissolve and wind down JPC Charities

pursuant to a consent judgment, in violation of § 2.2(i) of the Loan Agreement;

c.  Failing to hold all tenant security deposits in a segregated eligible account, in violation of § 2.2(s) of the Loan Agreement;

d.  Commingling its assets with those of other entities, in violation of § 2.3(c) of the Loan Agreement;

e.  Failing to observe all material business organization formalities, in violation of § 2.3(g) of the Loan Agreement;

f.  Advancing or loaning its funds to other entities, in violation of § 2.3(m) of the Loan Agreement;

g.  Failing to keep the Project in a safe condition and in good repair at Pavilion's own expense, in violation of § 4.6 of the Loan Agreement;

h.  Allegedly incurring other Indebtedness, in the form of so-called "intra-company loans," in violation of § 6.11 of the Loan Agreement;

i.  Engaging in the conduct described further below in this Third Amended Complaint.

65.  These breaches of contract have resulted in lost revenues and additional expenses for the Project, all of which the Trustee seeks to recover as damages in this action.

**D.  Greenbriar fails to send the Trustee notices of Pavilion's alleged defaults under the Ground Lease.**

66.  On August 16, 2022, Greenbriar, through counsel, sent a letter to counsel for Pavilion, stating that Pavilion has defaulted in its obligations under the Ground Lease based on an alleged failure to pay rent beginning in February 2022 and failure to pay utilities beginning in January 2022. The letter states that Greenbriar has elected to accelerate Pavilion's obligations

under the Ground Lease, including the payment of all rent and other amounts currently due or to become due in the future, and to terminate the Ground Lease effective October 16, 2022. A true and correct copy of the August 16, 2022 letter is attached hereto as **Exhibit J**.

67.     The August 16, 2022 letter was additionally sent to the Trustee.

68.     Greenbriar subsequently prepared a summary of Pavilion's alleged arrearages under the Ground Lease as of October 5, 2022. The summary reflects purported arrearages of $422,036.19. A true and correct copy of the arrearages summary is attached hereto as **Exhibit K**.

69.     Greenbriar has not served the Trustee with any notices other than the August 16, 2022 letter. Counsel for Greenbriar admitted this fact in a letter dated September 20, 2022: "we confirm [that] the only notice delivered to [the Trustee] regarding the defaults under the ground lease and listed on the summary was the August 16, 2022 letter from this firm." A true and correct copy of the September 20, 2022 letter is attached hereto as **Exhibit L**.

70.     Pursuant to the SNDA, Greenbriar expressly agreed that the rights and obligations of the parties described in § 3 of the Second Amended Lease apply to the parties to the SNDA, and that the Trustee is entitled to the benefits granted to the "Leasehold Mortgagee" in the Second Amended Lease. (SNDA ¶ 4(d).)

71.     Section 3(b)(i) of the Second Amended Lease provides that Greenbriar shall give notice to any "Leasehold Mortgagee"—the Trustee—upon Pavilion's default in the performance of any of its obligations under the Ground Lease. (Second Amended Lease § 3(b)(1).) Paragraph 3(b)(i) further provides that the Leasehold Mortgagee—the Trustee—shall have the right to cure any default by Pavilion under the Ground Lease, during the same time period in which Pavilion has such right to cure. (Id.)

72.     In addition, § 3(b)(ii) of the Second Amended Lease provides that Greenbriar shall give an additional notice to any "Leasehold Mortgage"—the Trustee—"if any default by [Pavilion] shall occur which entitles [Greenbriar] to terminate the Lease, and [Pavilion] shall have failed to cure or remedy any default or breach of covenant . . . by the expiration of any time period available for [Pavilion] to do so." The notice shall inform the Trustee "of such failure to cure and of [Greenbriar's] intent to so terminate at least forty-five (45) days in advance of the proposed effective date of such termination." (Second Amended Lease § 3(b)(ii).)

73.     Greenbriar failed to provide the Trustee with the notice required by § 3(b)(ii) of the Second Amended Lease.

74.     Due to Greenbriar's failure to provide the notice to the Trustee as required by § 3(b)(ii) of the Second Amended Lease, the Ground Lease cannot terminate as suggested by Greenbriar in its August 16, 2022 correspondence to Pavilion. (Ex. J.)

