# EXHIBIT K

# FORBEARANCE AGREEMENT

This **FORBEARANCE AGREEMENT** (this "Agreement"), dated as of May 26, 2021 to be effective as of May 20, 2021 (the "Effective Date"), is entered into by and among **Kiryat Greenbriar, L.P.**, a Pennsylvania limited partnership ("Landlord" or "Greenbriar"), and **Pavilion Apartments Penn LLC**, a Pennsylvania limited liability company ("Tenant" or "Pavilion").

## BACKGROUND

A.    Reference is hereby made to that certain real property consisting of 1.4067 acres located on Conshohocken Avenue in the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania more particularly described on Exhibit A attached hereto (the "Premises").

B.    Pursuant to that certain Lease Agreement dated November 28, 1973 (the "Original Lease") West Village, Landlord's predecessor in interest, leased the Premises to WV III, Tenant's predecessor in interest, for a term of seventy-five years for improvement and multi-unit residential use purposes. The Original Lease was recorded in Deed Book D.C.C. 515, Page 466 et seq. of the Records Department of the City of Philadelphia (the "Recorder's Office"). Thereafter, West Village and WV III entered into a certain Amendment of Lease dated September 28, 1983 (the "First Amendment"), which was recorded in Deed Book RFP 850, page 154 et seq. of the Recorder's Office.

C.    Pursuant to that certain Assignment and Assumption Agreement dated February 16, 1984, between WV III and Pavilion Associates ("Pavilion I"), which was recorded in Deed Book RFP 0039, page 247 of the Recorder's Office (the "Assignment Agreement"), WV III sold, assigned, transferred, and set over unto Pavilion I, all of WV III's right, title and interest, as tenant, in and to the Original Lease, as amended, and Pavilion I agreed to assume all of WV III's interests and obligations thereunder. Subsequently, West Village conveyed fee simple title to the Premises to Greenbriar pursuant to a Deed dated February 23, 1987 and recorded in Deed Book F.H.S. 714, Page 164 et seq. of the Recorder's Office.

D.    On or about January 4, 1989, Landlord and Pavilion I entered into a certain Agreement (the "Security Agreement"), which was recorded in Deed Book D 1267, Page 198 et seq. of the Recorder's Office, relating to the installment of a certain security gate and system adjacent to the Premises; by Stipulation dated June 8, 1989, Landlord and Pavilion I resolved certain outstanding litigation and differences concerning the Original Lease, as amended, and the Premises (the "Stipulation"); and on or about December 1, 2002, Landlord and Pavilion I entered into a certain Second Amendment of Lease Agreement relating to the Premises (the "Second Amendment"), which was recorded on December 20, 2002 in the Recorder's Office at Doc. ID 50582091.

E.    Thereafter, pursuant to a certain Assignment and Assumption Agreement dated December 10, 2002 (the "Second Assignment Agreement"), Pavilion I assigned to Pavilion

Preservation, L.P. ("Pavilion II") all of Pavilion I's right, title and interest, as tenant, in and to the Original Lease, as amended; and on or about July 5, 2016, pursuant to a certain Assignment and Assumption of Ground Lease (the "Third Assignment Agreement"), Pavilion II assigned to Pavilion all of Pavilion II's right, title and interest, as tenant, in and to the Original Lease, as amended, which was recorded on July 25, 2016 in the Recorder's Office at Doc. ID 53089387.

F.      Thereafter, Landlord and Tenant entered into a certain Third Amendment of Lease dated July 5, 2016 (the "Third Amendment") which, among other things, extended the lease term for thirty-five years from July 5, 2016 and modified the net minimum annual ground rent. The Third Amendment was recorded in the Recorder's Office on July 25, 2016 at Doc. ID 53089388. The Original Lease, as amended or supplemented by the First Amendment, Assignment Agreement, Security Agreement, Stipulation, Second Amendment, Second Assignment Agreement, Third Assignment Agreement and Third Amendment is hereinafter sometimes referred to as the "Lease." Capitalized terms used herein without definition shall have the meanings as set forth in the Lease.

G.      Tenant has failed to make certain payments of ground rent and items of additional rent required under the Lease (the "Payment Arrearages"). The Payment Arrearages and together with any other event of default that may exist as of the date of this Agreement are hereinafter collectively referred to as the "Existing Arrearages."

H.      Tenant wishes to have certain electrical work performed by [Bernstein] (the "Electrical Work") at the Premises in accordance with the specifications attached hereto as Exhibit B and, in connection therewith, has requested that Landlord grant Tenant an electrical line easement agreement (the "Electric Line Easement") across certain property owned by Landlord (the "Greenbriar Parcel") and permission to perform the Electrical Work.

I.      As of the Effective Date, the following sums are owing by Tenant to Landlord on account of the Payment Arrearages: (1) Unpaid rent, security and utility bills totaling $107,549.77 through January 31, 2021 (the "Pre-February Rent Arrearages"); (2) Unpaid rent, security and utility bills for the month of February 2021 totaling $44,141.25 (the "February Arrearage"); and (3) Unpaid rent and security ($4,703.33), electric ($11,550.75) and estimated gas ($5,222.81) and water ($11,222.54) bills for the month of April 2021 totaling $32,699.43 (the "April Arrearage");

J.      In addition, as of the Effective Date, Landlord claims the following sums for the expense of legal counsel and costs Landlord incurred in connection with the Existing Arrearages, Tenant's request to perform the Electrical Work and obtain the Electric Line Easement, and in connection with the negotiation and preparation of this Agreement and all documents, instruments, and agreements incidental hereto (the "Legal Expense"), consisting of: (1) unpaid legal expenses totaling $51,003.92 through December 31, 2020 (the "Pre-2021 Legal Expense") and (2) additional legal expenses for the period January 1, 2021 through the Effective Date (the "2021 Legal Expense).

2

PHIL1 9340116v.8

I.      In addition to requesting the Electric Line Easement and permission to perform the Electrical Work, Tenant has requested that Landlord forbear from exercising its rights and remedies relating to the Existing Arrearages. Landlord is willing to so forbear, permit Tenant to perform the Electrical Work and grant Tenant the Electric Line Easement, but only upon and subject to the terms and conditions set forth in this Agreement and the Electric Line Easement.

**NOW THEREFORE**, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      **Definitions**. In addition to the defined terms set forth in the Background section of this Agreement, as used in this Agreement the following terms shall have the following meanings:

(a)  "**Arrearage Amount**" shall mean the sum of $120,049.77, which consists of the Pre-February Rent Arrearages ($107,549.77) plus $12,500.00 on account of the Pre-2021 Legal Expenses.

(b)  "**Additional Arrearage Amount**" shall mean the balance of the Pre-2021 Legal Expenses ($38,503.92) plus the 2021 Legal Expense.

(c)  "**Total Arrearage Amount**" shall mean the Arrearage Amount plus the Additional Arrearage Amount.

(d)  "**Forbearance Period**" as defined in <u>Section 5</u> of this Agreement.

(e)  "**Forbearance Termination Date**" shall mean the earlier of the occurrence of a Termination Event, or 5:00 pm (EST) on October 1, 2021.

(f)  "**Termination Event(s)**" as defined in <u>Section 7</u> of this Agreement.

2.      **Acknowledgment of Obligations/ No Waiver of Defaults**.

(a)  Tenant hereby acknowledges and agrees that, in accordance with the terms and conditions of this Agreement and the Lease, as of the Effective Date, Tenant is unconditionally liable to Landlord for the Total Arrearage Amount, and that the Total Arrearage Amount, together with all fees, costs, expenses, and costs of collection (including reasonable attorneys' fees and expenses) hereafter incurred by the Landlord in connection with the Lease, is owing without claim, counterclaim, recoupment, defense or set-off of any kind or of any nature whatsoever.

(b)  Tenant hereby acknowledges and agrees that this Agreement is not and shall not be deemed to be a waiver of the Existing Arrearages or of any other alleged defaults which may now exist or hereafter occur under the Lease.

3.      **Ratification of Lease; Further Assurances**.

PHIL1 9340116v.8

(a) Tenant hereby ratifies, confirms, and reaffirms each of the terms and conditions of the Lease, and further acknowledges and agrees that except as previously amended in writing and as specifically modified by this Agreement and any other document executed in connection with this Agreement, all terms and conditions of the Lease.

(b) Tenant shall cooperate with Landlord and shall execute and deliver to the Landlord such further instruments and documents as the Landlord shall reasonably request to carry out to its satisfaction the transactions contemplated by this Agreement, the Electric Line Easement and the Lease.