75.     Pavilion's alleged defaults under the Ground Lease constitute further defaults under § 4.3 of the Loan Agreement, which requires Pavilion to pay all Operating Expenses when due. As provided in the Indenture, Operating Expenses include Lease Payments.

76.     The Trustee provided notice on or about September 8, 2022 that Pavilion is in default under the Loan Agreement based on its alleged defaults under the Ground Lease. A true and correct copy of the September 8, 2022 notice is attached hereto as **Exhibit M**.

E.      **Pavilion's Fraudulent Transfers to Insiders**

77.     On February 3, 2023, Pavilion provided various documents and information to Ian V. Lagowitz, the Court-appointed Receiver ("the Receiver"). These materials include, but are not limited to, Pavilion's general ledgers for 2021 and 2022; Pavilion's 2021, 2022, and January 2023

bank statements for its operating bank account and reserve bank account; and a reconciliation report that Pavilion itself created.

78.     Pavilion's general ledgers from 2021 and 2022 show that Pavilion engaged in many "loans," "online banking transfers," and "account transfers" to and from a host of other accounts. From between 2021 and 2022, these accounts include at least the following: -0382, -2160, -2977, -3504, -3672, -4282, -5333, -6441, -6506, -6520, -6820, -6974, -7985, -8622, and -8373.

79.     Based on a reconciliation report provided by Pavilion, these accounts belong to: Aloft, PF Holdings, Bishop Givens, Optimum, Brinton Manor, Beech Hill, Peach Tree, Capital Place, Landmark Square, Hoyt, Clemons, Forest Hill, Colonnade, Sunset Plaza, the Michael Walsh Apartments, and Addison Apartments.

80.     Before the Court appointed the Receiver, Aloft was the property manager for the Project.

81.     PF Holdings serves as the "consultant" in connection with the Project.

82.     Upon information and belief, Bishop Givens, Optimum, Brinton Manor, Beech Hill, Peach Tree, Capital Place, Landmark Square, Hoyt, Clemons, Forest Hill, Colonnade, Sunset Plaza, the Michael Walsh Apartments, and Addison Apartments are all insiders and affiliates of Pavilion.

83.     Pavilion's 2021 Audited Financial Statements—which were misstated in one or more material respects—provide that: "the Project occasionally has loans to and from entities under common ownership."  According to Pavilion's 2021 Audited Financial Statements, as of December 31, 2021, Pavilion's net amounts owed to related parties totaled $146,250.

84.     Upon information and belief, the "loans" described in Pavilion's financial statements and its general ledgers are not loans at all—they have no corresponding agreements or documentation.

85.     These transfers to affiliates, or insiders, were not made in the ordinary course of business because Pavilion did not receive reasonably equivalent value in exchange for these transfers.

86.     These transfers were made with actual intent to hinder, delay, or defraud the Trustee because the existence of these transfers was concealed from the Trustee and they were made to the exclusion of the payments required to be made to the Trustee under the Bond Documents, all while Pavilion was flouting the financial controls provided in the Bond Documents. In other words, Pavilion intended to prevent Project Revenues from being paid to the Trustee as required, instead siphoning those Project Revenues for the benefit of insiders and affiliates and concealing that fact.

87.     Upon information and belief, Pavilion retained control and/or custody of the funds after the transfer because the transferees are insiders and affiliates of Pavilion. Indeed, after Pavilion was forced to provide its bank statements to the Receiver—revealing Pavilion's pattern of fraudulent transfers—Pavilion was able to immediately recall nearly $800,000 of fraudulently transferred funds back from insiders and affiliates. This fact further underscores the absence of any legitimate business purpose for Pavilion's insider and affiliate transfers: caught with their "hands in the cookie jar," Pavilion and its insiders and affiliates did not even attempt to justify their wrongful actions.

88.     Upon information and belief, Pavilion's pervasive pattern of transferring Project Revenues to insiders and affiliates has spanned many years and did not begin in January 2021, the

earliest date for which the Trustee has Pavilion bank statements as of the date of this Third Amended Complaint.

89.     All Project Revenues transferred to insiders and affiliates of Pavilion since the date of the Loan Agreement were required to be paid to the Trustee in accordance with the Loan Agreement.

90.     As of the date of this Third Amended Complaint, upon information and belief, at least $55,000 of Project Revenues have been transferred to PF Holdings and have not been repaid to the Trustee or the Receiver.