4.      **Conditions to Effectiveness/Continued Effectiveness of Forbearance**.  The Landlord's agreement to forbear hereunder (as set forth in Section 5 below) is subject to each of the following terms and conditions, **TIME BEING OF THE ESSENCE** to the fulfillment of each term and condition:

(a) Tenant shall pay to Landlord, by wire transfer of immediately available federal funds to the order or account of Landlord as Landlord may designate in writing, the Arrearage Amount in five (5) installments, consisting of: (i) an initial installment of $20,008.30 on or prior to the Effective Date and as a condition precedent to the effectiveness of this Agreement (the "First Arrearage Installment"); and (ii) thereafter five (5) equal monthly installment payments of $20,008.30 each, commencing June 5, 2021 and continuing on the fifth (5th) day of each calendar month thereafter through and including October 5, 2021.

(b) On or prior to the Effective Date and as a condition precedent to the effectiveness of this Agreement, in addition to the First Arrearage Installment, Tenant shall pay to Landlord, by wire transfer of immediately available federal funds to the order or account of Landlord as Landlord may designate in writing, the sum of $76,840.68, consisting of the February Arrearage ($44,141.25), the April Arrearage ($32,699.43), **plus**, to the extent not already paid, the sum of $4,703.33 on account of the ground rent and security for the month of May, 2021.

(c) Throughout the Forbearance Period, Tenant shall remain current in payment of all ground rent, additional rent and other required payments under the Lease, including but not limited to utilities such as electric, gas and water (which in each such case shall be paid within 15 days of invoice and/or notice of estimated meter readings for such services) (the "Ongoing Regular Payments").

(d) This Agreement, and all documents, instruments and agreements required hereunder shall have been executed by Tenant and original counterpart signatures shall have been delivered to the Landlord (or its counsel), and all actions on the part of Tenant necessary for the valid execution, delivery and performance of the terms of this Agreement shall have been duly and effectively taken and evidence thereof reasonably satisfactory to the Landlord shall have been provided to the Landlord.

5.      **Forbearance by Landlord.**

PHIL1 9340116v.8

(a) Tenant agrees that as a result of the Existing Arrearages, Landlord has the right to immediately commence enforcement of its rights and remedies under the Lease and otherwise. In consideration of the Tenant's performance in accordance with each and every term and condition of this Agreement, as and when due, the Landlord shall forbear from demanding the payment of the Total Arrearage Amount (or any unpaid portion thereof including the Additional Arrearage Amount) and exercising its rights and remedies as a result of the Existing Arrearages, until the earlier of: (i) the Forbearance Termination Date, or (ii) the occurrence of a Termination Event. The period commencing as of the Effective Date of this Agreement and ending on the earlier of (i) or (ii) above shall be referred to as the **"Forbearance Period."**

(b) Tenant covenants and agrees that nothing contained in this Agreement, including, without limitation, any and all payments made by any Tenant pursuant hereto or the Lease, shall constitute a waiver of the Existing Arrearages (or of any Default or Events of Default hereafter arising under the Lease or this Agreement).

6.    **Additional Arrearage Amount.** Landlord agrees to forgo and waive the reimbursement of the Additional Arrearage Amount provided that Tenant satisfies all conditions of forbearance through October 1, 2021 as set forth in Section 4 of this Agreement.

7.    **Termination Events**. The occurrence of any one or more of the following events shall constitute an immediate termination event (each a **"Termination Event"**) under this Agreement:

(a) The failure of the Tenant to pay any amount required to be paid under this Agreement as and when due, it being expressly acknowledged and agreed that **TIME IS OF THE ESSENCE;**

(b) The failure of the Tenant, after the Effective Date, to promptly, punctually, or faithfully perform or comply with any other term or condition of this Agreement, the Lease or the Easement Documents (defined in Section 9 below) as and when required, it being expressly acknowledged and agreed that **TIME IS OF THE ESSENCE,** including but not limited to the occurrence of any additional Default or Events of Default under the Lease;

8.    **Effect of Termination/Remedies**. Tenant expressly understands and agrees that upon the occurrence of a Terminating Event, Landlord's agreement to forbear under this Agreement shall immediately terminate and Landlord shall be free to pursue all of its legal and equitable rights and remedies against the Tenant, including, but not limited to, all of its rights and remedies under each of the Lease, this Agreement, any related instruments, agreements and documents, at law, in equity and otherwise (including the right to collect the unpaid balance of the Total Arrearage Amount), in such order and manner as the Landlord may determine appropriate in its sole and exclusive discretion, and without prior demand, notice, or protest, all of which are hereby expressly **WAIVED** by Tenant. Landlord is relying on all terms, covenants, conditions, warranties and representations set forth in this Agreement and the Electric Line Easement, including, without limitation, the termination of the Forbearance Period at any time

5

after the occurrence of a Terminating Event, as a material inducement to Landlord to enter into this Agreement and the Electric Line Easement.

9.  **Easement Agreement**. Landlord and Tenant agree to enter into the Electric Line Easement in the form attached hereto as <u>Exhibit C</u>, providing for, among other things, the construction, maintenance and use by Tenant of an electrical easement over a designated portion of the Greenbriar Parcel, subject to the satisfaction of all conditions precedent to the effectiveness of this Agreement, as well as delivery to Landlord of the following, all of which shall be conditions to commencing, or permitting the commencement of, any excavation, construction, paving or other work associated with the Electric Line Easement for the Electrical Work (collectively, the "<u>Easement Documents</u>"):

1.  A copy of Tenant's fully executed contract with [Bernstein] or another contractor acceptable to Landlord, in its reasonable judgment, for the work contemplated by the Electric Line Easement;

2.  Payment and performance bonds in form and substance satisfactory to Landlord, in its sole but reasonable discretion, from a surety rated "A-" or better by the A.M. Best Company, or otherwise approved by Landlord in writing. Such bonds shall guaranty payment and performance of the obligations to complete the scope of the work contemplated by the Electric Line Easement in accordance with the terms of the Electric Line Easement Agreement and any other written agreement or contract document entered into by Tenant for such work. The payment and performance bonds shall be delivered to Landlord upon execution of the Electric Line Easement and shall have an effective date that is not later than the date of the Electric Line Easement.

3.  Alternatively, in lieu of providing the surety bond(s) in accordance with subparagraph (b) above, prior to commencing, or permitting the commencement of, any excavation, construction, paving or other work associated with the Electric Line Easement, Pavilion may cause an irrevocable letter of credit for the full cost of the work associated with the Electric Line Easement to be issued in favor of Landlord on or prior to the date of the Electric Line Easement. Any such letter of credit shall name Landlord as the beneficiary and be provided by an issuer, and be in form and content, satisfactory to Landlord in its sole discretion. Pavilion may cause the letter of credit to be reduced from time to time by the cost paid for any work associated with the Electric Line Easement provided that prior to any such reduction, Pavilion shall provide to Landlord paid invoices or receipts and unconditional statutory lien waivers for all work and costs included in the reduction, each of which shall be satisfactory to Landlord in its sole but reasonable discretion.

6

4. All other documents required to be delivered under the Electric Line Easement.

Upon execution, the Electric Line Easement shall be recorded with the Recorder's Office.

10. **Representations, Warranties and Covenants of Tenant.** Tenant hereby represents, warrants and covenants to the Landlord as follows:

(a) The execution and delivery of this Agreement and the Electric Line Easement by Tenant, and the performance by Tenant of its obligations and agreements under this Agreement and the Electric Line Easement are within the corporate authority of Tenant, have been duly authorized by all necessary corporate proceedings on behalf of Tenant and do not and will not contravene any provision of law, statute, rule or regulation to which Tenant is subject or Tenant's charters, other organization papers, by-laws or any stock provision or any amendment thereof or of any agreement or other instrument binding upon Tenant (if any).

(b) This Agreement, the Electric Line Easement and the Lease constitute legal, valid and binding obligations of the Tenant, enforceable in accordance with their respective terms.

(c) No approval or consent of, or filing with, any governmental agency or authority is required to make valid and legally binding the execution, delivery or performance by the Tenant of this Agreement and the Electric Line Easement.

(d) Tenant has read and understands each of the terms and conditions of this Agreement and is entering into this Agreement freely and voluntarily, without duress, after having had an opportunity for consultation with independent counsel of its own selection, and not in reliance upon any representations, warranties, or agreements made by the Landlord and not set forth in this Agreement.

11. **General Release.** Tenant for consideration in hand paid, and for other good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged, pursuant to this Agreement hereby forever releases and discharges Landlord and its successors, assigns, and past, present, and future affiliates, partners, participants, members, officers, directors, employees, shareholders, attorneys, and agents (collectively, the "Releasee") from any and all liabilities, duties, responsibilities, obligations, claims, demands, actions, causes of action, cases, controversies, damages, costs, losses, and expenses now existing or hereafter arising out of or in any way relating to or connected with, directly or indirectly, the Property or the Lease, **PROVIDED, HOWEVER,** nothing contained in this Release shall release the parties to this Agreement from their continuing obligations under the Lease or those specific matters or obligations of the parties arising under this Agreement.