91.     At all relevant times, Pavilion was insolvent within the definition in 12 Pa Stat. § 5102.

92.     With this Third Amended Complaint, the Trustee seeks to recover from Pavilion, its insiders and affiliates, and any other subsequent knowing recipients all Project Revenues that were improperly transferred by or on behalf of Pavilion. For the avoidance of doubt, this includes all amounts not yet known to the Trustee but to be determined through discovery.

93.     More appallingly, throughout the years that Pavilion siphoned Project Revenues to benefit its insiders and affiliates, it and Aloft allowed substantial bills to mount—including to Greenbriar—and allowed the Project to deteriorate to such an extent that the Project was riddled with serious life-safety issues; that HUD suspended HAP payments; that numerous units became unusable and were unable to earn rental income; that numerous units became infested with mold and bed bugs; and that plumbing failures became a regular fact of life for residents.

**F.     Pavilion's Improper Payment of Management Fees**

94.     In addition, Pavilion's general ledgers indicate that Pavilion has paid management fees to Aloft since at least 2021.

95.     Under section 4.8 of the Loan Agreement, Pavilion agreed that "it, the Sole Member, and any Manager or Asset Manager which is an Affiliate of the Borrower or the Sole Member, shall forbear from taking any management, administration, development or other fees, or any portions thereof, in the event and to the extent that money in the Revenue Fund are insufficient in any month to make all current and deferred deposits (other than deposits to the Surplus Fund) provided in the Indenture." (Loan Agreement § 4.8.)

96.     The "Asset Manager" is defined in the Indenture as PF Holdings Management LLC, a New York limited liability company. (Indenture §1.01.)

97.     The "Sole Member" is defined in the Indenture as JPC Charities, an Ohio nonprofit corporation. (Indenture §1.01.)

98.     The "Manager" is defined in the Indenture as any property manager under any Management Agreement, which at all relevant times has been Aloft. (Indenture §1.01.)

99.     Aloft is an insider and an "Affiliate" of Pavilion within the meaning of the Loan Agreement. Among other things, both Pavilion and Aloft are substantially controlled by Chaim Puretz and/or Aron Puretz.

100.    Upon information and belief, the money in the Revenue Fund has been insufficient to make all current and deferred deposits since at least October 2018.

101.    Nonetheless, Pavilion has been paying management fees to Aloft throughout that time.

102.    As an insider and an Affiliate of Pavilion, Aloft has, at all relevant times, had actual and/or constructive knowledge of section 4.8 of the Loan Agreement.

103.    Unbeknownst to the Trustee, Aloft's activities with respect to the Project constituted gross mismanagement and neglect. Among other things, Aloft oversaw and facilitated

fraudulent transfers to insiders and Affiliates of Pavilion, Aloft, PF Holdings, Chaim Puretz and Aron Puretz, at the same time that it allowed the Project to seriously deteriorate. In addition, it failed to pay routine vendors for the Project, resulting in one or more vendors harassing and threatening on-site employees of the Project.

104.    Pavilion is in default of the Loan Agreement due to its repeated violation of section 4.8 of the Loan Agreement.

105.    Section 4.8's prohibition on the payment of management and other fees to Affiliates, as well as the requirement in Section 4.5 to hire a Management Consultant, are not mere formalities. Rather, these provisions are critical controls to prevent insiders and Affiliates of the Borrower from misusing and siphoning Project Revenues, which is precisely what Pavilion and Aloft did.

106.    Pavilion and Aloft bear responsibility, jointly and severally, for repaying to the Trustee all amounts previously paid as management fees to Aloft in violation of the Loan Agreement.

**G.      Transfers of Cash Revenues to Aron Puretz**

107.    At some time after Pavilion acquired the Project, it determined that it was necessary to replace the laundry machines located in the Project's lower level, machines which are used by tenants on a daily basis for their personal laundry needs.

108.    The laundry machines are operated by tenants using prepaid cards, which are loaded and reloaded through a cash vending machine.

109.    The laundry machines constituted a necessary capital improvement and an equity contribution by Pavilion and its principals, and, pursuant to section 4.6 of the Loan Agreement,

became the property of Pavilion and were required to be kept free of all liens, security interests, and encumbrances.

110.    However, Aron Puretz claimed they constituted his personal property and extracted all money from the cash vending machine for himself personally over the course of several years (the "Cash Revenues").