12. **General.**

7

(a) Tenant hereby represents and warrants that it is fully aware of the terms set forth in this Agreement and has voluntarily, and without coercion or duress of any kind, entered into this Agreement intending to be legally bound by its terms.

(b) Any notice and other communication between the parties hereto shall be made in the manner prescribed by the Lease.

(c) From and after the occurrence of any Termination Event, Tenant agrees not to interfere with the exercise by Landlord of any of its rights and remedies under the Lease, this Agreement, the Easement Documents or applicable law.

(d) Tenant agrees that the running of any time period or statute of limitations applicable to any legal proceedings Landlord may commence to enforce its rights under the Lease shall be deemed tolled during the Forbearance Period. The tolling effected by this subsection shall inure only to the benefit of Landlord and shall not be construed as enlarging any period within which Tenant may, or is required to, act under the Lease or this Agreement.

(e) This Agreement shall be binding upon Tenant and Landlord and each of their respective successors and assigns and shall inure to the benefit of the Landlord and its successors and assigns.

(f) Any determination that any provision of this Agreement or any application thereof is invalid, illegal, or unenforceable in any respect in any instance shall not affect the validity, legality, or enforceability of such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

(g) This Agreement, together with the agreements, instruments and other documents executed in connection herewith, incorporates all discussions and negotiations between Tenant and Landlord, either express or implied, concerning the matters included herein and in such other instruments, any custom, usage, or course of dealings to the contrary notwithstanding. No such discussions, negotiations, custom, usage, or course of dealings shall limit, modify, or otherwise affect the provisions hereof. No modification, amendment, or waiver of any provision of this Agreement or of any provision of any other agreement between Tenant and Landlord shall be effective unless duly executed in writing by the party to be charged with such modification, amendment and waiver.

(h) Except as otherwise expressly provided for in this Agreement or any document executed in connection with this Agreement, all of the terms, conditions and provisions of the Lease shall remain the same. The Tenant shall continue to comply with all of the other terms and conditions of the Lease.

(i) All rights and obligations under this Agreement and the Lease, including matters of construction, validity, and performance, are and shall continue to be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania and are intended to take effect as sealed instruments.

8

(j) TENANT AND LANDLORD HEREBY IRREVOCABLY WAIVE TRIAL BY JURY AND ANY RIGHT THERETO relating to the subject matter of this Agreement.

(k) The captions of this Agreement are for convenience purposes only and shall not be used in construing the intent of the parties to this Agreement.

(l) In the event of any inconsistency between the provisions of this Agreement and the Lease, the provisions of this Agreement shall govern and control.

(m) It is the intention of the parties hereto that this Agreement may be executed in any number of counterparts (including by facsimile or e-mail transmission of an adobe file format document (also known as a PDF file)), and by the different parties hereto on the same or separate counterparts, each of which shall be deemed to be an original instrument but all of which together shall constitute one and the same agreement.

*[SIGNATURE PAGES FOLLOW]*

PHIL1 9340116v.8

**IN WITNESS WHEREOF**, this Agreement has been executed as an instrument under seal on the date first indicated above.

**LANDLORD:**

**KIRYAT GREENBRIAR, L.P.,**
a Pennsylvania limited partnership

By:  Greenbriar Club Associates, Inc.,
       a Pennsylvania Corporation, its
       General Partner
       By: _____
            Name: Joseph Yeh
            Title: Vice President

**TENANT**

**PAVILION APARTMENTS PENN, LLC**
a Pennsylvania limited liability company

By:  JPC Charities, an Ohio nonprofit corporation, its
       Sole Member
       By: _____
            Name: Oron Zarum
            Title: Member

*Signature Page to Forbearance Agreement*

**Exhibit A**
(Description of Premises)

PHIL1 9340116v.8

Legal Description

ALL THAT CERTAIN lot or piece of ground, Situate in the 52nd Ward of the City of Phila. described as follows, to wit:

BEGINNING at an interior point in the bed of a pond and a right of way for drainage which interior point is measured North 17 degrees, 58 minutes, 59.44 seconds, East the distance of 100.50 feet (U.S.S.) from an angle point which angle point is measured North 17 degrees, 44 minutes, 37 seconds East the distance of 77.05 feet (U.S.S.) from a point which point is measured North 64 degrees, 52 minutes, 29 seconds West the distance of 332.01 feet (U.S.S.) from a point on a stone which point is measured North 09 degrees, 53 minutes, 31 seconds East 297.30 feet (U.S.S.) from a point on the Northwesterly side of Conshohocken Avenue (80 feet wide) which point is measured North 79 degrees, 52 minutes, 12.9 seconds East along the said Northwesterly side of Conshohocken Avenue the distance of 1095.734 feet (U.S.S.) from a point of tangent which point of tangent is measured Southeastwardly on the arc of a circle curving to the left connecting the said Northwesterly side of Conshohocken Avenue and the Northeasterly side of 40th Street (70 feet wide);

THENCE extending North 17 degrees, 58 minutes, 59.44 seconds East passing partly through a right of way for drainage purposes partly crossing a pond and passing partly through a stream and crossing a stream the distance of 523.37 feet (U.S.S.) to a point;

THENCE South 72 degrees, 01 minute, 01 second East partly crossing said right of way for drainage purposes and
crossing a stream 189.99 feet (U.S.S.) to an angle point;

THENCE South 40 degrees, 23 minutes, 45 seconds East 69.72 feet (U.S.S.) to a point;

THENCE Southwestwardly on the arc of a circle curving to the left having a radius of 380 feet the arc distance of 217.77 feet (U.S.S.) to a point of tangent;

THENCE South 16 degrees, 46 minutes, 10 seconds West 263.50 feet (U.S.S.) to a point;

THENCE North 76 degrees, 39 minutes 01 second West partly recrossing said right of way for drainage and partly recrossing said pond 199.26 feet (U.S.S.) to a point in the beds thereof being the first mentioned point and Place of Beginning.

*For Company Reference Only, Not An Insuring Provision:*

Address:    3901 Conshohocken Avenue Philadelphia, PA 19131

Parcel ID / Tax ID Number:  88-11610-00

**Exhibit B**
**(Electrical Work Specifications)**

# H. BERSTEIN SERVICE COMPANY, INC.
## ELECTRICAL CONTRACTORS AND ENGINEERS

Pavilion Apartments                                         revised: 06/29/2020
3901 Conshohoken Avenue
Philadelphia, PA 19131
Att: Marcella Windle / Community Manager
Re: NEW UNDERGROUND 15KV FEED to PAVILION APTS

Dear Ms. Windle,

We hereby propose the following:

- Excavation and installation of new underground duct bank between Peco manhole and Pavilion Apartments.
- The duct bank will consist of (2) 4" PVC conduits, concrete encased.
- The duct bank is approximately 1000ft in length and will be located on Greenbriar property.
- Install new Peco approved #2 URD cable in one conduit, (2nd conduit required utility spare), from Peco manhole to Pavilion Apartments.
- Install a new Peco approved 15KV service Air Interrupter Switch with metering in main electrical room within Pavilion Apartments.
- Provide required documentation for L&I permit, Electrical Inspections, and approval of all installation work.

Notes:

1) All outlined work to be conducted during normal daily hours.

2) Scheduled power interruptions to building will be required at various points during the finalization and conversion to new Peco service line. Building generator must be operational to maintain critical loads during those times.

3) If during the course of the excavation and duct bank installation, another less intrusive method of installing conduits should arise it will be used at contractors' discretion.

1 of 4

2314-16 NORTH SECOND STREET              PHILADELPHIA, PA  19133-3397

TELEPHONE (215) 425-8500  •  FAX (215) 425-2949

# H. BERSTEIN SERVICE COMPANY, INC.
## ELECTRICAL CONTRACTORS AND ENGINEERS

Exclusions:

    1) Overtime Labor

    2) Peco fees *

       *(Peco Fees to be as Invoiced by Peco – costs unknown at this time)

    3) Repairs to any unmarked/undocumented underground utilities

    4) Rock excavation

    5) Resurface work in excavated areas

    6) Disconnection and removal of currently installed temporary 13KV service cables

Total price as outlined:

**$410,224.00***

*(above quoted price good for 30 days from quote date)

The percentage breakdown of above price is as follows:

    Excavation/duct bank work  -  56%

    Cable Installation  -  20%

    New 13KV Service switch / connection to building  -  20%

    Permits/Engineered Drawings/Inspections  -  4%

2 of 4

2314-16 NORTH SECOND STREET      PHILADELPHIA, PA 19133-3397

TELEPHONE (215) 425-8500 • FAX (215) 425-2949

# H. BERSTEIN SERVICE COMPANY, INC.
## ELECTRICAL CONTRACTORS AND ENGINEERS

**Payment Terms:**

Authorization to proceed with all specified work / pre-payment of   -   **$140,000.00**

**Progress payments as noted:**

50% completion of duct bank                                             -   **$65,000.00**

100% completion of duct bank work                                      -   **$65,000.00**

Installation of #2 URD cables                                          -   **$60,000.00**

Delivery of Service/ Metering Switch                                   -   **$55,000.00**

30 days after completion and approved electrical inspection            -   **$25,224.00**

**\*Peco Fees to be as invoiced by Peco – cost unknown**

3 of 4

2314-16 NORTH SECOND STREET              PHILADELPHIA, PA 19133-3397

TELEPHONE (215) 425-8500  •  FAX (215) 425-2949

# H. BERSTEIN SERVICE COMPANY, INC.
## ELECTRICAL CONTRACTORS AND ENGINEERS

I hereby Authorize H. Berstein Service Co. to proceed with the quoted work.