111.    Upon information and belief, no written agreement was entered into between Aron Puretz and Pavilion related to the laundry machines or the Cash Revenues.

112.    The actions of Pavilion and Aron Puretz violate section 6.14 of the Loan Agreement, which prohibits "any transaction, including, without limitation, the purchase, sale, lease, or exchange of property or the rendering of any service, with any Affiliate except in the ordinary course of business and pursuant to the reasonable requirements of [Pavilion's] business and upon terms found by the Governing Body of the Sole Member to be fair and reasonable and no less favorable to [Pavilion] than would be obtained in a comparable arm's length transaction with a Person not an Affiliate."

113.    Aron Puretz is an insider and an Affiliate within the definition in the Loan Agreement. Aron Puretz holds himself out as a Managing Member of Aloft and directly or indirectly controls or is under common control with Pavilion.

114.    Aron Puretz has, at all relevant times, had actual and/or constructive knowledge of the Loan Agreement and its terms.

115.    In addition, because the laundry machines constitute an asset of Pavilion, Aron Puretz did not provide reasonably equivalent value in exchange for the transfer of the Cash Revenues to himself.

116.    Upon information and belief, the Cash Revenues improperly taken by Aron Puretz total in the hundreds of thousands of dollars.

117.    At all relevant times, Pavilion was insolvent within the definition in 12 Pa. Stat. § 5102.

118.    All Cash Revenues constitute "Project Revenues" within the definition provided in the Loan Agreement and were required to be paid to the Trustee pursuant to section 3.2 of the Loan Agreement.

119.    Aron Puretz bears personal responsibility for repaying to the Trustee all Cash Revenues taken from the Project in violation of the Loan Agreement and Pennsylvania law.

**H.    The Trustee's Damages and Remedies**

120.    Due to Pavilion's ongoing and uncured defaults, the Trustee provided notice to Pavilion on October 5, 2022 that the Trustee has declared the outstanding principal balance and interest accrued on the Bonds and payments required to be made by Pavilion under § 3.2 of the Loan Agreement for the remainder of the term of the Loan Agreement to be immediately due and payable. A true and correct copy of the October 5, 2022 notice is attached hereto as **Exhibit N**.

121.    As of September 28, 2022, the amount due and owing by Pavilion under the Loan Agreement and the Leasehold Mortgage is **$26,980,000**, without defense, deduction, offset, recoupment, or counterclaim.

122.    Additional interest together with fees, charges and costs recoverable under the Bond Documents, have continued and continue to accrue on the Bonds.

123.    With this action, the Trustee is undertaking, without limitation, to exercise additional remedies available upon an Event of Default by Pavilion, including to foreclose the Leasehold Mortgage and to recover all Project Revenues that Pavilion failed to pay to the Trustee

as required under the Bond Documents; amounts necessary to pay all utilities, ground lease payments, repairs, and maintenance; and lost revenue.

## COUNT ONE – MORTGAGE FORECLOSURE – PAVILION

124.    The preceding paragraphs of this Complaint are incorporated herein by reference.

125.    Pavilion executed the Loan Agreement, which is secured by the Leasehold Mortgage, in favor of the Trustee.

126.    Pavilion has defaulted on its obligations under the Leasehold Mortgage, the Loan Agreement, and the other Bond Documents.

127.    The Trustee is authorized by the Leasehold Mortgage and by Pennsylvania law to foreclose the Leasehold Mortgage in the event of a default by Pavilion.

128.    As of September 28, 2022, there is due and owing on the Loan the sum of $26,980,000, together with accruing interest and fees, charges and costs recoverable under the Bond Documents.

## COUNT TWO – BREACH OF CONTRACT - PAVILION

129.    The preceding paragraphs of this Complaint are incorporated herein by reference.

130.    Pavilion is a party to certain contracts comprising the Bond Documents, including the Loan Agreement and the Leasehold Mortgage.