Authorized Entity: _Pavilion Apartments_

Authorized – Name: _Naftali Levenbrown_

Title: _manager_

Signature: _[signature]_     Date: _6/29/2020_

Upon receipt of your authorization to proceed, we will provide the following:

    A) A copy of land survey of GREENBRIAR CLUB APARTMENTS indicating their approximate location of the proposed duct bank, for review and signed acceptance by Greenbriar and Pavilion Managements.

    B) Department of Licenses and Inspections permit documents, drawings, etc. for review and acceptance to enable commencement of the work.

Should you have any questions regarding our proposal, please do not hesitate to contact us.

Respectfully,

Garry Greer

_[signature]_

H. Berstein Service Co., Inc.

4 of 4

**Exhibit C**
(Form of Electric Line Easement)

This instrument was prepared by,
and the original should be returned to:
Denise M. Day, Esquire
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

## ELECTRIC LINE EASEMENT AGREEMENT

This **ELECTRIC LINE EASEMENT AGREEMENT** (this "Agreement"), dated as of the 26th day of May, 2021, to be effective as of May 20, 2021 (the "Effective Date"), by and between **Kiryat Greenbriar, L.P.,** a Pennsylvania limited partnership ("Landlord" or "Greenbriar") and **Pavilion Apartments Penn LLC,** a Pennsylvania limited liability company ("Tenant" or "Pavilion"). Greenbriar and Pavilion are hereinafter sometimes collectively referred to as "Owners," and each individually as an "Owner."

## WITNESSETH

**WHEREAS,** Greenbriar is the fee owner of certain real estate consisting of 19.74 acres located on Conshohocken Avenue in the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania more particularly described on Exhibit A attached hereto (the "Greenbriar Parcel").

**WHEREAS,** pursuant to a certain Lease Agreement dated November 28, 1973 (the "Original Lease"), Landlord's predecessor in interest leased a 1.4067 acre portion of the Greenbriar Parcel (the "Pavilion Parcel") more particularly described on Exhibit B attached hereto. The Original Lease has subsequently been amended, most recently by a certain Third Amendment of Lease dated July 5, 2016. The Original Lease, as amended or supplemented, is hereinafter sometimes referred to as the "Lease."

**WHEREAS,** electric service is currently provided to the Pavilion Parcel through an existing electric line running through the Greenbriar Parcel.

**WHEREAS,** Pavilion desires to relocate the electric line which supplies the electric service to the Pavilion Parcel.

**WHEREAS,** Greenbriar and Pavilion agree that the relocation of the electric line is in the best interests of both the Greenbriar Parcel and the Pavilion Parcel.

**WHEREAS,** Greenbriar and Pavilion entered into a certain Forbearance Agreement with an Effective Date of May 20, 2021 (the "Forbearance Agreement"), pursuant to which Greenbriar agreed to grant Pavilion a certain electric line easement over the Greenbriar Parcel as more particularly shown pictorially on Exhibit C, attached hereto and made a part hereof (the "Electric

Line Easement Area") for the purposes of installing, maintaining, repairing, altering, replacing and operating a separate electric line for the sole benefit of the Pavilion Parcel.

**NOW, THEREFORE,** for good and valuable consideration paid by each Owner to the other Owner and the mutual covenants, terms, and conditions set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Owners agree as follows:

1.   Grants. Greenbriar hereby grants and conveys to Pavilion a perpetual, non-exclusive easement (the "Electric Line Easement") in, under, upon, about, over, and through the Electric Line Easement Area for the purposes of constructing, installing, using, inspecting, maintaining, repairing, replacing and/or removing an electric line for the benefit of the Pavilion Parcel (the "Purpose").

2.   Access. Pavilion and its authorized contractors, agents and employees shall be permitted access to the portion of the Greenbriar Parcel nearby the Electric Line Easement Area (the "Temporary Electric Line Easement Access Area"), as more particularly identified on Exhibit C, upon not less than ten (10) days prior written notice to Greenbriar for the purpose of access, ingress and egress to the Electric Line Easement Area in order to installing, replacing, performing improvements, maintenance and repairs as further described herein. Pavilion may only access the Temporary Electric Line Easement Access Area between the hours of [11:00 p.m.] (Eastern) and [5:00 a.m.] (Eastern) unless in the case of an emergency or otherwise consented to in writing by Greenbriar. Pavilion, its authorized contractors, agents and employees may use the Electric Line Easement for vehicular (including truck) access, ingress and egress to the extent necessary or appropriate in connection with the foregoing. Pavilion agrees not to interrupt Greenbriar's, or any other occupant's, use and enjoyment of the Greenbriar Parcel (if such interruption is necessary, such interruption shall be temporary in nature and designed to limit any interruption of access to and from the remaining lands of Greenbriar). In the event of emergency, Pavilion shall provide verbal notice to Greenbriar prior to entering onto the Temporary Electric Line Easement Access Area.

3.   Improvements. Pavilion may construct improvements over, under, in, along, across, and upon the Electric Line Easement Area that are reasonably related to both the purpose of the Electric Line Easement and Pavilion's use and enjoyment of the Electric Line Easement (the "Electric Line Easement Improvements"), upon receipt of the prior written consent of Greenbriar, which shall not be unreasonably withheld so long as all Electric Line Easement Improvements within the Electric Line Easement Area are entirely below grade. In undertaking the Electric Line Easement Improvements, Pavilion shall take reasonable steps to insure that such work is completed in a reasonable time. Notwithstanding the foregoing, any Electric Line Easement Improvements made over, under, in, along, across, and upon the Electric Line Easement Area, shall not interfere in any material fashion with Greenbriar's, or any other occupant's, use and enjoyment of the Greenbriar Parcel. Upon Greenbriar's request, with respect to any Electric Line Easement Improvements made after the Effective Date, Pavilion shall provide Greenbriar with as-built

2

drawings and a survey showing the location and depth of the Electric Line Easement Improvements installed in the Electric Line Easement Area.

4.    Costs/Lien-Free Construction. Pavilion shall bear and promptly pay without the imposition of any lien or charge on or against all or any portion of the Greenbriar Parcel all costs and expenses incurred by Pavilion in connection with the construction and maintenance of the Electric Line Easement Improvements. Pavilion hereby acknowledges and agrees that if any lien is filed against the Greenbriar Parcel as a result of the Electric Line Easement or Pavilion's activities in the Electric Line Easement Area or Temporary Electric Line Easement Access Area and Pavilion has not had such lien bonded over or removed of record within thirty (30) days after receiving formal notice of the date of the initial filing of such lien from Greenbriar, then Pavilion shall be in default of this Agreement and Lease, and Greenbriar shall have the right to exercise all of its remedies for monetary damages pursuant to this Agreement, the Lease and at law and in equity; provided, such default shall not give rise to a right to terminate the Lease except in accordance with its terms. As security for the obligations of Pavilion to pay all costs and expenses incurred by Pavilion in connection with the construction of the Electric Line Easement Improvements, Pavilion shall provide to Greenbriar a bond or letter of credit which satisfies the conditions of the Forbearance Agreement.

5.    Compliance with Laws. Pavilion shall construct, operate, maintain and repair the Electric Line Easement Improvements in a good and workmanlike manner and in compliance with the applicable statutes, ordinances, rules, and regulations of all governing public authorities as those statutes, ordinances, rules, and regulations are amended from time to time.

6.    Maintenance and Repair. If the surface of any portion of the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area is disturbed by Pavilion's exercise of any of its rights under this Agreement, such surface area shall be restored to substantially the same condition in which it existed as of the commencement of such activity.