131.    Pavilion has breached the Bond Documents, including the Loan Agreement and Leasehold Mortgage, by, among other things:

a.      Failing to remit Project Revenues in amounts sufficient to make Additional Loan Payments, in violation of § 3.2 of the Loan Agreement;

b.      Failing to certify its Debt Service Coverage Ratio, in violation of §§ 4.4 and 6.7(a) of the Loan Agreement;

c.     Failing to retain a Management Consultant, in violation of § 4.5 of the Loan Agreement;

d.     Failing to deliver the required annual reports from an Insurance Consultant, in violation of § 5.5 of the Loan Agreement;

e.     Failing to instruct the HAP Administrator to deposit revenues generated pursuant to the HAP Contract into the Revenue Fund, in violation of § 3.2(b) of the Loan Agreement;

f.     Failing to provide a written copy of the monthly HAP Payment request form to the Trustee, in violation of § 4.13(b) of the Loan Agreement;

g.     Failing to provide the Trustee a Needs Assessment Analysis, in violation of § 4.12 of the Loan Agreement;

h.     Failing to deliver to the Trustee Audited Financial Statements for the Fiscal Years of 2020 and 2021, in violation of § 6.7(a) of the Loan Agreement;

i.     Failing to deliver to the Trustee a statement certifying a review of Pavilion's activities, in violation of § 6.7(c) of the Loan Agreement;

j.     Failing to deliver to the Trustee an annual Budget for the Fiscal Years 2021 and 2022, in violation of § 6.8 of the Loan Agreement; and

k.     Failing to pay all Operating Expenses when due, in violation of § 4.3 of the Loan Agreement;

l.     Failing to maintain a rental licensure with the City of Philadelphia, in violation of § 2.2(e) of the Loan Agreement, causing Pavilion to lose the ability to enforce rental agreements and collect unpaid rent from tenants;

m.    Jeopardizing the tax-exempt status of Pavilion's sole member, JPC Charities, by disregarding corporate formalities, failing to file Form 990 tax returns with the IRS, and agreeing to dissolve and wind down JPC Charities pursuant to a consent judgment, in violation of § 2.2(i) of the Loan Agreement;

n.    Failing to hold all tenant security deposits in a segregated eligible account, in violation of § 2.2(s) of the Loan Agreement;

o.    Commingling its assets with those of other entities, in violation of § 2.3(c) of the Loan Agreement;

p.    Failing to observe all material business organization formalities, in violation of § 2.3(g) of the Loan Agreement;

q.    Advancing or loaning its funds to other entities, in violation of § 2.3(m) of the Loan Agreement;

r.    Failing to keep the Project in a safe condition and in good repair at Pavilion's own expense, in violation of § 4.6 of the Loan Agreement;

s.    Transferring Project Revenues to insiders and Affiliates;

t.    Paying management fees to Aloft in violation of the Loan Agreement; and

u.    Transferring Cash Revenues to Aron Puretz.

132.    The Trustee has been damaged by Pavilion's actions in an amount in excess of $26,980,000.

133.    The Trustee's damages include, but are not limited to, principal and accrued interest on the Bonds; Project Revenues that Pavilion failed to pay to the Trustee as required under the Bond Documents; amounts necessary to pay all utilities, ground lease payments, repairs, and maintenance; and lost revenue.

134.   The Trustee is entitled to judgment against Pavilion in an amount to be determined at trial in excess of $26,980,000, plus additional interest, attorneys' fees and costs as allowed by law, and specific performance of Pavilion's obligations under the Bond Documents.

### COUNT THREE – BREACH OF CONTRACT - GREENBRIAR

135.   The preceding paragraphs of this Complaint are incorporated herein by reference.

136.   The Trustee and Greenbriar are parties to the SNDA, pursuant to which the Trustee became the express third-party beneficiary of certain provisions of the Ground Lease, in particular the protections granted to Leasehold Mortgagees in Section 3 of the Second Amended Lease.

137.   Greenbriar has breached the SNDA and the Ground Lease by, among other things, failing to provide the Trustee with the notice and opportunity to cure required by section 3(b)(ii) of the Second Amended Lease.

138.   The Trustee has been damaged by Greenbriar's breaches of contract in an amount to be determined at trial in excess of $75,000. Among other things, Greenbriar's failure to provide the Trustee with timely notice of Pavilion's alleged defaults under the Ground Lease has deprived the Trustee of the ability to timely exercise suitable remedies and to prevent further losses and waste.

139.   The Trustee is entitled to judgment against Greenbriar in an amount to be determined at trial in excess of $75,000, together with attorneys' fees and costs as allowed by law.