7.    Reservation of Rights. All right, title, and interest in and to the Electric Line Easement Area and Temporary Electric Line Easement Access Area under this Agreement shall remain with Greenbriar; provided, however, that the Greenbriar shall not: (1) construct or maintain any building which is reasonably likely to cause damage to or interfere with the Electric Line Easement Improvements to be placed within the Electric Line Easement Area; or (2) take any other action that would in any material respect interfere with, or otherwise adversely affect any of Pavilion's rights or obligations in this Agreement.  Greenbriar shall have the right to grant additional easement rights within the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area to any other individual or entity provided that the same shall not in any material respect interfere with, or otherwise adversely affect any of Pavilion's rights or obligations in this Agreement and Greenbriar causes any grantee to enter into an indemnity agreement reasonably satisfactory to Pavilion (which indemnity agreement shall obligate said grantee to

3

defend, indemnify and hold harmless Pavilion in connection with the grantee's use of the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area).

8.    Mutual Representations and Warranties. Pavilion hereby represents and warrants to Greenbriar that the individual(s) signing this Agreement on behalf of Pavilion is/are the duly authorized representative(s) of Pavilion and his or her signatures on this Agreement have been duly authorized by, and create binding and enforceable obligations of, Pavilion. Greenbriar hereby represents and warrants to Pavilion that the individual(s) signing this Agreement on behalf of Greenbriar is/are the duly authorized representative(s) of Greenbriar and his or her signatures on this Agreement have been duly authorized by, and create binding and enforceable obligations of, Greenbriar.

9.    Transferability. The Owners hereby acknowledge and agree that the Electric Line Easement and other rights conferred by this Agreement are intended to, and do, constitute covenants that run with the land and shall inure to the benefit of and be binding upon each Owner and their respective grantees, heirs, successors, and assigns.

10.    Default and Remedies. Upon the occurrence of a default by either Owner, the non-defaulting Owner may seek any and all remedies permitted by law or equity. Such remedies shall be cumulative as to each default.

11.    Insurance. Pavilion shall maintain, at its expense, and keep in force at all times during the term of this Agreement, a policy of commercial general liability insurance, including a contractual liability endorsement, from an insurer authorized to do business in the Commonwealth of Pennsylvania that has an AM Best Rating of at least A-, VII, which shall include coverage against claims for any bodily injury and damage to property occurring on, in or about the Electric Line Easement Area and/or the Temporary Electric Line Easement Access Area and caused by the acts of Pavilion and Pavilion's use thereof, with a per occurrence limit of not less than Two Million ($2,000,000) Dollars.

12.    Condemnation. If the Electric Line Easement Area, a portion of the Electric Line Easement Area and/or access to or use of the Electric Line Easement is taken by eminent domain or is under notice of an eminent domain proceeding, Greenbriar shall not be required to enter into a new easement agreement with Pavilion or any electric provider to restore any resulting loss or diminution of the Pavilion's rights hereunder. Moreover, any resulting condemnation awards and/or payments received in relation to such actions shall be shall be the sole property of Greenbriar, regardless of whether such award shall be made as compensation for diminution in value of the Greenbriar, the value of any condemned real property interests, or for severance damages; *provided, however,* that Pavilion shall be entitled to pursue its own separate action to recover any compensation from any such condemning body/authority for the Pavilion's relocation expenses and/or loss of utility facilities situated within the Electric Line Easement Area.

4

13.     Non-Use. If, subject as set forth below, Pavilion or its successors or assigns cease to use the Electric Line Easement for a period of two (2) years then, upon thirty (30) days' prior, written notice to Pavilion, the Electric Line Easement and all rights granted hereunder relating thereto shall terminate and revert back to Greenbriar. Non-use shall not include any period during which the Pavilion Property is being actively marketed and/or developed, renovated or reconstructed.

14.     Indemnification. From the Effective Date forward, Pavilion shall indemnify, defend, and hold Greenbriar harmless from and against any and all losses, costs, damages, liens, claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) incurred by Greenbriar and caused by Pavilion's and/or its authorized contractors, agents and employees, tenants and invitees access to, or use of the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area.

15.     Further Cooperation. Each Owner agrees to execute such other documents and to perform such other acts as may be reasonably necessary or desirable to further the expressed and intent purpose of this Agreement.

16.     Realty Transfer Taxes. Pavilion hereby agrees to pay one hundred percent (100%) of the realty transfer taxes imposed on this Agreement and the Electric Line Easement.

17.     Notice. Each Owner shall deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "Notice") in writing and addressed to the other Owner at its address set out below (or to any other address that such Owner may designate from time to time in accordance with this Section). Each Owner shall deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective upon the earlier of: (1) delivery to the intended recipient, and (2) upon the intended recipient's refusal to accept delivery if the Owner giving the Notice has complied with the requirements of this Section.

As to Greenbriar:     Kiryat Greenbriar, L.P.

280 Aimee Drive

Freehold, New Jersey 07728


As to Pavilion:     Pavilion Apartments Penn, LLC

5

c/o JPC Charities

P.O. Box 234

Amlin, Ohio 43002

18.    Amendment. This Agreement may not be modified, amended, or terminated except in a writing signed by each Owner.

19.    Time of the Essence. Both Owners agree that time is of the essence and that time specifications contained herein shall be strictly construed.

20.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. EACH OWNER AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE TRIED AND LITIGATED IN STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, UNLESS SUCH ACTIONS OR PROCEEDINGS ARE REQUIRED TO BE BROUGHT IN ANOTHER COURT TO OBTAIN SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. TO THE EXTENT PERMITTED BY LAW, EACH OWNER IRREVOCABLY WAIVES ANY RIGHT SUCH OWNER MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS*, TO ASSERT THAT SUCH OWNER IS NOT SUBJECT TO THE JURISDICTION OF THE AFORESAID COURTS, OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. SERVICE OF PROCESS, SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST ANY OWNER, MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ANY SUCH OWNER'S ADDRESS INDICATED IN SECTION 20 OF THIS AGREEMENT.

21.    Counterparts. This Agreement may be executed by the Owners in separate counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument. A signed copy of this Agreement delivered by facsimile/email shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. Notwithstanding the foregoing, each Owner hereto shall deliver original counterpart signatures to the other Owner by no later than ten (10) business days after the Effective Date.

[SIGNATURE PAGE FOLLOWS]

6

IN WITNESS WHEREOF, the Owners have executed this Agreement as of the Effective Date.

**Kiryat Greenbriar, L.P.,**
a Pennsylvania limited partnership
By:     Greenbriar Club Associates, Inc.,
        a Pennsylvania Corporation, its General Partner

By: _____
        Name: Joseph Yeh
        Title: Vice President

**Pavilion Apartments Penn, LLC,**
a Pennsylvania limited liability company
By:     JPC Charities, an Ohio nonprofit corporation,
        its Sole Member

By: _____
        Name: Oron Zarum
        Title: member

Signature Page to Electric Line Easement Agreement

PHIL1 9402025v.7

### Acknowledgment of Kiryat Greenbriar, L.P.

STATE OF NEW JERSEY          )
                             ) ss.
COUNTY OF                    )

I CERTIFY that on _June 1_, 2021, Joseph Yeh personally came before me and stated to my satisfaction that he: (a) was the maker of the attached instrument; (b) was authorized to and did execute this instrument as the President of Greenbriar Club Associates, Inc., a Pennsylvania corporation, the general partner of **Kiryat Greenbriar, L.P.**, a Pennsylvania limited partnership (the entity named in this instrument); and (c) executed this instrument as the act of the entity named in this instrument.

In witness whereof, I hereunto set my hand and official seal.

_____

Print Name: _Nicholas Bassista_

Print Title: _Notary public_

Notary

NICHOLAS A. BASSISTA
NOTARY PUBLIC OF NEW JERSEY
COMMISSION # 50129486
MY COMMISSION EXPIRES 06/17/2025

(Seal)

Acknowledgement Page to Electric Line Easement Agreement

PHIL1 9402025v.7

**Acknowledgment of Pavilion Apartments Penn, LLC**

STATE OF _New Jersey_          )
                                                    ) ss.
COUNTY OF _Bergen_             )

On this, the _27th_ day of ___May___, 2021, before me, _Naftali Levenbrown_, the undersigned notary, personally appeared _Oron Zarum_, who acknowledged himself/herself to be the _member_ of JPC Charities, an Ohio nonprofit corporation, the sole member of **Pavilion Apartments Penn, LLC**, a Pennsylvania limited liability company, and that as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation, in its capacity as the sole member of the company (the entity named in this instrument) by himself/herself as such officer.

In witness whereof, I hereunto set my hand and official seal.