### COUNT FOUR – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING – GREENBRIAR

140.   The preceding paragraphs of this Complaint are incorporated herein by reference.

141.   The Trustee and Greenbriar are parties to the SNDA, the purpose of which is to confirm the understanding of all relevant parties with interests in the Project.

142.     Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.

143.     Greenbriar breached its duty of good faith and fair dealing to the Trustee when it failed to provide the Trustee timely notice of Pavilion's alleged defaults under the Ground Lease, thereby depriving the Trustee of the ability to timely exercise suitable remedies and to prevent further losses and waste. Greenbriar's lack of diligence and timely communication has effectively rendered the Trustee's rights under the Ground Lease illusory.

144.     The Trustee is entitled to judgment against Greenbriar in an to be determined at trial in excess of $75,000, together with attorneys' fees and costs as allowed by law.

## COUNT FIVE – DECLARATORY JUDGMENT – GREENBRIAR

145.     The preceding paragraphs of this Complaint are incorporated herein by reference.

146.     The Trustee and Greenbriar are parties to the SNDA, pursuant to which the Trustee became the express third-party beneficiary of certain provisions of the Ground Lease, in particular the protections granted to Leasehold Mortgagees in Section 3 of the Second Amended Lease.

147.     Pursuant to the Second Amended Lease, Greenbriar was required to provide the Trustee with notice of Pavilion's defaults and its failure to cure before purporting to terminate the Ground Lease.

148.     Greenbriar failed to provide the Trustee with the notice required by the Second Amended Lease.

149.     Pursuant to the Declaratory Judgment Act, 42 Pa.C.S. § 7532, this Court has the power to declare the rights, status, and other legal relations of the parties.

150.    The Trustee seeks a declaration from this Court that Greenbriar has failed to satisfy the necessary conditions precedent to terminating the Ground Lease, and that any such purported termination shall be null and void due to Greenbriar's actions and omissions.

## COUNT SIX – ACCOUNTING - PAVILION

151.    The preceding paragraphs of this Complaint are incorporated herein by reference.

152.    Pursuant to the Loan Agreement, Pavilion is required to provide to the Trustee, among other things, Audited Financial Statements, an annual Budget, and a certification of its Debt Service Coverage Ratio.

153.    Further, Pavilion is required under the Loan Agreement to deposit all Project Revenues with the Trustee upon receipt by Pavilion.

154.    Pavilion has, among other things, failed to provide such deposits and information as would enable the Trustee to verify that Project Revenues are being applied as contractually required and in the best interests of the holders of the Bonds.

155.    The Trustee is entitled to an accounting of Pavilion's operations and to access all of Pavilion's books, records, and financial statements.

## COUNT SEVEN – ACCOUNTING – GREENBRIAR

156.    The preceding paragraphs of this Complaint are incorporated herein by reference.

157.    Pursuant to the Ground Lease, Greenbriar must accurately account for all expenses and revenues related to the Project.

158.    Greenbriar has provided a belated summary, with no supporting documentation, purporting to show amounts owed by Pavilion under the Ground Lease.

159.    The Trustee is entitled to an accounting of the expenses and revenues of Greenbriar related to the Ground Lease, and to all corresponding books, records, and financial statements.

**COUNT EIGHT – VOIDABLE TRANSFERS –**
**ALOFT, PF HOLDINGS, AND ARON PURETZ**
**PUVTA, 12 PA. STAT. §§ 5101 – 5114**

160.    The preceding paragraphs of this Complaint are incorporated herein by reference.

161.    At all relevant times, the Trustee was a creditor of Pavilion pursuant to the Bond Documents.

162.    At all relevant times, Pavilion was a debtor of the Trustee, and Pavilion was insolvent within the definition provided in 12 Pa. Stat. § 5102.

163.    At all relevant times, the Trustee held claims against Pavilion pursuant to the Bond Documents.

164.    Over the course of several years, Pavilion transferred funds to and from a host of insiders and affiliates, which funds have not been repaid to Pavilion and have not been provided to the Trustee pursuant to the Bond Documents, including but not limited to:

>   a.   Substantial amounts paid to Aloft, including but not limited to so-called Management Fees, which were not permitted under the Bond Documents;

>   b.   At least $55,000 paid to PF Holdings;

>   c.   Hundreds of thousands of dollars in Cash Revenues paid to Aron Puretz personally.

165.    Pavilion engaged in these transfers with actual intent to hinder, delay or defraud the Trustee as a creditor of Pavilion.