_[signature]_
Notary
(Seal)
                    Naftali A. Levenbrown
                    Notary Public, State of New Jersey
                    No. 50150092
                    Qualified in Bergen County
                    Commission Expires February 4, 2026

Acknowledgement Page to Electric Line Easement Agreement

PHIL1 9402025v.7

**EXHIBIT A**

**LEGAL DESCRIPTION OF GREENBRIAR PARCEL**

EXHIBIT A

## DESCRIPTION OF THE PROPERTY

ALL THAT CERTAIN lot or piece or ground, Situate in the 52nd Ward of the City of Philadelphia, described according to a ALTA/ACSM Land Title Survey made for Greenbriar Club Apartments by TBI Consulting Engineers, Inc. dated 4/11/2002 and last revised 5/14/2002:

BEGINNING at a point, located the following 2 courses and distances from a point of tangency, said point of tangency being the Southwesterly end of a curve which connects the Northerly side of Conshohocken Avenue (80 feet wide) with the Easterly side of Monument Road (71 feet wide), having a radius of 50 feet and an arc length of 105.015 feet, (1) North 76 degrees 12 minutes 00 seconds East, the distance of 887.903 feet, (2) North 79 degrees 52 minutes 13 seconds East, the distance of 169.805 feet; thence extending North 9 degrees 53 minutes 31 seconds East from said point of beginning, the distance of 297.305 feet to a point; thence extending North 64 degrees 52 minutes 29 seconds West the distance of 331.671 feet to a point in the bed of a variable width Right of Way lot for Drainage Purposes; thence extending North 17 degrees 44 minutes 37 seconds East the distance of 77.052 feet to a point, thence extending North 17 degrees 58 minutes 59.44 seconds East, crossing Neill Drive (State Highway-50 feet wide), the distance of 852.967 feet to a point; thence extending South 65 degrees 51 minutes 53 seconds East, re-crossing said Neill Drive and also re-crossing said variable width Right-of-Way for State Highway purposes and also re-crossing said variable width Right-of-Way for Drainage purposes, the distance of 456.379 feet to a point; thence extending South 03 degrees 49 minutes 30 seconds East the distance of 608.361 feet to a point; thence extending South 30 degrees 21 minutes 40 seconds West, the distance of 456.046 feet to a point; thence extending North 87 degrees 02 minutes 49 seconds West, the distance of 326 feet to a point; thence extending South 11 degrees 17 minutes 48 seconds West, the distance of 471.797 feet to a point on the said Northerly side of Conshohocken Avenue; thence extending South 81 degrees 00 minutes 00 seconds West, the distance of 284.324 feet to a point; thence extending South 79 degrees 52 minutes 13 seconds West, the distance of 91.316 feet to the first mentioned point and place of BEGINNING.

TOGETHER WITH the benefits of the easements appurtenant to the Land as set forth in the below instruments of record:

Declaration of Easements as set forth in Deed Book DCC 515 Page 454, Agreement by and between Kiryat Greenbriar and Pavilion Associates as set forth in Deed Book FHS 1267 Page 198.

BEING Tax Parcel No. 88-1161000

**EXHIBIT B**

**LEGAL DESCRIPTION OF PAVILION PARCEL**

PHIL1 9402025v.7

Legal Description

ALL THAT CERTAIN lot or piece of ground, Situate in the 52nd Ward of the City of Phila. described as follows, to wit:

BEGINNING at an interior point in the bed of a pond and a right of way for drainage which interior point is measured North 17 degrees, 58 minutes, 59.44 seconds, East the distance of 100.50 feet (U.S.S.) from an angle point which angle point is measured North 17 degrees, 44 minutes, 37 seconds East the distance of 77.05 feet (U.S.S.) from a point which point is measured North 64 degrees, 52 minutes, 29 seconds West the distance of 332.01 feet (U.S.S.) from a point on a stone which point is measured North 09 degrees, 53 minutes, 31 seconds East 297.30 feet (U.S.S.) from a point on the Northwesterly side of Conshohocken Avenue (80 feet wide) which point is measured North 79 degrees, 52 minutes, 12.9 seconds East along the said Northwesterly side of Conshohocken Avenue the distance of 1095.734 feet (U.S.S.) from a point of tangent which point of tangent is measured Southeastwardly on the arc of a circle curving to the left connecting the said Northwesterly side of Conshohocken Avenue and the Northeasterly side of 40th Street (70 feet wide);

THENCE extending North 17 degrees, 58 minutes, 59.44 seconds East passing partly through a right of way for drainage purposes partly crossing a pond and passing partly through a stream and crossing a stream the distance of 523.37 feet (U.S.S.) to a point;

THENCE South 72 degrees, 01 minute, 01 second East partly crossing said right of way for drainage purposes and crossing a stream 189.99 feet (U.S.S.) to an angle point;

THENCE South 40 degrees, 23 minutes, 45 seconds East 69.72 feet (U.S.S.) to a point;

THENCE Southwestwardly on the arc of a circle curving to the left having a radius of 380 feet the arc distance of 217.77 feet (U.S.S.) to a point of tangent;

THENCE South 16 degrees, 46 minutes, 10 seconds West 263.50 feet (U.S.S.) to a point;

THENCE North 76 degrees, 39 minutes 01 second West partly recrossing said right of way for drainage and partly recrossing said pond 199.26 feet (U.S.S.) to a point in the beds thereof being the first mentioned point and Place of Beginning.

*For Company Reference Only, Not An Insuring Provision:*

Address:    3901 Conshohocken Avenue Philadelphia, PA 19131

Parcel ID / Tax ID Number: 88-11610-00

EXHIBIT C

ELECTRIC LINE EASEMENT AREA



This instrument was prepared by,
and the original should be returned to:
Denise M. Day, Esquire
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

## ELECTRIC LINE EASEMENT AGREEMENT

This **ELECTRIC LINE EASEMENT AGREEMENT** (this "Agreement"), dated as of the 26th day of May, 2021, to be effective as of May 20, 2021 (the "Effective Date"), by and between **Kiryat Greenbriar, L.P.,** a Pennsylvania limited partnership ("Landlord" or "Greenbriar") and **Pavilion Apartments Penn LLC,** a Pennsylvania limited liability company ("Tenant" or "Pavilion"). Greenbriar and Pavilion are hereinafter sometimes collectively referred to as "Owners," and each individually as an "Owner."

### WITNESSETH

**WHEREAS,** Greenbriar is the fee owner of certain real estate consisting of 19.74 acres located on Conshohocken Avenue in the City of Philadelphia, County of Philadelphia, Commonwealth of Pennsylvania more particularly described on Exhibit A attached hereto (the "Greenbriar Parcel").

**WHEREAS,** pursuant to a certain Lease Agreement dated November 28, 1973 (the "Original Lease"), Landlord's predecessor in interest leased a 1.4067 acre portion of the Greenbriar Parcel (the "Pavilion Parcel") more particularly described on Exhibit B attached hereto. The Original Lease has subsequently been amended, most recently by a certain Third Amendment of Lease dated July 5, 2016. The Original Lease, as amended or supplemented, is hereinafter sometimes referred to as the "Lease."

**WHEREAS,** electric service is currently provided to the Pavilion Parcel through an existing electric line running through the Greenbriar Parcel.

**WHEREAS,** Pavilion desires to relocate the electric line which supplies the electric service to the Pavilion Parcel.

**WHEREAS,** Greenbriar and Pavilion agree that the relocation of the electric line is in the best interests of both the Greenbriar Parcel and the Pavilion Parcel.

**WHEREAS,** Greenbriar and Pavilion entered into a certain Forbearance Agreement with an Effective Date of May 20, 2021 (the "Forbearance Agreement"), pursuant to which Greenbriar agreed to grant Pavilion a certain electric line easement over the Greenbriar Parcel as more particularly shown pictorially on Exhibit C, attached hereto and made a part hereof (the "Electric

Line Easement Area") for the purposes of installing, maintaining, repairing, altering, replacing and operating a separate electric line for the sole benefit of the Pavilion Parcel.

**NOW, THEREFORE,** for good and valuable consideration paid by each Owner to the other Owner and the mutual covenants, terms, and conditions set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Owners agree as follows:

1.  <u>Grants</u>. Greenbriar hereby grants and conveys to Pavilion a perpetual, non-exclusive easement (the "<u>Electric Line Easement</u>") in, under, upon, about, over, and through the Electric Line Easement Area for the purposes of constructing, installing, using, inspecting, maintaining, repairing, replacing and/or removing an electric line for the benefit of the Pavilion Parcel (the "<u>Purpose</u>").

2.  <u>Access</u>. Pavilion and its authorized contractors, agents and employees shall be permitted access to the portion of the Greenbriar Parcel nearby the Electric Line Easement Area (the "<u>Temporary Electric Line Easement Access Area</u>"), as more particularly identified on <u>Exhibit C</u>, upon not less than ten (10) days prior written notice to Greenbriar for the purpose of access, ingress and egress to the Electric Line Easement Area in order to installing, replacing, performing improvements, maintenance and repairs as further described herein. Pavilion may only access the Temporary Electric Line Easement Access Area between the hours of [11:00 p.m.] (Eastern) and [5:00 a.m.] (Eastern) unless in the case of an emergency or otherwise consented to in writing by Greenbriar. Pavilion, its authorized contractors, agents and employees may use the Electric Line Easement for vehicular (including truck) access, ingress and egress to the extent necessary or appropriate in connection with the foregoing. Pavilion agrees not to interrupt Greenbriar's, or any other occupant's, use and enjoyment of the Greenbriar Parcel (if such interruption is necessary, such interruption shall be temporary in nature and designed to limit any interruption of access to and from the remaining lands of Greenbriar). In the event of emergency, Pavilion shall provide verbal notice to Greenbriar prior to entering onto the Temporary Electric Line Easement Access Area.