166.    Pavilion engaged in these transfers without receiving a reasonably equivalent value in exchange for the transfers. Among other things, Aloft, PF Holdings, and Aron Puretz's activities, including Aloft's so-called management of the Project, robbed the Project of value by

abusing their insider status to funnel Cash Revenues to themselves and other insiders and Affiliates at the same time that they allowed the Project to seriously deteriorate and bills to go unpaid.

167.   At the time of the transfers, Pavilion was engaged or was about to engage in a business or a transaction for which the remaining assets of Pavilion were unreasonably small in relation to the business or transaction.

168.   At the time of the transfers, Pavilion intended to incur, or believed or reasonably should have believed that Pavilion would incur, debts beyond its ability to pay as they became due.

169.   At the time of the transfers, Pavilion was either insolvent or became insolvent as a result of the transfers.

170.   The Trustee has been detrimentally affected by these fraudulent transfers because the funds consisted of Project Revenues owed to the Trustee, not other entities.

171.   The Trustee is entitled to avoid all fraudulent transfers to insiders and affiliates pursuant to 12 Pa. Stat. § 5107. Accordingly, the Trustee seeks a judgment against the recipients of any and all fraudulently transferred funds.

172.   This count expressly includes all voidable transfers made by Pavilion and not yet known to the Trustee, but to be uncovered in discovery.

**WHEREFORE**, the Trustee asks that a judgment be entered in its favor as follows:

(1)   Against Pavilion for foreclosure of the Leasehold Mortgage and in the amount of $26,980,000, together with additional accrued and accruing interest, fees, charges and costs recoverable under the Bond Documents;

(2)   Against Pavilion, requiring specific performance of all terms and covenants in the Loan Agreement and other Bond Documents;

28

(3)      Against Greenbriar in the amount in excess of $75,000, together with additional accrued and accruing interest, fees, charges and costs recoverable under applicable law;

(4)      For appointment of a receiver to take control of all operations of Pavilion in a manner in the best interests of the holders of the Bonds;

(5)      For a declaration that Greenbriar has failed to satisfy the necessary conditions precedent to terminating the Ground Lease, and that no such purported termination shall be effective due to Greenbriar's actions and omissions;

(6)      Against Pavilion for all Project Revenues not previously paid to the Trustee pursuant to the Bond Documents; amounts necessary to pay all utilities, ground lease payments, repairs, and maintenance; and lost revenue;

(7)      Against Pavilion and Aloft for the amount of all management fees previously paid to Aloft in violation of the Loan Agreement;

(8)      Against Pavilion, Aloft, PF Holdings, and Aron Puretz avoiding and preserving the transfers for the Trustee; directing that the transfers be set aside; and recovering the transfers, or the value thereof, from Pavilion, Aloft, PF Holdings, Aron Puretz, and any subsequent transferees in an amount to be determined at trial;

(9)      For an award of the Trustee's costs, expenses, and attorneys' fees in accordance with the Loan Agreement and other applicable law;

(10)    For temporary and permanent injunctive relief to prevent the termination of the Ground Lease based on the alleged defaults by Pavilion for which no notice was provided to the Trustee;

(11)    For such other and further relief as the Court in its discretion may deem equitable and just.

*(Signature block on next page)*

Dated:  August 10, 2023                    Respectfully Submitted,


                                           /s/ *Karla M. Vehrs*
                                           Karla M. Vehrs (*pro hac vice*)
                                           William P. Wassweiler (*pro hac vice*)
                                           BALLARD SPAHR LLP
                                           2000 IDS Center
                                           80 South 8th Street
                                           Minneapolis, MN 55402-2119
                                           (612) 371-3211
                                           vehrsk@ballardspahr.com
                                           wassweilerw@ballardspahr.com

                                           Raymond A. Quaglia, PA ID No. 63146
                                           BALLARD SPAHR LLP
                                           1735 Market Street, 51st Floor
                                           Philadelphia, PA  19103
                                           (215) 665-8500
                                           quaglia@ballardspahr.com


                                           *Counsel for Plaintiff Wilmington Trust, National
                                           Association*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically on August 10, 2023.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Dated: August 10, 2023                     */s/ Karla M. Vehrs*_____
                                             Karla M. Vehrs

                                           *Counsel for Plaintiff Wilmington Trust, National Association*