3.  <u>Improvements</u>. Pavilion may construct improvements over, under, in, along, across, and upon the Electric Line Easement Area that are reasonably related to both the purpose of the Electric Line Easement and Pavilion's use and enjoyment of the Electric Line Easement (the "<u>Electric Line Easement Improvements</u>"), upon receipt of the prior written consent of Greenbriar, which shall not be unreasonably withheld so long as all Electric Line Easement Improvements within the Electric Line Easement Area are entirely below grade. In undertaking the Electric Line Easement Improvements, Pavilion shall take reasonable steps to insure that such work is completed in a reasonable time. Notwithstanding the foregoing, any Electric Line Easement Improvements made over, under, in, along, across, and upon the Electric Line Easement Area, shall not interfere in any material fashion with Greenbriar's, or any other occupant's, use and enjoyment of the Greenbriar Parcel. Upon Greenbriar's request, with respect to any Electric Line Easement Improvements made after the Effective Date, Pavilion shall provide Greenbriar with as-built

2

drawings and a survey showing the location and depth of the Electric Line Easement Improvements installed in the Electric Line Easement Area.

4.     Costs/Lien-Free Construction. Pavilion shall bear and promptly pay without the imposition of any lien or charge on or against all or any portion of the Greenbriar Parcel all costs and expenses incurred by Pavilion in connection with the construction and maintenance of the Electric Line Easement Improvements. Pavilion hereby acknowledges and agrees that if any lien is filed against the Greenbriar Parcel as a result of the Electric Line Easement or Pavilion's activities in the Electric Line Easement Area or Temporary Electric Line Easement Access Area and Pavilion has not had such lien bonded over or removed of record within thirty (30) days after receiving formal notice of the date of the initial filing of such lien from Greenbriar, then Pavilion shall be in default of this Agreement and Lease, and Greenbriar shall have the right to exercise all of its remedies for monetary damages pursuant to this Agreement, the Lease and at law and in equity; provided, such default shall not give rise to a right to terminate the Lease except in accordance with its terms. As security for the obligations of Pavilion to pay all costs and expenses incurred by Pavilion in connection with the construction of the Electric Line Easement Improvements, Pavilion shall provide to Greenbriar a bond or letter of credit which satisfies the conditions of the Forbearance Agreement.

5.     Compliance with Laws. Pavilion shall construct, operate, maintain and repair the Electric Line Easement Improvements in a good and workmanlike manner and in compliance with the applicable statutes, ordinances, rules, and regulations of all governing public authorities as those statutes, ordinances, rules, and regulations are amended from time to time.

6.     Maintenance and Repair. If the surface of any portion of the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area is disturbed by Pavilion's exercise of any of its rights under this Agreement, such surface area shall be restored to substantially the same condition in which it existed as of the commencement of such activity.

7.     Reservation of Rights. All right, title, and interest in and to the Electric Line Easement Area and Temporary Electric Line Easement Access Area under this Agreement shall remain with Greenbriar; provided, however, that the Greenbriar shall not: (1) construct or maintain any building which is reasonably likely to cause damage to or interfere with the Electric Line Easement Improvements to be placed within the Electric Line Easement Area; or (2) take any other action that would in any material respect interfere with, or otherwise adversely affect any of Pavilion's rights or obligations in this Agreement.  Greenbriar shall have the right to grant additional easement rights within the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area to any other individual or entity provided that the same shall not in any material respect interfere with, or otherwise adversely affect any of Pavilion's rights or obligations in this Agreement and Greenbriar causes any grantee to enter into an indemnity agreement reasonably satisfactory to Pavilion (which indemnity agreement shall obligate said grantee to

3

defend, indemnify and hold harmless Pavilion in connection with the grantee's use of the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area).

8.    Mutual Representations and Warranties. Pavilion hereby represents and warrants to Greenbriar that the individual(s) signing this Agreement on behalf of Pavilion is/are the duly authorized representative(s) of Pavilion and his or her signatures on this Agreement have been duly authorized by, and create binding and enforceable obligations of, Pavilion. Greenbriar hereby represents and warrants to Pavilion that the individual(s) signing this Agreement on behalf of Greenbriar is/are the duly authorized representative(s) of Greenbriar and his or her signatures on this Agreement have been duly authorized by, and create binding and enforceable obligations of, Greenbriar.

9.    Transferability. The Owners hereby acknowledge and agree that the Electric Line Easement and other rights conferred by this Agreement are intended to, and do, constitute covenants that run with the land and shall inure to the benefit of and be binding upon each Owner and their respective grantees, heirs, successors, and assigns.

10.    Default and Remedies. Upon the occurrence of a default by either Owner, the non-defaulting Owner may seek any and all remedies permitted by law or equity. Such remedies shall be cumulative as to each default.

11.    Insurance. Pavilion shall maintain, at its expense, and keep in force at all times during the term of this Agreement, a policy of commercial general liability insurance, including a contractual liability endorsement, from an insurer authorized to do business in the Commonwealth of Pennsylvania that has an AM Best Rating of at least A-, VII, which shall include coverage against claims for any bodily injury and damage to property occurring on, in or about the Electric Line Easement Area and/or the Temporary Electric Line Easement Access Area and caused by the acts of Pavilion and Pavilion's use thereof, with a per occurrence limit of not less than Two Million ($2,000,000) Dollars.

12.    Condemnation. If the Electric Line Easement Area, a portion of the Electric Line Easement Area and/or access to or use of the Electric Line Easement is taken by eminent domain or is under notice of an eminent domain proceeding, Greenbriar shall not be required to enter into a new easement agreement with Pavilion or any electric provider to restore any resulting loss or diminution of the Pavilion's rights hereunder. Moreover, any resulting condemnation awards and/or payments received in relation to such actions shall be shall be the sole property of Greenbriar, regardless of whether such award shall be made as compensation for diminution in value of the Greenbriar, the value of any condemned real property interests, or for severance damages; provided, however, that Pavilion shall be entitled to pursue its own separate action to recover any compensation from any such condemning body/authority for the Pavilion's relocation expenses and/or loss of utility facilities situated within the Electric Line Easement Area.

4

13.    Non-Use. If, subject as set forth below, Pavilion or its successors or assigns cease to use the Electric Line Easement for a period of two (2) years then, upon thirty (30) days' prior, written notice to Pavilion, the Electric Line Easement and all rights granted hereunder relating thereto shall terminate and revert back to Greenbriar. Non-use shall not include any period during which the Pavilion Property is being actively marketed and/or developed, renovated or reconstructed.

14.    Indemnification. From the Effective Date forward, Pavilion shall indemnify, defend, and hold Greenbriar harmless from and against any and all losses, costs, damages, liens, claims, liabilities, or expenses (including, but not limited to, reasonable attorneys' fees, court costs, and disbursements) incurred by Greenbriar and caused by Pavilion's and/or its authorized contractors, agents and employees, tenants and invitees access to, or use of the Electric Line Easement Area and/or Temporary Electric Line Easement Access Area.

15.    Further Cooperation. Each Owner agrees to execute such other documents and to perform such other acts as may be reasonably necessary or desirable to further the expressed and intent purpose of this Agreement.

16.    Realty Transfer Taxes. Pavilion hereby agrees to pay one hundred percent (100%) of the realty transfer taxes imposed on this Agreement and the Electric Line Easement.

17.    Notice. Each Owner shall deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "Notice") in writing and addressed to the other Owner at its address set out below (or to any other address that such Owner may designate from time to time in accordance with this Section). Each Owner shall deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective upon the earlier of: (1) delivery to the intended recipient, and (2) upon the intended recipient's refusal to accept delivery if the Owner giving the Notice has complied with the requirements of this Section.

As to Greenbriar:    Kiryat Greenbriar, L.P.

280 Aimee Drive

Freehold, New Jersey 07728

As to Pavilion:    Pavilion Apartments Penn, LLC

5

c/o JPC Charities

P.O. Box 234

Amlin, Ohio 43002

18.　Amendment. This Agreement may not be modified, amended, or terminated except in a writing signed by each Owner.

19.　Time of the Essence. Both Owners agree that time is of the essence and that time specifications contained herein shall be strictly construed.

20.　Governing Law. THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. EACH OWNER AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE TRIED AND LITIGATED IN STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, UNLESS SUCH ACTIONS OR PROCEEDINGS ARE REQUIRED TO BE BROUGHT IN ANOTHER COURT TO OBTAIN SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. TO THE EXTENT PERMITTED BY LAW, EACH OWNER IRREVOCABLY WAIVES ANY RIGHT SUCH OWNER MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS*, TO ASSERT THAT SUCH OWNER IS NOT SUBJECT TO THE JURISDICTION OF THE AFORESAID COURTS, OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION. SERVICE OF PROCESS, SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST ANY OWNER, MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ANY SUCH OWNER'S ADDRESS INDICATED IN SECTION 20 OF THIS AGREEMENT.

21.　Counterparts. This Agreement may be executed by the Owners in separate counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument. A signed copy of this Agreement delivered by facsimile/email shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. Notwithstanding the foregoing, each Owner hereto shall deliver original counterpart signatures to the other Owner by no later than ten (10) business days after the Effective Date.

[SIGNATURE PAGE FOLLOWS]

6

IN WITNESS WHEREOF, the Owners have executed this Agreement as of the Effective Date.

**Kiryat Greenbriar, L.P.,**
a Pennsylvania limited partnership
By:    Greenbriar Club Associates, Inc.,
       a Pennsylvania Corporation, its General Partner

By:    _____
       Name: Joseph Yeh
       Title:  President
          Vice

**Pavilion Apartments Penn, LLC,**
a Pennsylvania limited liability company
By:    JPC Charities, an Ohio nonprofit corporation,
       its Sole Member

By:    _____
       Name: Oron Zarum
       Title: member

Signature Page to Electric Line Easement Agreement

## Acknowledgment of Kiryat Greenbriar, L.P.

STATE OF NEW JERSEY          )
                             ) ss.
COUNTY OF                    )

I CERTIFY that on _June 1_, 2021, Joseph Yeh personally came before me and stated to my satisfaction that he: (a) was the maker of the attached instrument; (b) was authorized to and did execute this instrument as the President of Greenbriar Club Associates, Inc., a Pennsylvania corporation, the general partner of **Kiryat Greenbriar, L.P.**, a Pennsylvania limited partnership (the entity named in this instrument); and (c) executed this instrument as the act of the entity named in this instrument.

In witness whereof, I hereunto set my hand and official seal.



Print Name: _Nicholas Bassista_
Print Title: _Notary public_

Notary

NICHOLAS A. BASSISTA
NOTARY PUBLIC OF NEW JERSEY
COMMISSION # 50129486
MY COMMISSION EXPIRES 06/17/2025

(Seal)

Acknowledgement Page to Electric Line Easement Agreement

PHIL1 9402025v.7

## Acknowledgment of Pavilion Apartments Penn, LLC

STATE OF  New Jersey  )

                     ) ss.

COUNTY OF  Bergen  )

On this, the 27th day of May, 2021, before me, Naftali Levenbrun, the undersigned notary, personally appeared Oron Zarum, who acknowledged himself/herself to be the member of JPC Charities, an Ohio nonprofit corporation, the sole member of **Pavilion Apartments Penn, LLC**, a Pennsylvania limited liability company, and that as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation, in its capacity as the sole member of the company (the entity named in this instrument) by himself/herself as such officer.

In witness whereof, I hereunto set my hand and official seal.

Notary

(Seal)
        Naftali A. Levenbrown
       Notary Public, State of New Jersey
           No. 50150092
        Qualified in Bergen County
    Commission Expires February 4, 2026

Acknowledgement Page to Electric Line Easement Agreement

**EXHIBIT A**

**LEGAL DESCRIPTION OF GREENBRIAR PARCEL**

EXHIBIT A

## DESCRIPTION OF THE PROPERTY

ALL THAT CERTAIN lot or piece or ground, Situate in the 52nd Ward of the City of Philadelphia, described according to an ALTA/ACSM Land Title Survey made for Greenbriar Club Apartments by TBI Consulting Engineers, Inc. dated 4/14/2002 and last revised 5/14/2002:

BEGINNING at a point, located the following 2 courses and distances from a point of tangency, said point of tangency being the Southwesterly end of a curve which connects the Northerly side of Conshohocken Avenue (80 feet wide) with the Easterly side of Monument Road (71 feet wide), having a radius of 50 feet and an arc length of 105.015 feet, (1) North 76 degrees 12 minutes 00 seconds East, the distance of 887.903 feet, (2) North 79 degrees 52 minutes 13 seconds East, the distance of 169.885 feet; thence extending North 9 degrees 53 minutes 31 seconds East from said point of beginning, the distance of 297.305 feet to a point; thence extending North 64 degrees 52 minutes 29 seconds West the distance of 331.671 feet to a point in the bed of a variable width Right of Way lot for Drainage Purposes; thence extending North 17 degrees 44 minutes 37 seconds East the distance of 77.052 feet to a point, thence extending North 17 degrees 58 minutes 59.44 seconds East, crossing Neill Drive (State Highway-50 feet wide), the distance of 852.967 feet to a point; thence extending South 65 degrees 51 minutes 53 seconds East, re-crossing said Neill Drive and also re-crossing said variable width Right-of-Way for State Highway purposes and also re-crossing said variable width Right-of-Way for Drainage purposes, the distance of 456.379 feet to a point; thence extending South 63 degrees 49 minutes 30 seconds East the distance of 608.361 feet to a point; thence extending South 30 degrees 21 minutes 40 seconds West, the distance of 436.046 feet to a point; thence extending North 87 degrees 02 minutes 49 seconds West, the distance of 326 feet to a point; thence extending South 11 degrees 17 minutes 48 seconds West, the distance of 471.797 feet to a point on the said Northerly side of Conshohocken Avenue; thence extending South 87 degrees 00 minutes 00 seconds West, the distance of 284.324 feet to a point; thence extending South 79 degrees 52 minutes 13 seconds West, the distance of 91.316 feet to the first mentioned point and place of BEGINNING.

TOGETHER WITH the benefits of the easements appurtenant to the Land as set forth in the below instruments of record:

Declaration of Easements as set forth in Deed Book DCC 515 Page 454, Agreement by and between Kiryat Greenbriar and Pavilion Associates as set forth in Deed Book FHS 1267 Page 198.

BEING Tax Parcel No. 88-1161000

**EXHIBIT B**

LEGAL DESCRIPTION OF PAVILION PARCEL

## Legal Description

ALL THAT CERTAIN lot or piece of ground, Situate in the 52nd Ward of the City of Phila. described as follows, to wit:

BEGINNING at an interior point in the bed of a pond and a right of way for drainage which interior point is measured North 17 degrees, 58 minutes, 59.44 seconds, East the distance of 100.50 feet (U.S.S.) from an angle point which angle point is measured North 17 degrees, 44 minutes, 37 seconds East the distance of 77.05 feet (U.S.S.) from a point which point is measured North 64 degrees, 52 minutes, 29 seconds West the distance of 332.01 feet (U.S.S.) from a point on a stone which point is measured North 09 degrees, 53 minutes, 31 seconds East 297.30 feet (U.S.S.) from a point on the Northwesterly side of Conshohocken Avenue (80 feet wide) which point is measured North 79 degrees, 52 minutes, 12.9 seconds East along the said Northwesterly side of Conshohocken Avenue the distance of 1095.734 feet (U.S.S.) from a point of tangent which point of tangent is measured Southeastwardly on the arc of a circle curving to the left connecting the said Northwesterly side of Conshohocken Avenue and the Northeasterly side of 40th Street (70 feet wide);

THENCE extending North 17 degrees, 58 minutes, 59.44 seconds East passing partly through a right of way for drainage purposes partly crossing a pond and passing partly through a stream and crossing a stream the distance of 523.37 feet (U.S.S.) to a point;

THENCE South 72 degrees, 01 minute, 01 second East partly crossing said right of way for drainage purposes and crossing a stream 189.99 feet (U.S.S.) to an angle point;

THENCE South 40 degrees, 23 minutes, 45 seconds East 69.72 feet (U.S.S.) to a point;

THENCE Southwestwardly on the arc of a circle curving to the left having a radius of 380 feet the arc distance of 217.77 feet (U.S.S.) to a point of tangent;

THENCE South 16 degrees, 46 minutes, 10 seconds West 263.50 feet (U.S.S.) to a point;

THENCE North 76 degrees, 39 minutes 01 second West partly recrossing said right of way for drainage and partly recrossing said pond 199.26 feet (U.S.S.) to a point in the beds thereof being the first mentioned point and Place of Beginning.

*For Company Reference Only, Not An Insuring Provision:*

Address:   3901 Conshohocken Avenue Philadelphia, PA 19131

Parcel ID / Tax ID Number: 88-11610-00

EXHIBIT C

ELECTRIC LINE EASEMENT AREA

